Michael D. Fitzgerald (NJ #004391985)
**LAW OFFICES OF MICHAEL D. FITZGERALD**
1 Industrial Way West, Unit B
Eatontown, NJ 07724
(202) 349-1482
mdfitz@briellelaw.com

***Interim Liaison Counsel for Plaintiffs and the Proposed Class***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| *IN RE AXON VIEVU ANTITRUST LITIGATION* | No. 3:23-cv-7182-RK-RLS<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

## TABLE OF CONTENTS

I.      NATURE OF ACTION .................................................................................................... 1

II.     PARTIES ....................................................................................................................... 10

III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE ....................................... 11

IV.     ALLEGATIONS OF FACT SUPPORTING PLAINTIFFS' CLAIMS FOR RELIEF ....... 13

        A.      Relevant Markets and Monopoly Power ................................................................. 13

                1.      BWC Systems—Product and Geographic Markets .................................... 13

                2.      Axon Exercises Monopoly Power Within the U.S. BWC Systems Market . 16

                3.      Long-Range CEWs—Product and Geographic Markets ............................ 20

                4.      Axon Exercises Monopoly Power in the U.S. Long-Range CEW Market ... 23

                5.      The BWC Systems and Long-Range CEW Markets Have High Barriers to Entry ........................................................................................................ 23

        B.      Axon and Safariland Agree to Restrain Competition in the BWC Systems and Long-Range CEW Markets ............................................................................................... 27

                1.      Before the Acquisition, Safariland Aggressively Competed with Axon for

|  |  | BWC Systems, Yielding Lower Prices and Other Benefits for Customers.. | 27 |
|  | 2. | The Acquisition and Its Presumptive Illegality | 29 |
|  | 3. | Defendants' Conduct Has Harmed Competition Substantially | 34 |
| C. | | Lack of Countervailing Factors | 42 |
|  | 1. | High Barriers to Entry and Expansion | 42 |
|  | 2. | Efficiencies | 42 |
| D. | | The FTC Alleges the Acquisition Violates the Antitrust Laws | 43 |
| E. | | Defendants' Conduct Has Harmed the Class | 44 |
| V. | | CLASS ACTION ALLEGATIONS | 45 |
| VI. | | CONTINUING VIOLATION | 47 |
| VII. | | TOLLING OF STATUTE OF LIMITATION | 47 |
| VIII. | | CLAIMS FOR RELIEF | 49 |

Plaintiffs the Township of Howell, Monmouth County, New Jersey; the Mayor and City Council of Baltimore; and the City of Augusta, Kennebec County, Maine, (together, "Plaintiffs") on behalf of themselves and all others similarly situated, make the following allegations based on their own personal knowledge, information, and belief; investigation of Interim Co-Lead Counsel; and the complaint issued by the Federal Trade Commission ("FTC") in *In re Axon Enterprise, Inc.*, FTC No. D9389 (Jan. 3, 2020) (the "FTC Complaint").

## I.      NATURE OF ACTION

1.      This is an action for damages and injunctive relief under the federal antitrust laws to redress injuries to competition caused by Axon Enterprise, Inc. ("Axon") and Safariland, LLC ("Safariland"). The relevant geographic market is the United States, and the relevant product markets ("the Markets") are: (1) Body-Worn Camera ("BWC") Systems, which are BWCs, digital evidence management systems ("DEMS"), docks, and related services such as transcription, redaction, and warranties; and (2) long-range conducted energy weapons ("CEWs"), which include components and related services such as electricity cartridges, battery packs, docks, cameras, signals, training, and warranties (collectively, "the Products").

2.      BWCs are body-worn cameras specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions. BWCs operate with certain hardware, including docking stations ("docks"), and certain software, DEMS. DEMS enable police departments to store BWC data in a central location; redact non-relevant images, such as the faces of bystanders; share pertinent evidence with prosecutors; and maintain chain of custody of the video for evidentiary use. DEMS can also work with camera data from camera types other than BWCs, such as in-car cameras (which Axon also manufactures). Together, BWCs, along with DEMS and docks, comprise a BWC System. Although these components of BWC Systems may be purchased separately, many, if not most, police departments buy them all together along with

related services such as transcription, redaction, and warranties, typically from the same manufacturer—for example, Axon. Axon touts the efficiencies that come from using the products together.

3.    BWCs have been described as "a powerful tool for increasing transparency and accountability for officers, the public and for police officials."[1] For example, a 2020 report by a federal monitor appointed to oversee reforms of policing practices by the New York City Police Department ("NYPD") found that officers who wore the devices were more likely to accurately report pedestrian stops they made under the department policy known as stop-and-frisk.[2] The American Civil Liberties Union has stated that police cameras "have the potential to be a win-win, helping protect the public against police misconduct, and at the same time helping protect police against false accusations of abuse."[3]

4.    Long-range CEWs—which are virtually synonymous with Axon's dominant long-range CEW, the Taser—are a type of "less-lethal" weapon, which is a class of weapons that can be used to deal with a threat to the public, bystanders, or police, from violent or armed individuals without resorting to deadlier weapons such as firearms. Less-lethal weapons are a key part of a police officer's arsenal to subdue threatening individuals without resorting to deadly force.[4] Unlike other CEWs such as stun guns, which deliver an electric shock to their target by making direct

---

[1] Ashley Southall, *Police Body Cameras Cited as 'Powerful Tool' Against Stop-and-Frisk Abuses*, N.Y. Times (Nov. 30, 2020), https://www.nytimes.com/2020/11/30/nyregion/nypd-body-cameras.html.

[2] *Id.*

[3] Jay Stanley, *Police Body-Mounted Cameras: With Right Policies in Place, a Win for All*, ACLU (Mar. 2015), https://www.aclu.org/other/police-body-mounted-cameras-right-policies-place-win-all.

[4] *How Conducted Energy Devices Work*, Nat'l Inst. Just. (June 22, 2008), https://nij.ojp.gov/topics/articles/how-conducted-energy-devices-work.

contact, long-range CEWs fire a barbed probe at their target, allowing the shock to be delivered at long range (up to 35 feet away).

5.      Long-range CEWs include the main weapon component itself along with various other components, including electricity cartridges, battery packs, docks, cameras, and signals.  The electricity cartridges supply the charge to the barbed probes and must be replaced each time the long-range CEW is fired. Axon advertises that only Axon-produced cartridges may be used with its long-range CEWs.[5] Although these cartridges may be purchased separately, many, if not most, police departments buy them together with the other components of long-range CEWs and related services such as training and warranties from Axon.

6.      In May 2018, Axon, already by far the dominant maker and supplier of BWC Systems and long-range CEWs, unlawfully gained monopoly power in these Markets by acquiring its largest and most vigorous competitor in the BWC Systems market, VieVu, LLC ("VieVu"), from Safariland (the "Acquisition"). As part of the deal, Axon and Safariland further entered into various related anticompetitive agreements with each other. Among other things, these agreements prohibited Safariland from competing with Axon in the BWC Systems and long-range CEW markets for a decade or more. The Federal Trade Commission ("FTC") challenged the Acquisition and its related agreements as anticompetitive and unlawful, alleging that the Acquisition violated Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.[6] Section 7 of the Clayton Act prohibits acquisitions the effect of which

---

[5]      *TASER 7 Cartridge Characteristics*, Axon (Sept. 18, 2023), https://my.axon.com/s/article/TASER-7-Cartridge-Characteristics?language=en_US ("The TASER 7 CEW is designed to work with TASER 7 Cartridges manufactured by Axon Enterprise, Inc. Do not use cartridges made by other companies with a TASER 7 energy weapon.").

[6] Compl. at ¶¶ 58, 60, *In re Axon Enter., Inc.*, FTC No. D9389 ("FTC Compl.").

"may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

7.     In recent years, many local governments and agencies around the country have invested significant sums of money—often tens of millions of dollars—to purchase Axon's BWC Systems. Yet ever since and because of Axon's anticompetitive acquisition of VieVu, these governments and agencies have overpaid substantially for these BWC Systems. They have also been deprived of the added innovation in BWC Systems that would have occurred but for the Acquisition.

8.     The Acquisition eliminated direct and substantial competition between Axon and VieVu, which Axon described as the "#2 competitor."[7] This reduced competition allowed Axon to increase prices for BWC Systems, and suppressed output and innovation.

9.     Before the Acquisition, VieVu aggressively competed against Axon for the sale of BWC Systems to police departments in the United States. This competition resulted in substantially lower prices and provided customers with robust features and significant improvements. For example, Axon told its Board in May 2018 that the "VieVu business strategy [was to] [u]ndercut on price."[8] VieVu also focused on improving its products in part because Axon "is aggressively pushing feature set and existing customers are demanding those features."[9]

10.     The competition between Axon and VieVu was intense. VieVu was successful in winning accounts at prices well below Axon's for several large police departments. The competition between the two rivals became especially intense after VieVu won a contract with NYPD—by far the largest municipal police department in the country—with a bid that was *62%*

---

[7] FTC Compl. ¶ 2.

[8] *Id.* ¶ 3.

[9] *Id.*

lower than Axon's. VieVu's former General Manager acknowledged that "[w]e started a price war."[10] Axon's CEO testified that after losing the contract, Axon made an offer of 1,000 free BWCs to New York City. Axon eventually expanded its promotion on or around April 5, 2017, when it offered free BWC Systems for one year to every police agency in the United States. Axon's CEO also admitted that part of its reason for acquiring VieVu was to obtain the huge NYPD account.

11.     After, and as a result of the Acquisition, customers lost the benefit of this head-to-head competition. Axon began to tout its pricing power, enacting "substantial price increases," including on BWC Systems and on long-range CEWs, according to a source cited in the FTC's complaint.[11] This is exactly what VieVu's owner before the Acquisition, Safariland, predicted would happen, stating, "I believe this will greatly improve their ability to increase price in the BWC and I can easily see [Axon's] stock lifting by 20% or more."[12] (Axon's stock price actually increased by more than 40% in the month following the acquisition, far more than the broader U.S. stock market.)

12.     As a result of the Acquisition, Axon charges substantially higher prices for BWC Systems. One need hardly look further than Axon's own reported sales and revenue data in its SEC filings to see this dramatic effect. Axon's 10-K filings show that its average selling price for BWCs actually *declined* from $195.17 in 2016 to $169.07 in 2017, while it was intensely competing with VieVu, even as Axon's annual BWC unit sales increased. But in 2018, the year of the Acquisition, Axon's average BWC selling price jumped by *34%* to *$254.56*. The average price relentlessly

---

[10] *Id.* ¶ 5.

[11] *Id.* ¶ 42.

[12] *Id.* ¶ 6.

continued to increase after that, to **$290.69** in 2019, **$313.09** in 2020, **$415.52** in 2021, and **$489.80** in 2022—a nearly **threefold** increase from 2017, as illustrated by the following graph:



13.    Axon admitted in its SEC filings to such "increase[s] in the average sales price" for its BWC Systems since the Acquisition. Moreover, Axon's reported gross margins on BWCs follow a nearly identical trend, increasing every year from 2017 to 2022 (after declining from 2016 to 2017), jumping nearly **fourfold** over that period, indicating that these price increases cannot be

explained by increasing costs:



14.     In addition to increasing prices, Axon limited the availability of VieVu BWC Systems to customers and stopped developing new generations of VieVu hardware and software.

15.     The Acquisition has entrenched Axon's already dominant share of the BWC Systems market and significantly increased market concentration. Pre-Acquisition, Axon was described by one Wall Street analyst as already controlling approximately 60% to 80% of the

market for BWC Systems.[13] For its part, VieVu had hundreds of BWC Systems contracts with police agencies around the country, including the NYPD and other major police departments, such as Miami-Dade, Florida; Phoenix, Arizona; Oakland, California; and Aurora, Colorado.

16. Due to the Acquisition, Axon swallowed up VieVu's BWC Systems contracts.[14] Another analysis concluded that, immediately after, and as a direct result of the Acquisition, Axon "own[ed] *80%* of all big-city police department contracts."[15] Axon boasted that "[a]s of the end of the second quarter of 2019, 48 of the 79 major city law enforcement agencies have purchased Axon body-worn cameras and/or its digital evidence management solution."[16] Because Axon was so dominant among the very largest cities, including New York City, Axon's true share of large metropolitan police department purchases was likely even higher than 80%. Axon's market share is likely similar in the broader relevant market, given the breadth of its agency relationships.

17. Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2,500 points as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points, renders a merger presumptively unlawful. According to the FTC Complaint, Axon's acquisition of VieVu resulted in an HHI above 2,500, and increased HHIs in an already concentrated market by well over 200 points. Thus, the

---

[13] Luke Schiefelbein, *Why Taser Stock Could Have Shocking Upside*, Forbes (Mar. 13, 2018), https://www.forbes.com/sites/lukeschiefelbein/2018/03/13/why-taser-stock-could-have-shocking-upside/?sh=47c4b26077d7.

[14] Rich Duprey, *Axon Enterprise Now Owns the Police Body Cam Market*, the Motley Fool (May 18, 2018), https://www.fool.com/investing/2018/05/18/is-there-any-stopping-axon-enterprise-now.aspx.

[15] *Id.* (emphasis added).

[16] Axon, *Axon Media Press Kit*, PDF at 3, https://axon.cdn.prismic.io/axon%2F5e7d06a9-44f9-4d1f-a633-cdfa8795fea6_axon+media+press+kit+2019.pdf (last visited Oct. 6, 2023).

Acquisition is presumptively unlawful.

18.     The Acquisition also entrenched Axon's monopoly power in the long-range CEW market. Before the Acquisition, Axon already controlled approximately 95% of this market.[17] With the Acquisition, Axon further cemented that dominance by extracting an agreement from Safariland, a potential competitor in the long-range CEW market, not to compete in that market for *12 years*. Showing that Axon viewed entry by Safariland into the long-range CEW market as a real threat, Axon's CEO called this noncompete a "hidden jewel in the deal."[18] As part of their broader anticompetitive deal, Axon and Safariland further agreed that Safariland, a maker of holsters for long-range CEWs, would supply these holsters exclusively to Axon and serve as Axon's preferred supplier for the holsters.

19.     New entry or repositioning by existing producers has not been and will not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. Barriers to entry in the BWC Systems and long-range CEW markets are high because of the substantial upfront capital investment required, switching costs, Axon's long-term customer contracts, bundling, and the need for references from police departments. With respect to BWC Systems, Safariland's then-Executive Vice President noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done."[19]

20.     Axon also cannot show that the Acquisition resulted in merger-specific efficiencies sufficient to outweigh the competitive harm caused by the Acquisition. Axon did not analyze or

---

[17] Schiefelbein, *supra* note 13.

[18] FTC Compl. ¶ 46.

[19] *In the Police Body Camera Business, the Real Money's on the Back End*, Marketplace (Apr. 18, 2017), https://www.marketplace.org/2017/04/18/police-body-camera-business-real-moneys-on-back-end/.

anticipate efficiencies when deciding to acquire VieVu.

21.     The Acquisition and Defendants' other anticompetitive conduct thus substantially lessened competition and created a monopoly in the Markets. Defendants' conduct has harmed and continues to harm Plaintiffs and others who have purchased the Products from Axon after the Acquisition, causing them to pay inflated prices, and reducing output and innovation in these markets with important public-safety and civil-rights ramifications. Thus, Plaintiffs bring this action to hold Axon and Safariland accountable for their violations of the federal antitrust laws.

## II.     PARTIES

22.     Plaintiff Township of Howell, Monmouth County, New Jersey ("Township of Howell") is a township located in Monmouth County, and is a public entity organized and existing pursuant to the laws of New Jersey. Township of Howell manages operations of Howell Township Police, which directly purchased BWC Systems and long-range CEWs from Defendant Axon at unlawfully inflated prices. As a result of Defendants' conduct, the Township of Howell was injured in its business or property by reason of the violations of law alleged herein.

23.     Plaintiff the Mayor and City Council of Baltimore ("City of Baltimore") is a municipality located in Baltimore, Maryland. The City of Baltimore directly purchased millions of dollars' worth of BWC Systems and long-range CEWs from Defendant Axon at unlawfully inflated prices during the Class Period. As a result of Defendants' conduct, the City of Baltimore was injured in its business or property by reason of the violations of law alleged herein.

24.     Plaintiff City of Augusta is a municipality located in Kennebec County and the state capital of Maine. As a municipality organized and existing pursuant to the laws of Maine, Plaintiff manages operations of the Augusta Police Department, which directly purchased long-range CEWs directly from Defendant Axon at unlawfully inflated prices during the Class Period. As a result of Defendants' conduct, the City of Augusta was injured in its business or property by reason

10

of the violations of law alleged herein.

25.     Defendant Axon Enterprise, Inc. is a Delaware corporation, with its principal place of business in Scottsdale, Arizona. Axon changed its name in 2017 from Taser International, Inc.

26.     Defendant Safariland, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Safariland is wholly owned by Cadre Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware. Cadre Holdings' principal place of business is located at 13386 International Parkway, Jacksonville, Fla.

## III.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

27.     This action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2), and Section 7 of the Clayton Act (15 U.S.C. §§ 18). This action seeks injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorney's fees.

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

29.     This Court has personal jurisdiction over Axon and Safariland because they transacted business, maintained substantial contacts, and committed overt acts in furtherance of their market-allocation conspiracy and conspiracy to monopolize the markets for BWC Systems and long-range CEWs, as well as Axon's attempt to monopolize, or its actual monopolization of, the markets for BWC Systems and long-range CEWs in the United States, including in this District. Axon and Safariland should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

30.     Axon and Safariland's anticompetitive conduct was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

31.     Venue is proper in this District pursuant to, among other statutes, Section 12 of the

Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c). Defendants transacted business or acted through subsidiaries or agents present in this District; a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

A.      Axon negotiated contracts with purchasers in this District to provide BWC Systems and long-range CEWs, including to members of the Class; and

B.      Axon delivered BWC Systems and long-range CEWs to purchasers in this District, including to members of the Class.

C.      Safariland negotiated contracts with purchasers in this District to provide BWC Systems, including to members of the Class; and

D.      Safariland delivered BWC Systems to purchasers in this District, including to members of the Class.

32.     Axon markets and delivers BWC Systems and long-range CEWs to purchasers across state lines. Axon makes and receives substantial payments across state lines for and from the sale of BWC Systems and long-range CEWs, and Axon's business activities that are the subject of this Complaint are within the flow of, and have substantially affected, the interstate commerce of the United States. During the Class Period, Axon used the instrumentalities of interstate commerce, including interstate wires, in furtherance of Defendants' conspiracy to monopolize the markets for BWC Systems and long-range CEWs as well as its attempted or actual monopolization of the markets for BWC Systems and long-range CEWs.

33.     Safariland marketed and delivered BWC Systems to purchasers across state lines. Safariland made and received substantial payments across state lines for and from the sale of BWC Systems, and Safariland's business activities that are the subject of this Complaint are within the

12

flow of, and have substantially affected, the interstate commerce of the United States. Safariland used the instrumentalities of interstate commerce, including interstate wires, in furtherance of Defendants' conspiracy to monopolize the markets for BWC Systems and long-range CEWs.

## IV.   ALLEGATIONS OF FACT SUPPORTING PLAINTIFFS' CLAIMS FOR RELIEF

### A.   Relevant Markets and Monopoly Power

34.   The relevant markets in which to analyze the effects of Defendants' conduct are the sale of (1) BWC Systems and (2) long-range CEWs—all in the United States. A hypothetical monopolist in either of these markets would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

### 1.   BWC Systems—Product and Geographic Markets

35.   BWCs are cameras specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions. Axon's BWCs include the Axon Body and the Axon Flex. The Body is a one-piece camera typically worn on the chest. The Flex is a two-part system with a smaller camera piece that can be mounted on eyewear.

36.   BWCs operate in conjunction with associated hardware including docks and with DEMS, the software component. Together, these components form an integrated BWC System.

37.   DEMS enable police departments to store body camera data in a central location; redact non-relevant images, such as the faces of bystanders; share pertinent evidence with prosecutors; and maintain chain of custody of the video for evidentiary use. Axon's DEMS is called Axon Evidence and uses the website name Evidence.com. DEMS can also work with camera data from camera types other than BWCs, such as in-car cameras. Axon's DEMS, for example, also works with its in-car camera, the Fleet.

38.   Docks are hardware that connect to BWCs for purposes such as charging the BWCs' batteries and uploading data (including video footage) from the BWCs onto a computer or

cloud-based server system. Axon sells docks for its BWCs under the brand name Axon Dock (the "Dock"). According to Axon, the Dock provides intuitive uploading of data from Axon BWCs to Evidence.com, allows recharging of Axon BWC batteries, and acts as a mechanism to ensure Axon BWCs receive and operate the most updated firmware.[20]

39.     Axon also sells services such as transcription, redaction, and warranties related to BWC Systems. For example, Axon sells a Technology Assurance Plan (formerly known as the Taser Assurance Plan) for its BWCs and Docks, which includes warranty coverage for several years, spare BWCs or Docks, and replacement or upgraded BWCs or Docks after several years.

40.     Police departments frequently issue requests for proposals seeking to purchase BWC Systems components together as part of an integrated BWC System. The products are closely related, and it is important for them to interoperate effectively. Indeed, Axon requires police departments to integrate Axon BWCs with Evidence.com, Axon's DEMS, because Axon body cameras only work with Evidence.com.[21] Axon touts the efficiencies that come from using the products together, for example stating that "[a]ll technologies" in one bundled offering that includes BWCs, Docks, and DEMS "work together to deliver unprecedented efficiency and impact."[22] Axon similarly states that Axon BWCs are "fully integrated with the growing Axon network [including DEMS] to give you better evidence capture and management."[23]

41.     There are no reasonably interchangeable substitutes for BWC Systems. Police

---

[20] *Axon Device and On-Premise Security*, Axon Trust Center, https://www.axon.com/axon-dock-security (last visited Oct. 6, 2023).

[21] *In the Police Body Camera Business, the Real Money's on the Back End*, *supra* note 19.

[22] *Officer Security Plan*, Axon, https://www.axon.com/products/osp (last visited Oct. 6, 2023).

[23] *Axon Body 2*, Axon, https://www.axon.com/products/axon-body-2 (last visited Oct. 6, 2023).

departments could not realistically switch to other products in the face of a SSNIP for any of these products. Other recording systems, such as in-car camera systems, cannot record interactions outside of the view of the car, or when officers patrol on foot or bicycle. Further, seven states now require law enforcement to use body cameras while on duty.[24] In-car cameras also tend to be more expensive than body cameras. According to the FTC, Axon's Chief Revenue Officer has testified that in-car systems and BWC Systems are not good substitutes.[25]

42.     Records Management Systems ("RMS") are not substitutes for DEMS. RMS collect and centralize in one source, in digital format, the many types of written reports generated by police agencies, including arrest, probation, and crime scene reports, whereas DEMS are designed principally to record video and audio evidence captured by BWCs. Industry participants do not view RMS as a substitute for BWC Systems or for the DEMS component of those systems.

43.     BWC Systems use is widespread. In 2022, nearly half of police departments in the United States used body cameras, and seven states currently have laws requiring police officers to use them. And where police departments use body cameras, over 90% of prosecutors use body camera evidence to prosecute civilians—so police departments' operations depend on having body camera footage integrated into their evidence system.[26]

44.     The relevant geographic market is customers in the United States. In the relevant market it is possible for producers to price discriminate to specific customers. Customers based in

---

[24] *Body-Worn Camera Laws Database*, Nat'l Conf. of State Legislatures (Apr. 30, 2021), https://www.ncsl.org/civil-and-criminal-justice/body-worn-camera-laws-database.

[25] FTC Compl. ¶ 24.

[26] Lily Robin & Susan Nembhard, *What Can Policymakers Expect of Body-Worn Cameras in Law Enforcement after a Decade of Use?*, Urban Inst. (July 14, 2022), https://www.urban.org/urban-wire/what-can-policymakers-expect-body-worn-cameras-law-enforcement-after-decade-use.

the United States cannot arbitrage or substitute based on different prices offered to customers outside the United States, including differing laws and rights for evidence collected from body cameras outside of the United States.

45.      Many police departments also are required to comply with the FBI's Criminal Justice Information Service ("CJIS") standards. CJIS compliance requires storing BWC-generated data in the United States. Additionally, U.S.-based police departments look mostly to other U.S.-based police departments to vet potential BWC Systems vendors.

46.      A hypothetical monopolist in the market for BWC Systems would find it profit-maximizing to impose at least an SSNIP in this market. This is evident from Axon's own reported financial data, which, as noted above, shows that Axon significantly increased its annual unit sales of BWCs from 2017 to 2022 even as it raised its average price nearly *threefold* over that period and profit margins also increased.

### 2.      Axon Exercises Monopoly Power Within the U.S. BWC Systems Market

47.      At all relevant times, the U.S. market for BWC Systems has been highly concentrated and dominated by one player: Axon.

48.      Before the Acquisition, Axon was described by one Wall Street analyst as controlling approximately 60% to 80% of the market for BWC Systems.[27] A Huffington Post article from April 2017 reported that Axon "has already provided gear and service to more than 85 percent of major cities that have adopted body cameras."[28]

49.      VieVu was the next largest competitor by market share. Before the Acquisition,

---

[27] Schiefelbein, *supra* note 13.

[28] Ryan J. Reilly & Nick Wing, *The Company Formerly Known as Taser Goes All In on Police Body Cameras*, Huffington Post (Apr. 5, 2017), https://www.huffpost.com/entry/taser-

VieVu had hundreds of BWC Systems contracts with police agencies around the country, including at least five of the 69 major U.S. metropolitan agencies comprising the Major Cities Chiefs Association ("MCCA"), a professional organization of police executives representing the largest cities in the United States and Canada. These five were New York City; Miami-Dade, Florida; Phoenix, Arizona; Oakland, California; and Aurora, Colorado. VieVu's contract with New York City in particular significantly boosted its market share as measured by output and revenue.

50.     Post-Acquisition, the BWC Systems market has been even more highly concentrated. Under a bullet point regarding Axon's "Software and Sensors" business segment, which includes BWC Systems, Axon's 10-K for the year ending 2018 stated that "[o]f the 69 largest metropolitan area police departments in the U.S., 46 are on the Axon network"—fully two-thirds of these departments. A December 2019 Axon investor presentation represented that Axon BWC Systems controlled 47 of the 69 U.S. Major City Chiefs Agencies.[29] Further, 10 of these 69 agencies did not have a BWC contract at all. Thus, Axon reported controlling 47 of the 59 relevant agencies as of December 2019, i.e., *80% of them*.[30] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies.[31]

51.     Measured in terms of output or revenue, Axon's market share among large U.S.

---

axon-body-cameras_n_58e3d79ce4b0f4a923b29722. An analysis conducted in November 2017 by The Leadership Conference on Civil and Human Rights found that 62 of 69 major city police departments in the U.S. had BWC programs with policies in place with respect to BWCs at that time. *Police Body Worn Cameras: A Policy Scorecard*, Leadership Conference (Nov. 2017), https://www.bwcscorecard.org/.

[29] *Investor Presentation, Axon Enterprise, December 2019*, at 6, Axon Enterprise (December 2019).

[30] Consistent with this figure, an analysis published by investment advice website Motley Fool concluded that, immediately after and as a direct result of the Acquisition, Axon "own[ed] 80% of all big-city police department contracts." Duprey, *supra* note 14.

[31] Akela Lacy, *Two Companies Fight To Corner The Police Body Camera Market*,

cities is even higher than 80%—likely at least 85%. This is indicated by a chart from the same presentation, showing Axon BWC Systems' dominance in terms of U.S. Major City Chief Agencies ranked by size, starting with New York City at the top left, then moving downward and spilling over into the subsequent columns, with the smallest agency in the chart being Salt Lake City, at bottom right:

## Serving the top tier (Major City Chiefs)

| | | |
|---|---|---|
| New York City, New York | Baltimore, Maryland | Oklahoma City, Oklahoma |
| Chicago, Illinois | Charlotte-Mecklenburg, North Carolina | Cincinnati, Ohio |
| Los Angeles County, California | Atlanta, Georgia | El Paso, Texas |
| Los Angeles, California | Indianapolis, Indiana | Tucson, Arizona |
| Philadelphia, Pennsylvania | Cleveland, Ohio | Buffalo, New York |
| Houston, Texas | Fairfax County, Virginia | Tampa, Florida |
| Washington D.C. | Prince George's Co, Maryland | Portland, Oregon |
| Detroit, Michigan | Fort Worth, Texas | Minneapolis, Minnesota |
| Las Vegas, Nevada | Kansas City, Missouri | DeKalb County, Georgia |
| Dallas, Texas | Denver, Colorado | Long Beach, California |
| Baltimore County, Maryland | Jacksonville, Florida | Albuquerque, New Mexico |
| Phoenix, Arizona | Nashville, Tennessee | Mesa, Arizona |
| Nassau County, New York | San Jose, California | Fresno, California |
| Miami-Dade, Florida | St. Louis, Missouri | Virginia Beach, Virginia |
| Suffolk County, New York | New Orleans, Louisiana | Omaha, Nebraska |
| Memphis, Tennessee | Tulsa, Oklahoma | Orlando, Florida |
| San Francisco, California | Newark, New Jersey | Raleigh, North Carolina |
| Milwaukee, Wisconsin | Louisville, Kentucky | Wichita, Kansas |
| Honolulu, Hawaii | Seattle, Washington | Sacramento, California |
| San Antonio, Texas | Montgomery County, Maryland | Aurora, Colorado |
| Boston, Massachusetts | Miami, Florida | Arlington, Texas |
| Columbus, Ohio | Austin, Texas | Oakland, California |
| San Diego, California | Pittsburgh, Pennsylvania | Salt Lake City, Utah |

☐ Axon network   ☐ Competitor   ☐ No cameras

32

As the chart shows, of the 69 Major City Chief members, Axon controlled 4 of the top 5, 7 of the top 10, and 15 of the top 20. In other words, Axon similarly dominated among the very largest U.S. agencies, which are much larger than the smaller MCCA agencies. According to available data, around this same time, New York City and Chicago alone accounted for approximately 31% of the total officers and non-sworn personnel of all U.S. MCCA members combined.[33] Assuming

---

Intercept (Dec. 8, 2021), https://theintercept.com/2021/12/08/police-reform-body-cameras-axon-motorola/.

[32] *Investor Presentation, Axon Enterprise, December 2019*, at 11, *supra* note 29.

[33] The MCCA says its members comprise a workforce of 222,973 officers and non-sworn personnel in the U.S. *Corporate Partnerships*, MCCA, https://majorcitieschiefs.com/corporate-

that New York and Chicago made up 31% of the market represented by the MCCA, and that the remaining 67 MCCA cities each represent an equal share of the remaining 69% of the market (a simplifying assumption), then according to the data from its December 2019 investor presentation, Axon had 85% of the market represented by the MCCA.

52.     Axon acknowledges its dominance—according to the FTC, in a company presentation, Axon implored its salespeople to "embrace being the gorilla," and Axon's CEO confirmed that Axon is a "really strong market leader."[34]

53.     As a result of its dominance, Axon wields its monopoly power to profitably charge supracompetitive prices for BWC Systems and their components, including the huge price increases Axon implemented after the Acquisition, and to generate high profit margins.[35] In 2022, Axon reported $392 million in gross margin in its "software and sensors" department, driven primarily by sales of its BWC Systems. With $658 million in net sales from software and sensors, Axon generates a 60% profit margin from these BWC Systems, an extremely margin reflecting its monopoly power.[36]

54.     Motorola, Panasonic, and Utility largely make up the rest of the BWC Systems market. As demonstrated by the dramatic price increases that Axon implemented after acquiring

---

partnerships/ (last visited Oct. 6, 2023). According to New York City, the NYPD has approximately 36,000 officers and 19,000 civilian employees. *About NYPD*, NYPD, https://www1.nyc.gov/site/nypd/about/about-nypd/about-nypd-landing.page (last visited Oct. 6, 2023). Moreover, "[t]he NYPD body-worn camera program is the largest in the United States with over 24,000 members of the Department equipped with body-worn cameras." *Body-Worn Cameras,* NYPD, https://www1.nyc.gov/site/nypd/about/about-nypd/equipment-tech/body-worn-cameras.page (last visited Oct. 6, 2023). Chicago reported having 14,221 sworn and civilian members at the end of 2019. *Chicago Police Department 2019 Annual Report*, Chi. Police Dep't (2019), https://home.chicagopolice.org/wp-content/uploads/2019-Annual-Report.pdf.

[34] FTC Compl. ¶ 30.

[35] *See supra* ¶¶ 12-13; *infra* ¶¶ 107-112.

[36] 2023 Axon Enterprise, Inc. Form 10-K, at 39 (Feb. 28, 2023).

VieVu, none of these other competitors pose the same competitive constraint on Axon as did VieVu, and none were able to constrain the exercise of Axon's monopoly power. These other competitors' BWC Systems rarely provided significant competition to Axon in RFP processes conducted by police departments. A chart included in a December 2019 Axon investor presentation shows the meager market share these competitors had compared to Axon, with the closest competitor, Motorola, controlling only 7 of 69 U.S. Major City Chief Agencies compared to Axon's 47.[37]

### 3.    Long-Range CEWs—Product and Geographic Markets

55.    Long-range CEWs are a type of "less-lethal" weapon, which is a class of weapons that can be used "to deal with a threat to the public, bystanders or police, from violent or armed individuals . . . prior to it escalating to a level where firearms would otherwise have to be used."[38] Less-lethal weapons include CEWs (both long-range CEWs like Tasers and traditional CEWs like stun guns), pepper spray, tear gas, rubber bullets, and other types of riot gear, which are less likely to injure or kill their target.[39] Less-lethal weapons are a key part of a police officer's arsenal to subdue threatening individuals without resorting to deadly force.[40]

56.    Long-range CEWs are highly differentiated from other types of less-lethal weapons because of their accuracy, effectiveness, and versatility. Unlike traditional stun guns or pepper

---

[37] *See supra* ¶¶ 16-17.

[38] *Competition Document: Advancing Less Lethal Weapons*, Defence & Security Accelerator UK Home Off. (2020), https://www.gov.uk/government/publications/competition-advancing-less-lethal-weapons/competition-document-advancing-less-lethal-weapons.

[39] Kelsey D. Atherton, *What 'Less Lethal' Weapons Actually Do*, Scientific Am. (June 23, 2020), https://www.scientificamerican.com/article/what-less-lethal-weapons-actually-do/.

[40] *How Conducted Energy Devices Work*, *supra* note 4.

spray, long-range CEWs can be used on targets up to 35 feet away.[41] Further, unlike other long-range less-lethal weapons like tear gas and rubber bullets, long-range CEWs are designed to be used on a single person and can be highly accurate up to more than 30 feet away.[42]

57.    The main weapon component of long-range CEWs is used in conjunction with related components including electricity cartridges, battery packs, and docks. Cartridges supply the electricity charge to the barbed probe and must be replaced each time the long-range CEW is fired.[43] Battery packs supply the power needed to operate the long-range CEW, and docks allow the battery packs to charge and upload data to the DEMS.[44] Further, Axon recommends using cameras and camera signals in conjunction with long-range CEWs. Taser cameras record the actions of the long-range CEW, while camera signals send a signal to the officer's BWC to record when the long-range CEW is removed from its holster.[45] Axon also recommends purchasing long-range CEW training and warranties for the long-range CEWs, which are included in its standard supply contracts.[46] Thus, the long-range CEW market also includes these components and related services. Police departments prefer to buy these products in an all-inclusive supply contract with

---

[41] Joint Intermediate Force Capabilities Off., *Taser® X26™*, U.S. Dep't of Defense Non-Lethal Weapons Program, https://jnlwp.defense.gov/Current-Intermediate-Force-Capabilities/X26-Taser/ (last visited Aug. 18, 2023).

[42] Warren Wilson, *Why I Think the Taser 10 May Be the Most Effective Less Lethal Device in History*, Police1 (Feb. 12, 2023), https://www.police1.com/police-products/less-lethal/taser/articles/why-i-think-the-taser-10-may-be-the-most-effective-less-lethal-device-in-history-dmpdMBS5efSNTL6l/.

[43] *Product Resources: Pulse*, Taser https://taser.com/pages/training-pulse (last visited Nov. 27, 2023).

[44] *Taser 6-Bay Dock and Core*, Axon, https://my.axon.com/buy/s/product/taser-6bay-dock-and-core/01t4y00000ExxjZAAR?language=en_US (last visited Nov. 27, 2023).

[45] *Officer Safety Plan*, Axon, https://www.axon.com/products/osp (last visited Nov. 27, 2023).

[46] *See, e.g.*, *Taser 60*, Axon, https://www.axon.com/taser-60v (last visited Nov. 27, 2023).

the long-range CEW manufacturer, which saves the police departments time and resources compared to buying them separately.

58.    Long-range CEW use is widespread. As of 2018, two-thirds of police departments used long-range CEWs,[47] and as of 2020, an estimated 73% of police officers carried long-range CEWs when on duty.[48] Axon bragged in a 2019 investor presentation that "17,000 out of 18,000 US police agencies procure Taser devices," adding, "[w]e estimate ~70% of US patrol officers carry a Taser device."[49]

59.    Because of long-range CEWs' differentiation from other less-lethal weapons, long-range CEWs are a vital tool for law enforcement, and they cannot be easily replaced by other less-lethal or lethal weapons. Recognizing this differentiation, Tom Shea, the program director of the Police Graduate Studies Program at Seton Hall University and a former police lieutenant, "said it's hard to imagine not arming police with Tasers. 'When someone's holding a knife and is violent and obviously irrational and out of his mind on drugs, those are situations where Tasers are absolutely necessary, because otherwise, you're going [to] resort to deadly force.'"[50] Currently and throughout the class period, no substitutes exist for long-range CEWs.

60.    For the same reasons that police officers prefer to use long-range CEWs over other

---

[47] Laurel Wamsley, *Taser Changes Its Name to Axon and Offers Free Body Cameras for Police*, NPR: The Two-Way (Apr. 7, 2017), https://www.npr.org/sections/thetwo-way/2017/04/07/522878573/we-re-more-than-stun-guns-says-taser-as-it-changes-company-name.

[48] Univ. of Mich. Inst. for Soc. Res., *Weapons Authorized for Full-Time Sworn Officers/Deputies: Conducted Energy Device (e.g. Taser)* (2020), https://www.icpsr.umich.edu/web/NACJD/studies/38651/datasets/0001/variables/EQ_CED?archive=nacjd.

[49] *Investor Presentation, Axon Enterprise, December 2019*, at 8, *supra* note 29.

[50] Ken Serrano, *Tasers, Hailed as a Way to Avoid Deadly Police Shootings, Are Seldom Used in NJ*, Asbury Park Press (Apr. 18, 2022), https://www.app.com/story/news/local/public-safety/2021/11/08/police-taser-gun-use-nj-how-/.

types of less-lethal and lethal weapons, civilians interested in self-defense also prefer to use long-range CEWs: they enable civilians to incapacitate a would-be attacker at a safer distance and more effectively than other CEWs and less-lethal weapons.

61.     The relevant geographic market for long-range CEWs is the United States, as importing long-range CEWs into the United States is impractical due to their regulation as a crime-control product.[51]

### 4.     Axon Exercises Monopoly Power in the U.S. Long-Range CEW Market

62.     Axon is effectively the sole player in the market for long-range CEWs, with an estimated 95% market share.[52] Axon has no notable competitors in long-range CEW manufacturing, as only a handful—if any—police departments use non-Axon CEWs.

63.     Axon enjoys healthy profits from its long-range CEWs, with a 63.3% gross margin in 2022.[53] Axon also enjoys healthy profits by selling the cartridge component of long-range CEWs. In 2022, over 40% of Axon's Taser-related revenue derived from non-weapon sales, most of which were attributed to cartridges.[54]

64.     Axon's high operating margins and market share show that the long-range CEW market is highly concentrated, with Axon exercising monopoly power.

### 5.     The BWC Systems and Long-Range CEW Markets Have High Barriers to Entry

65.     Axon's monopoly power over BWC Systems and long-range CEWs is durable because it benefits from significant barriers to entry. These barriers include high capital

---

[51] *See* 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 36, at 11.

[52] Schiefelbein, *supra* note 13.

[53] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 36, at 41.

[54] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 36, at 39.

investment, contract length, switching costs, integration, bundling, sales relationships, patents, and regulations.

66.     First, the high capital investment it takes to develop a BWC System represents a significant barrier to entry. Axon developed Evidence.com in 2009 and invests millions in research and development annually.[55] The large amount of capital necessary to develop and service an effective BWC System can be profitable only when costs are spread across a substantial number of BWC Systems users. Because of this, new entrants to the BWC Systems market must capture a significant proportion of police department contracts to maintain profitability.

67.     Contract length remains another barrier to entry. BWC Systems and long-range CEW supply contracts can last ten years or longer,[56] limiting the number of police departments with which BWC Systems and long-range CEW suppliers can attempt to contract in any given year. Typical supply agreements for long-range CEWs cover not only the weapons themselves, but also associated components like cartridges and battery packs, training, warranties, and servicing.[57] Given the significant capital investment needed to develop and maintain BWC Systems, as well as the significant time needed to develop a long-range CEW, the inability to compete for most police departments at any one time due to contract length further renders market entry unprofitable for would-be competitors.

68.     Further, because Axon includes both BWC Systems and long-range CEWs in its general supply contracts, companies must provide both long-range CEWs and BWC Systems to

---

[55] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 36, at 42.

[56] *See, e.g.*, Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement.

[57] *See, e.g.*, Emily Wolf, *Fort Worth City Council Unanimously Approves $74 Million Police Technology Contract*, Fort Worth Report (Apr. 26, 2022), https://fortworthreport.org/2022/04/26/fort-worth-city-council-unanimously-approves-74-million-police-technology-contract/.

compete for those police departments that prefer to integrate their long-range CEW and BWC Systems supply.

69.     Switching costs pose another barrier to entry. BWC Systems are complex, with police departments taking months to become fully trained on Evidence.com's capabilities. If a police department does switch BWC Systems, it must incur significant IT and training costs in switching its body camera videos away from the DEMS.[58] Further, police officers using BWCs also face high switching costs because police officers themselves use them habitually, and retraining police officer habits at scale is difficult.[59]

70.     Axon is well aware of these high switching costs: its 2017 offer of free body cameras enticed police departments into using the Axon BWC System, because Axon's body cameras work only with Axon software. Safariland's then-Executive Vice President called the Axon offer for free body cameras a "Venus fly trap" and noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done."[60]

71.     This "free" Evidence.com subscription also served to entrench Axon's position in the long-range CEW market, since Evidence.com "seamlessly integrates" with Tasers.[61] This integration further locked purchasers into the Axon system for both long-range CEWs and BWC Systems.[62]

72.     Long-range CEWs also have significant switching costs. Axon includes Taser

---

[58] Schiefelbein, *supra* note 13.

[59] *Id.*

[60] *In the Police Body Camera Business, the Real Money's on the Back End*, *supra* note 19.

[61] *E.g.*, *Taser X26P*, Axon, https://www.axon.com/industries/federal/products/taser-x26p (last visited Nov. 27, 2023).

[62] Schiefelbein, *supra* note 13.

training in its typical supply contracts,[63] and police departments that provide Tasers have trained a significant proportion of police officers in Taser use and protocol.[64] Would-be competitors wishing to sell their own long-range CEWs would need to entice police departments to retrain their police force to use a new type of long-range CEW.

73.     Because of these high switching costs, police departments seldom switch their BWC Systems or long-range CEW provider from one supplier to another when a contract is renewed.

74.     Product integration and bundling are another key barrier to entry. Currently, Axon's BWC Systems integrate with its Tasers, and police departments that want to integrate Taser data into their evidence software must use the Axon BWC System. Many police departments use Axon to supply both long-range CEWs and BWC Systems in the same contract. Axon has also bundled BWC Systems and long-range CEWs in contracts with police departments. BWC Systems competitors without long-range CEWs are disadvantaged in competing for those police departments that want their BWC Systems to integrate with long-range CEWs.

75.     Axon's nearly 300 U.S. patents covering its products form another barrier to entry.[65] Axon is unafraid to enforce its patents and has instituted numerous lawsuits against would-be competitors, most involving its Tasers.

76.     One would-be competitor, Robert Gruder, attempted to launch competing long-range CEW companies Stinger Systems and Karbon Arms. Both times, according to Gruder, Axon

---

[63] *See, e.g.*, Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement, *supra* note 56.

[64] Aaron Smith, *Axon Is Watching You, and Seeing a Bright Future in Police Cameras and Tasers*, Forbes (Feb. 10, 2021), https://www.forbes.com/sites/aaronsmith/2021/02/10/axon-is-watching-you-and-seeing-a-future-in-police-cameras-and-tasers/?sh=4aa385af5228.

[65] 2023 Axon Enterprise, Inc. Form 10-K, *supra* note 36, at 39.

"sued [the companies] out of business."[66]

77.     Regulations pose a final barrier to potential new entrants, which must ensure their BWC Systems and long-range CEWs comply with a variety of state and local laws governing recording and less-lethal weapons.

**B.     Axon and Safariland Agree to Restrain Competition in the BWC Systems and Long-Range CEW Markets**

**1.     Before the Acquisition, Safariland Aggressively Competed with Axon for BWC Systems, Yielding Lower Prices and Other Benefits for Customers**

78.     Axon and Safariland have engaged in anticompetitive conduct to entrench Axon's unlawful monopolies in the BWC Systems and long-range CEW markets.

79.     In 2018, before the Acquisition, as described above, Axon dominated both the long-range CEW market and the BWC Systems market, with 95% market share in long-range CEW supply to police departments and approximately 70%-85% market share in BWC Systems supply.[67]

80.     VieVu was Axon's closest and most serious competitor in the BWC Systems market. For example, Safariland acknowledged: "We own the #2 player in the market, and to date we have seen no other credible market entrant," and "VieVu and Taser are consistently the finalists in major opportunities."

81.     Stock analysts and the financial press also recognized that VieVu was Axon's most significant competitor. A Raymond James stock report stated: "In May 2018, Axon closed the $7.1 million strategic tuck-in acquisition of its most formidable body cam competitor, VieVu."[68] A

---

[66] Matt Stroud, *Meet the Company Trying to Break the Taser Monopoly*, Verge (Feb. 13, 2018),     https://www.theverge.com/2018/2/13/17007376/axon-taser-monopoly-digital-ally-wireless.

[67] Schiefelbein, *supra* note 13.

[68] FTC Compl. ¶ 37.

Bloomberg article dated May 4, 2018, titled "The Biggest Police Body Cam Company Is Buying Its Main Competitor," declared that "[t]he combination of the two largest providers of the recording devices will create a dominant force in police surveillance."[69] A May 18, 2018 article from the Motley Fool, titled "Axon Enterprise Now Owns the Police Body Cam Market," observed that "[t]here is going to be no stopping Axon Enterprise . . . now that it has acquired its main body camera rival VieVu."[70]

82.     Before the Acquisition, VieVu and Axon were the competitors that could best satisfy the RFP requirements, from both a technical and price perspective, for BWC Systems for many of the police agencies in the United States. A number of police agencies found that, of multiple bidders, Axon and VieVu had the best offerings by a significant margin.

83.     Axon and VieVu vigorously and consistently competed on the price of BWC Systems in an effort to win police department contracts. After Respondent Safariland acquired VieVu in 2015, VieVu lowered its pricing in an explicit effort to take market share from Axon. VieVu's former General Manager confirmed that in early 2016, VieVu "made a relatively deliberate decision to take price down in the market considerably," and VieVu admittedly "took [Axon] by surprise with disruptive pricing and nearly comparable technology." As late as 2018, VieVu's strategy was to "win on price," including specifically to charge "less than Axon."[71] By early 2018, VieVu had won the contracts of at least five of the largest 90 U.S. police departments.[72]

84.     Competition between Axon and VieVu resulted in substantially lower BWC

---

[69] Joshua Brustein, *The Biggest Police Body Cam Company Is Buying Its Main Competitor*, Bloomberg (May 4, 2018), https://www.bloomberg.com/news/articles/2018-05-04/the-biggest-police-body-cam-company-is-buying-its-main-competitor.

[70] Duprey, *supra* note 14.

[71] FTC Compl. ¶ 39.

[72] Schiefelbein, *supra* note 13.

System prices for police departments. A number of cities received substantially lower bids from VieVu as compared to Axon. For example, in a blind bidding process, VieVu's bid for the NYPD contract was *$6.4 million* compared to Axon's *$17 million*.[73]

85.     VieVu's lower pricing caused Axon to reduce its own bids. VieVu at times responded to Axon's competing bids by offering better terms. In 2017, Axon was forced to offer free BWC Systems for one year in order to promote its BWC System against this competition from VieVu.[74] Axon admitted that VieVu was "undercutting" the company on price for BWC Systems, while VieVu's CEO noted that VieVu has started a "price war" with Axon.[75] VieVu at times responded to Axon's competing bids by offering better terms.

86.     Axon and VieVu also competed vigorously on non-price aspects of BWC Systems, including the development of various innovative features such as auto-activation of BWCs in the event of an officer unholstering a gun or Taser, and computer-assisted facial redaction tools for DEMS videos. Consumers benefited from this competition in innovation.

### 2.     The Acquisition and Its Presumptive Illegality

87.     Rather than compete with VieVu and Safariland, on May 3, 2018, Axon instead acquired VieVu from Safariland and entered into related anticompetitive agreements with Safariland.

88.     Under the 2010 U.S. Department of Justice and Federal Trade Commission

---

[73] Alex Pasternack, *NYC Mayor Defends Police Body Camera Buy, Decrying a Competitor's "Smear" Campaign*, Fast Company (Feb. 9, 2017), https://www.fastcompany.com/3068047/new-york-de-blasio-police-body-cameras-vievu-taser.

[74] Cyrus Farivar, *Taser Stuns Law Enforcement World, Offers Free Body Cameras to All US Police*, ArsTechnica (Apr. 5, 2017), https://arstechnica.com/tech-policy/2017/04/taser-announces-free-body-cameras-cloud-storage-to-all-us-cops-for-a-year/.

[75] FTC Compl. ¶¶ 3-5.

Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful.[76] HHIs are calculated by totaling the squares of the market shares of every firm in the relevant market. The Acquisition significantly increased concentration in the U.S. BWC Systems market.

89.     Since the Acquisition, one firm, Axon, has controlled an estimated 85% of the BWC Systems market as measured by output or revenue. According to the FTC Complaint, the Acquisition resulted in a post-Acquisition HHI in excess of 2,500, and increased concentration by more than 200 points—a conclusion further supported by the market share analysis contained herein.[77] Therefore, the Acquisition is presumptively anticompetitive under the Merger Guidelines and applicable case law.

90.     In its 10-K for fiscal year 2018, Axon reported the total purchase price as $17.6 million. The consideration Axon paid included $5.0 million in cash; $2.4 million, or 58,843 shares,

---

[76] DOJ & FTC, *Horizontal Merger Guidelines* 19 (2010). The DOJ and FTC have released draft merger guidelines, which presume anticompetitive any merger that increases HHI by more than 100 points and results in a market HHI greater than 1,800. DOJ & FTC, *Draft Merger Guidelines* 7 (2023).

[77] While the FTC's HHI analysis seems to be based on an alleged market limited to "large, metropolitan police departments," there is no reason to think that Axon's market share is any lower for the broader relevant market alleged herein, especially given the disproportionate size of larger police departments among the overall U.S. police department population. For example, in its 2020 10-K, Axon boasted that it had "dedicated sales representatives for the 1,200 largest agencies, which account for 70% to 80% of U.S. law enforcement patrol officers." Likewise, as of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies, or 94%. Lacy, *supra* note 31. With approximately 36,000 officers, the NYPD alone accounts for around 7.6% of total full-time sworn officers employed by the approximately 11,800 general-purpose local police departments in the U.S. *About NYPD, supra* note 33; *Local Police Departments Personnel, 2020,* U.S. Dep't of Just. (Nov. 2022), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/lpdp20.pdf.   Thus the Acquisition (which gave Axon control over the New York City contract among many others) significantly increased HHI in the relevant market alleged herein as well.

of Axon common stock issued to Safariland, contingent consideration of up to $6.0 million, or 141,226 additional shares of Axon common stock, if certain conditions were met (the fair value of which as of the acquisition date was $5.8 million, according to Axon), and the "Holster Agreement." Pursuant to the Holster Agreement, Safariland agreed for 10 years, *inter alia*, to develop a new CEW holster for Axon's next-generation CEW and to supply CEW holsters exclusively to Axon. Axon agreed, *inter alia*, to make Safariland its preferred supplier of CEW holsters. According to Axon, the estimated fair value of the Supply Agreement as of the acquisition date was $4.5 million.

91.     Axon and Safariland also agreed, as part of the Acquisition Agreement and Holster Agreement, to several market-allocation and noncompete agreements related to the Markets. As described in more detail below, "Safariland agreed not to compete (i) for products and services that Respondent Axon supplies and in industries where Respondent Axon is active, irrespective of their relation to the [Acquisition] and (ii) for Respondent Axon's customers; and both [Defendants] agreed not to affirmatively solicit each other's employees."[78] These agreements each lasted 10 or more years. According to the FTC's complaint, the noncompete agreements are contained in the Acquisition Agreement itself and in Exhibit E, the Holster Agreement.[79]

92.     In Section 5.03(a) of the Acquisition Agreement, Safariland agreed not to engage in "(a) body worn video products and services, (b) in-car video products and services, (c) digital evidence management products and services provided to third parties that ingest digital evidence audio and video files, and (d) enterprise records management systems provided to third parties,"

---

[78] FTC Compl. ¶ 44.

[79] *Id.* ¶ 12.

31

anywhere in the world for 10 years.

93.    In Section 15.1 of the Holster Agreement, Safariland further agreed not to compete in the "CEW industry, BWC industry, fleet or vehicle camera industry, surveillance room camera industry, and digital evidence management system and storage industry, with regard to law enforcement, military, security or consumers," anywhere in the world for 12 years.

94.    According to the FTC complaint, "Respondent Axon was concerned about Respondent Safariland potentially entering into competition with Respondent Axon's lucrative [long-range] CEW business. Respondent Axon's CEO called the 12-year CEW noncompete a 'hidden jewel in the deal.'"[80] Axon's CEO's comment demonstrates that Axon viewed the CEW noncompete as having significant value for Axon. This could only be the case if Axon believed that Safariland would otherwise be a *bona fide* potential competitor in the long-range CEW market.

95.    In Section 5.03(c) of the Acquisition Agreement, "Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting business or services away from Axon, for 10 years."[81]

96.    "In Section 15.3 of the Holster Agreement, Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting CEW, CEW holster, or CEW accessory business or purchases away from Axon, for 11 years."[82]

97.    In Section 5.03(b) of the Acquisition Agreement, "Safariland agreed not to hire or solicit any of Axon's employees, or encourage any employees to leave Axon, or hire certain former employees of Axon, except pursuant to a general solicitation. Safariland agreed to refrain from

---

[80] *Id.* ¶ 46.

[81] *Id.* ¶ 47.

[82] *Id.* ¶ 48.

these activities for 10 years."[83]

98.    In Section 5.06(a) of the Acquisition Agreement, "Axon agreed not to hire or solicit any of Safariland's employees, or encourage any employees to leave Safariland, or hire certain former employees of Safariland, except pursuant to a general solicitation. Axon agreed to refrain from these activities for 10 years.[84]

99.    "In Section 15.4 of the Holster Agreement, Respondents Axon and Safariland agreed not to solicit each other's employees for the purpose of inducing the employees to leave their respective employers, except pursuant to a general solicitation. Respondents Axon and Safariland agreed to refrain from this activity for 11 years."[85]

100.    By prohibiting Safariland from competing against Axon—in terms of products and services Safariland can offer as well as customers Safariland can solicit—these provisions harmed customers who would otherwise benefit from potential or actual competition by Safariland, including specifically in the market for BWC Systems. By prohibiting Axon and Safariland from affirmatively soliciting each other's employees, these provisions eliminated a form of competition to attract skilled labor and thereby tended to reduce quality, service, and innovation, including specifically in the market for BWC Systems.

101.    These provisions also harmed customers who would otherwise benefit from potential or actual competition by Safariland in the market for long-range CEWs. Axon's decision to include the long-range CEW market in its noncompete agreements reflects Axon's understanding that Safariland was poised to develop a long-range CEW that could compete with

---

[83] *Id.* ¶ 49.

[84] *Id.* ¶ 50.

[85] *Id.* ¶ 51.

Axon's long-range CEWs. Further, Safariland's success in developing VieVu showed that Safariland likely had the technological capability, capital, and sales relationships necessary to develop and distribute a rival long-range CEW.

102.    The noncompete agreements were not reasonably limited in scope to protect a legitimate business interest. A mere general desire to be free from competition is not a legitimate business interest, nor were these agreements protecting a legitimate investment by Axon in VieVu since the Acquisition itself was unlawful. But even if the Acquisition were lawful (which it was not), the noncompete agreements went far beyond any intellectual property, goodwill, or customer relationship necessary to protect Axon's investment in VieVu. Moreover, even if a legitimate interest existed, the noncompete agreements were longer in duration than reasonably necessary because they prevented Safariland and Axon from competing for products and services, customers, and employees for 10 years or longer.

### 3.    Defendants' Conduct Has Harmed Competition Substantially

103.    Axon's dominance in the Markets became impenetrable after the VieVu acquisition and related market-allocation and noncompete agreements with Safariland. Axon remains the market leader of both long-range CEWs and BWC Systems, with 90% of the long-range CEW market and approximately 70%-85% of the BWC Systems market.[86] Through its acquisition, market-allocation, and noncompete agreements, Axon has effectively acquired and maintained its unlawful monopoly power in these markets.

104.    The Acquisition eliminated intense price and innovation competition between Axon and VieVu in the BWC Systems market. The result has been higher prices and reduced

---

[86] Duprey, *supra* note 14.

quality, service, and innovation.

105.    As described above, Axon and VieVu were each other's closest competitors, and industry analysts predicted that the Acquisition would make Axon a monopolist. Before the Acquisition, Axon and VieVu's competition caused Axon to reduce its own bids and resulted in substantially lower prices in the BWC Systems market overall. Axon and VieVu's competition also led to increased innovation in that market.

106.    Post-Acquisition, customers lost the benefit of this head-to-head price and innovation competition.

107.    The prices Axon charges for BWC Systems have shot up dramatically as a result of the Acquisition. This is shown by Axon's own 10-K filings with the SEC. Notably, these filings show that Axon's average selling price for BWCs (calculated as revenue per unit sold) *declined* from $195.17 in 2016 to $169.07 in 2017, the last year before the Acquisition, while VieVu was still vigorously competing with Axon, even as Axon sold substantially more BWCs in 2017 than in 2016. But Axon's revenue per BWC sold jumped to ***$254.56*** in 2018, the year of the Acquisition—an increase of ***34%***—even though Axon sold roughly the same number of BWCs that year as in 2017. And its average BWC price has relentlessly increased further since then, rising to ***$290.69*** in 2019, ***$313.09*** in 2020, ***$415.52*** in 2021, and ***$489.80*** in 2022—a nearly ***threefold*** increase from 2017, the year before the Acquisition. (By comparison, Apple's base iPhone MSRP has gone up only from $699 to $799 from 2017 to 2023 despite many feature improvements over

that period.) The following graph illustrates this stark trend:



Average price of Axon body cameras, 2016-2022

$489.80

$415.52

$313.09

$290.60

$256.56

$195.17

$169.07

**Year of Acquisition**

108.    Prices for Docks exhibit a similar pattern. Axon's 10-K reports show that the average price for its Docks *decreased* from $437.03 in 2016 to $414.44 in 2017, the year before the Acquisition. That increased to *$602.75* in 2018, the year of the Acquisition (a *45%* increase), and then *$918.02* in 2019 (a *122%* increase from 2017). By 2022, the average price was $1,043.06, well over twice as expensive as 2017.

109.    Prices for Axon's DEMS have also increased, as is demonstrated by price quotes

36

and contracts with local governments from before and after the Acquisition. For example, in 2017 Axon offered four Pro Evidence.com licenses to Fayetteville, Arkansas, at an effective rate of $243.34 per license per year for five years (net of discounts). In 2020, however, Axon offered two Pro Evidence.com licenses to another local government for an effective rate of $468 per license per year for five years—nearly twice the effective 2017 price.

110.    Further evidence that the Acquisition has led to supracompetitive prices comes from Axon's reported profit margins on BWCs. Indeed, these margins follow a trend nearly identical to Axon's BWC prices from 2016 to 2022. Axon's reported gross margin on "hardware" in its "Software and Sensors" segment (the term it uses for its BWC business) was 17.6% in 2016 and just 10.5% in 2017, when it was competing intensely with VieVu. That figure (later reported as "product gross margin," as opposed to "service margins," for the Software and Sensors segment) then jumped to 20.8% in 2018, *29.8*% in 2019, *36.6*% in 2020, *39.2*% in 2021, and *42.1*% in

2022—a ***fourfold*** increase from 2017, as shown in the following graph:



111.    This profit margin data shows that the increase in Axon's BWC Systems prices after the Acquisition is not due to increased costs (to the extent they increased at all).

112.    Since the Acquisition, Axon has likewise raked in eye-popping gross margins on its DEMS business—74.6% in 2021, and 73.3% in 2022, for example, according to its 10-K filings.

113.    Existing BWC Systems providers have not replaced the competition that was lost as a result of the Acquisition between Axon and VieVu, which were the two closest competitors

38

in the relevant market. While each remaining competitor has different strengths and weaknesses, each competitor faces real and significant challenges in replacing competition lost through Axon's Acquisition of VieVu. These challenges include, but are not limited to, reputation or lack of references from police department customers, service levels that are inadequate for such customers, and software with limited functionality.

114.   The challenges faced by these competitors are even greater because of the clout Axon has with police departments from its Taser product. Axon has acknowledged that this is a "key" "[d]ifferentiator" that sets Axon apart, bragging in a 2019 investor presentation that "Taser success drives customer access" more broadly and that "17,000 out of 18,000 US police agencies procure Taser devices." Axon further acknowledged that it "leveraged its deep agency relationships and Taser's strength to establish the market lead in body cameras & software."[87]

115.   Moreover, some of the other BWC Systems providers price significantly higher than VieVu and have not sufficiently replaced VieVu's aggressive pricing. As the analysis of Axon's prices above demonstrates, the remaining firms in the relevant market have not replaced the competitive constraint of VieVu's lower-priced offerings.

116.   Axon's price increases have been highly profitable for it. Its annual unit sales of BWCs and DEMS have increased significantly since the Acquisition despite its higher prices. It is clear, therefore, that Axon has been able to impose and profitably sustain a significant non-transitory price increase in BWC Systems market since and as a result of the Acquisition.

117.   Defendants' anticompetitive conduct has also increased prices for long-range CEWs compared to what those prices would have been absent the Acquisition and Defendants'

---

[87] *Investor Presentation, Axon Enterprise, December 2019* at 9, *supra* note 29.

conduct.

118.    Safariland was a large manufacturer of less-lethal weapons through its Defense Technology brand. Its products included pepper spray and rubber bullets, as well as weapon holsters. These products allowed it to develop relationships with police departments and become a trusted supplier of less-lethal weapons.[88]

119.    Absent the Acquisition and Defendants' other anticompetitive conduct, entry into the long-range CEW market by Safariland would have been likelier, and this threat would have lowered prices. As noted above, Axon's own CEO's comment that the Acquisition's market-allocation provision with respect to long-range CEWs was a "hidden jewel" of the Acquisition indicates that Axon itself viewed entry by Safariland into the long-range CEW market as a real threat.[89]

120.    Axon's actual prices and profit margins on long-range CEWs reflect this anticompetitive impact. For example, in 2014–15, Oklahoma City paid around $630,000 and $683,325 for five-year contracts of at least 305 Tasers and a BWC System with 305 body cameras (supplied by competitor WatchGuard).[90] Under its new contract, all with Axon, it pays $28.9 million over ten years for a full supply agreement with 500 long-range CEWs and 665 body cameras—of which, $18.7 million is allocated to long-range CEWs and BWC Systems. These contracts represent a per-year cost increase for long-range CEWs and BWC Systems from just

---

[88] FTC Compl. ¶ 36.

[89] *Id.* ¶ 46.

[90] Josh Wallace, *Oklahoma City Body Camera Program Full Implemented*, Oklahoman (Feb. 17, 2018), https://www.oklahoman.com/story/news/local/oklahoma-city/2018/02/17/oklahoma-city-body-camera-program-full-implemented/60542805007/; Brian Bus, *Shock Value: OKC Selling Back Its Obsolete Tasers*, J. Record (Nov. 22, 2017), https://journalrecord.com/2017/11/22/shock-value-okc-selling-back-its-obsolete-tasers/.

under $263,000 to $1.9 million, an increase of 611%, when its supply of long-range CEWs and body cameras increased by less than 100%.

121.    Moreover, Axon's gross margins on its Taser business have exceeded 61% every year from 2019 through 2022, reaching 65.7% in 2021, according to its 10-K filings.

122.    Axon has acknowledged the negative impact of price increases on budget constrained law enforcement officers and communities: "It's no secret that budget constraints are a constant inconvenience for law enforcement agencies. Long needs lists + short funds = under equipped officers and potentially underserved communities."[91]

123.    Indeed, Axon's monopoly prices have priced many police departments out of the Markets. In its 2019 article, "Some U.S. Police Departments Dump Body-Camera Programs Amid High Costs," the Washington Post reported that "many departments—especially in smaller jurisdictions—are now dropping or delaying their [BWC] programs, finding it too expensive to store and manage the thousands of hours of footage"—i.e. via DEMS.[92] The article further noted how "Axon . . . said every one of its clients that have canceled contracts cited costs."[93] This type of "dead-weight loss," as economics calls it—where a monopolist's supracompetitive prices price out buyers who would otherwise buy the product if it were priced competitively—is a classic harm

---

[91] FTC Compl. ¶ 42.

[92] Kimberly Kindy, *Some U.S. Police Departments Dump Body-Camera Programs amid High Costs*, Wash. Post (Jan. 21, 2019), https://www.washingtonpost.com/national/some-us-police-departments-dump-body-camera-programs-amid-high-costs/2019/01/21/991f0e66-03ad-11e9-b6a9-0aa5c2fcc9e4_story.html.

[93] *Id.*

inflicted by monopoly power, which reduces total economic output and welfare.

### C.    Lack of Countervailing Factors

#### 1.    High Barriers to Entry and Expansion

124.    Defendants cannot demonstrate that new entry or expansion by existing firms has been or would be timely, likely, or sufficient to offset the anticompetitive effects of their conduct. *De novo* entrants into the Markets would face considerable barriers in replicating the competition that the Acquisition has eliminated. Effective entry into the Markets would require substantial, costly upfront investments in creating a new BWC System or long-range CEW offering. These products also must be designed for use by law enforcement agencies, with features such as secured layers for authorized personnel access and strict recording of file access history for chain of custody purposes. There are high switching costs related to the transfer of metadata for DEMS video files, as well as long-range CEW training; in both situations, training officers is challenging and expensive, making customers sticky.

125.    Barriers to entry are even higher because of Axon's clout with police departments thanks to its Taser product. As noted above, Axon has acknowledged that this clout is a "key" "[d]ifferentiator" that sets Axon apart, allowing it to "leverage[] its deep agency relationships" to market and sell products.

126.    Significant barriers to entry and expansion are confirmed by Axon's continued dominance in the Markets today despite its continuing price increases that would otherwise be expected to entice new market participants to enter or existing participants to expand.

#### 2.    Efficiencies

127.    Defendants cannot show that merger-specific efficiencies would result from the Acquisition that will offset the anticompetitive effects. According to the FTC, Axon's President

admitted that potential efficiencies played no role in Axon's analysis of the Acquisition.[94]

**D.    The FTC Alleges the Acquisition Violates the Antitrust Laws**

128.    On January 3, 2020, the Federal Trade Commission issued an administrative complaint against Axon and Safariland alleging that the Acquisition "constitutes a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45."[95] The complaint also alleged that the Acquisition "constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45."[96] The Commission vote to issue the administrative complaint was 5-0.[97]

129.    Many of the allegations from the FTC complaint are specifically incorporated and realleged herein. The FTC complaint specifically alleged, *inter alia*, that the Acquisition "eliminated intense price and innovation competition between Respondent Axon and VieVu in the relevant market" and has resulted in higher prices for BWC Systems.[98]

130.    The relief contemplated by the FTC complaint consisted of various forms of injunctive relief, including, *inter alia*, divestiture of assets (including those acquired from Safariland) to restore the level of competition that was lost through the Acquisition, taking various steps to assist the divested business, and voiding all anticompetitive agreements between Axon

---

[94] FTC Compl. ¶ 55.

[95] *Id.* ¶ 60.

[96] *Id.* ¶ 58.

[97] *Axon Enterprise and Safariland, In the Matter of*, FTC (last updated October 6, 2023), https://www.ftc.gov/enforcement/cases-proceedings/1810162/axonvievu-matter.

[98] FTC Compl. ¶¶ 7, 35, 42.

and Safariland.

131.    On June 11, 2020, Safariland settled with the FTC.[99] Under the terms of the settlement agreement, Safariland must obtain approval from the FTC before entering into any noncompete or similar agreements with Axon.

132.    On October 6, 2023, the FTC dismissed its complaint against Axon and returned the matter to adjudication.[100] That dismissal followed years of litigation by Axon challenging the constitutionality of the FTC's administrative adjudication process. In dismissing its complaint, the FTC cited factors "including the increasingly unlikely possibility of reaching a timely resolution of the antitrust merits that led to the filing of our complaint in the first place."[101] In reaching that "difficult conclusion," the FTC reaffirmed its view that the allegations in its complaint remain sound. That is, this was an "anticompetitive merger" that "harms markets and adversely affects the American people" by "eliminat[ing] competition between two rivals, effectively creating a monopoly and harming both police departments and communities who fund them."[102]

### E.    Defendants' Conduct Has Harmed the Class

133.    Defendants' conduct has harmed Plaintiffs and other Class members who purchased BWC Systems or long-range CEWs (or their components) from Axon after the Acquisition. As a result of the Acquisition and Defendants' other anticompetitive conduct, Plaintiffs and Class members have paid supracompetitive prices for these products and services.

---

[99] *FTC Approves Final Order Settling Charges that Vievu's Former Parent Company Safariland Entered into Anticompetitive Agreements with Body-Worn Camera Systems Seller Axon*, FTC (June 16, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/06/ftc-approves-final-order-settling-charges-vievus-former-parent-company-safariland-entered.

[100] Order Returning Matter to Adjudication and Dismissing Compl., *In re Axon Enter., Inc.*, FTC No. D9389 (Oct. 6, 2023).

[101] *Id.* at 2.

[102] *Id.*

Plaintiffs and Class members have also suffered from reduced quality, service, and innovation in the Markets because of Defendants' conduct. These are antitrust injuries of the type that the antitrust laws were meant to punish and prevent.

## V.  CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action on behalf of themselves and, pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who have directly purchased any of the following from Axon in the United States from May 3, 2018 until the effects of Defendants' unlawful conduct cease (the "Class Period"): (1) a BWC System or any component of a BWC System or related services such as transcription, redaction, and warranties, and/or (2) a long-range CEW or components and related services such as electricity cartridges, battery packs, docks, cameras, signals, training, and warranties.

135.    The following are specifically excluded from the Class: Defendants; the officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants. Also excluded from the Class are: any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

136.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

137.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

138.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the

other members of the Class.

139.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of antitrust, class action, and other complex litigation.

140.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

    a.  whether the Acquisition substantially lessened competition and/or tended to create a monopoly;

    b.  the definitions of the relevant markets;

    c.  whether the alleged market-allocation and noncompete agreements violated the federal antitrust laws;

    d.  whether, through the conduct alleged herein, Axon willfully acquired, maintained, and/or enhanced its monopoly power in the Markets in the United States;

    e.  whether Axon unlawfully attempted to monopolize the relevant markets;

    f.  whether Defendants unlawfully conspired to monopolize the relevant markets;

    g.  whether Defendants' conduct caused Class members to suffer antitrust injury and, if so, the appropriate measure of damages; and

    h.  whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

141.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to

prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

142.   The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

143.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

144.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

145.   Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VI.   CONTINUING VIOLATION

146.   From May 3, 2018 and continuing to the present day, as a result of the anticompetitive conduct described above, Defendants have repeatedly overcharged customers throughout the United States for (1) BWC Systems and/or (2) long-range CEWs. Each such sale was an overt act causing additional anticompetitive injury to the proposed Class.

## VII.   TOLLING OF STATUTE OF LIMITATION

147.   Plaintiffs incorporate by reference and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

148.   The federal government's initiation of its antitrust action concerning Defendants' unlawful conduct operates to toll any federal statute of limitations under Section 5(i) of the Clayton

Act, 15 U.S.C. § 16(i), which tolls the running of the statute of limitations "during the pendency" of a government action about the same matter "and for one year thereafter."

149.    The FTC initiated a government action against Defendants based on the acquisition of VieVu and Defendants' associated noncompete and market-allocation agreements. Because Axon launched a collateral attack on the FTC administrative complaint, the FTC's case against Axon remained pending until October 6, 2023. The administrative complaint qualifies for tolling the statute of limitations on related private actions.

150.    This action, which is based on the acquisition of VieVu and Defendants' market-allocation and noncompete agreements in the Markets, is based in part on a matter complained of in the government action. Because this action meets all requirements for tolling under Section 5(i) of the Clayton Act, tolling is appropriate, and this action has been brought within the statute of limitations.

151.    The statute of limitations is further tolled because Defendants' fraudulently concealed their conspiracy. Specifically, Defendants fraudulently concealed the ancillary noncompete agreements that they entered into in connection with the Acquisition. Defendants' affirmative acts of fraudulent concealment in connection with their anticompetitive conduct in the BWC Systems and long-range CEW markets prevented Plaintiffs and members of the class from having notice of their claims more than four years before filing this Complaint, and tolled the statute of limitations on Plaintiffs' claims.

152.    Many of the overt acts in furtherance of the conspiracy alleged in this complaint were done with the purpose of concealing the conspiracy and preventing Plaintiffs and other purchasers of BWC Systems and long-range CEWs from learning about the conspiracy's existence. Accordingly, Plaintiffs did not know or reasonably suspect the existence of their claims

more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims.

## VIII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18
### (Axon & Safariland)

153.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

154.   Axon's acquisition of VieVu was a stock acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

155.   Axon's acquisition of VieVu from Safariland eliminated one of Axon's potential competitors.

156.   The effect of this acquisition has been to substantially lessen competition and to tend to create a monopoly in the Markets in the United States, in violation of Section 7 of the Clayton Act.

157.   The relevant product and geographic markets consist of BWCs Systems and their components and related services, and long-range CEWs and their components and related services.

158.   The Products are not reasonably interchangeable with any other products in the United States. There is no reasonably interchangeable product that would effectively constrain, or has effectively constrained, Axon from imposing and profitably sustaining a SSNIP.

159.   High barriers to entry and expansion have made it infeasible for a competitor to enter the Markets to compete with Axon and restrain its monopoly power despite dramatic price increases.

160.   Axon controls an estimated 85% of the BWC Systems market and an estimated

95% of the long-range CEW market.

161.    As a result of Axon's conduct in violation of Section 7 of the Clayton Act, Plaintiffs

and the Class have been injured and have paid artificially inflated prices for the Products.

162.    Plaintiffs and members of the Class are entitled to treble damages and an injunction

against Defendants preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### Conspiracy in Restraint of Trade (Axon & Safariland)

163.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

164.    Axon entered into a number of agreements with Safariland that have reduced

competition, output, and innovation and raised prices above competitive levels in the Markets.

165.    Defendants' agreements, combination, or conspiracy constitute a per se violation

of Section 1 of the Sherman Act.

166.    Defendants' conduct also violates the rule-of-reason standard of antitrust liability

because Defendants' conduct had actual anticompetitive effects with no or insufficient offsetting

procompetitive benefits.

167.    Defendants' anticompetitive acts have injured and will continue to injure

competition in the Markets.

168.    Defendants' anticompetitive acts affect interstate commerce and injure competition

nationwide.

169.    Defendants' conduct has caused Plaintiffs and all the other Class members to suffer

damages in the form of injuries to their business or property, which they will continue to suffer if

Defendants do not cease their anticompetitive conduct.

170.    Plaintiffs and the Class are threatened with future injury to their business and property by Defendants' continuing violation of Section 1 of the Sherman Act.

171.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Monopolization of the BWC Systems Market (Axon)

172.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173.    The relevant product and geographic market consists of BWC Systems and their components and related services sold in the United States.

174.    Since the Acquisition, Axon has had monopoly power in the relevant market.

175.    Axon willfully obtained and maintained its monopoly power through the Acquisition and related noncompete agreements.

176.    Axon's conduct has had substantial anticompetitive effects. It has raised prices for BWC Systems above competitive levels and otherwise injured competition with no or insufficient offsetting procompetitive benefits.

177.    Axon's anticompetitive acts have injured, and will continue to injure, competition in this market.

178.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

179.    Axon's conduct has caused Plaintiffs and the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if

Axon does not cease its anticompetitive conduct.

180.    Plaintiffs and the Class are threatened with future injury to their business and property from Axon's continuing violation of Section 2 of the Sherman Act.

181.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Axon preventing and restraining the violations alleged herein.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the BWC Systems Market (Axon)**

182.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

183.    The relevant product and geographic market consists of BWC Systems and their components and related services sold in the United States.

184.    If Axon does not already have monopoly power in the United States for BWC Systems, Axon has attempted to monopolize this market. Axon attempted to acquire and maintain that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of foreclosing competition in the market for BWC Systems and inflating the price of BWC Systems.

185.    As described in more detail above, with its purchase of VieVu, Axon attempted to acquire and maintain market power through anticompetitive conduct, including the acquisition of VieVue from Safariland and the noncompete agreements entered between Axon and Safariland.

186.    The anticompetitive conduct described here, undertaken by Axon, creates a dangerous probability that Axon will achieve monopoly power in the BWC Systems market.

187.    Axon's conduct constitutes unlawful attempted monopolization in violation of

Section 2 of the Sherman Act.

188.    As a direct and proximate result of Axon's continuing attempted violation of Section 2 of the Sherman Act, prices of BWC Systems in the U.S. have been raised above competitive levels and otherwise injured competition with no or insufficient offsetting procompetitive benefits, causing injury to Plaintiffs and members of the Class.

189.    Axon's anticompetitive acts have injured and will continue to injure competition in this market.

190.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

191.    Axon's conduct has caused Plaintiffs and the other members of the Class to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

192.    Plaintiffs and the Class are threatened with future injury to their business and property by Axon's continuing violation of Section 2 of the Sherman Act.

193.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Axon preventing and restraining the violations alleged herein.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopolize the BWC Systems Market (Axon & Safariland)**

194.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195.    Defendants entered into and engaged in an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in exclusionary conduct designed to prevent competition on the merits in the relevant market for

BWC Systems.

196.    Specifically, in exchange for Axon's purchasing VieVu and signing the Holster Agreement, Safariland agreed to withdraw from the market for BWC Systems and not to re-enter, thereby securing Axon's ability to achieve monopoly profits by eliminating a competitor well-situated to compete on price and innovation.

197.    Overt acts in furtherance of this conspiracy consisted of, inter alia: (a) the unlawful customer and product market-allocation agreements between Axon and Safariland entered into on May 3, 2018 by which Safariland agreed not to compete in the BWC Systems market or solicit Axon's customers or employees, and (b) the unlawful acquisition of VieVu on May 3, 2018 by which Safariland agreed to withdraw from the BWC System market.

198.    Defendants engaged in this with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits.

199.    Defendants' anticompetitive and unlawful conduct proximately caused injury to Plaintiffs and members of the Class by eliminating independent competition by Safariland on price, promotional activity, and innovation. This conduct has reduced customer choice and allowed Axon to raise, maintain, or stabilize the prices of BWC Systems sold to direct purchasers in the United States.

200.    Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

201.    Defendants' conduct has caused Plaintiffs and the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

202.    Plaintiffs and the Class are threatened with future injury to their business and

property by Defendants' continuing violation of Section 2 of the Sherman Act.

203.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants preventing and restraining the violations alleged herein.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Monopolization of the Long-Range CEW Market (Axon)**

204.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

205.    The relevant product market is long-range CEWs and their components and related services, as set forth herein.

206.    The relevant geographic market is the United States.

207.    Axon possesses monopoly price-setting power in the United States for long-range CEW supply. Axon acquired and maintains that market power through anticompetitive, exclusionary, and predatory conduct, which Axon intended to have, and did actually have, the effect of: a) foreclosing competition in the market for long-range CEWs and their components and related services; and b) inflating the price of long-range CEWs and their components and related services.

208.    As described in more detail above, Axon entered into an agreement with Safariland under which Safariland agreed not to compete in the long-range CEW market.

209.    Axon's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Act.

210.    As a direct and proximate result of Axon's continuing violation of Section 2 of the Sherman Act, prices of long-range CEWs in the U.S. long-range CEW market have been and continue to be inflated above competitive levels, causing injury to Plaintiffs and members of the

Class.

211.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

212.    Axon's conduct has caused Plaintiffs and the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

213.    Plaintiffs and all other similarly situated persons and entities are threatened with future injury to their business and property by Axon's continuing violation of Section 2 of the Sherman Act.

214.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants preventing and restraining the violations alleged herein.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the Long-Range CEW Market (Axon)**

215.    Plaintiffs incorporate and reallege, as fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

216.    The relevant product market is long-range CEWs and their components and related services, as set forth herein.

217.    The relevant geographic market is the United States.

218.    If Axon does not already have monopoly power in the United States for long-range CEWs, Axon has attempted to monopolize this market. Axon attempted to possess monopoly price-setting power in the United States for long-range CEW supply. Axon attempted to acquire and maintain that market power through anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of: a) foreclosing competition in the market for long-range

CEWs and their components and related services; and b) inflating the price of long-range CEWs and their components and related services.

219.    As described in more detail above, Axon's noncompete agreements with Safariland attempted to prevent would-be competitors and suppress competition.

220.    Axon's anticompetitive conduct creates a dangerous probability that Axon will achieve monopoly power in the long-range CEW market.

221.    Axon's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

222.    As a direct and proximate result of Axon's attempted violation of Section 2 of the Sherman Act, prices of long-range CEWs and their components and related services have been and continue to be inflated above competitive levels, causing injury to Plaintiffs and members of the Class.

223.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

224.    Axon's conduct has caused Plaintiffs and the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

225.    Plaintiffs and the Class are threatened with future injury to their business and property by reason of Axon's continuing violation of Section 2 of the Sherman Act.

226.    Plaintiffs and members of the Class are entitled to treble damages and an injunction

against Axon preventing and restraining the violations alleged herein.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopolize the Long-Range CEW Market (Axon & Safariland)**

227.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

228.    The relevant product market is long-range CEWs and their components and related services, as set forth herein.

229.    The relevant geographic market is the United States.

230.    Defendants entered into an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act by engaging in exclusionary conduct designed to prevent competition in the relevant market for long-range CEWs and their components and related services.

231.    Specifically, pursuant to the Holster Agreement, Safariland agreed not to enter the long-range CEW market in exchange for Axon's pledge to make Safariland a preferred Taser holster supplier, thereby securing Axon's ability to achieve monopoly profits by eliminating a competitor well situated to compete on price and innovation.

232.    Overt acts in furtherance of this conspiracy consisted of, inter alia: the unlawful noncompete agreements between Axon and Safariland entered into on May 3, 2018 by which Safariland agreed not to compete in the long-range CEW market or solicit Axon's customers or employees in exchange for the preferred treatment of the Holster Agreement and Axon's purchasing VieVu.

233.    Defendants entered into and effectuated this agreement with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated

monopoly profits in the long-range CEW market.

234.    Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

235.    Defendants' conduct has caused Plaintiffs and the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

236.    Plaintiffs and the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Act.

237.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants preventing and restraining the violations alleged herein.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.

November 27, 2023

Respectfully submitted,

*/s/ Michael D. Fitzgerald*
Michael D. Fitzgerald (NJ #004391985)
**LAW OFFICES OF MICHAEL D. FITZGERALD**
1 Industrial Way West, Unit B
Eatontown, NJ 07724
(202) 349-1482
mdfitz@briellelaw.com
***Interim Liaison Counsel for Plaintiffs and the Proposed Class***

Kellie Lerner (NJ #018532003)
William V. Reiss (NY #4431177) (*pro hac vice*)
Jonathan Edelman (DC #1719587) (*pro hac vice*)
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
(212) 980-7400
klerner@robinskaplan.com
wreiss@robinskaplan.com
jedelman@robinskaplan.com

Heidi M. Silton (MN #025759X) (*pro hac vice*)
Jessica N. Servais (MN #0326744) (*pro hac vice*)
Joseph C. Bourne (MN #0389922) (*pro hac vice*)
Eura Chang (MN #0403526) (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
echang@locklaw.com

Sharon K. Robertson (NJ #030642006)
Christopher J. Bateman (NY #5323837) (*pro hac vice* forthcoming)
Jared A. Dummitt (NY #5723036) (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL**

60

PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
srobertson@cohenmilstein.com
cbateman@cohenmilstein.com
jdummitt@cohenmilstein.com

Daniel H. Silverman (MA #704387) (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
769 Centre Street | Suite 207
Boston, MA 02130
(617) 858-1990
dsilverman@cohenmilstein.com

***Interim Co-Lead Counsel for Plaintiffs and the Proposed Class***

William G. Caldes (SBN 00062-1995)
John A. Macoretta (SBN 03912-1990)
Diana J. Zinser (*pro hac vice forthcoming*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
bcaldes@srkattorneys.com
jmacoretta@srkattorneys.com
dzinser@srkattorneys.com

Michael S. Smith (*pro hac vice forthcoming*)
Michael D. Hanify (*pro hac vice forthcoming*)
**PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
One City Center, P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000
msmith@preti.com
mhanify@preti.com

***Counsel for Plaintiff City of Augusta, Kennebec County, Maine***

## <u>LOCAL RULE 11.2 CERTIFICATION</u>

The undersigned hereby certifies, pursuant to 28 U.S.C. § 1746, that the within action is not the subject matter of any other actions in this Court or any other Court, or of any pending arbitration or administrative proceeding, except as follows:

1. *Mayor and City Council of Baltimore v. Axon Enterprise, Inc. and Safariland, LLC*, Case No. 23-cv-21156 in the United States District Court for the District of New Jersey;

2. *City of Augusta, Kennebec County, Maine v. Axon Enterprise, Inc. and Safariland, LLC*, Case No. 23-cv-20897 in the United States District Court for the District of New Jersey;

3. *In the Matter of Axon Enterprise, Inc. and Safariland, LLC*, Case No. D9389 before the Federal Trade Commission.[103]

I further certify that no other action is contemplated and that the matter in controversy is not the subject of any arbitration proceedings.

I certify that the foregoing statement made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: November 27, 2023                                   */s/ Michael D. Fitzgerald*
                                                          Michael D. Fitzgerald

---

[103] On October 10, 2023, the Federal Trade Commission dismissed the complaint and returned the matter to adjudication.