IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| *IN RE AXON VIEVU ANTITRUST LITIGATION* | No. 3:23-cv-7182-RK-RLS

Jury Trial Demanded |

## MEMORANDUM IN SUPPORT OF AXON'S
## MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

WALSH PIZZI O'REILLY FALANGA LLP
Liza M. Walsh
Katelyn O'Reilly
Eric S. Padilla
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Tel: (973) 757-1100

AXON ENTERPRISE, INC.
Pamela B. Petersen (*pro hac vice*)
Gayathiri Shanmuganatha (*pro hac vice*)
17800 N. 85th Street
Scottsdale, Arizona 85255
Tel: (623) 326-6016

JONES DAY
Julia E. McEvoy (*pro hac vice*)
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Tel: (202) 879-3939

Aaron M. Healey (*pro hac vice*)
250 Vessey Street
New York, New York 10281
Tel: (212) 326-3939

*Attorneys for Defendant Axon Enterprise, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

BACKGROUND ................................................................4

LEGAL STANDARD ...........................................................7

ARGUMENT ....................................................................8

    I.    Plaintiffs Fail To State A Claim In A CEW Market Because They Fail To Plausibly Plead An Anticompetitive Effect .................8

        A.    The Non-Compete Cannot Be An Unreasonable Restraint Because Safariland Was Not An Actual Or Potential Competitor In The CEW Market (Count 2) ...............................9

        B.    Plaintiffs' Section 2 Claims In The CEW Market Fail For Similar Reasons (Counts 6-8) .................................................15

        C.    Plaintiffs' Section 7 Claim Fails As To The CEW Market (Count 1) .................................................................................17

    II.    Plaintiffs Fail To Establish Antitrust Standing For Their CEW Claims Because Axon's Patents Are An Independent Bar To Entry ...............................................................................19

    III.    Plaintiffs' BWC System Claims Must Be Dismissed As Untimely ...........................................................................21

        A.    Section 5(i) Tolling Does Not Apply Because Plaintiffs' BWC Claims Implicate A Different Market Than The FTC Action .................................................................................22

        B.    Plaintiffs Have Not Adequately Pled Fraudulent Concealment..............................................................................24

        C.    Plaintiffs Fail To Plead A Continuing Violation .....................27

# TABLE OF CONTENTS
(continued)

**Page**

D.    Because Plaintiffs' Claims Are Untimely Under The Analogous Statute Of Limitations, Their Equitable Claims Also Fail...................................................................28

E.    At A Minimum, Laches Bars Any Claim For Divestiture.......29

IV.    Plaintiffs Are Not Entitled To Injunctive Relief.................................31

A.    Plaintiffs Have Not Stated A Claim Of Entitlement To Injunctive Relief................................................................31

B.    Plaintiffs Lack Standing To Pursue Injunctive Relief.............33

V.    Township Of Howell And City Of Augusta Lack Standing For The BWC Claims ...................................................................34

VI.    All Of Plaintiffs' Claims Fail Because They Are Not Grounded In Any Cognizable Antitrust Product Market ....................................36

CONCLUSION .....................................................................................38

# TABLE OF AUTHORITIES

**Page**

CASES

*Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan*,
596 F. Supp. 3d 860 (E.D. Mich. 2022) ............................................................15

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) .............................................................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................8

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ..............................................................................................7

*BanxCorp v. Bankrate, Inc.*,
847 F. App'x 116 (3d Cir. 2021) ..................................................................14, 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..............................................................................................8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ............................................................................................14

*Camaisa v. Pharm. Rsch. Assocs., Inc.*,
2022 WL 843653 (D. Del. Mar. 22, 2022) ........................................................18

*Charley's Tour and Transp., Inc. v. Interisland Resorts, Ltd.*,
618 F. Supp. 84 (D. Haw. 1985) .........................................................................23

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ..............................................................................................33

*City of Pittsburgh v. W. Penn Power Co.*,
147 F.3d 256 (3d Cir. 1998) ..........................................................................19, 20

*Conergy AG v. MEMC Elec. Materials, Inc.*,
   651 F. Supp. 2d 51 (S.D.N.Y. 2009) ................................................................10

*Davis v. Grusemeyer*,
   996 F.2d 617 (3d Cir. 1993) ...........................................................................27

*Dawson Chem. Co. v. Rohm & Haas Co.*,
   448 U.S. 176 (1980)........................................................................................20

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006)........................................................................................32

*Endsley v. City of Chicago*,
   230 F.3d 276 (7th Cir. 2000) ..........................................................................16

*Fed. Home Loan Bank Bd. v. Elliott*,
   386 F.2d 42 (9th Cir. 1967) ............................................................................30

*Fid. Eatontown, LLC v. Excellency Enter., LLC*,
   2017 WL 2691417 (D.N.J. June 22, 2017)......................................................16

*Forbes v. Eagleson*,
   228 F.3d 471 (3d Cir. 2000) ......................................................................25, 26

*Frank's GMC Truck Ctr/, Inc. v. Gen. Motors Corp.*,
   847 F.2d 100 (3d Cir. 1988) ......................................................................31, 32

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .....................................................................17, 36

*Fuqua v. Bristol-Myers Squibb Co.*,
   926 F. Supp. 2d 538 (D.N.J. 2013)..................................................................25

*Ginsburg v. InBev NV/SA*,
   623 F.3d 1229 (8th Cir. 2010) ........................................................................30

*Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd.*,
   2018 WL 11426956 (D. Del. Feb. 28, 2018)....................................................17

*Green v. Green Mountain Coffee Roasters, Inc.*,
  279 F.R.D. 275 (D.N.J. 2011)................................................................35

*Hemy v. Perdue Farms, Inc.*,
  2011 WL 6002463 (D.N.J. Nov. 30, 2011) ...................................34, 35

*In re Arthur Treacher's Franchisee Litig.*,
  689 F.2d 1137 (3d Cir. 1982) .............................................................32

*In re Canadian Imp. Antitrust Litig.*,
  470 F.3d 785 (8th Cir. 2006) ..............................................................21

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  782 F. Supp. 481 (C.D. Cal. 1991) .............................................22, 24

*In re New Jersey Title Ins. Litig.*,
  683 F.3d 451 (3d Cir. 2012) ...............................................................34

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
  868 F.3d 132 (3d Cir. 2017) .............................................19, 20, 34

*In re Zinc Antitrust Litig.*,
  2016 WL 3167192 (S.D.N.Y. June 6, 2016) ...................................18

*Intel Corp. v. Seven Networks, LLC*,
  562 F. Supp. 3d 454 (N.D. Cal. 2021) ...............................................37

*Janowski v. City of N. Wildwood*,
  259 F. Supp. 3d 113 (D.N.J. 2017)....................................................10

*Kane v. Union of Soviet Socialist Republics*,
  189 F.2d 303 (3d Cir. 1951) ..............................................................29

*Klawonn v. YA Glob. Invs., L.P.*,
  2011 WL 3502022 (D.N.J. Aug. 10, 2011) .........................................7

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*,
  573 F. Supp. 2d 1125 (E.D. Ark. 2008)..............................................37

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
634 F.2d 1197 (9th Cir. 1980) ............................................................32

*Marian Bank v. Elec. Payment Servs., Inc.,*
1997 WL 367332 (D. Del. Feb. 5, 1997).....................................34, 35

*McCray v. Fid. Nat. Title Ins. Co.,*
682 F.3d 229 (3d Cir. 2012) ..............................................................33

*Midwestern Mach. Co. v. Nw. Airlines, Inc.,*
392 F.3d 265 (8th Cir. 2004) ........................................................27, 31

*Morton v. Beyer,*
822 F.2d 364 (3d Cir. 1987) ..............................................................32

*New York v. Facebook, Inc.,*
549 F. Supp. 3d 6 (D.D.C. 2021).................................................30, 31

*New York v. Meta Platforms, Inc.,*
66 F.4th 288 (D.C. Cir. 2023).......................................................28, 30

*Novell, Inc. v. Microsoft Corp.,*
505 F.3d 302 (4th Cir. 2007) .......................................................23, 24

*Ocean View Capital, Inc. v. Sumitomo Corp.,*
1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999).....................................35

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n,*
948 F. Supp. 2d 416 (M.D. Pa. 2013)................................................13

*Pinckney v. Cofaro,*
2023 WL 5177492 (D.N.J. Aug. 11, 2023) ..........................................6

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,*
828 F.2d 211 (4th Cir. 1987) .......................................................25, 26

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
124 F.3d 430 (3d Cir. 1997) ..............................................................36

*Ragner Tech. Corp. v. Berardi*,
324 F. Supp. 3d 491 (D.N.J. 2018) ..................................................20

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) ..............................................21

*Robinson v. Johnson*,
313 F.3d 128 (3d Cir. 2002) .............................................................22

*S. Cal. Elec. Firm v. S. Calif. Edison Co.*,
2023 WL 4317362 (C.D. Cal. Apr. 7, 2023) ....................................37

*Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*,
401 F.3d 123 (3d Cir. 2005) .............................................................28

*Santiago v. Warminster Twp.*,
629 F.3d 121 (3d Cir. 2010) ...............................................................8

*Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*,
140 F. Supp. 3d 405 (E.D. Pa. 2015) ................................................16

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ...............................................................7

*Shire US, Inc. v. Allergan, Inc.*,
375 F. Supp. 3d 538 (D.N.J. 2019) ...................................................36

*Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*,
242 F. Supp. 2d 1350 (S.D. Fla. 2003) .............................................13

*State of N.J. v. Morton Salt Co.*,
387 F.2d 94 (3d Cir. 1967) ...............................................................22

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..........................................................................33

*Syncsort Inc. v. Sequential Software, Inc.*,
50 F. Supp. 2d 318 (D.N.J. 1999) .....................................................16

*Taleff v. Sw. Airlines Co.*,
   828 F. Supp. 2d 1118 (N.D. Cal. 2011) ............................................................. 30

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020) ...................................................................................... 34

*Transource Int'l, Inc. v. Trinity Indus., Inc.*,
   725 F.2d 274 (5th Cir. 1984) ........................................................................... 10

*TV Commc'ns Network, Inc. v. ESPN, Inc.*,
   767 F. Supp. 1062 (D. Colo. 1991) .................................................................. 12

*United Cap. Funding Grp., LLC v. Brick City Brewing, LLC*,
   2022 WL 225458 (D.N.J. Jan. 26, 2022) ......................................................... 12

*United States v. Merck-Medco Managed Care, L.L.C.*,
   336 F. Supp. 2d 430 (E.D. Pa. 2004) ................................................................. 6

*United States v. Sargent Elec. Co.*,
   785 F.2d 1123 (3d Cir. 1986) ............................................................................ 9

*Vanderklok v. United States*,
   868 F.3d 189 (3d Cir. 2017) .............................................................................. 6

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ................................................................... 9, 27, 28

*Warner v. Sun Ship, LLC*,
   2012 WL 1521866 (E.D. Pa. Apr. 30, 2012) ................................................... 29

*Z Techs. Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) .................................................................... 21, 27

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ........................................................................... 32

**STATUTES**

15 U.S.C.

    § 15b.................................................................................................21

    § 16...................................................................................................22

    § 18...................................................................................................18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) .......................................................................25

**INTRODUCTION**

Almost six years ago, in May 2018, Axon Enterprise, Inc. acquired VieVu LLC, then a subsidiary of Safariland LLC.  VieVu, like Axon, sold body-worn cameras ("BWCs") and digital evidence management systems ("DEMS") to law enforcement agencies.  But, unlike Axon, VieVu was on an irreversible path to failure.  At the time of the acquisition, VieVu was losing a million dollars *a month*, was saddled with more than $19 million in debt, and had less than three days of cash to cover its operating expenses.  After an exhaustive effort to shop VieVu failed to attract another buyer, Safariland approached Axon as a last resort.  Axon's purchase of VieVu, contrary to the claims contained in the Consolidated Amended Complaint, ("Compl.," ECF 37), did not reduce competition.  It preserved vital services for police departments across the country as VieVu inched toward implosion.

Today, three municipalities purporting to represent a nationwide class of purchasers of Axon's products—the Township of Howell (NJ), the City of Augusta (ME), and the City of Baltimore (MD)—have attempted to co-opt a *dismissed* administrative complaint filed by the Federal Trade Commission (FTC) in January 2020 regarding the VieVu acquisition and an ancillary Axon–Safariland holster supply agreement for  next-generation TASER® conducted electrical weapons

("CEWs").[1] But while the FTC complaint was limited to BWC Systems for "large metropolitan police departments," these plaintiffs seek to substantially expand both the product and geographic markets to bring claims on behalf of all U.S. law enforcement agencies that purchased everything from BWCs and CEWs to batteries, charging stations, training services, and warranties in the last six years. Plaintiffs' claims fail for myriad reasons.

Plaintiffs' CEW claims (Counts 1-2, 6-8) all fail because plaintiffs have not plausibly alleged any anticompetitive conduct in that market. Their claims are based entirely on Safariland's promise in the ancillary holster agreement not to compete with Axon in the sale of CEWs. But this "non-compete" provision—intended to protect Axon's substantial intellectual property investments in new CEW products— cannot constitute actionable anticompetitive conduct because plaintiffs fail to allege that Safariland was ever an actual or potential CEW competitor. Indeed, the implausibility of plaintiffs' claims is demonstrated by the fact that the challenged non-compete was rescinded four years ago in January 2020 and Safariland has not at any point since launched or attempted to launch a CEW product. Relatedly, while plaintiffs attempt to sweep CEWs into their Clayton Act challenge to the VieVu

---

[1] TASER® is a registered trademark of Axon, formerly TASER International, Inc. As an acronym, TASER is always written in all capital letters, even in the former corporate name. Axon manufactures energy weapons or CEWs, not "tasers."

acquisition, they have not alleged any facts explaining how the acquisition of a company that sold only BWCs—*not* CEWs—could have lessened competition for the sale of CEWs.

Moreover, and critically, plaintiffs allege that *before* the VieVu acquisition and challenged non-compete provision, Axon "already controlled approximately 95%" of the CEW market based on its "nearly 300 U.S. patents" as the inventor of modern CEW technology. Accordingly, plaintiffs cannot establish antitrust standing for their CEW claims because their own allegations demonstrate that Axon's CEW patents would have served as an independent regulatory or legislative bar to any new competitor entry regardless of any non-compete provision.

As to plaintiffs' BWC System claims (Counts 1-5), the Township of Howell and City of Augusta lack standing to pursue these claims because neither actually purchased a BWC System from Axon. In fact, public documents show that Howell is a BWC System customer of Motorola Watchguard, which itself demonstrates competition in this market. Moreover, the BWC System claims of all plaintiffs are time-barred because they challenge well-publicized conduct outside the four-year antitrust limitations period without alleging a plausible basis for tolling under any doctrine. And even if plaintiffs' BWC System claims were timely, the Court should dismiss all claims for injunctive relief because plaintiffs have not plausibly alleged

a likelihood of future purchases or other entitlement to an injunction, and any claim for divestiture is barred by laches.

Finally, each of plaintiffs' claims must be dismissed because plaintiffs fail to define a cognizable product market.  Antitrust law is clear that the relevant market must be defined by reference to potential *substitutes* for the product at issue.  Plaintiffs have blown past that rule and attempted to include ancillary products and services in their alleged markets—essentially including *complements* for the product at issue rather than substitutes for it.  Because a complement-based market is not cognizable, plaintiffs have failed to adequately allege relevant markets.

For these and other reasons set forth herein, all of plaintiffs' claims should be dismissed.

## BACKGROUND

Axon is a leading provider of public safety technology. Axon develops and sells products to support its mission to protect life, providing law enforcement with cutting-edge technology to protect them and the people in the communities they serve, as well as to increase transparency and accountability.  Plaintiffs' claims broadly relate to two different products that Axon manufactures and sells to police departments:  BWCs and CEWs.  BWCs enable police officers to record video of their interactions and conduct while on patrol or responding to calls.  BWCs are often used with DEMS, which help police departments process and maintain the

video data recorded by BWCs.  Compl. ¶¶ 36-37.  Long-range CEWs, which are "virtually synonymous with Axon's" TASER products, are a type of less-lethal weapon that police officers may include in their public safety gear.  Compl. ¶ 4.

Plaintiffs attempt to define two antitrust product markets.  First, plaintiffs purport to define a "BWC System Market," which allegedly consists of the BWCs, DEMS, and other ancillary products (such as charging stations known as "docks") and ancillary services (such as warranties, transcription, and redaction add-ons).  Compl. ¶¶ 1, 35-40, 134.  Plaintiffs also purport to define a "CEW Market," which they allege consists of the long-range CEWs plus "components and related services such as electricity cartridges, battery packs, docks, cameras, signals, training, and warranties."  Compl. ¶¶ 1, 55, 57, 134.  Plaintiffs do not allege that the constituent products and services they have swept into their definitions of a BWC System Market and CEW Market must be purchased together.  Instead, plaintiffs merely allege that "many" police departments prefer to purchase these products and services from a single manufacturer, and that Axon has suggested or recognized the efficiency of purchasing these products and services together.  Compl. ¶¶ 2, 57.

Further, plaintiffs allege that VieVu was Axon's largest competitor "in the BWC Systems market."  Compl. ¶ 6, 49.  Plaintiffs' theory is that by acquiring VieVu, Axon unlawfully reduced competition in the BWC System Market.  *E.g.*, Compl. ¶ 8.  Plaintiffs do not allege that VieVu—or Safariland or any of its other

subsidiaries—ever competed or attempted to compete with Axon in the separately alleged CEW Market.

Beyond the acquisition itself, plaintiffs challenge what they call "related anticompetitive agreements" between Axon and Safariland. Compl. ¶ 87. Plaintiffs allege the existence of two separate agreements—the Acquisition Agreement and the Holster Agreement. Plaintiffs allege that one or both of those agreements included provisions by which (1) Safariland agreed not to compete with Axon for certain products and services, including CEWs and BWCs (or solicit Axon's customers in those markets); and (2) Safariland and Axon agreed not to compete for each other's employees. Compl. ¶¶ 91, 93, 95-99, 197. Plaintiffs also allege that the Holster Agreement made Safariland a preferred supplier of holsters for Axon's long-range CEWs. Compl. ¶ 90.

On January 3, 2020, the FTC filed an administrative complaint against Axon and Safariland, alleging the transaction violated Section 7 of the Clayton Act and Section 5 of the FTC Act. *See* Ex. A ("FTC Compl.").[2] Unlike the plaintiffs'

---

[2] All "Ex. __" references are to the Declaration of Liza M. Walsh filed concurrently herewith. The Court may take judicial notice of and consider Exhibits A–D because they are "information [made] publicly available on government websites." *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017); *see also Pinckney v. Cofaro*, 2023 WL 5177492, *2-3 (D.N.J. Aug. 11, 2023) (Kirsch, J.) (taking judicial notice of information found on a county social service board website); *United States v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d 430, 446 n.12 (E.D. Pa. 2004) ("tak[ing] judicial notice of the facts contained in" an FTC complaint and press release). Exhibit E is a judicially noticeable Form 10-K

complaint here, the FTC's action was focused on BWC systems and did not even attempt to define a CEW market. *Id.* ¶ 20. And the FTC defined its BWC system market differently from the current plaintiffs in two significant ways. First, the FTC limited its market definition to BWCs and DEMS without including any ancillary components and services. *Id.* Second, the FTC limited its market definition to BWCs and DEMS sold to "large, metropolitan police departments." *Id.*

On January 16, 2020, shortly after the FTC filed its complaint, Safariland and Axon rescinded the challenged non-compete provisions of the Holster Agreement and Acquisition Agreement. *See* Ex. B (Decision and Order), § I-F–I-I & § II (summarizing rescission of non-compete provisions via January 2020 contract amendments); Ex. C (FTC Press Release announcing rescission). And following Axon's successful challenge to the constitutionality of the FTC's adjudication procedures, *see Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023), the FTC dismissed its complaint against Axon without consent decree or other condition. Compl. ¶ 132.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual

---

filed with the Securities Exchange Commission. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (noting documents "like the SEC filings attached by a number of the defendants, are matters of public record of which the court can take judicial notice"); *Klawonn v. YA Glob. Invs., L.P.*, 2011 WL 3502022, *3 (D.N.J. Aug. 10, 2011) (taking judicial notice of Form 10-K in considering motion to dismiss).

matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires factual allegations establishing as plausible all elements of a cause of action. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130-31 (3d Cir. 2010). "Threadbare recitals" of the elements, "conclusory statements" of fact, and mere "legal conclusions" "do not suffice" and are not accepted as true. *Iqbal*, 556 U.S. at 678. The allegations must "raise a right to relief above the speculative level," meaning that they must render the claim not merely "conceivable," but "plausible." *Twombly*, 550 U.S. at 555, 570.

## ARGUMENT

### I. PLAINTIFFS FAIL TO STATE A CLAIM IN A CEW MARKET BECAUSE THEY FAIL TO PLAUSIBLY PLEAD AN ANTICOMPETITIVE EFFECT.

Plaintiffs fail to state a claim as to the alleged CEW Market. Plaintiffs' CEW claims are based exclusively on Safariland's promise not to compete with Axon in the CEW Market, which was ancillary to its agreement to supply Axon with holsters for certain TASER products.[3] As explained below, the challenged non-compete

---

[3] While plaintiffs generically suggest that "Axon entered into a number of agreements" that restrained trade, Compl. ¶ 164, the only other provisions of the Holster Agreement or Acquisition Agreement discussed in the complaint are (1) those relating to Safariland and Axon's *employees* and (2) making Safariland a preferred supplier of CEW *holsters*. Compl. ¶¶ 90-91, 97-98. But plaintiffs have not defined any market for labor services or holsters, nor alleged that any such market was restrained in an anticompetitive fashion. Plaintiffs have also failed to allege any facts to explain how the purported agreements relating to Axon and

provision is not a valid basis for any of plaintiffs' CEW claims because plaintiffs fail to allege that Safariland was ever an actual or potential competitor in the CEW Market, and the history of this case demonstrates that Safariland would not have been a competitor in this market.

A.   **The Non-Compete Cannot Be An Unreasonable Restraint Because Safariland Was Not An Actual Or Potential Competitor In The CEW Market (Count 2).**

Section 1 of the Sherman Act provides that "[e]very contract, combination . . . or conspiracy, in restraint of trade" is illegal.  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (quoting 15 U.S.C. § 1)).  But despite this "seemingly absolute language, section 1 has been construed to prohibit only *unreasonable* restraints of trade."  *Id.* (emphasis in original).  A restraint is "unreasonable," and therefore illegal, only if it produces anticompetitive effects, such as increased prices, reduced output, and reduced quality in the relevant market. *Id.* at 100.

"An agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes *brutum fulmen*"—*i.e.*, a nullity. *United States v. Sargent Elec. Co*., 785 F.2d 1123, 1127 (3d Cir. 1986).  The rationale for this rule is simple:  A non-compete agreement necessarily causes no

---

Safariland's employees or holsters could have resulted in a restraint of trade in the entirely distinct CEW Market. Accordingly, the existence of the other two agreements is irrelevant for evaluating plaintiffs' claims.

harm to competition—nor any injury to the plaintiff—when the agreement is between entities that never would have competed in the relevant market anyway. *See, e.g.*, *Transource Int'l, Inc. v. Trinity Indus., Inc*., 725 F.2d 274, 281 (5th Cir. 1984) (plaintiff lacked antitrust injury where nothing indicated it could have entered the relevant market as a competitor but-for the challenged non-compete).

This principle is fatal to plaintiffs' CEW claims. Plaintiffs do not allege any facts suggesting that Safariland, VieVu, or any of Safariland's other subsidiaries, ever manufactured CEWs, were capable of doing so, or had any intention of doing so—much less facts plausibly establishing that the challenged non-compete provision impeded those non-existent plans. *Cf. Conergy AG v. MEMC Elec. Materials, Inc*., 651 F. Supp. 2d 51, 58 (S.D.N.Y. 2009) (outlining factors to consider in evaluating whether a non-compete agreement is between "potential competitors," including the putative competitor's ability and intent to enter the relevant market). Plaintiffs' allegation that Safariland was "poised to develop a long-range CEW", Compl. ¶ 101, has no factual support whatsoever. Such "textbook conclusory allegations are not entitled to the assumption of truth." *Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 120 (D.N.J. 2017). Plaintiffs speculate that Safariland might have become a CEW competitor because it had developed VieVu into a *BWC System* competitor, Compl. ¶ 101, but they offer no allegations explaining how Safariland's purported success in developing body-worn

cameras and digital evidence management systems would translate into having the ability and intent to enter what plaintiffs allege to be an entirely distinct product market—CEWs.

Nor do plaintiffs' allegations that Safariland manufactured *other* "less-lethal weapons," namely pepper spray and rubber bullets, Compl. ¶ 118, make their claim any more plausible. Plaintiffs plead no facts that experience with either of those distinct products—a chemical mixture and shaped rubber—is comparable to producing and selling a sophisticated electrical weapon. Indeed, plaintiffs explicitly allege that CEWs are "highly differentiated" from those products. Compl. ¶ 55-56. Plaintiffs further plead that entering the CEW Market would require the capacity to overcome Axon's patents, high-switching costs for police agencies, technological barriers to developing CEW products, regulatory hurdles, and allege that "the significant time needed to develop a long-range CEW [and] the inability to compete for most police departments at any one time due to contract length further renders market entry unprofitable for would-be competitors." Compl. ¶¶ 67-68, 72-77, 124. Plaintiffs plead not even a single fact as to how Safariland had the ability (or incentive) to overcome these myriad hurdles and disincentives to entry, or that Safariland could or would have done so during the brief 18-month window before the non-compete provision was rescinded. Pleading that Safariland sold *other* products, without more, is not enough to make plaintiffs' claims plausible. And that

is particularly true given plaintiffs' own allegations regarding the inability of competitors to enter the CEW Market. *See United Cap. Funding Grp., LLC v. Brick City Brewing, LLC*, 2022 WL 225458, *2 (D.N.J. Jan. 26, 2022) ("inconsistent factual allegations" rendered plaintiff's claim implausible).

The implausibility of plaintiffs' generic allegations that Safariland was an actual or potential CEW competitor is reaffirmed by Safariland's conduct both before and after the non-compete provision was rescinded in January 2020.  Ex. B, § I-F–I-I & § II.  Safariland, which was not in the CEW Market in May 2018, still has not entered the CEW Market in the four-year post-rescission period or expressed any intention to do so in the future.  *See generally* Compl. (lacking any allegations as to this issue).  Because Safariland did not enter the CEW Market at any point prior to May 2018 or in the last *four years*, it is implausible to assert that Safariland nevertheless would have done so between May 2018 and January 2020 absent the challenged non-compete provision.

Simply put, there is no basis in the complaint to infer that Safariland is, was, or ever would have been a competitor in the CEW Market.  Accordingly, plaintiffs' CEW claims must be dismissed. *See TV Commc'ns Network, Inc. v. ESPN, Inc*., 767 F. Supp. 1062, 1075 (D. Colo. 1991) (granting motion to dismiss where complaint made clear that "defendants do not compete with each other" and "an agreement between entities that are not competitors does not violate [Sherman Act] section

one"); *Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d 1350, 1361 (S.D. Fla. 2003) (concluding that "as a non-competitor who has no present potential to compete with [the plaintiff], [the defendant] cannot, as a matter of law, conspire with [a co-defendant] to violate Section One"), *aff'd*, 376 F.3d 1065 (11th Cir. 2004).

Without any facts suggesting that Safariland was an actual or potential competitor, the non-compete provision cannot constitute an "unreasonable" restraint of trade.  In fact, plaintiffs themselves allege that even before the challenged non-compete provision, Axon "already controlled approximately 95%" of the CEW Market, Compl. ¶ 18, which is *higher* than the 90% share of the CEW Market that Axon allegedly enjoyed *after* it entered into the non-compete with Safariland, Compl. ¶ 103.

Given the foregoing, it is no surprise that plaintiffs fail to plausibly allege that the non-compete provision had *any* impact on competition in the CEW Market.  *See Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 430-31 (M.D. Pa. 2013) (dismissing complaint for failure to adequately allege anticompetitive effect in relevant market).  They allege no facts regarding how the quality or output of CEWs was impacted by the rescinded non-compete provision.  Similarly, they allege no well-pleaded facts regarding the prices of CEWs.  Although they allude to the prices of CEWs paid by "Oklahoma City," their sole allegation combines CEWs

and BWC Systems of differing quantities, Compl. ¶ 120, leaving the Court only to guess at the price of *CEWs* specifically, let alone whether any purportedly elevated prices are attributable to the challenged non-compete provision rather than other factors.

Plaintiffs' other allegations are similarly conclusory or irrelevant. For example, plaintiffs summarily allege, without any supporting facts that Axon began enacting "substantial price increases" on CEWs. Compl. ¶ 11. But a price increase—even a substantial one in a consolidated market—is not sufficient alone to infer supracompetitive pricing. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 120 (3d Cir. 2021) (recognizing that "price increases, without more, do not constitute supracompetitive pricing"). Plaintiffs' allegations regarding generic financial metrics—in years where the challenged non-compete provision was not even in effect—are even further afield. Compl. ¶¶ 63, 121 (noting CEW profit margins in 2019-2022 without suggesting any change because of non-compete).

Plaintiffs seemingly hope to avoid these fundamental deficiencies by copying out of the FTC's administrative complaint a disembodied alleged comment from Axon's CEO that the non-compete provision was a "hidden jewel" of the Safariland–Axon dealings. Compl. ¶ 119 (citing FTC Compl.). But this comment is irrelevant given the posture of this case. It is clear—with nearly four years of experience since

the non-compete was rescinded—that the agreement had no impact on Safariland's entry (or lack thereof) into the CEW Market. *See Anesthesia Assocs. of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan*, 596 F. Supp. 3d 860, 875 (E.D. Mich. 2022) (insurer failed to plausibly plead that its injury—being forced to raise its fee schedule for anesthesiology services—was proximately caused by allegedly wrongful conduct where increase occurred after some of the challenged non-compete agreements were removed). And, in any event, this stray alleged comment alone is insufficient to render plaintiffs' inherently implausible claims plausible. *See BanxCorp*, 847 F. App'x at 121 (former CEO's alleged comments regarding existence of competitors were "no substitute" for facts).[4]

### B.     Plaintiffs' Section 2 Claims In The CEW Market Fail For Similar Reasons (Counts 6-8).

Section 2 of the Sherman Act prohibits three types of conduct: monopolization, attempted monopolization, and conspiracy to monopolize. "To state a claim for monopolization under Section Two of the Sherman Act, a plaintiff must plead facts indicating (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business

---

[4] Plaintiffs' reliance on the FTC's allegation that Axon was "concerned" about Safariland potentially entering into competition with Axon in the CEW Market fails for the same reason, as the FTC's allegation was based entirely on the same alleged comment from Axon's CEO. *See* Compl. ¶ 94 (citing Ex. A [FTC Compl.] ¶ 46).

acumen, or historic accident." *Syncsort Inc. v. Sequential Software, Inc*., 50 F. Supp. 2d 318, 327 (D.N.J. 1999) (internal quotation marks and citations omitted). The second element—willful acquisition or maintenance of monopoly power—requires the possession of monopoly power be "accompanied by some anticompetitive conduct on the part of the possessor." *Fid. Eatontown, LLC v. Excellency Enter., LLC*, 2017 WL 2691417, *3 (D.N.J. June 22, 2017) (cleaned up).

An *attempted* monopolization claim requires plausible allegations that the defendant "(1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Syncsort*, 50 F. Supp. 2d at 327 (citation omitted). And, a plaintiff claiming *conspiracy* to monopolize must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Satnam Distribs. LLC v. Commonwealth-Altadis, Inc*., 140 F. Supp. 3d 405, 417 (E.D. Pa. 2015) (citation omitted).

The throughline between each of these Section 2 claims is that the plaintiff must plausibly allege that the defendant has engaged in (or conspired to engage in) some anticompetitive or exclusionary conduct. *See Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) ("Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power *by*

*anticompetitive means*.") (emphasis added); *Godo Kaisha IP Bridge 1 v. TCL Commc'n Tech. Holdings Ltd*., 2018 WL 11426956, *9 (D. Del. Feb. 28, 2018) (alleged conspiracy must be "in furtherance of anticompetitive conduct").

As with their Section 1 claim, plaintiffs' Section 2 claims are all predicated entirely on Safariland's promise not to compete in the CEW Market.  Compl. ¶¶ 208, 219, 231-232.  But because there are no plausible allegations that Safariland was an actual or potential competitor of Axon's in the CEW Market (*supra* § I-A), the non-compete provision cannot provide the foundation for a Section 2 claim.  *See FTC v. Qualcomm Inc*., 969 F.3d 974, 991 (9th Cir. 2020) ("If, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2.").  Indeed, plaintiffs plead that Axon's market share in CEWs went *down*—not up—after the transaction.  Compl. ¶¶ 18, 103.  Moreover, plaintiffs plead no effect on the prices of CEWs, including the prices the named plaintiffs paid.  *See supra*, pp. 13-14.  Accordingly, plaintiffs' monopolization, attempted monopolization, and conspiracy to monopolize claims with respect to the CEW Market must be dismissed.

## C.    Plaintiffs' Section 7 Claim Fails As To The CEW Market (Count 1).

Section 7 of the Clayton Act prohibits mergers or acquisitions where "the effect of [the challenged] acquisition may be substantially to lessen competition, or

to tend to create a monopoly." 15 U.S.C. § 18. To state a Section 7 claim, a plaintiff must "(1) propose the proper relevant market, and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Camaisa v. Pharm. Rsch. Assocs., Inc.*, 2022 WL 843653, *6 (D. Del. Mar. 22, 2022) (cleaned up). The Clayton Act is concerned with whether an acquisition or merger *itself* may cause antitrust injury. *See In re Zinc Antitrust Litig.*, 2016 WL 3167192, *22-24 (S.D.N.Y. June 6, 2016) (dismissing complaint where plaintiffs' "theory [was] too attenuated to the acquisition itself to plausibly support a Section 7 claim").

Plaintiffs do not articulate any theory (let alone a plausible theory) as to how Axon's acquisition of VieVu—a BWC System company that did not ever compete in the CEW Market—lessened competition in the CEW Market. All of plaintiffs' merger-related allegations are focused entirely on the alleged impact on competition within the BWC System Market. *See, e.g.*, Compl. ¶¶ 153-162. Plaintiffs do not allege that VieVu competed or intended to compete in the CEW Market. Undaunted, plaintiffs have tacked the CEW Market onto their Section 7 claim anyway. *See* Compl. ¶ 157.

Regardless, any Section 7 claim as to the CEW Market fails. Plaintiffs identify no source of potential harm in the CEW Market flowing from the merger. Rather, plaintiffs only potential theory of harm in the CEW Market relates entirely to the challenged non-compete provision. But by definition, that non-compete had

no impact on competition for the reasons explained above (§ I-A) and would not represent a harm to competition from the *merger itself* that a Section 7 claim requires. While plaintiffs allege in conclusory terms that the acquisition of VieVu "entrenched" Axon's market power in the CEW Market, Compl. ¶ 18, they offer no facts or theory that would explain how that could be so. On the contrary, plaintiffs' own allegations establish that the merger had no impact on competition in the CEW Market, *i.e.*, prior to the merger and challenged non-compete provision Axon "already controlled approximately 95%" of the CEW Market. Compl. ¶¶ 18, 103. Accordingly, plaintiffs' Clayton Action Section 7 claim as to the CEW Market must be dismissed.

## II. PLAINTIFFS FAIL TO ESTABLISH ANTITRUST STANDING FOR THEIR CEW CLAIMS BECAUSE AXON'S PATENTS ARE AN INDEPENDENT BAR TO ENTRY.

A plaintiff must plausibly allege antitrust standing, which includes showing an injury that "flows from that which makes [the] defendants' acts unlawful," *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163-64 & n.54 (3d Cir. 2017) (cleaned up), and a "causal connection between the purportedly unlawful conduct and the injury" asserted, *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998). "[A] regulatory or legislative bar" such as the existence of a patent preventing would-be competitors from entering the market anyway "can break the chain of causation in an antitrust case." *In re Wellbutrin*, 868 F.3d at 165.

Plaintiffs' own allegations regarding Axon's patents on CEWs demonstrate their inability to plausibly allege antitrust standing.  Plaintiffs admit that Axon holds "nearly 300 U.S. patents" and enforces those patents against would-be CEW competitors.  Compl. ¶¶ 75-76.  Put differently, plaintiffs allege that would-be competitors cannot enter the CEW Market (with or without a non-compete in effect) because of Axon's patents.  This is fatal to plaintiffs' CEW claims because "[a]s a general rule, behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws." *Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491, 512 (D.N.J. 2018); *see also Dawson Chem. Co. v. Rohm & Haas Co*., 448 U.S. 176, 215 (1980) ("[T]he essence of a patent grant is the right to exclude others from profiting by the patented invention").[5]

Because plaintiffs offer no facts suggesting that the alleged harm in the CEW Market was caused by the non-compete rather than "federal patent law," their CEW claims must be dismissed for lack of antitrust standing.  *In re Wellbutrin*, 868 F.3d at 165 (plaintiffs lacked antitrust standing where a patent "would have prevented market entry"); *W. Penn Power*, 147 F.3d at 265, 269 (upholding dismissal of complaint where plaintiff failed to plausibly allege that competition "would have

---

[5] Although there are exceptions to this general rule, such as for "sham litigation" or patents obtained through fraud, plaintiff alleges no facts suggesting that any exception applies.

existed but for the [allegedly wrongful] actions of the defendants"); *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (upholding dismissal where "absence of competition" complained of "is caused by the federal statutory and regulatory scheme" at issue, "not by the conduct of the defendants").

## III.    PLAINTIFFS' BWC SYSTEM CLAIMS MUST BE DISMISSED AS UNTIMELY.

A four-year statute of limitations applies to private antitrust suits.  15 U.S.C. § 15b.  Plaintiffs' BWC System claims center on Axon's May 2018 acquisition of VieVu from Safariland.  Compl. ¶¶ 148, 197.[6]  But plaintiffs' complaint was filed (at the earliest) in August 2023 (*see* ECF 1), which was more than five years after the challenged acquisition.  *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014) ("[A] Section 7 cause of action challenging an acquisition accrues at the time of the merger or acquisition[.]"); *Reveal Chat Holdco, LLC v. Facebook,*

---

[6] To the extent plaintiffs are attempting to predicate their BWC System claims on Safariland's purported promise not to compete with Axon in that market (*e.g.*, Compl. ¶¶ 100, 102-103, 133, 164-165), this effort fails.  First, plaintiffs offer no non-conclusory allegations suggesting that the non-compete provision relating to BWC Systems was anticompetitive.  *Cf.* Compl. ¶ 102 (conclusory recitation that the non-compete was not "protecting a legitimate investment" and "were longer in duration than reasonably necessary").  Second, there are no allegations suggesting that Safariland had the ability or intent to enter the BWC System market after the sale of VieVu.  *See supra* § I-A (explaining that a non-compete must be between actual or potential competitors to be actionable as potentially anticompetitive).  On the contrary, plaintiffs' own allegations demonstrate that this would not have happened in the short window the non-compete was in effect.  *E.g.*, Compl. ¶¶ 65-67, 124 (alleging that entry would have required "substantial, costly upfront investments in creating a new BWC System").

*Inc.*, 471 F. Supp. 3d 981, 996 (N.D. Cal. 2020) (Sherman Act claims predicated on pre-limitations-period conduct were time barred). Accordingly, plaintiffs' BWC System claims are facially time-barred and must be dismissed. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (dismissal is proper where the limitations bar is apparent from the face of the complaint).

Plaintiffs, clearly cognizant of the fact that their claims are untimely, purport to rely on three tolling doctrines: Section 5(i) of the Clayton Act, fraudulent concealment, and the continuing violation doctrine. But as explained below, none of these tolling doctrines apply so plaintiffs' stale claims must be dismissed.

### A.    Section 5(i) Tolling Does Not Apply Because Plaintiffs' BWC Claims Implicate A Different Market Than The FTC Action.

Plaintiffs allege that they are entitled to tolling under Clayton Act Section 5(i) due to the pendency of the FTC action against Axon. Compl. ¶¶ 148-150. But that statute only permits tolling where the private action is "based in whole or in part on any matter complained of in [the government] proceeding[,]" 15 U.S.C. § 16(i), and there must be "a *substantial identity* between the matters alleged in the Government's action and those alleged in the private action." *State of N.J. v. Morton Salt Co.*, 387 F.2d 94, 98 (3d Cir. 1967) (emphasis added). Courts have held that "substantial identity" is lacking when the private plaintiffs' claims arise in different geographic or product markets than the government enforcement action. *See id.*; *see also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,

782 F. Supp. 481, 486 (C.D. Cal. 1991) (rejecting tolling where the defined markets covered the same product, crude oil, but different geographic areas); *Charley's Tour and Transp., Inc. v. Interisland Resorts, Ltd.*, 618 F. Supp. 84, 86 (D. Haw. 1985) (tolling inapplicable where product markets at issue were different). Courts have applied this different-markets rule because Section 5(i) tolling "should [not] be construed to permit private plaintiffs to 'sit on their rights' and assert, years after the traditional statute of limitations has run, 'claims so much broader than those asserted by the government that they open entirely new vistas of litigation.'" *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 322 (4th Cir. 2007) (citation omitted).

Plaintiffs are not entitled to tolling here because their purported BWC System Market is defined distinctly from, and more broadly than, the FTC's market. While the FTC action related solely to BWCs themselves and DEMS (FTC Compl. ¶ 20), plaintiffs here have lumped together a variety of ancillary products and services well beyond BWCs and DEMS, as explained below (§ VI). Moreover, the FTC action specifically limited the "relevant market" to "large, metropolitan police departments." FTC Compl. ¶ 20. The FTC noted that these departments "have distinct requirements for BWC Systems that differ from the needs and preferences of other law enforcement organizations." FTC Compl. ¶ 23. Plaintiffs, on the other hand, significantly expand the relevant market to *any* sales of BWC Systems to

*anyone* in the United States, which they admit results in a "broader relevant market" than the FTC's market.  Compl. ¶¶ 34, 89 & n.77.

Plaintiffs' broader definition of the BWC System Market is fatal to their effort to invoke Section 5(i) tolling.  As the Fourth Circuit has explained, the "Supreme Court has accepted tolling ***only*** where the private plaintiffs make claims in markets ***identical to, or completely encompassed by***, those at issue in the earlier government suit."  *Novell*, 505 F.3d at 321-22 & n.27 (emphasis added) (holding that tolling was inapplicable because this standard was unmet).  Because plaintiffs' BWC System Market is defined far more broadly, it is neither identical to nor completely encompassed by the market at issue in the FTC suit.  *See also Petroleum Prods. Antitrust Litig.*, 782 F. Supp. at 486 (rejecting tolling where government's geographic market excluded areas that were included in plaintiffs' market).  Consequently, plaintiffs are not entitled to Section 5(i) tolling.[7]

## B.    Plaintiffs Have Not Adequately Pled Fraudulent Concealment.

To adequately plead fraudulent concealment, plaintiffs must plausibly allege (1) "*active misleading* by the defendant"; (2) that plaintiffs "exercised reasonable diligence in attempting to uncover the relevant facts"; and (3) that plaintiffs "actually

---

[7] Plaintiffs CEW claims are even further afield from the FTC's complaint, as the FTC did not even define a CEW Market.  *See* Ex. A, ¶ 20.  Axon maintains that plaintiffs' CEW claims are also untimely and not entitled to tolling under the Clayton Act or any other tolling doctrine, and reserves all its defenses should plaintiffs' CEW claims not be dismissed on their merits.  *Supra* § I.

[were] misled into thinking that [they] did not have a cause of action[.]" *Forbes v. Eagleson*, 228 F.3d 471, 487 (3d Cir. 2000) (cleaned up; emphasis in original). And fraudulent concealment must be pled with particularity in accordance with Fed. R. Civ. P. 9(b). *See Fuqua v. Bristol-Myers Squibb Co.*, 926 F. Supp. 2d 538, 549 (D.N.J. 2013).

Plaintiffs' effort to invoke fraudulent concealment fails at the outset, as they have not alleged that they were *actively misled* by any of *Axon's* conduct. Plaintiffs allege in conclusory terms that "many of the overt acts in furtherance of the conspiracy alleged" were done with the purpose of concealment, Compl. ¶ 152, but they lack any particularized factual allegations, as required under Rule 9(b), as to what those acts were or how they constituted an affirmative act of deception. Without any allegations that Axon took some affirmative and fraudulent action to prevent plaintiffs' discovery of the facts underlying their claims, plaintiffs have not pled fraudulent concealment at all—let alone to the degree of particularity required by Rule 9(b). *See Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987) (a plaintiff must claim conduct "affirmatively directed at deflecting litigation" and cannot rely on "ignorance" alone).

Even ignoring this fatal defect, plaintiffs' fraudulent concealment claim also fails because they allege no facts indicating reasonable diligence. *See Forbes*, 228 F.3d at 487. Plaintiffs' conclusory allegation that they "did not know or reasonably

suspect the existence of their claims" is directly contradicted by plaintiffs' own allegations that the acquisition at issue and most of its details were publicly announced or otherwise available, Compl. ¶ 152; *cf. id.* ¶¶ 16, 81, 90; *see Pocohontas*, 828 F.2d at 218 (holding fraudulent concealment inapplicable where facts were "necessarily discoverable upon simple inquiry and consultation of public records[.]").

Finally, plaintiffs have not alleged they were actually misled as to the existence of their claims. Nor could they have plausibly done so, as most of the facts plaintiffs allege to support their antitrust claims were publicly available, such as assertions that the acquisition would give Axon a dominant position in the BWC System Market. *See, e.g.*, Compl. ¶ 81 (reciting a Bloomberg article dated May 4, 2018, titled "The Biggest Police Body Cam Company Is Buying Its Main Competitor," which allegedly declared that "[t]he combination of the two largest providers of the recording devices will create a dominant force in police surveillance"); *id.* (reciting May 18, 2018 article from the Motley Fool, titled "Axon Enterprise Now Owns the Police Body Cam Market," which allegedly observed that "[t]here is going to be no stopping Axon Enterprise . . . now that it has acquired its main body camera rival VieVu"). These public articles, which are cited in the complaint and summarize plaintiffs' own antitrust theory, are more than enough to put them on notice of their claim. *Forbes*, 228 F.3d at 487 (recognizing that if

"plaintiffs either knew or reasonably should have known the facts support their [cause] of action," then tolling is unwarranted); *Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir. 1993) ("[F]raudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim."), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998).

## C.    Plaintiffs Fail To Plead A Continuing Violation.

The continuing violation doctrine posits that "each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and ... as to those damages, the statute of limitations runs from the commission of the act." *W. Penn Allegheny Health*, 627 F.3d at 106 (citation omitted). But courts have recognized that this doctrine "makes no sense" as applied to mergers because "a merger is a discrete act, not an ongoing scheme." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004); *see also Z Techs. Corp.*, 753 F.3d at 599 ("We have not discovered a case . . . in which the continuing violations doctrine has been applied to price increases following a merger or acquisition."). As the Eighth Circuit explained, a contrary approach in the merger context would mean that "every [post-merger] business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued to desire to be merged." *Midwestern*, 392 F.3d at 271. Such an approach would

undermine the very purpose of the statute of limitations—"to pull the blanket of peace over acts and events which have themselves already slept for the statutory period, thus barring the proof of wrongs embedded in time-passed events[,]" *W. Penn Allegheny Health*, 627 F.3d at 108. Accordingly, plaintiffs' BWC System claims, which are predicated on the Axon–VieVu merger, are not entitled to tolling under the continuing-violation doctrine.

Ultimately, plaintiffs' BWC System claims all relate to an acquisition from May 2018, which is more than four years before plaintiffs filed suit in August 2023 (at the earliest), and are therefore facially time-barred. And because plaintiffs have not adequately alleged Section 5(i) tolling or fraudulent concealment, and the continuing violation doctrine does not apply in the merger context, all of plaintiffs' BWC claims must be dismissed as untimely.

### D. Because Plaintiffs' Claims Are Untimely Under The Analogous Statute Of Limitations, Their Equitable Claims Also Fail.

Laches bars a claim for injunctive relief when the plaintiff unreasonably delayed bringing suit and the defendant is prejudiced as a result. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 295 (D.C. Cir. 2023). In the Third Circuit, laches is presumed when the plaintiff files suit after the Sherman Act's four-year statute of limitations has expired. *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005). In such cases, the *plaintiff* bears the burden of proving that "its delay was excusable *and* that it did not prejudice" the defendant. *Id.* at 139

(emphasis in original).  As explained above, plaintiffs' BWC System claims are all untimely under the four-year statute of limitations.  And plaintiffs have alleged no facts attempting to explain the reasonableness of their delay in bringing suit or negating the presumed prejudice to Axon.  Accordingly, plaintiffs' equitable claims must be dismissed as barred by laches.  *See Kane v. Union of Soviet Socialist Republics*, 189 F.2d 303, 307 (3d Cir. 1951) (affirming dismissal of claim based on laches); *Warner v. Sun Ship, LLC*, 2012 WL 1521866, *2 (E.D. Pa. Apr. 30, 2012) (granting motion to dismiss where presumption of laches not negated in complaint).

### E.    At A Minimum, Laches Bars Any Claim For Divestiture.

Even if plaintiffs' BWC System claims were not time-barred under the statute of limitations, at a minimum, any request for divestiture would be barred by laches.  To the extent plaintiffs' unspecified request for an "injunction," *e.g.*, Compl. ¶ 171, includes a request for divestiture of the VieVu acquisition (which seems likely given that the only other challenged conduct, the non-compete provision, has been rescinded), laches bars plaintiffs' claim.

The challenged VieVu acquisition was consummated in May 2018—more than five years before the first plaintiff filed suit.  Even ignoring the period in which plaintiffs' claim was purportedly tolled, plaintiffs have still unreasonably rested on any right to pursue a claim available to them.  Plaintiffs were on notice of the exact theory of their claim—that the VieVu acquisition lessened competition in the BWC

System Market—at the time the merger was consummated and publicly announced in May 2018. *E.g.*, Compl. ¶ 81 (citing a string of articles regarding the acquisition). Accordingly, even assuming plaintiffs were entitled to Section 5(i) tolling, they inexplicably sat on their claims for 20 months (from May 2018 to the FTC's January 2020 complaint) despite being on notice of the exact antitrust theory they now press. *See Meta*, 66 F.4th at 300 (upholding dismissal where plaintiffs were on notice of acquisitions and "analysts" at the time "perfectly summarize[d] Plaintiffs' exact theory of the case"). Indeed, courts routinely find delays far shorter than 20 months to be unreasonable. *See Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1173 (C.D. Cal. 2000) (laches barred claim brought on "the day of the merger's consummation"); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1123-24 (N.D. Cal. 2011) (dismissing claim for divestiture brought ***one day*** after the merger was completed), *aff'd*, 554 F. App'x 598 (9th Cir. 2014); *Fed. Home Loan Bank Bd. v. Elliott*, 386 F.2d 42, 56 (9th Cir. 1967) (similar); *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) (waiting only ***two months*** after merger announcement was "inexcusable delay").

Moreover, divestiture at this late stage—more than five-and-a-half years after the merger's consummation—would plainly prejudice Axon. "The more the merged firms are joined together, the more costly and difficult [it is] to separate" them. *Meta*, 66 F.4th at 301; *see also New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 35

(D.D.C. 2021) ("Such a remedy, if ordered well after the merger has closed, will usually prejudice the defendant by inflicting substantial hardship and competitive disadvantage." (cleaned up)).   And because Axon is publicly traded (Ex. E), unwinding the merger now would unduly prejudice Axon's shareholders who "had no reason to believe that a merger occurring [so long ago] could be the basis for suit." *Midwestern Mach.*, 392 F.3d at 277; *see also Facebook*, 549 F. Supp. 3d at 37.

## IV.   PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF.

Plaintiffs' claims for injunctive relief fail for two independent reasons: (1) plaintiffs have not plausibly stated entitlement to that relief; and (2) plaintiffs lack standing to pursue it.

### A.   Plaintiffs Have Not Stated A Claim Of Entitlement To Injunctive Relief.

The "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Ctr/, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).   A plaintiff seeking injunctive relief must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not

be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

"Even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is 'unavailable absent a showing of *irreparable injury*, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983) (emphasis added). Economic harm and monetary losses are not irreparable damages: "The availability of adequate monetary damages belies a claim of irreparable injury. *Frank's GMC Truck Ctr., Inc.*, 847 F.2d at 102; *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (similar).

Plaintiffs fail to allege that they have been or are likely to be irreparably injured in the future. The word "irreparable" does not appear once in the Amended Complaint. In fact, plaintiffs make clear that the harm they seek to redress is past payment of allegedly inflated prices for CEWs and BWC Systems. Compl. ¶¶ 21-24, 161, 210, 222. Therefore, the only alleged harm is "purely economic in nature and thus compensable in money," *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987), which is not irreparable and cannot serve as the basis for injunctive relief, *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1145-46 (3d Cir. 1982). As

such, the Amended Complaint fails to state a claim for injunctive relief and those claims must be dismissed.

### B.    Plaintiffs Lack Standing To Pursue Injunctive Relief.

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  At the pleading stage, a plaintiff must therefore plausibly allege, at a minimum, an imminent threat of future injury. *See McCray v. Fid. Nat. Title Ins. Co.*, 682 F.3d 229, 243-44 (3d Cir. 2012) (affirming dismissal of injunctive relief claims where the plaintiffs "did not indicate when such 'future losses and injuries' will occur").

Here, plaintiffs fail to allege any threat of future injury at all.  Plaintiffs assert that they are direct and indirect *past-purchasers* of Axon products and are seeking alleged damages arising from those past purchases.  Compl. ¶¶ 21-24, 161, 210, 222.

Plaintiffs offer no allegations that they are likely to be injured in the future—or even that they will purchase the at-issue products from Axon again. Accordingly, their injunctive relief claims must be dismissed. *See In re New Jersey Title Ins. Litig.*, 683 F.3d 451, 460-61 (3d Cir. 2012) (affirming dismissal of injunctive relief claims for failure to allege imminent harm because the plaintiffs did not adequately allege an intent to re-purchase the products in the future).

## V. TOWNSHIP OF HOWELL AND CITY OF AUGUSTA LACK STANDING FOR THE BWC CLAIMS.

An antitrust plaintiff must plausibly allege both Article III standing, *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020), and "antitrust standing," which requires "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 163-64 & n.54 (cleaned up). A plaintiff that has not even purchased the products at issue "fail[s] to sufficiently allege an injury-in-fact." *Hemy v. Perdue Farms, Inc.*, 2011 WL 6002463, *11 (D.N.J. Nov. 30, 2011). Similarly, a plaintiff who has not purchased the product that allegedly included a supracompetitive overcharge lacks "antitrust injury" because such a plaintiff necessarily "cannot prove any causal connection between its alleged injury and any [wrongful conduct] exercised by" the defendant. *Marian Bank v. Elec. Payment Servs., Inc.*, 1997 WL 367332, *3 (D. Del. Feb. 5, 1997).

These elementary principles doom the Township of Howell's and City of Augusta's BWC System claims because neither of those plaintiffs purchased BWC Systems from Axon. City of Augusta does not even allege that it purchased BWC Systems, and therefore lacks standing to bring claims with respect to them. Compl. ¶ 24 (alleging only purchases of CEWs); *see Hemy*, 2011 WL 6002463, *11 (dismissing claims related to products that plaintiffs did not claim to purchase); *Green v. Green Mountain Coffee Roasters, Inc*., 279 F.R.D. 275, 280 (D.N.J. 2011) (similar); *see also Marian Bank*, 1997 WL 367332, *3 (D. Del. Feb. 5, 1997) (dismissing antitrust claim against three of the four defendants because the plaintiff never purchased the services at issue from them); *Ocean View Capital, Inc. v. Sumitomo Corp*., 1999 WL 1201701, *7 (S.D.N.Y. Dec. 15, 1999) (dismissing complaint where plaintiff only purchased copper, not the futures on the allegedly restrained copper exchange). The Township of Howell alleges that it purchased "BWC Systems and long-range CEWs" from Axon, but Axon's records demonstrate that Howell has never in fact purchased BWC Systems from it—a fact also reflected on Howell's own public website. Ex. D (disclosing Howell uses the "Motorola Watchguard V300 Body Worn Camera," demonstrating BWC System competition). Accordingly, Howell likewise lacks standing to pursue any BWC System claims.

## VI.    ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY ARE NOT GROUNDED IN ANY COGNIZABLE ANTITRUST PRODUCT MARKET.

"A threshold step in any antitrust case is to accurately define the relevant market[.]" *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  "[T]wo markets must be defined: the relevant product market and the relevant geographic market." *Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 546 (D.N.J. 2019). A proposed product market must be defined "with reference to the rule of reasonable interchangeability and cross-elasticity of demand[.]" *Queen City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 436 (3d Cir. 1997).  Put differently, the market must include substitutes for the defendant's products at issue—*i.e.*, the goods that can replace one another and thus "compete" for the user's purchase.  When a plaintiff's proposed market fails to adhere to these principles, it "is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza*, 124 F.3d at 436.

Plaintiffs' proposed market definitions fail here because they lump together products and services that are not substitutes for each other.  The BWC Systems Market is defined to include not just BWCs, but also DEMS, "docks, and related services such as transcription, redaction, and warranties." Compl. ¶¶ 1, 35-39, 134. But plaintiffs offer no allegations that these disparate products and services are reasonably interchangeable substitutes *with each other*.  Nor could they as transcription, redaction, or DEMS are plainly not substitutes for a product like a

BWC.  Similarly, purchasers would not turn to "docks" as a substitute for the BWCs themselves.  Plaintiffs' CEW Market suffers from the same defect:  It is defined to include ancillary "components and related services such as electricity cartridges, battery packs, docks, cameras, signals, training, and warranties."  Compl. ¶¶ 1, 57, 134.  Yet none of these add-on products and services are substitutes for the CEW itself.

Rather than defining the alleged relevant market based on the substitutes for the products at issue (BWCs and CEWs), plaintiffs define their markets based on *complements* for the products—*i.e.*, goods that are "most efficiently made or used together."  Antitrust Law ¶ 565.  This is fatal to plaintiffs' claims because "as a matter of law, complementary products sold separately are not in the same product market."  *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1146 (E.D. Ark. 2008) (cardiology and hospital services could not be combined into a single product market); *see also Intel Corp. v. Seven Networks, LLC*, 562 F. Supp. 3d 454, 462 (N.D. Cal. 2021) (rejecting alleged market where plaintiff "has not pled any specific facts to suggest that the complementary patents [included in the market definition] could plausibly be substitutes as well"); *S. Cal. Elec. Firm v. S. Calif. Edison Co.*, 2023 WL 4317362, *7 (C.D. Cal. Apr. 7, 2023) (services that were complements, not substitutes, could not be combined into a single market).  Plaintiffs' admission that components in each market "may be purchased

separately," Compl. ¶ 2 (BWC Systems), ¶ 5 (CEW cartridges), together with the lack of any allegations that the components must be purchased together, renders their market definitions legally insufficient.

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' Consolidated Amended Complaint.

Dated:        February 5, 2024

By: */s/ Liza M. Walsh*
Liza M. Walsh

WALSH PIZZI O'REILLY FALANGA LLP
Liza M. Walsh
Katelyn O'Reilly
Eric S. Padilla
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Tel: (973) 757-1100

JONES DAY
Julia E. McEvoy (*pro hac vice*)
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Tel: (202) 879-3939

Aaron M. Healey (*pro hac vice*)
250 Vessey Street
New York, New York 10281
Tel: (212) 326-3939

AXON ENTERPRISE, INC.
Pamela B. Petersen (*pro hac vice*)
Gayathiri Shanmuganatha (*pro hac vice*)
17800 N. 85th Street
Scottsdale, Arizona 85255
Tel: (623) 326-6016

*Attorneys for Defendant Axon Enterprise, Inc.*