Liza M. Walsh
Katelyn O'Reilly
Eric S. Padilla
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Tel: (973) 757-1100

*Attorneys for Defendant Axon Enterprise, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| *IN RE AXON VIEVU ANTITRUST LITIGATION* | Civil Action No. 3:23-cv-7182 (RK-RLS) <br><br> **DECLARATION OF LIZA M. WALSH** |

I, Liza M. Walsh, hereby declare as follows:

1.      I am an attorney admitted to practice before this Court and partner with the law firm of Walsh Pizzi O'Reilly Falanga LLP, counsel for Defendant Axon Enterprise, Inc. ("Axon"). I am fully familiar with the facts set forth herein.

2.      I submit this Declaration in support of Axon's Motion to Dismiss Plaintiffs' Consolidated Amended Complaint.

3.      Attached as **Exhibit A** is a true and correct copy of the Federal Trade Commission's (FTC) Complaint against Axon and Safariland LLC, dated January 3, 2020,        available        on        the        FTC's        website        at: https://www.ftc.gov/system/files/documents/cases/d09389_administrative_part_iii _-_public_redacted.pdf (relevant portions highlighted).

4.      Attached as **Exhibit B** is a true and correct copy of the FTC's April 17, 2020, Decision and Order regarding Safariland, available on the FTC's website at: https://www.ftc.gov/system/files/documents/cases/d09389safarilanddecisionorder. pdf (relevant portions highlighted).

5.      Attached as **Exhibit C** is a true and correct copy of an FTC Press Release, dated April 17, 2020, available on the FTC's website at: https://www.ftc.gov/news-events/news/press-releases/2020/04/vievus-former- parent-company-safariland-agrees-settle-charges-it-entered-anticompetitive- agreements (relevant portions highlighted).

6.      Attached as **Exhibit D** is a true and correct copy of the Internal Affairs homepage of the Howell Township Police Department's website, available at: https://www.howellpolice.org/internal-affairs/ (relevant portions highlighted).

7.    Attached as **Exhibit E** is a true and correct copy of an excerpt from Axon's Form 10-K for fiscal year 2022, available at: https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/1069183/000155837023002413/axon-20221231x10k.htm (relevant portions highlighted).

I declare that the foregoing statements made by me are true.


Dated: February 5, 2024                              *s/ Liza M. Walsh*
                                                      Liza M. Walsh

# EXHIBIT A

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:    Joseph J. Simons, Chairman
                  Noah Joshua Phillips
                  Rohit Chopra
                  Rebecca Kelly Slaughter
                  Christine S. Wilson

In the Matter of

    Axon Enterprise, Inc.,
        a corporation,

and

    Safariland, LLC,
        a corporation.

Docket No. D9389

PUBLIC

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondent Axon Enterprise, Inc., ("Respondent Axon") acquired VieVu, LLC ("VieVu") from Safariland, LLC ("Respondent Safariland"), and executed agreements in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

### I.    NATURE OF THE CASE

1.    Respondent Axon is the leading manufacturer and supplier of body-worn cameras ("BWCs") and digital evidence management systems ("DEMS") (collectively "BWC Systems"). BWCs are cameras specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions. BWCs operate in conjunction with DEMs, the software component. DEMS enable police departments to store BWC data in a central location, redact non-relevant images such as the faces of bystanders, share pertinent evidence with prosecutors, and maintain chain of custody of the video for evidentiary use.

2.    On May 3, 2018, Respondent Axon acquired VieVu (the "Merger"), its closest competitor in the market for BWC Systems sold to large, metropolitan police departments. The

Merger eliminated direct and substantial competition between Respondent Axon and the "#2 competitor," further entrenching Respondent Axon's position as the dominant supplier of BWC Systems to large, metropolitan police departments.

3.    Prior to the Merger, VieVu aggressively challenged Respondent Axon for the sale of BWC Systems to large, metropolitan police departments in the United States. This competition resulted in substantially lower prices for these customers, and provided customers with robust features and significant improvements. For example, Respondent Axon told its Board in May 2018 that the "VieVu business strategy [was to] [u]ndercut on price: Typically ▆▆▆▆▆▆▆ less than Axon." VieVu also focused on improving its products in part because Axon "is aggressively pushing feature set and existing customers are demanding those features."

4.    VieVu was successful in winning accounts at prices substantially below Respondent Axon's for several large, metropolitan police departments, including ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Respondent Axon's CEO admitted that it acquired VieVu to obtain the New York City Police Department ("NYPD") account.

5.    The competition between Respondent Axon and VieVu was intense, especially after VieVu won New York City with a substantially lower bid. VieVu's former General Manager acknowledged that, "[w]e started a price war. . . ." Respondent Axon's CEO testified that after losing the contract Respondent Axon made a free offer of 1,000 body-worn cameras to New York City. Respondent Axon eventually expanded its promotion, on or around April 5, 2017, when it offered free BWC Systems for one year to every police agency in the United States.

6.    Post-merger, customers lost the benefit of this head-to-head competition, and Respondent Axon began to tout its pricing power, enacting "substantial price increases of ▆▆▆▆ ▆▆▆▆ - including on body cameras and on the TASER weapon." This is exactly what Respondent Safariland predicted after the parties signed the Letter of Intent leading to the Merger: "I believe this will greatly improve their ability to increase price in the BWC market and I can easily see the stock lifting by 20% or more." The stock actually increased by more than 40% in the month following the acquisition.

7.    In addition to increasing price on BWCs, Respondent Axon limited the availability of VieVu BWC Systems to customers and stopped developing new generations of VieVu hardware and software. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

8.    The Merger will likely entrench Respondent Axon's already dominant share of the relevant market and would significantly increase market concentration. Pre-Merger, Respondent Axon held over ▆▆▆▆ share and VieVu held over a ▆▆▆▆ share of sales by officer count of BWC Systems to large, metropolitan police departments in the United States.

9.    Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level

above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful. Post-Merger market concentration would be more than 2,500, and the Merger would increase HHIs in an already concentrated market by well over 200 points. Thus, the Merger is presumptively unlawful.

10.     New entry or repositioning by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Merger. Barriers to entry are high because of the substantial up-front capital investment required, switching costs, and the need for large, metropolitan police department references.

11.     Respondent Axon cannot show that the Merger resulted in merger-specific efficiencies sufficient to outweigh the competitive harm caused by the Merger. Respondent Axon did not analyze or anticipate efficiencies when deciding to acquire VieVu.

12.     As part of the Merger, Respondent Safariland entered several non-compete and customer non-solicitation agreements covering products and services not related to the Merger, and both Respondents entered company-wide non-solicitation agreements that all run for 10 or more years (together, "Non-Competes"). The Non-Competes are not reasonably limited to protect a legitimate business interest. The Non-Competes are contained in the Membership Interest Purchase Agreement ("Merger Agreement") itself and in Exhibit E, the Product Development and Supplier Agreement ("Holster Agreement").

13.     The Holster Agreement is a decade-long supply agreement whereby Respondent Safariland would develop and exclusively supply conducted electrical weapons ("CEW") holsters to Respondent Axon for its Taser-branded CEW. Respondent Axon is the dominant supplier of CEWs, and its Taser brand is synonymous with the category. Respondents Axon and Safariland executed the Holster Agreement as additional consideration for the Merger.

## II.     JURISDICTION

14.     Respondents are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

15.     The Merger constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## III.     RESPONDENTS

16.     Respondent Axon is the dominant provider of BWC Systems. The majority of the largest metropolitan police departments in the United States use Respondent Axon's BWC System solution. Respondent Axon's newest model BWC is the "Axon Body 3," and its DEMS is known as "Evidence.com." Respondent Axon changed its name in 2017 from TASER International, Inc.

17.     Respondent Axon is also the dominant supplier of CEWs under the "Taser" brand, which is Respondent Axon's flagship product and is employed by more than ▉▉▉ of all police departments.  In 2018, Respondent Axon had annual revenues of $420 million.

18.     Respondent Safariland manufactures and sells holsters (including for use with CEWs and other weapons), body armor, armor systems, and other safety and forensics equipment for the law enforcement, military, and recreational markets.  Respondent Safariland purchased VieVu in 2015**.**

## IV.     THE MERGER AND ASSOCIATED AGREEMENTS

19.     Pursuant to the Merger Agreement, Respondent Axon consummated the purchase of VieVu from Respondent Safariland on May 3, 2018 for approximately ▉▉ million in cash, stock, earn-outs, and the Holster Agreement, which is included as Exhibit E in the Merger Agreement and was executed as additional consideration for the Merger.  Pursuant to the Holster Agreement, Respondent Safariland agreed for 10 years, *inter alia*, to develop a new CEW holster for Respondent Axon's next-generation CEW and to supply CEW holsters exclusively to Respondent Axon.  Respondent Axon agreed, *inter alia*, to make Respondent Safariland its preferred supplier of CEW holsters.  Respondents Axon and Safariland also agreed, as part of the Merger Agreement and Holster Agreement, to Non-Competes related for products and services, customers, and employees.

## V.     RELEVANT MARKET

20.     The relevant market in which to analyze the effects of the Merger is the sale of BWC Systems, comprising BWCs and DEMS, to large, metropolitan police departments in the United States.  A hypothetical monopolist in this relevant market would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

### A.  Relevant Product Market

21.     The relevant product market in which to assess the effects of the Merger is the sale of BWC Systems to large, metropolitan police departments.  BWCs are the hardware component, and DEMS are the software component, of an integrated BWC System.

22.     Large, metropolitan police departments frequently issue requests for proposals seeking to purchase BWCs and DEMS together as an integrated BWC System.  The products are closely related, and it is important for the hardware and software to interoperate effectively.

23.     Both Respondent Axon and VieVu focused on selling their products to large, metropolitan police departments, which have distinct requirements for BWC Systems that differ from the needs and preferences of other law enforcement organizations.  Due to their particular needs, large, metropolitan police departments may require or prefer elements such as feature-rich and cloud-based DEMS, scalability for the BWC Systems deployment, references from other large metropolitan police departments, secured layers for authorized personnel access, automatic population of metadata for a video (e.g., officer, location, etc.), and tools that enable faster

redaction of bystanders' faces when a video is being prepared for public disclosure or use in court. VieVu recognized this. According to VieVu's former General Manager, "VIEVU played in the large agency market, cloud, tech forward agencies, which is the same spot where Axon played."

24.    There are no reasonably interchangeable substitutes for BWC Systems, and large, metropolitan police departments could not realistically switch to other products in the face of a SSNIP for BWC Systems.

25.    In-car camera systems are not substitutes for BWC Systems for large, metropolitan police departments. In-car camera systems are mounted in the vehicle, usually a front-facing camera to record what takes place in front of the vehicle, and a rear-facing camera to record what takes place inside the vehicle. In-car systems are more often used by highway patrol officers, or other officers who spend most of their time working in or directly outside of their patrol vehicles. Most officers in large, metropolitan police departments, however, are rarely in patrol cars and generally conduct their policing by other means, such as on foot, horse, and bike. Given the nature of policing in metropolitan areas, these officers need cameras that can capture video when a police officer is not near a police vehicle, but is instead on the street or in a building. In-car systems are also significantly more expensive than BWC Systems. Respondent Axon's Chief Revenue Officer testified that in-car systems and BWC Systems are not good substitutes.

26.    Records Management Systems ("RMS") are not substitutes for DEMS for large, metropolitan police departments. RMS collect and centralize in one source, in digital format, the many types of written reports generated by police agencies, including arrest, probation, and crime scene reports, whereas DEMS are designed principally to record video and audio evidence captured by BWCs. Industry participants do not view RMS as a substitute for BWC Systems or for the DEMS component of those systems.

**B. Relevant Geographic Market**

27.    The relevant geographic market in which to assess the competitive effects of the Merger is customers in the United States. The relevant market is a bid market in which it is possible to price discriminate to specific customers. Customers based in the United States cannot arbitrage or substitute based on different prices offered to customers outside the United States.

28.    Many police departments also are required to comply with the FBI's Criminal Justice Information Service ("CJIS") standards. CJIS compliance requires storing BWC-generated data in the United States. Additionally, U.S.-based police departments look mostly to other U.S.-based police departments to vet potential BWC System vendors.

29.    A hypothetical monopolist in the market for BWC Systems sold to large, metropolitan police departments in the United States would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

## VI.    MARKET STRUCTURE AND THE MERGER'S PRESUMPTIVE ILLEGALITY

30.    The market for the sale of BWC Systems to large, metropolitan police departments based in the United States is highly concentrated.  Prior to the Merger, Respondent Axon was already the dominant BWC System provider to these customers, with over ▮▮▮ of the relevant market by officer count.  Respondent Axon acknowledges this dominance—in a company presentation, it implored its salespeople to "embrace being the gorilla"—and Respondent Axon's CEO confirmed that Respondent Axon is a "really strong market leader." VieVu was the next largest competitor with over ▮▮▮ of the relevant market by officer count. Post-Merger, the relevant market is even more highly concentrated, with Respondent Axon controlling over ▮▮▮ of the relevant market by officer count.

31.    Motorola, Panasonic, WatchGuard and Utility largely make up the rest of the relevant market.  None of these other competitors pose the same competitive constraint on Respondent Axon as did VieVu.  In particular, the other competitors' BWC Systems ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Consequently, these other competitors rarely provided significant competition to Respondent Axon in RFP processes conducted by large, metropolitan police departments.

32.    Even when considering all customers (i.e., not just large, metropolitan police departments), Respondent Axon believed that post-Merger it had "about ▮▮▮ of the US market."

33.    The Merger Guidelines and courts often measure concentration using HHIs. HHIs are calculated by totaling the squares of the market shares of every firm in the relevant market.  Under the Merger Guidelines, a merger is presumed likely to create or enhance market power and is presumptively illegal when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

34.    The Merger significantly increased concentration in the relevant market, as one firm now controls more than ▮▮▮ of the relevant market by officer count. Motorola/WatchGuard, the next largest competitor, controls less than ▮▮▮ of the relevant market by officer count.  The Merger resulted in a post-Merger HHI in excess of 2,500, and increased concentration by more than 200 points.  Therefore, the Merger is presumptively anticompetitive under the Merger Guidelines and applicable case law.

## VII.    ANTICOMPETITIVE EFFECTS

### A.  The Merger Eliminated Vital Competition Between VieVu and Respondent Axon

35.    The Merger eliminated intense price and innovation competition between Respondent Axon and VieVu in the relevant market.  The result is likely to be higher prices, inferior service, and reduced quality and innovation.

36.    Respondent Axon and VieVu were each other's closest competitors.  For example, Respondent Safariland acknowledged:  "We own the #2 player in the market, and to date we have seen no other credible market entrant," and "VieVu and Taser are consistently the finalists in major opportunities."  Respondent Axon's Vice President of Investor Relations touted that by purchasing VieVu, Respondent Axon had "acquired #2 competitor."

37.    Stock analysts and the financial press also recognize that VieVu was Respondent Axon's most significant competitor.  A Raymond James stock report states:  "In May 2018, Axon closed the $7.1 million strategic tuck-in acquisition of its most formidable body cam competitor, VieVu."  A Bloomberg article dated May 4, 2018, entitled "The Biggest Police Body Cam Company Is Buying Its Main Competitor," declares that "[t]he combination of the two largest providers of the recording devices will create a dominant force in police surveillance."  A May 18, 2018 article from the Motley Fool, entitled "Axon Enterprise Now Owns the Police Body Cam Market," asserts that "[t]here is going to be no stopping Axon Enterprise (NASDAQ:AAXN) now that it has acquired its main body camera rival VIEVU."

38.    Prior to the Merger, VieVu and Respondent Axon were the competitors that could best satisfy the RFP requirements, from both a technical and price perspective, for many of the largest metropolitan police agencies in the United States.  For example, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ all found that, of multiple bidders, Respondent Axon and VieVu had the best offerings by a significant margin.

39.    Respondent Axon and VieVu vigorously and consistently competed on price in an effort to win large, metropolitan police department contracts.  After Respondent Safariland acquired VieVu in 2015, VieVu lowered its pricing in an explicit effort to take market share from Respondent Axon.  VieVu's former General Manager confirmed that in early 2016, VieVu "made a relatively deliberate decision to take price down in the market considerably," and VieVu admittedly "took [Axon] by surprise with disruptive pricing and nearly comparable technology."  As late as 2018, VieVu's strategy was to "win on price typically ▮▮▮▮▮▮ less than Axon."

40.    Competition between Respondent Axon and VieVu resulted in substantially lower prices for police departments.  For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ all received substantially lower bids from VieVu as compared to Respondent Axon.  VieVu's lower pricing for ▮▮▮▮▮▮ caused Respondent Axon to reduce its own bids.  VieVu at times responded to Respondent Axon's competing bids by offering better terms.

41.     Respondent Axon and VieVu also competed vigorously on non-price aspects of BWC Systems, including the development of various innovative features such as auto-activation of BWCs in the event of an officer unholstering a gun or Taser, and computer-assisted facial redaction tools for DEMS videos.  Consumers benefited from this innovation competition.

42.     Post-merger, customers lost the benefit of this head-to-head price and innovation competition, and Respondent Axon began to tout its pricing power, enacting "substantial price increases of ███████████ - including on body cameras and on the Taser weapon."  Respondent Axon has acknowledged the negative consequence of price increases on budget constrained law enforcement officers:  "It's no secret that budget constraints are a constant inconvenience for law enforcement agencies.  Long needs lists + short funds = under equipped officers and potentially underserved communities."

43.     Existing BWC System providers are unlikely to replace the competition that was lost as a result of the Merger between Respondents, the two closest competitors in the relevant market.  While each remaining competitor has different strengths and weaknesses, each competitor faces real and significant challenges in replacing competition lost through Respondent Axon's merger with VieVu.  These challenges include, but are not limited to, reputation or lack of references from large, metropolitan police department customers, service levels that are inadequate for such customers, and software with limited functionality.  Moreover, some of the other BWC System providers price significantly higher than VieVu and would not sufficiently replace VieVu's aggressive pricing.  The remaining firms in the relevant market are not likely to replace the competitive constraint of VieVu's lower-priced offerings in a timely and sufficient way.

### B.  As Part of the Merger, Respondents Agreed to Additional Provisions that Substantially Lessen Competition

44.     As part of the Merger Agreement, Respondents Axon and Safariland entered into the Non-Competes: Respondent Safariland agreed not to compete (i) for products and services that Respondent Axon supplies and in industries where Respondent Axon is active, irrespective of their relation to the Merger and (ii) for Respondent Axon's customers; and both Respondents agreed not to affirmatively solicit each other's employees.  These agreements each last 10 or more years.  The Non-Competes prevent actual and potential competition between Respondents Axon and Safariland.  The Non-Competes are contained in the Merger Agreement itself and in Exhibit E, the Holster Agreement.

### *Non-Compete Agreements for Respondent Axon's Products/Services and Industries*

45.     In Section 5.03(a) of the Merger Agreement, Respondent Safariland agreed not to engage in "(a) body worn video products and services, (b) in-car video products and services, (c) digital evidence management products and services provided to third parties that ingest digital evidence audio and video files, and (d) enterprise records management systems provided to third parties," anywhere in the world for 10 years.

8

46.    In Section 15.1 of the Holster Agreement, Respondent Safariland agreed not to compete in the "CEW industry, BWC industry, fleet or vehicle camera industry, surveillance room camera industry, and digital evidence management system and storage industry, with regard to law enforcement, military, security or consumers," anywhere in the world for 12 years. Respondent Axon was concerned about Respondent Safariland potentially entering into competition with Respondent Axon's lucrative CEW business. Respondent Axon's CEO called the 12-year CEW non-compete a "hidden jewel in the deal."

***Non-Compete Agreements for Respondent Axon's Customers***

47.    In Section 5.03(c) of the Merger Agreement, Respondent Safariland agreed not to solicit or entice any of Respondent Axon's customers or potential customers for purposes of diverting business or services away from Respondent Axon, for 10 years.

48.    In Section 15.3 of the Holster Agreement, Respondent Safariland agreed not to solicit or entice any of Respondent Axon's customers or potential customers for purposes of diverting CEW, CEW holster, or CEW accessory business or purchases away from Respondent Axon, for 11 years.

***Employee Non-Solicitation Agreements***

49.    In Section 5.03(b) of the Merger Agreement, Respondent Safariland agreed not to hire or solicit any of Respondent Axon's employees, or encourage any employees to leave Respondent Axon, or hire certain former employees of Respondent Axon, except pursuant to a general solicitation. Respondent Safariland agreed to refrain from this activity for 10 years.

50.    In Section 5.06(a) of the Merger Agreement, Respondent Axon agreed not to hire or solicit any of Respondent Safariland's employees, or encourage any employees to leave Respondent Safariland, or hire certain former employees of Respondent Safariland, except pursuant to a general solicitation. Respondent Axon agreed to refrain from this activity for 10 years.

51.    In Section 15.4 of the Holster Agreement, Respondents Axon and Safariland agreed not to solicit each other's employees for the purpose of inducing the employees to leave their respective employers, except pursuant to a general solicitation. Respondents Axon and Safariland agreed to refrain from this activity for 11 years.

52.    By prohibiting Respondent Safariland from competing against Respondent Axon--in terms of products and services Respondent Safariland can offer as well as customers Respondent Safariland can solicit--these provisions harm customers who would otherwise benefit from potential or actual competition by Respondent Safariland. By prohibiting Respondents Axon and Safariland from affirmatively soliciting each other's employees, these provisions eliminate a form of competition to attract skilled labor and deny employees and former employees of Respondents Axon and Safariland access to better job opportunities. They restrict workers' mobility, and deprive them of competitively significant information that they could use to negotiate better terms of employment.

53. The Non-Competes are not reasonably limited in scope to protect a legitimate business interest. A mere general desire to be free from competition is not a legitimate business interest. The Non-Competes go far beyond any intellectual property, goodwill, or customer relationship necessary to protect Respondent Axon's investment in VieVu. Moreover, even if a legitimate interest existed, the lengths of the Non-Competes are longer than reasonably necessary, because they prevent Respondent Safariland from competing for products and services, customers, and employees for 10 years or longer.

## VIII.  LACK OF COUNTERVAILING FACTORS

### A.  High Barriers to Entry and Expansion

54. Respondents cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Merger. *De novo* entrants into this market would face considerable barriers in replicating the competition that the Merger has eliminated. Effective entry into this market would require substantial, costly upfront investments in creating a new BWC System offering. The system also must be designed for use by law enforcement agencies, with features such as secured layers for authorized personnel access and strict recordation of file access history for chain of custody purposes. There are high switching costs related to the transfer of metadata for video files, and customers are sticky because moving data to a new provider and training officers on a new platform is challenging and expensive.

### B.  Efficiencies

55. Respondent Axon cannot show that merger-specific efficiencies would result from the Merger that will offset the anticompetitive effects. Respondent Axon's President admitted that potential efficiencies played no role in Respondent Axon's analysis of the Merger**.**

### C.  Failing Firm

56. Respondents cannot demonstrate that Respondent Safariland was a failing firm under the criteria set out in the Horizontal Merger Guidelines.

## IX.    VIOLATIONS

### Count I – Illegal Agreement

57. The allegations of Paragraphs 1 through 56 above are incorporated by reference as though fully set forth herein.

58. The Merger Agreement constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## Count II — Illegal Merger

59.    The allegations of Paragraphs 1 through 56 above are incorporated by reference as though fully set forth herein.

60.    The Merger, including the Non-Competes, constitutes a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## NOTICE

Notice is hereby given to the Respondents that the nineteenth day of May, 2020, at 10 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you.  An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect.  Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true.  Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding.  In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers.  Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C.

20580.  Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers).  Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

### Notice of Contemplated Relief

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the merger with VieVu violated Section 7 of the Clayton Act, as amended, or Section 5 of the Federal Trade Commission Act, as amended, as alleged in the complaint, the Commission may order such relief as is supported by the record and is necessary and appropriate ("Order"), including:

1.  Ordering Respondent Axon to divest, absolutely and in good faith, at no minimum price, in a manner and to an acquirer approved by the Commission, assets to establish a distinct, separate, and viable business to design, produce, license, and sell BWC Systems in a manner that restores the level of competition to the market today that was lost through Respondent Axon's acquisition of VieVu, including ordering divestiture of the assets acquired from Respondent Safariland, and as necessary, facilitating customer migration from Axon to an appropriate divestiture buyer, divestiture or licensing of other assets, including but not limited to those necessary for research and development, production, marketing and sale, and servicing of Respondent Axon's BWC Systems products.

2.  Ordering Respondent Axon to provide transitional assistance to enable the acquirer to conduct the divested BWC Systems business and serve BWC Systems customers at a level that restores the competitive dynamics in the current market that was lost through the Merger, including facilitating the recruitment of Respondent Axon employees, providing technical assistance, know-how, and other information, acting, as necessary, as subcontractor to provide, at direct cost, services to enable the acquirer to successfully operate the divested BWC Systems business during the transition period, and subsidizing the direct costs of switching customers from Respondent Axon to the acquirer's BWC Systems.

3.  Ordering Respondent Axon to, among other things, remove legal impediments, facilitate migration of data, and provide file structure, formatting, organization, and other technical information regarding Respondent Axon's DEMS and content and information accessible by the customer through the DEMS in order to enable a customer to move all videos and other data accessed through a DEMS supplied by Respondent Axon to a DEMS supplied by a competitor without the customer losing the ability to use or access metadata and other information connected with videos.

4.  Ordering Respondents to void all existing agreements between them that are found to be anticompetitive and to obtain the prior approval from the Commission before entering into, enforcing, or soliciting any other agreement or understanding that restricts competition between Respondents.

5. Ordering Respondent Axon to provide at least thirty (30) days prior notice to the Commission before acquiring any firm engaged in the design, development, production, sale, or marketing of BWC Systems.

6. Requiring that Respondent Axon's compliance with the Order be monitored at Respondent Axon's expense by an independent monitor, pursuant to terms and conditions determined by the Commission.

7. Ordering each Respondent to establish an antitrust compliance program and ordering each Respondent to submit at least one report to the Commission sixty (60) days after issuance of the Order, an annual report for the term of the Order, and other reports requested by staff of the Commission, that describe how the submitting Respondent has complied, is complying, and will comply with the Order.

8. Issuing an Order that terminates ten (10) years from the date it becomes final.

9. Ordering such other or additional relief as is necessary to ensure the creation of a viable, competitive, and independent entity offering BWC Systems with the level of features and capabilities necessary to restore the level of competition lost as a result of the acquisition of VieVu, and remedy the anticompetitive effects of conduct alleged in the complaint.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this third day of January, 2020.

By the Commission.

April Tabor
Acting Secretary

SEAL:

13

# EXHIBIT B

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:           **Joseph J. Simons, Chairman**
                         **Noah Joshua Phillips**
                         **Rohit Chopra**
                         **Rebecca Kelly Slaughter**
                         **Christine S. Wilson**

| | |
|---|---|
| **In the Matter of**<br><br>**Axon Enterprise, Inc.**, **a corporation,**<br><br>**and**<br><br>**Safariland, LLC, a limited liability company.** | **DECISION AND ORDER**<br><br>**DOCKET NO. 9389** |

**DECISION**
**(Safariland)**

The Federal Trade Commission ("Commission") having heretofore issued its complaint charging Safariland, LLC, with violations of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Safariland, LLC, having been served with a copy of that complaint together with a notice of contemplated relief, and Safariland, LLC, having answered the complaint denying said charges; and

Safariland, LLC, its attorneys, and counsel for the Commission having thereafter executed an agreement containing a consent Order, an admission by Safariland, LLC, of all the jurisdictional facts, as those facts relate to the First and Second Violations set forth in the complaint, a statement that the signing of said agreement is for settlement purposes only and does not constitute an admission by Safariland, LLC, that the law has been violated as alleged in such complaint, or that the facts as alleged in such complaint, other than jurisdictional facts related to the First and Second Violations of the complaint, are true, and waivers and other provisions as required by the Commission's Rules; and

The Secretary of the Commission having thereafter withdrawn this matter from adjudication in accordance with § 3.25(c) of its Rules; and

The Commission having considered the matter and having thereupon accepted the executed Consent Agreement and placed it on the public record for a period of 30 days for the receipt and consideration of public comments. In further conformity with the procedure described in Commission Rule 2.34, 16 C.F.R. § 2.34, the Commission makes the following jurisdictional findings and issues the following Decision and Order ("Order"):

1.      Safariland, LLC, is a limited liability company organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware with its executive offices and principal place of business located at 13386 International Parkway, Jacksonville, Florida 32218.

2.      The Federal Trade Commission has jurisdiction over the subject matter of this proceeding and over Safariland, LLC, and the proceeding is in the public interest.

## ORDER

### I.      Definitions

**IT IS HEREBY ORDERED** that, as used in this Order, the following definitions apply:

A.      "Axon" means Axon Enterprise, Inc., its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Axon Enterprise, Inc., and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B.      "Safariland" or "Respondent Safariland" means Safariland, LLC, its directors, managers, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Safariland, LLC, and the respective directors, managers, officers, employees, agents, representatives, successors, and assigns of each.

C.      "Commission" means the Federal Trade Commission.

D.      "Antitrust Compliance Program" means a program, including an effective in-person or web-based antitrust training program, to ensure compliance with this Order.

E.      "Business" means a joint venture, subsidiary, partnership, division, group, affiliate, firm, corporation, association, unincorporated organization, or other asset participating in the sales of products or services.

F.      "Holster Agreement" means the Product Development and Supplier Agreement executed by Axon Enterprise, Inc., and Safariland, LLC, and attached to the Purchase Agreement as Exhibit E.

G.      "Purchase Agreement" means the Membership Interest Purchase Agreement between Axon Enterprise, Inc., and Safariland, LLC, dated May 3, 2018.

H.    "Operative Amendments" means the First Amendment to the Purchase Agreement and the First Amendment to the Holster Agreement, dated January 16, 2020 (attached as Confidential Exhibit A).

I.    "Prohibited Provisions" are provisions 5.03(a), 5.03(b), 5.03(c), and 5.06(a) of the Purchase Agreement and provisions 15.1, 15.3, and 15.4 of the Holster Agreement.

## II.    Prohibition

**IT IS FURTHER ORDERED** that Respondent Safariland, having rescinded the Prohibited Provisions through execution of the Operative Amendments, shall not, directly or indirectly, modify the Operative Amendments, or enter into any agreement or understanding with Axon that, in whole or part, incorporates or reproduces the language or substance, directly or indirectly, expressed or implied, of any of the Prohibited Provisions.

## III.    Prior Approval

**IT IS FURTHER ORDERED** that Respondent Safariland shall not, without the prior approval of the Commission, enter into, enforce, or solicit any agreement or understanding, whether written or oral, expressed or implied, entered into with Axon after the date this Order is issued, that in whole or part prohibits or restricts competition between Safariland and Axon, including through prohibiting or restricting:

1.    Hiring or soliciting employees,

2.    Selling or supplying a product or service,

3.    Acquiring an interest in a Business, or

4.    Soliciting or selling to any customer or customers,

## IV.    Litigation Assistance Obligations

**IT IS FURTHER ORDERED** that until a final determination of the litigation with Axon in Docket 9389, including any appeals, and in any Commission action related to Docket 9389 that the Commission may take against Axon, and with the understanding that Complaint Counsel agrees to use reasonable efforts to reduce the burden and expense on Safariland of any efforts Safariland is asked to undertake under this Section IV, Respondent Safariland shall:

A.    At the request of Complaint Counsel, authenticate any documents and/or data that Respondent Safariland produces or has produced to the Commission;

B.    At the request of Complaint Counsel, make representatives of Safariland available, upon reasonable notice, for in-person or telephone interviews with Commission staff;

C.    Agree to service of process of subpoenas issued by Complaint Counsel under Rule 3.34 of the Commission Rules of Practice;

D.    Respond to any outstanding discovery requests issued by Complaint Counsel and not object on the basis that Respondent Safariland is not a party to the litigation in Docket No. 9389;

E.    Make available at least 3 Safariland officers, directors, agents, or employees, or corporate representatives (designated under Rule 3.33(c)(1) of the Commission Rules of Practice) selected by Complaint Counsel for deposition at a mutually-agreed date, time and location;

F.    Make available Safariland deponents to provide hearing testimony if requested to do so by Complaint Counsel;

G.    Provide to Complaint Counsel the best available contact information (current addresses, phone numbers, and email addresses) for the former Safariland employees identified on Confidential Exhibit B attached, and, upon request, contact information for any other former Safariland employees; and

H.    Not withhold information, testimony or documents based on a joint defense agreement or common interest basis when responding to discovery or testimony sought by Complaint Counsel after this Order is issued.

## V.    Compliance Program

**IT IS FURTHER ORDERED** that Respondent Safariland, to assure compliance with this Order, shall for 5 years from the date this Order is issued either include in its Antitrust Compliance Program or, if such a Program does not or ceases to exist, include in a newly designed, maintained, and operated Antitrust Compliance Program:

A.    Designation of an officer or director to supervise personally the design, maintenance, and operation of the program, and to be available on an ongoing basis to respond to any questions by officers and directors of Respondent Safariland;

B.    Distribution of a copy of this Order to all officers and directors:

1.    Within thirty (30) days after the Order is issued; and,

2.    Annually within thirty (30) days of the anniversary of the Order Date until the Order terminates;

C.    Annual training on the requirements of its obligations under Paragraphs II, III, and V of this Order for Respondent Safariland's officers and directors; and,

D.    Retention of documents and records sufficient to record Respondent's compliance with its obligations under Paragraphs II, III, and V of this Order.

## VI.    Compliance Reports

**IT IS FURTHER ORDERED** that Respondent Safariland shall file verified written reports ("compliance reports") in accordance with the following:

A.    Respondent Safariland shall submit an interim compliance report 30 days after the Order is issued; annual compliance reports one year after the date this Order is issued, and

4

annually for the next 4 years on the anniversary of that date; and additional compliance reports as the Commission or its staff may request.

B.    Each compliance report shall contain sufficient information and documentation to enable the Commission to determine independently whether Respondent Safariland is in compliance with the Order. Conclusory statements that Respondent Safariland has complied with its obligations under the Order are insufficient. Respondent Safariland shall include in its report, among other information or documentation that may be necessary to demonstrate compliance:

    1.    A full description of the measures Respondent Safariland has implemented or plans to implement to ensure that it has complied or will comply with each paragraph of the Order; and

    2.    Full descriptions of each agreement or modification thereto, whether written or oral, between Respondent Safariland and Axon to the extent not submitted in prior reports.

C.    Respondent Safariland shall retain all material written communications with each party identified in the compliance report and all non-privileged internal memoranda, reports, and recommendations concerning fulfilling Respondent Safariland's obligations under the Order and provide copies of these documents to Commission staff upon request.

D.    Respondent Safariland shall verify each compliance report in the manner set forth in 28 U.S.C. § 1746 by the Chief Executive Officer or another officer or employee specifically authorized to perform this function. Respondent Safariland shall submit an original and 2 copies of each compliance report as required by Commission Rule 2.41(a), 16 C.F.R. § 2.41(a), including a paper original submitted to the Secretary of the Commission and electronic copies to the Secretary at ElectronicFilings@ftc.gov and to the Compliance Division at bccompliance@ftc.gov.

## VII.    Change in Respondent Safariland

**IT IS FURTHER ORDERED** that Respondent Safariland shall notify the Commission at least 30 days prior to:

A.    The dissolution of Safariland, LLC;

B.    The acquisition, merger or consolidation of Safariland, LLC; or

C.    Any other change in Respondent Safariland, including assignment and the creation, sale, or dissolution of subsidiaries, if such change may affect compliance obligations arising out of this Order.

## VIII.    Access

**IT IS FURTHER ORDERED** that, for purposes of determining or securing compliance with this Order, and subject to any legally recognized privilege, upon written request and 5 days' notice to Respondent Safariland, made to its principal place of business as identified in this Order, registered office of its United States subsidiary, or its headquarters office, Respondent Safariland shall, without restraint or interference, permit any duly authorized representative of the Commission:

A.     Access, during business office hours of Respondent Safariland and in the presence of counsel, to all facilities and access to inspect and copy all business and other records and all documentary material and electronically stored information as defined in Commission Rules 2.7(a)(1) and (2), 16 C.F.R. § 2.7(a)(1) and (2), in the possession or under the control of Respondent Safariland related to compliance with this Order, which copying services shall be provided by Respondent Safariland at the request of the authorized representative of the Commission and at the expense of Respondent Safariland; and

B.     To interview officers, directors, or employees of Respondent Safariland, who may have counsel present, regarding such matters.

## IX.    Purpose

**IT IS FURTHER ORDERED** that the purpose of this Order is to remedy the harm alleged in Paragraphs 44-53 and 59-60 of the complaint filed in this civil action as it relates to Respondent Safariland.

## X.    Term

**IT IS FURTHER ORDERED** that this Order shall terminate 10 years from the date it is issued.

By the Commission.

April Tabor
Secretary (Acting)

SEAL

ISSUED:

# EXHIBIT C

Case 3:23-cv-07182-RK-PLS   Document 76-2   Filed 05/18/24   Page 26 of 35 PageID: 621



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# VieVu's Former Parent Company Safariland Agrees to Settle Charges That It Entered into Anticompetitive Agreements with Body-Worn Camera Systems Seller Axon

Settlement is part of a larger case challenging Axon's consummated acquisition of former competitor VieVu

April 17, 2020

**Tags:** Competition | Bureau of Competition | Merger | Technology | Government

Safariland, LLC, which manufactures and sells equipment for the law-enforcement, military, and recreational markets, has agreed to settle Federal Trade Commission allegations that it entered several anticompetitive non-compete and customer non-solicitation agreements with body-worn camera system seller Axon. Safariland entered into these agreements when Axon acquired Safariland's VieVu body-worn camera division.

The FTC issued an administrative complaint against Axon and Safariland on Jan. 3, 2020, challenging the acquisition and the non-compete and non-solicitation agreements. Since the complaint issued, Safariland and Axon rescinded the non-compete and non-solicitation provisions that the complaint alleged were anticompetitive. The proposed order, which settles all charges against Safariland, ensures that Axon and Safariland do not enter into new agreements with similar anticompetitive provisions.

According to the complaint, the agreements barred Safariland from competing with Axon now and in the future on all of Axon's products, limited solicitation of customers and employees by either company, and stifled potential innovation or expansion by Safariland. These restraints, some of which

were intended to last more than a decade, substantially lessened actual and potential competition and were not reasonably limited to protect a legitimate business interest, according to the complaint.

Under the proposed order, Safariland is required to obtain approval from the Commission before entering into any agreement with Axon that restricts competition between the two companies.

The Commission vote to accept the proposed consent agreement for public comment was 5-0. The FTC published the consent agreement packing in the Federal Register on April 23, 2020. Instructions for filing comments appear in the published notice. Comments must be received 30 days after publication in the Federal Register. Once processed, comments will be posted on Regulations.gov.

**NOTE:** The Commission issues an administrative complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. When the Commission issues a consent order on a final basis, it carries the force of law with respect to future actions. Each violation of such an order may result in a civil penalty of up to $43,280.

The Federal Trade Commission works to promote competition, and protect and educate consumers. You can learn more about how competition benefits consumers or file an antitrust complaint. For the latest news and resources, follow the FTC on social media, subscribe to press releases and read our blog.

# Contact Information

**MEDIA CONTACT:**
Betsy Lordan
*Office of Public Affairs*
202-326-3707

# EXHIBIT D



# HOWELL TOWNSHIP
## POLICE DEPARTMENT

### 300 Old Tavern Road, Howell, New Jersey 07731

  

HOME          INSIDE THE AGENCY          SERVING OUR COMMUNITY          FIREARMS

PROFESSIONAL STANDARDS          RECORDS BUREAU          IMPORTANT INFORMATION



## Internal Affairs

---

**Internal Affairs Summary Reports:**
2023 2022  2021

**Annual Major Discipline Reporting Forms:**
2023 2022  2021  2020

**Internal Affairs Forms:**

INSTRUCTIONS, تعليمات, 指示, Enstriksyon yo, निर्देश, 지침, Instrukcje, Instruções, Instrucciones,

Mga tagubilin, Hướng dẫn

| English | If you decide to print and mail the Internal Affairs Complaint Form (IAPP Appendix B), you can return the form to the Howell Township Police Department, 300 Old Tavern Rd, Howell, NJ 07731. This form may be mailed to the attention of the Internal Affairs Commander, or dropped off any time. |
|---------|--------------------------------------------------------------------------|
| Arabic | إعادة فيمكنك ، بالبريد وإرساله (IAPP Appendix B) الداخلية الشؤون شكوى نموذج طباعة قررت إذا إلى النموذج Howell Township Department; 300 Old Tavern Rd, Howell; NJ 07731. وقت أي في النزول أو ، الداخلية الشؤون قائد. |
| Chinese | 如果您决定打印并邮寄内部事务投诉表（IAPP 附录 B）， 您可以将表格交回 Howell Township Police Department, 300 Old Tavern Rd, Howell, NJ 07731。内务指挥官，或随时下车。 |
| Haitian | Si w deside enprime ak poste Fòm Plent Afè Entèn yo (IAPP Apendis B), ou ka voye fòm nan bay Depatman Lapolis Howell Township, 300 Old Tavern Rd, Howell, NJ 07731. Yo ka voye fòm sa a bay atansyon a. Kòmandan Afè Entèn, oswa depoze nenpòt ki lè. |
| Hindi | यदि आप आंतरिक मामलों के शिकायत फॉर्म (आईएपीपी परिशिष्ट बी) को प्रिंट और मेल करने का निर्णय लेते हैं, तो आप फॉर्म को हॉवेल टाउनशिप पुलिस डिपार्टमेंट, 300 ओल्ड टैवर्न रोड, हॉवेल, एनजे 07731 को वापस कर सकते हैं। यह फॉर्म निम्नलिखित के ध्यान में भेजा जा सकता है। आंतरिक मामलों के कमांडर, या किसी भी समय हटा दिया गया। |
| Korean | 내무 불만 양식(IAPP 부록 B)을 인쇄하여 우편으로 보내기로 결정한 경우 양식을 Howell Township Police Department, 300 Old Tavern Rd, Howell, NJ 07731로 반송할 수 있습니다. 내무 사령관, 또는 언제든지 하차. |
| Polish | Jeśli zdecydujesz się wydrukować i wysłać formularz skargi do spraw wewnętrznych (IAPP Załącznik B), możesz go zwrócić do Departamentu Policji Howell Township, 300 Old Tavern Rd, Howell, NJ 07731. Ten formularz można wysłać pocztą na adres Dowódca ds. Wewnętrznych lub w dowolnym momencie. |
| Portuguese | Se você decidir imprimir e enviar o Formulário de Reclamação de Assuntos Internos (IAPP Apêndice B), você pode devolver o formulário ao Howell Township Police Department, 300 Old Tavern Rd, Howell, NJ 07731. Este formulário pode ser enviado aos cuidados do Comandante de Assuntos Internos, ou entregue a qualquer momento. |
| Spanish | Si decide imprimir y enviar por correo el Formulario de Queja de Asuntos Internos (IAPP Apéndice B), puede devolver el formulario al Departamento de Policía del Municipio de Howell, 300 Old Tavern Rd, Howell, NJ 07731. Este formulario puede enviarse por correo a la atención del Comandante de Asuntos Internos, o dejarlo en cualquier momento. |
| Tagalog | Kung magpasya kang i-print at ipadala sa koreo ang Internal Affairs Complaint Form (IAPP Appendix B), maaari mong ibalik ang form sa Howell Township Police Department, 300 Old Tavern Rd, Howell, NJ 07731. Ang form na ito ay maaaring ipadala sa koreo sa atensyon ng Internal Affairs Commander, o ibinaba anumang oras. |
| Vietnamese | Nếu bạn quyết định in và gửi Biểu mẫu Khiếu nại Nội vụ (IAPP Phụ lục B), bạn có thể gửi lại biểu mẫu này cho Sở cảnh sát thị trấn Howell, 300 Old Tavern Rd, Howell, NJ 07731. Biểu mẫu này có thể được gửi qua đường bưu điện để nhận được sự chú ý của Nội Vụ Chỉ Huy Trưởng, hay bỏ đi lúc nào không hay. |

IAPP Appendix A: Complaint Information Sheet   IAPP Appendix B: IA Report Form

Additional Internal Affairs Complaint Form available here https://www.njoag.gov/programs/iapp/ (Available in Multiple Languages)

Howell Township Police Department Drug Testing Policy

Howell Township Police Department Early Warning System Policy

**Body Worn Camera:**

Howell Township Police Department utilizes the Motorola Watchguard V300 Body Worn Camera pictured below.



Information on this page is posted in accordance with the New Jersey Attorney General Directives

Inside the Agency
Patrol Division
Communications Division
Investigations Bureau
Canine Unit
Traffic Safety
Emergency Medical Services
Emergency Services Unit MOCERT

Community Services Division

Frequently Asked Questions
Forms
Records Bureau

**CONTACT INFORMATION**
300 Old Tavern Road
Howell, New Jersey 07731
**9-1-1** Emergency
**732-938-4111** Dispatch
**732-938-4575** Administration

2020© Howell Township Police Department • All Rights Reserved

# EXHIBIT E

Exhibits

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Form 10-K

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31 , 2022

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 001-16391

# Axon Enterprise, Inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **86-0741227** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |
| **17800 North 85th Street** | **85255** |
| **Scottsdale , Arizona** | (Zip Code) |
| (Address of principal executive offices) | |

Registrant's telephone number, including area code:

( 480 ) 991-0797

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of exchange on which registered |
|---|---|---|
| Common Stock, $0.00001 par value per share | AXON | The NASDAQ Global Select Market |

Securities registered pursuant to Section 12(g) of the Act:

**None**

**(Title of Class)**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large

accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer ☐ | |
| Non-accelerated filer | ☐ | Smaller reporting company ☐ | |
| | | Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 762(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

As of June 30, 2022, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $6.3 billion based on the closing sale price as reported on The NASDAQ Global Select Market.

The number of shares of the registrant's common stock outstanding as of February 24, 2023 was 72,862,227

**DOCUMENTS INCORPORATED BY REFERENCE**

Parts of the registrant's definitive proxy statement for its 2023 annual meeting of stockholders to be prepared and filed with the Securities and Exchange Commission not later than 120 days after December 31, 2022 are incorporated by reference into Part III of this Form 10-K.