NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE AXON VIEVU ANTITRUST LITIGATION | Civil Action No. 23-7182 (RK) (RLS) <br><br> **OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon Defendants Axon Enterprise, Inc. ("Axon") and Safariland, LLC's ("Safariland") Motions to Dismiss the Consolidated Amended Class Action Complaint ("CAC"). (ECF Nos. 76, 78.) Axon has also filed a Motion to Strike Class Allegations. (ECF No. 77.) Plaintiffs Township of Howell, Monmouth County, New Jersey ("Howell"), City of Augusta, Kennebec County, Maine ("Augusta"), and Mayor and City Council of Baltimore ("Baltimore") (collectively, "Plaintiffs") oppose the Motions, (ECF Nos. 80–82), joined by the Federal Trade Commission ("FTC"), which, with the consent of the parties, seeks leave to file a proposed brief as *amicus curiae*, (ECF No. 86). The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions are **GRANTED in part** and **DENIED in part**, and the FTC's Motion is **DENIED**.

## I.      BACKGROUND[1]

This putative antitrust class action arises from the sale of VieVu, LLC ("VieVu"), owned by Defendant Safariland, to Defendant Axon in May 2018. At the time, Axon was the dominant manufacturer and supplier of body-worn camera ("BWC") systems ("BWC Systems") and long-

---

[1] The facts set forth in this Opinion are taken as true directly from the CAC for the sole purpose of deciding Defendants' pending Motions. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

range conducted energy weapons ("CEW") in the United States. (ECF No. 37 ("CAC") ¶ 6.) Safariland, a manufacturer of protective equipment in the law enforcement and sporting markets, with its origins in holsters,[2] sold BWCs through its subsidiary, VieVu, which was Axon's "#2" competitor in that market. (*Id.* ¶ 80.) As part of VieVu's acquisition, Axon and Safariland agreed to various non-compete and non-solicitation provisions relating to the BWC and CEW markets. (*Id.* ¶¶ 91–99.) Plaintiffs are three local government entities that allegedly bought BWC Systems and/or CEWs from Axon after May 2018. (*Id.* ¶¶ 22–24.) They allege that Axon's acquisition of VieVu and the non-compete provisions related to it were "anticompetitive," resulting in reduced competition that allowed Axon to substantially increase prices in the BWC Systems and CEW markets and "suppressed output and innovation." (*Id.* ¶¶ 7–21.)

A.    **PLAINTIFFS' CLASS ACTION CLAIMS**

Plaintiffs Howell, August, and Baltimore pursue claims on behalf of themselves and, under "Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure," on behalf of all persons or entities who have "directly purchased" the following products from Axon in the United States from May 3, 2018 until the effects of Defendants' unlawful conduct cease (the "Class Period"):

> (1) a BWC System or any component of a BWC System or related services such as transcription, redaction, and warranties, and/or (2) a long-range CEW or components and related services such as electricity cartridges, battery packs, docks, cameras, signals, training, and warranties.

(*Id.* ¶ 134.) Plaintiffs allege that the Howell Township Police Department, whose operations are managed by Plaintiff Howell, purchased BWC Systems and CEWs from Axon. (*Id.* ¶ 22.) Plaintiff Baltimore also allegedly purchased "millions of dollars' worth" of BWC Systems and CEWs from

---

[2] https://safariland.com/pages/about-us (last visited Jan. 31, 2025).

Axon (*Id.* ¶ 23.) Plaintiffs allege that Augusta Police Department, whose operations are managed by Plaintiff Augusta, purchased CEWs from Axon. (*Id.* ¶ 24.)

Plaintiffs bring the following eight class action claims: (1) unlawful merger or acquisition in violation of Section 7 of the Clayton Act against both Defendants; (2) conspiracy in restraint of trade in violation of Section 1 of the Sherman Act against both Defendants; (3) monopolization of the BWC Systems market in violation of Section 2 of the Sherman Act against Axon; (4) attempted monopolization of the BWC Systems market in violation of Section 2 of the Sherman Act against Axon; (5) conspiracy to monopolize the BWC Systems market in violation of Section 2 of the Sherman Act against both Defendants; (6) monopolization of the CEW market in violation of Section 2 of the Sherman Act against Axon; (7) attempted monopolization of the CEW market in violation of Section 2 of the Sherman Act against Axon; and (8) conspiracy to monopolize the CEW market in violation of Section 2 of the Sherman Act against both Defendants. (*Id.* ¶¶ 153–237.) As relief for these claims, Plaintiffs seek "treble damages" and an injunction "preventing and restraining" Defendants from committing the antitrust violations alleged. (*Id.* ¶¶ 162, 171, 181, 193, 203, 214, 226, 237.)

**B.    PROCEDURAL HISTORY**

On August 22, 2023, Plaintiff Howell filed the original Class Action Complaint initiating this case. (ECF No. 1.) On November 14, 2023, the Court granted Plaintiffs' motion to consolidate the above-captioned matter with similar cases brought by Baltimore (No. 23-21156) and Augusta (No. 23-20897). (ECF No. 36.) The Court also appointed interim class counsel and ordered Plaintiffs to file a consolidated amended complaint. (*Id.*) On November 27, 2023, Plaintiffs filed the CAC. (ECF No. 37.)

On February 1, 2024, the Court approved the parties' proposed briefing schedule for motions to dismiss and ordered the proposed motions to be filed together on the docket once fully

briefed. (ECF No. 52.) On May 18, 2024, the parties filed their fully briefed motions on the docket. (ECF Nos. 76, 78.) Plaintiffs filed separate briefs opposing each Defendant's Motion to Dismiss, (ECF Nos. 80, 81), and each Defendant filed a reply brief, (ECF Nos. 83, 85). In addition to its Motion to Dismiss, Axon filed a Motion to Strike the Class Action Allegations. (ECF No. 77.) Plaintiffs opposed it, (ECF No. 82), and Axon replied, (ECF No. 84). The Federal Trade Commission also sought leave to file an *amicus curiae* brief in support of Plaintiffs' class action, (ECF No. 86-2), which Axon opposed, (ECF No. 93).

### C. PLAINTIFFS' PROPOSED PRODUCT AND GEOGRAPHIC MARKETS

Plaintiffs allege anticompetitive conduct in two relevant markets in which Axon operates: BWC Systems and CEWs. (CAC ¶ 34.)

#### 1. Body-Worn Camera Systems

BWC Systems comprise several related components. First are the BWCs themselves—body-worn cameras "specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions." (*Id.* ¶ 35.) Axon sells two BWCs: the "Axon Body" (chest-worn) and the "Axon Flex" (eyewear-worn). (*Id.* ¶ 35.) BWCs come with additional hardware, like docking stations for BWC charging, and software, like digital evidence management systems ("DEMS") to form "an integrated BWC System." (*Id.* ¶ 36.) DEMS, which incorporate camera data from both BWCs as well as in-car cameras, enable law enforcement to store, redact, share, and maintain chain of custody records for BWC camera data. (*Id.* ¶ 37.) Axon's docking station, "Axon Dock," and Axon's DEMS, "Axon Evidence," operate through the website Evidence.com. (*Id.* ¶¶ 37–38.) BWC Systems are also sold with related services such as transcription, redaction, and warranties. (*Id.* ¶ 39.) The warranties, for example, include coverage for "several years, spare BWCs or Docks, and replacement or upgraded BWCs or Docks after several years." (*Id.*) According to Plaintiffs, police departments frequently purchase the

components of BWC Systems together because they are "closely related" and must "interoperate effectively." (*Id.* ¶ 40.) For example, Axon's BWCs only work with Axon's DEMS, requiring police departments to purchase BWCs and DEMS from Axon together. (*Id.* ¶ 40.)

Nearly half of police departments in the United States use BWCs, and seven states have laws requiring their use. (*Id.* ¶ 43.) As Plaintiffs allege, police departments cannot realistically switch to other products to avoid using BWCs because the alternatives—like in-car camera systems—have limited recording scope and are more expensive than BWCs. (*Id.* ¶ 41.) Alternatives to DEMS—like "record management systems"—are not viable substitutes because they are principally used for written reports rather than audio and video evidence. (*Id.* ¶ 42.) The relevant geographic market for BWC Systems is limited to customers in the United States as United States police departments cannot use BWC Systems products offered to customers outside of the United States based on practical and legal barriers to switching. (*Id.* ¶¶ 44–45 ("Customers based in the United States cannot arbitrage or substitute based on different prices offered to customers outside the United States, including differing laws and rights for evidence collected from body cameras outside of the United States. . . . [The FBI's Criminal Justice Information Service standards] require[] storing BWC-generated data in the United States. Additionally, U.S.-based police departments look mostly to other U.S.-based police departments to vet potential BWC Systems vendors.")

2.    Long-Range Conducted Energy Weapons

CEWs are a type of "less-lethal" weapon that "can be used to deal with a threat to the public, bystanders, or police, from violent or armed individuals" without using deadly force. (*Id.* ¶ 55.) A CEW operates by "fir[ing] a barbed probe at [a] target, allowing [an electric] shock to be delivered at a long range (up to 35 feet away)." (*Id.* ¶ 4.) Plaintiffs allege that CEWs are "virtually synonymous" with Axon's "dominant long-range CEW, the Taser." (*Id.* ¶ 4.) CEWs are available

with other components, including electricity cartridges, battery packs, docks, cameras, and camera signals, as well as related services, like training and warranties. (*Id.* ¶ 57.) Cartridges supply an electrical charge to the CEW's barbed probe and must be replaced after each firing. (*Id.*) Cameras record the CEW's actions, and camera signals inside the CEW's holster work in tandem with the BWC, activating it when removed. (*Id.*) As with BWC Systems, many police departments purchase CEWs and related components together. (*Id.*)

As of 2018, nearly two-thirds of police departments use CEWs, and, as of 2020, approximately 73% of police officers carry CEWs when on duty. (*Id.* ¶ 58.) CEWs are "highly differentiated" from other less-lethal weapons (stun guns, pepper spray, tear gas, rubber bullets) "because of their accuracy, effectiveness, and versatility." (*Id.* ¶ 56.) CEWs "cannot easily be replaced by other less-lethal or lethal weapons." (*Id.* ¶ 59.) "[C]ivilians interested in self-defense" also prefer using CEWs. (*Id.* ¶ 60.) The relevant CEW market is limited to the United States because of regulatory barriers to importing CEWs into the United States. (*Id.* ¶ 61.)

**D.    AXON'S ACQUISITION OF VIEVU AND RELATED AGREEMENTS**

On May 3, 2018, Axon acquired VieVu from Safariland, entering into "anticompetitive agreements" related to that acquisition. (*Id.* ¶ 87.) As part of the Acquisition Agreement, Axon paid Safariland $17.6 million. (*Id.* ¶ 90.) That payment was comprised of cash, "$2.4 million, or 58,843 shares" of Axon common stock, and "up to $6.0 million, or 141,226 additional shares of Axon common stock, if certain conditions were met." (*Id.*) In addition to this consideration, the parties also entered into the "Holster Agreement," under which Safariland agreed for 10 years to develop and supply Axon with a new holster for Axon's next-generation CEW. (*Id.* ¶ 90.) In turn, under the "Supply Agreement," Axon agreed to make Safariland its preferred supplier of CEW holsters. (*Id.* ¶ 90.)

According to Plaintiffs, Axon and Safariland also agreed to "market-allocation and noncompete" terms in the "Acquisition Agreement" and "Holster Agreement." (*Id.* ¶¶ 91–99.) Those terms provide the following:

- "In Section 5.03(a) of the Acquisition Agreement, Safariland agreed not to engage in '(a) body worn video products and services, (b) in-car video products and services, (c) digital evidence management products and services provided to third parties that ingest digital evidence audio and video files, and (d) enterprise records management systems provided to third parties,' anywhere in the world for 10 years." (*Id.* ¶ 92.)

- "In Section 15.1 of the Holster Agreement, Safariland further agreed not to compete in the 'CEW industry, BWC industry, fleet or vehicle camera industry, surveillance room camera industry, and digital evidence management system and storage industry, with regard to law enforcement, military, security or consumers,' anywhere in the world for 12 years." (*Id.* ¶ 93.)

- "In Section 5.03(c) of the Acquisition Agreement, 'Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting business or services away from Axon, for 10 years.'" (*Id.* ¶ 95.)

- "In Section 15.3 of the Holster Agreement, Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting CEW, CEW holster, or CEW accessory business or purchases away from Axon, for 11 years." (*Id.* ¶ 96.)

- "In Section 5.03(b) of the Acquisition Agreement, 'Safariland agreed not to hire or solicit any of Axon's employees, or encourage any employees to leave Axon, or hire certain former employees of Axon, except pursuant to a general solicitation. Safariland agreed to refrain from these activities for 10 years.'" (*Id.* ¶ 97.)

- "In Section 5.06(a) of the Acquisition Agreement, 'Axon agreed not to hire or solicit any of Safariland's employees, or encourage any employees to leave Safariland, or hire certain former employees of Safariland, except pursuant to a general solicitation.['] Axon agreed to refrain from these activities for 10 years." (*Id.* ¶ 98.)

- "In Section 15.4 of the Holster Agreement, Respondents Axon and Safariland agreed not to solicit each other's employees for the purpose of inducing the employees to leave their respective employers, except pursuant to a general solicitation. Respondents Axon and Safariland agreed to refrain from this activity for 11 years." (*Id.* ¶ 99.)

E.    MARKET EFFECTS OF THE ACQUISITION AND NON-COMPETE PROVISIONS

1.    BWC Systems Market

Plaintiffs allege that, prior to May 2018, Axon was already the dominant company in the BWC Systems market. (*Id.* ¶ 6.) Axon "control[ed] approximately 60% to 80% of the market for BWC systems" and "provided gear and service to more than 85 percent of major cities that have adopted body cameras." (*Id.* ¶ 48; *see also id.* ¶ 79 (Axon had 70% to 85% market share in BWC Systems).) However, at this time, "VieVu was the next largest competitor by market share." (*Id.* ¶ 49; *see also id.* ¶¶ 80, 82.) A fact, according to Plaintiffs, that Safariland freely acknowledged. (*Id.* ¶ 80.)

The competition between Axon and VieVu allegedly resulted in lower prices for BWC Systems purchasers. (*Id.* ¶ 9; *see also id.* ¶ 83 ("Axon and VieVu vigorously and consistently competed on the price of BWC Systems in an effort to win police department contracts.").) Indeed, before its acquisition, VieVu held hundreds of contracts for BWC Systems with police agencies. (*Id.* ¶ 49.) This included contracts with at least five of the 69 major metropolitan police departments in the Major Cities Chiefs Association ("MCCA"), including New York, New York, Miami-Dade, Florida, Phoenix, Arizona, Oakland, California, and Aurora, Colorado. (*Id.*) VieVu allegedly won these contracts by "lower[ing] its pricing in an explicit effort to take market share from Axon." (*Id.* ¶ 83.) According to Plaintiffs, VieVu's strategy resulted in "substantially lower BWC Systems prices" overall, as cities received "substantially lower bids from VieVu as compared to Axon." (*Id.* ¶ 84.) As one example, VieVu's bid for the New York City contract was $6.4 million against Axon's $17 million bid. (*Id.* ¶ 84.) This "price war," instigated by VieVu, allegedly resulted in the sale of higher quality equipment for less. (*Id.* ¶¶ 85–86.)

However, after May 2018, Plaintiffs allege that Axon's market position increased when it "swallowed up VieVu's BWC Systems contracts." (*Id.* ¶ 16.) At the end of 2018 (after the

acquisition), two-thirds (46 of 69) of MCCA police departments were "on the Axon network." (*Id.* ¶ 50.) In fact, not all of those agencies had a BWC contract; ten did not. (*Id.*) By December 2019, Axon controlled "47 of the 59" MCCA agencies with BWC contracts, "i.e., *80% of them.*" (*Id.* (emphasis in original).) Among these police departments were New York City, Chicago, Los Angeles, and Philadelphia—four of the top five MCCA agencies. (*Id.* ¶ 51 (alleging that Axon controls "4 of the top 5, 7 of the top 10, and 15 of the top 20" MCCA agencies).) According to Plaintiffs, "many local governments and agencies around the country have invested significant sums of money . . . to purchase Axon's BWC Systems." (*Id.* ¶ 114.) As of 2020, Axon claimed it had customer relationships with "17,000 of the 18,000" United States law enforcement agencies. (*Id.* ¶ 89 n.77.)

Plaintiffs allege that Axon's BWC market dominance allowed it to implement "huge price increases" for BWC Systems and their components "to generate high profit margins." (*Id.* ¶ 53.) In 2022, for its "software and sensors" department (which includes BWC Systems), Axon reported $658 million in net sales, $392 million in gross margins, and a 60% profit margin on BWC Systems. (*Id.*) Although Axon has competitors in the BWC Systems market like Motorola, Panasonic, and Utility, those competitors did not hold enough market share "to constrain the exercise of Axon's monopoly power." (*Id.* ¶ 54.) Compared to Axon's 46 MCCA department customers, Axon's nearest competitor, Motorola, "control[ed]" only 7 MCCA departments. (*Id.*)

Plaintiffs claim that the prices charged by Axon for BWC Systems "have shot up dramatically as a result of the Acquisition." (*Id.* ¶ 107.) Plaintiffs note that, while price decreased from 2016 to 2017 when Axon was competing with VieVu, BWCs almost tripled in price between 2017 and 2022 after Axon acquired VieVu. (*Id.* ¶ 107.) Axon's average selling price (revenue per unit sold) for BWCs from 2016 to 2022 changed as follows: $195.17 (2016), $169.07 (2017),

$254.56 (2018), $290.69 (2019), $313.09 (2020), $415.52 (2021), and $489.80 (2022). (*Id.* ¶ 107.) The consumer price for an Axon Dock followed the same theme, decreasing from 2016 to 2017 ($437.03 to $414.44) and then increasing from 2017 to 2022 ($414.44 to $1,043.06). (*Id.* ¶ 108.) The annual cost of a license to use Axon Evidence likewise increased from 2017 to 2020 ($243.34 to $468). (*Id.* ¶ 109.) Plaintiffs similarly point to the decrease in profitability of Axon's BWC Systems hardware from 2016 to 2017 (while competing with VieVu) and its subsequent increase from 2017 to 2022: 17.6% (2016), 10.5% (2017), 20.8% (2018), 29.8% (2019), 36.6% (2020), 39.2% (2021), and 42.1% (2022). (*Id.* ¶ 110.) During this same period when Axon's prices and profitability increased, Axon's annual unit sales of BWCs and DEMs also increased. (*Id.* ¶ 116.) Axon has allegedly acknowledged that its price increases have put its BWC Systems out of the financial reach of some police departments. (*Id.* ¶¶ 122–23.)

Plaintiffs also allege that the agreements prohibiting Safariland from competing against Axon by restraining products offered, customers Safariland could solicit, and employees Axon could hire "tended to reduce quality, service, and innovation" in the BWC Systems market. (*Id.* ¶ 100.)

Plaintiffs claim that the endowment of monopoly power on Axon is "exactly what . . . Safariland[] predicted would happen[:] 'I believe this will greatly improve [Axon's] ability to increase price in the BWC and I can easily see [Axon's] stock lifting by 20% or more.'" (*Id.* ¶ 11.) Indeed, Axon's stock price "actually increased by more than 40% in the month following the acquisition . . . ." (*Id.*) According to Plaintiffs, "[s]ince the Acquisition, one firm, Axon, has controlled an estimated 85% of the BWC Systems market as measured by output or revenue." (*Id.* ¶ 89.)

10

2.     CEW Market

Prior to the 2018 acquisition, Axon "dominated" the CEW market with a 95 percent market share. (*Id.* ¶ 79.) Plaintiffs seem to acknowledge that Axon's market share has, in fact, not changed since Axon's acquisition of VieVu: Axon remains "effectively the sole player in the market for CEWs, with an estimated 95% market share." (*Id.* ¶ 62.) "[O]nly a handful" of police departments use CEWs provided by an Axon competitor. (*Id.*) In 2022, Axon earned 63.3% gross margin on CEW sales as well as significant revenues from the sale of related components, like cartridges. (*Id.* ¶ 63.)

While Plaintiffs do not allege a change in Axon's CEW market position after the acquisition, Axon was allegedly concerned about Safariland "potentially" competing with Axon's "lucrative CEW business." (*Id.* ¶ 94.) Axon's Chief Executive Officer allegedly "called the 12-year CEW noncompete a 'hidden jewel in the deal.'" (*Id.*) Plaintiffs allege that Safariland was "poised" to enter the market and that "Safariland's success in developing VieVu showed that Safariland likely had the technological capability, capital, and sales relationships necessary to develop and distribute a rival long-range CEW." (*Id.* ¶ 101.) To support this allegation, Plaintiffs note that Safariland was a "large manufacturer of less-lethal weapons" (*e.g.*, pepper spray, rubber bullets, weapon holsters) that "allowed it to develop relationships with police departments and become a trusted supplier of less-lethal weapons." (*Id.* ¶ 118.) Plaintiffs claim that Defendants' "anticompetitive conduct has also increased prices for CEWs compared to what those prices would have been absent the Acquisition and Defendants' conduct." (*Id.* ¶ 117.) They point to "high gross margins" in Axon's Taser business, which have "exceeded 61% every year from 2019 through 2022." (*Id.* ¶ 121.)

### 3.    Barriers to Entry in Both Markets

Plaintiffs claim that "new entry or expansion" into the BWC Systems and CEW markets by existing businesses would not be "timely, likely, or sufficient to offset the anticompetitive effects" of Defendants' conduct due to "significant barriers to entry." (*Id.* ¶¶ 65, 124.) Those barriers include "high capital, investment, contract length, switching costs, integration, bundling, sales relationships, patents, and regulations." (*Id.* ¶ 65.) Specifically, Plaintiffs allege that the following factors render market entry for "would-be" competitors "unprofitable":

- Axon "invests millions in research and development annually," and a "large amount of capital [is] necessary to develop and service an effective BWC system," (*id.* ¶ 66);

- Axon's contract length can last ten years or longer, "limiting the number of police departments with which BWC Systems and long-range CEW suppliers can attempt to contract in any given year," (*id.* ¶ 67);

- BWC Systems are "complex," and police departments that switch "must incur significant IT and training costs in switching its body camera videos away from the DEMS," (*id.* ¶ 69);

- Competitors "wishing to sell their own long-range CEWs would need to entice police departments to retrain their police force to use a new type of long-range CEW," (*id.* ¶ 72);

- Axon's BWC Systems "integrate with its Tasers, and police departments that want to integrate Taser data into their evidence software must use the Axon BWC System," (*id.* ¶ 74);

- Axon has "nearly 300 U.S. patents covering its products," (*id.* ¶ 75); and

- BWC Systems and CEWs "must comply with a variety of state and local laws governing recording and less-lethal weapons," (*id.* ¶ 77).

### F.    FEDERAL TRADE COMMISSION ADMINISTRATIVE PROCEEDINGS

On January 3, 2020, the FTC filed an administrative complaint against Axon and Safariland (the "FTC Complaint"), seeking to challenge Axon's acquisition of VieVu. (*Id.* ¶ 128.) The FTC alleged that Axon's acquisition of VieVu "eliminated price and innovation competition between

Respondent Axon and VieVu in the relevant market" and would "likely entrench Respondent Axon's already dominant share of the relevant market and [] significantly increase market concentration." FTC Compl. ¶¶ 8, 35.[3] The FTC Complaint defined the relevant market as "the sale of BWC Systems, comprising BWCs and DEMS, to large, metropolitan police departments in the United States." *Id.* ¶ 20. According to the FTC, "BWCs are the hardware component, and DEMS are the software component, of an integrated BWC System." *Id.* ¶ 21.

The FTC alleged that, prior to the acquisition, "VieVu aggressively challenged Respondent Axon for the sale of BWC Systems to large, metropolitan police departments in the United States," resulting in "substantially lower prices" and "robust features and significant improvements" for these customers. *Id.* ¶ 3. According to the FTC, Axon's acquisition of VieVu resulted in substantial price increases on Axon's BWCs and Taser products as well as limitations on product availability. *Id.* ¶¶ 6–7. The FTC also noted that, as part of the acquisition, Respondents Axon and Safariland agreed to non-compete provisions and "company-wide non-solicitation agreements" that "prevent actual and potential competition between Respondents and Safariland." *Id.* ¶¶ 12, 44–51. For example, in the "Holster Agreement," "a decade-long supply agreement whereby Respondent Safariland would develop and exclusively supply [CEW] holsters to Respondent Axon for its Taser-branded CEW," *id.* ¶ 13, Safariland agreed not to compete in the CEW and BWC industry, among other industries, "anywhere in the world for 12 years." *Id.* ¶ 46. The FTC claimed that the non-compete and non-solicitation provisions went "far beyond any intellectual property, goodwill, or customer relationship necessary to protect Respondent Axon's investment in VieVu" and are "longer than reasonably necessary." *Id.* ¶¶ 52–53.

---

[3] The FTC's Complaint is publicly available at
https://www.ftc.gov/system/files/documents/cases/d09389_administrative_part_iii
_-_public_redacted.pdf (last visited Jan. 31, 2025). Axon has also attached a copy of the FTC's Complaint to its Motion to Dismiss. (*See* ECF No. 76-2 at 5–17.)

The FTC alleged two counts in its complaint: (1) the acquisition agreement constitutes an unfair method of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45; and (2) the acquisition and non-compete provisions constitute a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. *Id.* ¶¶ 58, 60.

On June 11, 2020, Safariland settled with the FTC. (CAC ¶ 131); *see also In the Matter of Axon Enter., Inc., A Corp., & Safariland, LLC, A Ltd. Liab. Co.* ("*Safariland Settlement*"), No. 181-0162, 2020 WL 3446890 (F.T.C. June 11, 2020). The settlement agreement memorialized Safariland's recission of the non-compete and non-solicitation provisions in the Axon acquisition agreements through an amendment executed on January 16, 2020. *Compare Safariland Settlement*, 2020 WL 3446890, at *2 (defining "Prohibited Provisions" as "provisions 5.03(a), 5.03(b), 5.03(c), and 5.06(a) of the Purchase Agreement and provisions 15.1, 15.3, and 15.4 of the Holster Agreement"), *with* CAC ¶¶ 92–93, 95–99 (setting forth the content of Sections 5.03(a), 5.03(b), 5.03(c) of the "Acquisition Agreement" and Sections 15.1, 15.3, and 15.4 of the "Holster Agreement."). The settlement agreement provided that Safariland "must obtain approval from the FTC before entering into any noncompete or similar agreements with Axon." (CAC ¶ 131.) Accordingly, Safariland was only bound by the non-compete and non-solicitation provisions in the Axon acquisition agreements from May 2018 until January 2020, after which those provisions no longer had any force or effect.

On October 6, 2023, the FTC dismissed the complaint against Axon and returned the matter to adjudication. (CAC ¶ 132); *see also In the Matter of Axon Enter., Inc., A Corp.* (hereinafter, "*FTC Dismissal Order*"), No. 9389, 2023 WL 6895829, at *1 (F.T.C. Oct. 6, 2023). According to Plaintiffs, the FTC's dismissal "followed years of litigation by Axon challenging the constitutionality of the FTC's administrative adjudication process." (*Id.*); *see also Axon Enter. Inc.*

*v. Fed. Trade Comm'n*, 452 F. Supp. 3d 882, 886–87 (D. Ariz. 2020). The FTC's dismissal order summarized the history of this litigation:

> The [FTC] voted to issue an administrative complaint on January 3, 2020, consistent with the directive that Congress set forth in the FTC Act. [On the same day], the parties chose to file in federal court a complaint alleging, *inter alia*, that the FTC's administrative adjudication process is constitutionally deficient. On April 8, 2020, the federal district court dismissed Axon's complaint due to a lack of subject matter jurisdiction. Axon appealed to the United States Court of Appeals for the Ninth Circuit. In September 2020, Axon filed an Emergency Motion to Stay Administrative Trial with the Ninth Circuit, asking the court to temporarily stay the evidentiary hearing scheduled before th[e] [FTC] pending consideration of Axon's appeal. In October 2020, the Ninth Circuit granted Axon's motion. As a result, the administrative adjudication process was stayed. That federal court challenge resulted in years of litigation going all the way up to the Supreme Court, which rendered a decision on the jurisdictional issue in April 2023.

*FTC Dismissal Order*, 2023 WL 6895829, at *1. The Supreme Court of the United States held that federal courts had federal question jurisdiction to hear a challenge to the structure or existence of the FTC despite Congress providing an alternative review scheme in the FTC Act. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023).

In its October 2023 order, the FTC noted that, after the Supreme Court remanded the case to the District of Arizona, Axon filed an amended complaint "raising, yet again, constitutional challenges to the [FTC's] adjudication process," which "will likely result in years of additional litigation." *FTC Dismissal Order*, 2023 WL 6895829, at *1. The FTC maintained in its dismissal order that Axon's acquisition of VieVu "eliminated competition between two rivals, effectively creating a monopoly and harming both police departments and communities who fund them." *Id.* Despite its continued position on the merits of its claims, the FTC ultimately dismissed its complaint against Axon for the following reasons:

Every anticompetitive merger harms markets and adversely affects the American people, and the allegations in the complaint suggest this one is no different. The complaint states that this merger eliminated competition between two rivals, effectively creating a monopoly and harming both police departments and communities who fund them. As it does with any enforcement action, however, the [FTC] must constantly evaluate the deployment of its limited agency resources to ensure maximal efficacy and utility. Here, there are a variety of factors we must consider in pursuit of those priorities, including the increasingly unlikely possibility of reaching a timely resolution of the antitrust merits that led to the filing of our complaint in the first place.

*Id.* As the FTC concluded, "the public interest requires that this litigation no longer be continued."

*Id.*[4]

### G.    CONTINUING VIOLATIONS AND TOLLING THE STATUTE OF LIMITATIONS

Plaintiffs also plead allegations relevant to the timeliness of their claims. Plaintiffs claim that Defendants have engaged in a continuing violation of federal antitrust laws "[f]rom May 3, 2018 and continuing to the present day" by "repeatedly overcharg[ing] customers throughout the

---

[4] As mentioned above, the FTC has moved for leave to file an *amicus* brief in support of the CAC. A court will typically grant *amicus* leave to file a brief when "(1) the amicus has a 'special interest' in the particular case; (2) the amicus' interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the amicus is not partial to a particular outcome in the case." *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002). Whether to do so is "within the broad discretion of the district court." *Granillo v. FCA US, LLC*, No. 16-153, 2018 WL 4676057, at *4 (D.N.J. Sept. 28, 2018) (citations and internal quotation marks omitted). While the parties consented to the FTC filing its motion, Axon opposes the proposed brief, arguing that it is irrelevant and unhelpful. While the FTC's brief contains helpful background information regarding its administrative action, the Court did not find it to be particularly useful in addressing the legal arguments in Defendants' Motions. Indeed, the Court has not relied on any of the FTC's arguments in reaching its conclusions in this Opinion. In addition, the Court questions whether the FTC is not partial to a particular outcome in the case as the FTC pursued a prior action against both Defendants in which many of the same issues arose. *See Pro. Drug Co. Inc. v. Wyeth Inc.*, No. 11-5479, 2012 WL 4794587, at *2 (D.N.J. Oct. 3, 2012) ("Here, it appears that the FTC, itself a litigant in past and present proceedings in which similar issues have arisen or may arise, is significantly partial to a particular outcome in this case."). The FTC is also currently involved in litigation with Axon over its administrative proceeding, which Axon has claimed is unconstitutional. *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023); *see also Axon Enter. Inc. v. Fed. Trade Comm'n*, 452 F. Supp. 3d 882, 886–87 (D. Ariz. 2020). Therefore, the Court denies the FTC's Motion for leave to file an *amicus* brief. The Court's decision on the FTC's current motion, however, will not prevent the FTC from seeking to join as *amicus* in future proceedings in this case.

United States for (1) BWC Systems and/or (2) long-range CEWs." (*Id.* ¶ 146.) According to Plaintiffs, "[e]ach such sale was an overt act causing additional anticompetitive injury to the proposed Class." (*Id.*)

Plaintiffs additionally allege that their case is based "in part on a matter complained of in the government action." (*Id.* ¶ 150.) Plaintiffs claim that the FTC's initiation of its administrative complaint tolled the federal statute of limitations under Section 5(i) of the Clayton Act. (*Id.* ¶ 148.)

Plaintiffs also assert that the statute of limitations is tolled because "Defendant fraudulently concealed the ancillary noncompete agreements that they entered into in connection with the Acquisition." (*Id.* ¶ 151.) They continue that Defendants' "affirmative acts" of fraudulent concealment "prevented Plaintiffs and members of the class from having notice of their claims more than four years before filing this Complaint." (*Id.*) Plaintiffs claim that Defendants carried out "[m]any of the overt acts in furtherance of the conspiracy" to "conceal[] the conspiracy and prevent[] Plaintiffs and other purchasers of BWC Systems and long-range CEWs from learning about the conspiracy's existence." (*Id.* ¶ 152.) According to Plaintiffs, they "did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint," and they were also not "aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims." (*Id.*)

## II.    <u>LEGAL STANDARD</u>

### A.    MOTION TO DISMISS FOR LACK OF STANDING

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear the claim. Fed. R. Civ. P. 12(b)(1). A motion to dismiss for want of standing is properly brought under Rule 12(b)(1), because "standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). On a motion to dismiss for lack of standing, plaintiff "bears the burden of establishing the elements of standing,

and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations and internal quotation marks omitted); *see also Transunion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (confirming that "plaintiffs must demonstrate standing for each claim that they press and for each form of relief they seek . . . with the manner and degree of evidence required at the successive stages of the litigation").

In evaluating a Rule 12(b)(1) motion to dismiss, courts must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to consider the allegations of the complaint as true." *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted). A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Id.* The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. The party invoking the federal court's jurisdiction has "the burden of proof that jurisdiction does in fact exist." *Petruska*, 462 F.3d at 302 n.3 (quoting *Mortensen*, 549 F.2d at 891).

**B.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

For a complaint to survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must contain "sufficient factual matter" to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023). The court accepts all allegations in the complaint as true and gives the plaintiff "the benefit of every favorable inference to be drawn therefrom." *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

In deciding a Rule 12(b)(6) motion, the court can only consider "the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

C.    MOTION TO STRIKE CLASS ACTION ALLEGATIONS

A motion to strike class allegations in a complaint implicates Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) of the Federal Rules of Civil Procedure. Rule 12(f) permits courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (citations and internal quotations omitted). Striking a pleading is a "drastic" remedy "usually 'viewed with disfavor.'" *Id.* (citing *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)); *see also Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 702 (D.N.J. 2013) (noting that motions to strike are "extremely disfavored"). In other words, a court should deny a motion to strike unless "some harm will result from permitting something to be alleged at all—a high bar." *In re Allergan Biocell Textured Breast Implant Prod. Liab. Litig.*, 537 F. Supp. 3d 679, 704 (D.N.J. 2021). Under Rule 23(c)(1)(A), "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Rule 23(d)(1)(D) provides that a court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly[.]" Fed. R. Civ. P. 23(d)(1)(D).

Motions to strike class allegations from a pleading under Rule 23 are also "disfavored" as "a motion for class certification is a more appropriate vehicle for arguments about class propriety." *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 386 (D.N.J. 2014); *see also 6803 Blvd. E., LLC v. DIRECTV, Inc.*, No. 12-2657, 2012 WL 3133680, at *2 (D.N.J. July 31, 2012) ("Generally courts do not consider whether a proposed class meets the Fed. R. Civ. P. 23 class requirements

until after plaintiffs move for class certification."). "A motion to strike class allegations under Rule 23 is 'for all practical purposes, identical to an opposition to a motion for class certification' and [] '[i]t would be improper to allow Defendants to slip through the backdoor what is essentially an opposition to a motion for class certification before Plaintiffs have made such a motion and when discovery on the issue is still ongoing.'" *Viggiano v. Lakeshore Equip. Co.*, No. 17-00707, 2018 WL 11310868, at *6 (D.N.J. Jan. 11, 2018) (quoting *Korman v. The Walking Co.*, 502 F. Supp. 2d 755, 762–63 (E.D. Pa. 2007)).

"Courts have 'considerable discretion' in deciding a Rule 12(f) motion but should exercise that discretion to strike class allegations 'only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23.'" *Parkin v. Avis Rent a Car Sys. LLC*, No. 22-cv-05481, 2023 WL 4045049, at *7 (D.N.J. June 16, 2023) (citations omitted); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 205 n.3 (D.N.J. 2003) ("A defendant may move to strike class action allegations prior to discovery in those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." (citations omitted)). In other words, because "[c]lass determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action, [] discovery is [] integral." *Gray*, 22 F. Supp. 3d at 386.

As with a motion to dismiss under Rule 12(b)(6), "[w]hen evaluating a motion to strike allegations of a complaint, the court must accept as true all factual allegations in the complaint and view all reasonable inferences in the light most favorable to Plaintiffs." *Viggiano*, 2018 WL 11310868, at *6 (internal quotation marks omitted).

III.    **DISCUSSION**

The Court turns now to Defendants' Motions. *First*, the Court will address Axon's Motion to Strike. *Second*, it will summarize the statutory antitrust law relevant to the CAC. *Third*, the Court analyzes the arguments raised in Defendants' Motions to Dismiss.

### A.    MOTION TO STRIKE

Axon seeks to strike the class allegations in the CAC on three grounds.[5] *First*, Axon argues that federal and state entities are entitled to sovereign immunity and are, therefore, barred from inclusion as class members. (ECF No. 77-1 ("Axon MTS Br.") at 9–13.) *Second*, Axon contends that private counsel for Plaintiffs is prohibited from representing any government class members because federal, state, and local laws permit only specific government attorneys to do so. (*Id.* at 13–19.) *Third*, Axon argues that, due to these sovereign immunity and representation issues, Plaintiffs cannot establish the class action prerequisites of Rule 23 of the Federal Rules of Civil Procedure. (*Id.* at 19–24.) The Court addresses each of these arguments in turn.

1.    Sovereign Immunity

Axon argues that, without an express waiver of their sovereign immunity, the Court cannot join federal and state entities[6] as class members. (*Id.* at 9–13.) Furthermore, according to Axon, the potential opportunity for these entities to opt out of the purported class does not overcome this jurisdictional hurdle. (*Id.*) Thus, according to Axon, striking the class allegations at this pre-discovery stage is appropriate. (*Id.*) Plaintiffs respond that Axon lacks standing to assert sovereign immunity on behalf of any government entity and that the immunity of these government entities

---

[5] Safariland has joined Axon's Motion to Strike. (ECF No. 79.)

[6] Axon does not appear, at this stage, to request dismissal of class allegations against local government entities based on sovereign immunity. Indeed, it cannot, unless those entities are deemed arms of the state. An "important limit to the principle of sovereign immunity is that it bars suits against States but not lesser entities." *Alden v. Maine*, 527 U.S. 706, 756 (1999) ("The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State.").

does not bar the Court from certifying a class including them. (ECF No. 82 ("Pls. MTS Opp.") at 24–35.) The Court disagrees. For the reasons set forth below, the Court will grant Axon's Motion to Strike on sovereign immunity grounds.

"As a sovereign, the United States is immune from suit unless it consents to be sued." *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010) (citing *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). Its consent to suit or, rather, the waiver of its immunity must be "unequivocally expressed." *Id*. Each state is also a sovereign entity and, as provided by the Eleventh Amendment, not "amenable to the suit of an individual without its [express] consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996); *see also* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). Sovereign immunity "acts as a limit on the jurisdiction of federal courts." *Sossamon v. Texas*, 563 U.S. 277, 284 (2011); *Mitchell*, 445 U.S. at 538. The question of whether a sovereign has waived its immunity is "strictly construed, in favor of the sovereign." *Sossamon*, 563 U.S. at 285.

Suits "against" sovereigns include suits compelling a sovereign to act. *In re Flonase Antitrust Litig.*, 879 F.3d 61, 66 (3d Cir. 2017) ("[A] suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." (quoting *Pennhurst State Sch. & Hosp.*, 465 U.S. 89, 102 n. 11 (1984))). Indeed, courts have extended immunity to suits in which a sovereign is compelled to act as a plaintiff. *Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 505 (8th Cir. 1995) (finding that "involuntary joinder" would compel a state agency to act "by forcing it to prosecute [the defendant]

at a time and place dictated by the federal courts"); *Havasupai Tribe v. Anasazi Water Co. LLC*, 321 F.R.D. 351, 355 (D. Ariz. 2017) (concluding that the United States was a necessary party to the lawsuit but could not be involuntarily joined).

As reasoned by the United States Court of Appeals for the Eighth Circuit, to force a sovereign to prosecute a claim "at a time and place dictated by the federal courts" constitutes "disrespect for state autonomy in decision-making" and is "precisely what the Eleventh Amendment was intended to avoid." *Thomas*, 50 F.3d at 505–506. "The very object and purpose of the Eleventh Amendment [is] to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Id.* (quoting *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 147 (1993)) (internal quotation marks omitted).

The United States Court of Appeals for the Third Circuit has adopted similar logic in the context of class action settlements. In *In re Flonase Antitrust Litigation*, the defendant GlaxoSmithKline ("GSK") sought to enforce a court-approved class action settlement against the State of Louisiana, enjoining Louisiana, an absent class member, from bringing allegedly released claims in state court. 879 F.3d at 63. Louisiana opposed GSK's motion, arguing that the Eleventh Amendment barred its "involuntary inclusion" in the settlement agreement. *Id.* The Third Circuit considered two questions in affirming the district court's decision: (1) "does a motion for approval of a class action settlement qualify as a suit against a state for Eleventh Amendment purposes if the requested settlement agreement enjoins a state from suing in a state court?" and (2) "if the Eleventh Amendment does cover this motion for settlement approval, may GSK avoid the Eleventh Amendment's prohibition by showing that Louisiana waived its sovereign immunity?" *Id.*

The Third Circuit answered the first question in the affirmative. *Id.* It reasoned that the Eleventh Amendment "covers claims that seek equitable remedies" and that GSK's motion to

enforce the class action settlement qualified as such because the settlement agreement enjoined all class members from bringing any released claims against GSK in any state or federal court. *Id.* at 66–67. The Third Circuit explained that the "same concerns" expressed by the Eighth Circuit in *Thomas* "motivate[d]" their decision. *Id.* at 67. That is, to hold that GSK's motion was not a suit under the Eleventh Amendment would "undermine the Amendment's aims by: (a) allowing a private party to waive a state's sovereign immunity, and (b) compelling [p]remature litigation [that] potentially limits the costs [the state] can recover." *Id.*

As to the second question, the Third Circuit concluded that Louisiana did not waive its sovereign immunity by receiving a Class Action Fairness Act ("CAFA") notice and "failing to oppose the settlement based on that notice." *Id.* at 69. In reaching this conclusion, the court reasoned that Louisiana had not provided a "clear declaration" that it intended to submit itself to the district court's jurisdiction by merely receiving the CAFA notice and failing to act. *Id.* GSK argued that to deny its motion would "afford States more protection against becoming absent class members than what ordinary litigants receive under Rule 23." *Id.* at 70 (internal quotation marks omitted). In rejecting this argument, the Third Circuit explained that "[t]he Constitution requires more protections for States than for ordinary litigants not because of their sophistication but because of their status as sovereigns" and to "[a]nalogiz[e] states to private parties . . . ignores this justification." *Id.*

However, whether private parties may bind states as absent class members in an opt-out class under Rule 23 is an "open question of law." *In re Flonase Antitrust Litig.*, No. 08-3301, 2015 WL 9273274, at *5 n.7 (E.D. Pa. Dec. 21, 2015); *see also Richey v. Axon Enterprises, Inc.*, No. 19-00192, 2020 WL 3800524, at *2 (D. Nev. July 6, 2020) ("[T]he court was unable to locate any binding case law holding that the Eleventh Amendment precludes states from being plaintiffs in a

class action or that states that the Eleventh Amendment cannot be applied in this manner . . . [T]he issues presented by the motion to strike are novel and present a variety of issues that appear to be legally unsettled."). Some courts have dismissed class allegations against states on sovereign immunity grounds. *In re Auto. Parts Antitrust Litig.*, No. 12-02311, 2015 WL 14047405, at *4 (E.D. Mich. Apr. 30, 2015); *Walker v. Liggett Grp., Inc.*, 982 F. Supp. 1208, 1210 (S.D.W. Va. 1997); *see also In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 271 (D. Mass. 2011) (noting that "significant sovereignty issues may preclude defining a class to include state entities as absent class members under the Eleventh Amendment of the Constitution" but dismissing class allegations on superiority grounds).

Other courts—although none in response to a sovereign immunity challenge—have permitted class allegations to proceed against state agencies so long as they are afforded the opportunity to opt out of the class. *S. States Police Benev. Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 93 (D. Mass. 2007) (concluding that local and state "police departments may be certified as part of the class so long as they are afforded the opportunity to opt out of the class."); *see also In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 816 (3d Cir. 1982) (noting that the district court "certified each minority state and its respective government entities as a separate plaintiff class"); *In re Dynamic Random Access Memory Antitrust Litig.*, No. 06-4333, 2014 WL 12879520, at *2 (N.D. Cal. June 27, 2014) (certifying a settlement class of "[a]ll state government entities, all political subdivisions and all public colleges and universities" in various states).

Rule 23(c)'s "so-called" opt-out requirement "mandat[es] that members of a class certified under Rule 23(b)(3) be afforded an opportunity to 'request exclusion' from that class." *Kern v. Siemens Corp.*, 393 F.3d 120, 124 (2d Cir. 2004). Many courts have interpreted this provision to

preclude the certification of "opt-in" classes under Rule 23. *E.g.*, *Ackal v. Centennial Beauregard Cellular L.L.C.*, 700 F.3d 212, 216 (5th Cir. 2012) ("[P]roceedings under Rule 23 do not require that class members affirmatively 'opt in,' nor is such a requirement mandated by due process considerations."); *id.* (finding that the district court erred in certifying an "opt-in" class under Rule 23(b)(3)); *Hassine v. Simon's Agency Inc.*, No. 18-09031, 2021 WL 9990348, at *2 (D.N.J. Dec. 21, 2021) (denying the defendant's request for an opt-in requirement under Rule 23); *see also In re Actos Antitrust Litig.*, No. 13-09244, 2024 WL 4251891, at *27 (S.D.N.Y. Aug. 9, 2024), *R. & R. adopted by*, No. 13-9244, 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024); *Cox v. Spirit Airlines, Inc.*, No. 17- -5172, 2023 WL 2788457, at *1 (E.D.N.Y. Apr. 5, 2023) ("Rule 23 does not, however, require members of any class affirmatively to opt into membership." (internal quotation marks omitted)).

Additionally, subsection (c)'s opt-out requirement does not extend on its face to injunction classes certified under Rule 23(b)(2), which are, by default, "mandatory in nature." *Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) ("Rule 23(b)(2) classes are 'mandatory,' in that 'opt-out rights' for class members are deemed unnecessary and are not provided under the Rule."); *Reeb v. Ohio Dep't of Rehab. & Correction*, 435 F.3d 639, 645 (6th Cir. 2006) ("Rule 23(b)(2) authorize[s] 'mandatory' class actions under which potential class members do not have an automatic right to notice or a right to opt out of the class."); *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 19-2875, 2023 WL 1818922, at *11 n.9 (D.N.J. Feb. 8, 2023) ("A Rule 23(b)(2) class commands mandatory entry for class members who have neither a mechanism to opt out, nor the need to be noticed, of their class membership."); *Slamon v. Carrizo (Marcellus) LLC*, No. 16-2187, 2020 WL 2525961, at *16 (M.D. Pa. May 18, 2020) (denying the motion for class certification based on the "inability of class members to opt out" under Rule 23(b)(2) and

"the lack of any need that a class member be afforded notice of the action"); *see also DDMB, Inc. v. Visa, Inc.*, No. 05-1720, 2021 WL 6221326, at *47 (E.D.N.Y. Sept. 27, 2021) ("Under Rule 23 of the Federal Rules of Civil Procedure, neither notice nor an opportunity to opt out is required for classes certified pursuant to Rule 23(b)(2).").

Here, Plaintiffs purport to bring this action on behalf of themselves and "on behalf of all persons or entities who have directly purchased any of the following from Axon in the United States from May 3, 2018 until the effects of Defendants' unlawful conduct cease" under Rules 23(b)(2) and (b)(3):

> (1) a BWC System or any component of a BWC System or related services such as transcription, redaction, and warranties, and/or (2) a long-range CEW or components and related services such as electricity cartridges, battery packs, docks, cameras, signals, training, and warranties.

(CAC ¶ 134.) Plaintiffs allege that "many local governments and agencies around the country have invested significant sums of money . . . to purchase Axon's BWC Systems" and that Axon has "customer relationship[s] with 17,000 of the nation's 18,000 law enforcement agencies." (*Id.* ¶¶ 7, 89 n.77, 114.) Plaintiffs also assert that, as to the BWC Systems' market, of the "69 Major City" police departments, Axon controls "4 of the top 5, 7 of the top 10, and 15 of the top 20." (*Id.* ¶¶ 50–51.)

Although the parties have not yet engaged in discovery, like the court in *In re Automotive Parts Antitrust Litigation*, this Court finds that it need not defer a decision on sovereign immunity until the class certification stage. 2015 WL 14047405, at *4. The *Automotive Parts* decision is particularly instructive here. In that case, five local government entities filed a class action complaint, alleging antitrust violations in connection with bid-rigging practices in the automotive parts industry. *Id.* at *1. In their complaint, the plaintiffs identified a putative damages class

including various states and their subunits. *Id.* at \*2. None of those states had raised sovereign immunity as a defense because the court had not yet certified a class. *Id.* In deciding to rule on the issue of the state's sovereign immunity pre-class certification, the court adopted the Eighth Circuit's reasoning in *Thomas v. FAG Bearings Corp.* on the involuntary joinder of states, explaining that "the Eleventh Amendment's protection for state autonomy and treasure precluded forcing a state agency from prematurely prosecuting its claim at a time and place dictated by federal court." *Id.* at \*4. Based on these principles and the Southern District of West Virginia's decision in *Walker v. Liggett Group, Inc.*, 982 F. Supp. 1208 (S.D. W. Va. 1997), the court concluded that Rule 23's opt-out procedure did not give "proper deference to the doctrine of sovereign immunity" because, in an opt-out class, the states are "'cast as unwilling [p]laintiffs,' more analogous to defendants." *Id.* at \*4 (quoting *Walker*, 982 F. Supp. at 1210 (finding that, because the states had not "consented affirmatively" to participate in the class action, "nor ha[d] they acquiesced in any way to suggest their willing participation," they were "entitled to the protection of the Eleventh Amendment")).

These same concerns and those articulated in the Third Circuit's precedential decision in *Flonase* motivate the Court's decision today to strike the class allegations against all federal and state entities. *Flonase* held that the court could not approve a class action settlement as to a state class member when that agreement sought to enjoin the state from separately pursuing released claims because the state's failure to opt out of the settlement after receiving a CAFA notice did not constitute a waiver of sovereign immunity. 879 F.3d at 69. That is, a state does not waive sovereign immunity by "receiving notice and failing to act." *Id.* at 70. In reaching this conclusion, the Third Circuit emphasized that "[t]he Constitution requires more protections for States than for ordinary litigants not because of their sophistication but because of their status as sovereigns." *Id.* at 70.

Although the Third Circuit, indeed, no Circuit, has addressed the precise sovereign immunity issue before this Court, based on the reasoning in *Flonase*, the Court finds that dismissal of the class allegations against all state and federal entities is appropriate.

Plaintiffs' arguments—primarily to certify a class and defer the sovereign immunity decision until the state and federal entities can weigh in themselves—do not persuade the Court otherwise. The Court disagrees with Plaintiffs that Axon lacks standing to raise sovereign immunity at the motion to dismiss stage. "Sovereign immunity is jurisdictional in nature." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Thus, a party may raise it "at any time, even on appeal." *U.S. v. Bein*, 214 F.3d 408, 412 (3d Cir. 2000). The court may also raise sovereign immunity *sua sponte*. *Id.* Although the Court can decline to consider immunity until the sovereign raises it, *see Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 390 (1998), nothing precludes the Court from considering this question now, either as raised by Axon or of its own accord.

Furthermore, the Court is unconvinced by Plaintiffs' argument that the opportunity to opt out of the class, once certified, saves these claims, as a state or federal entity's failure to opt out is not sufficient to waive sovereign immunity under *Flonase*. Plaintiffs pursue two different types of classes—an injunction class under Rule 23(b)(2)[7] and a damages class under Rule 23(b)(3). A Rule 23(b)(2) class, by default, does not provide class members with the opportunity to opt out or even to receive notice of their class membership. *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, 2023 WL 1818922, at *11 n.9. Thus, by Plaintiffs' own logic, sovereign immunity would prevent the Court from including government entities in such a class as they could not opt out of it. While Rule 23(b)(3) does provide an opt-out procedure, Plaintiffs cite no case establishing that

---

[7] As set forth *infra*, the Court dismisses without prejudice Plaintiffs' claims for injunctive relief on separate grounds.

a state or federal entity's failure to respond to an opt-out notice under this rule would constitute a waiver of sovereign immunity. Indeed, *Flonase* teaches the opposite—a state's failure to act, or, in this instance, to opt out of a class, is insufficient to waive its sovereign immunity.

Plaintiffs argue, however, that a state or federal entity need not "affirmatively" exercise its waiver and that such waiver may be implied from "litigation conduct," citing to cases finding sovereign immunity waiver in the removal context. (Pls. MTS Opp. at 41.) *Flonase* determined, however, that whether the sovereign engaged in "litigation conduct" is not the test for waiver. 879 F.3d at 69. *Flonase* compared a sovereign's act of removal, which constituted waiver, to a sovereign's engagement in interstate marketing and administration knowing that it may be statutorily subject to suit, which did not constitute waiver. 879 F.3d at 69 (citing *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613 (2002); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999)). In doing so, the court explained that the rule when assessing a sovereign's waiver is not whether the state was engaging in "litigation conduct," but rather whether that conduct was a "clear indication of the State's intent to waive sovereign immunity." *Id.* (internal quotation marks omitted). The Third Circuit found that, unlike an act of removal, a sovereign's failure to act in response to a CAFA notice "in its capacity either as a litigant . . . or a market participant" was not a clear indication of its intent to waive sovereign immunity. *Id.* Considering this reasoning in *Flonase*, which arose in a context very similar to this one, and this Court's duty to strictly construe waiver in favor of the sovereign, *Sossamon*, 563 U.S. at 285, the Court concludes that a sovereign's failure to respond to an opt-out notice is not a clear indication of its waiver of sovereign immunity.

Plaintiffs' attempt to distinguish *Flonase* based on the type of notice received fails. While the type of class action notice at issue may differ (CAFA as opposed to Rule 23), the sovereign

immunity principles do not. The Eleventh Amendment bars this Court from compelling the state to act "by forcing it to prosecute [a private party] at a time and place dictated by the federal courts" absent a clear indication of waiver. 879 F.3d at 67 (quoting *Thomas*, 50 F.3d at 505). To hold otherwise would "allow[] a private party to waive a state's sovereign immunity," and "compel[] '[p]remature litigation [that] potentially limits the costs [the state] can recover.'" *Id.* Whether a sovereign fails to object to a class action settlement under a CAFA notice or to its inclusion as an absent class member under a Rule 23 opt-out notice, both scenarios involve a sovereign's silence and, thus, both scenarios lack a clear indication of waiver. Indeed, the intention behind a sovereign's failure to respond to a Rule 23 notice, no matter how "descriptive," is not clearly a "cho[ic]e not to opt out," as Plaintiffs contend. (Pls. MTS Opp. at 41.) A sovereign's failure to respond would still require this Court to infer the meaning of its silence. Such an inference would run afoul of sovereign immunity principles.

Plaintiffs' reliance on *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), to combat this point is inapposite. There were no sovereign class members in *Shutts*, let alone concerns regarding their sovereign immunity. *Shutts* addressed the due process concerns of private, absent class members in the context of personal jurisdiction. *Shutts*, 472 U.S. at 807. The Court rejected the claim that due process required absent class members who had "no minimum contacts with the forum State" to opt into the class in order to affirmatively consent to the state's jurisdiction. *Id.* at 811. The Court concluded that due process is satisfied and the "interest[s] of absent plaintiffs are sufficiently protected by the forum State when those plaintiffs are provided with a request for exclusion that can be returned within a reasonable time to the court." *Id.* at 814. Moreover, *Shutts*, which dealt with private litigants, is all the more inapplicable considering *Flonase*'s rejection of the concern that states receive "more protection against becoming absent class members than

ordinary litigants receive under Rule 23." 879 F.3d at 70. As *Flonase* made clear, sovereigns require more protections than private litigants "because of their status as sovereigns," and comparing states to private parties "ignores this justification." *Id.*

Plaintiffs do cite cases, unlike *Shutts*, in which courts have certified a class to include government entities, but those cases are distinguishable. (Pls. MTS Opp. at 28-30 & n. 14-15.)[8] None of them, including *S. States Police Benev. Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85 (D. Mass. 2007), on which Plaintiffs heavily rely, addressed a sovereign immunity challenge. Furthermore, almost all of the cases certify a class to include only local government entities, such as cities, counties, towns, and their subdivisions, for which there are no Eleventh Amendment protections anyway. *Alden*, 527 U.S. at 756 ("The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State."); *In re Auto. Parts Antitrust Litig.*, 2015 WL 14047405, at *5 ("The Eleventh Amendment does not bar suits against counties, cities, towns, or villages . . . ."). Indeed, Axon's sovereign immunity challenge pertains only to the class membership of state and federal entities.

Finally, the Court disagrees that its holding strips away the rights of a sovereign to prosecute their claims in a class action. States remain free to initiate together a putative class action rather than prosecuting claims on their own. They are also free to seek consolidation of their own actions through multi-district litigation ("MDL"). Indeed, there is a pending MDL request, filed on December 23, 2024, before the Judicial Panel on Multidistrict Litigation, seeking to consolidate

---

[8] Plaintiffs assert that *In re Lupron Marketing & Sales Practices Litigation*, certified a class including the "United States government . . . and all other government entities' claims." 228 F.R.D. 75, 78 n.3 (D. Mass. 2005). Not so. The class settlement agreement excluded those entities. *Id.* ("Excluded from the class are . . . the United States government, its officers, agents, agencies and departments, and all other government entities' claims.").

cases with "overlapping claims of antitrust violations by [Axon] related to its acquisition of VieVu" and "its alleged monopoly in the markets for [BWC] systems and digital evidence management systems." (ECF No. 1-1 at 2, *In re: Axon Enter., Inc., Body-Worn Camera and Digital Evidence Mgmt. Systems Antitrust Litig.*, MDL No. 3145 (J.P.M.L.).) What this Court will not do, and what Plaintiffs ignore, is restrict any sovereign's right to prosecute Defendants when and where it wants. In other words, this Court will not force any sovereign that fails to respond to a Rule 23 notice to prosecute Defendants as absent class members. Accordingly, the Court strikes the class allegations to the extent that they are raised on behalf of state and federal entities.

2.    Representation, Predominance, and Superiority Concerns

As to the local government entities included in the proposed class, Axon argues that municipal or county laws authorize only city, county, or district attorneys to initiate litigation on behalf of local government entities and that Plaintiffs have failed to allege any facts suggesting the authority of private counsel to represent the thousands of these entities potentially included in the proposed class. (Axon MTS Br. at 24–25.) Axon also asserts that, due to these representation issues, Plaintiffs cannot satisfy Rule 23's predominance and superiority requirements. (*Id.*) Plaintiffs respond that Axon lacks standing to assert the rights of any local government entities, that Rule 23 preempts local law on these representation issues, and that the rights of these local government entities are protected by their ability to opt out of the class. (Pls. MTS Opp. at 16–31.)

Considering the rare circumstance in which it is appropriate to strike class allegations pre-discovery, the Court declines to exercise its discretion to do so here. Axon is primarily focused on local ordinances that may affect whether private counsel can represent the local government entities included in the proposed class. Axon hinges its predominance and superiority arguments on this same concern. Although the CAC specifically identifies some local government entities that purchased Axon's BWC systems, (CAC ¶¶ 50–51), the record for the most part does not yet

identify the local government entities included in the proposed class. Axon argues that "countless municipal or county laws" preclude private counsel from representing the local government entities included in Plaintiffs' proposed class. (Axon MTS Br. at 24.) However, the Court cannot, at this stage, simply accept this claim as true when it does not know which local government entities are included in the class and if there are local laws prohibiting private counsel from representing those specific entities in a class action. Indeed, Axon cites only a handful of city charter provisions and no case law interpreting them or assessing their application to Rule 23 class actions. (*Id.* at 25 & n.6.) Accordingly, the Court concludes that it lacks a factual record sufficient to deny preemptively the certification of a class of local government entities.

Additionally, the Court disagrees, in terms of predominance, that potential representation issues necessitate "highly individualized inquiries that will dwarf any common issues." (*Id.* at 27–28.) To be sure, an assessment of whether Plaintiffs' private counsel can represent every city, county, town, or village in the proposed class may well be labor-intensive, and likely outside of this Court's province. However, federal law (Sherman Act and Clayton Act), not state law, governs the antitrust claims pursued by Plaintiffs. Those Sherman Act and Clayton Act claims and their elements are most relevant to the question of predominance. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."). Although the Court reserves its determination of predominance for the class certification stage, it notes that the federal laws at issue are common to the antitrust claims of all proposed class members. Contrary to Axon's contention, the Court need not analyze fifty different state statutes or face complex choice-of-law questions in order to determine the legal standard applicable to Plaintiffs' antitrust claims. Indeed, "[p]redominance is a test readily met" in antitrust cases. *In re McKesson Governmental Entities*

*Average Wholesale Price Litig.*, 767 F. Supp. 2d at 271–272 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

In sum, the Court reserves decision on potential issues related to the representation of local government entities and whether they implicate Rule 23's class action prerequisites until the class certification stage. The Court, therefore, denies Axon's Motion to Strike on these grounds.

The Court turns now to an overview of relevant antitrust law and the merits of Defendants' Motions to Dismiss.

**B.    OVERVIEW OF RELEVANT ANTITRUST LAW**

1.    Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits unreasonable restraints of trade. Section 1 states: "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Supreme Court explained the Sherman Act's purpose:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conductive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition.

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). While the plain language of Section 1 sweeps broadly, Section 1 is not interpreted literally, as "only those contracts or combinations which 'unreasonably' restrain competition" are prohibited. *Id.* at 4 (citing *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1 (1911); *Chicago Bd. of Trade v. United States*, 246 U.S. 231 (1918)).

To prove a Section 1 claim, a plaintiff must satisfy four elements: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) ("An antitrust plaintiff must plead the following two elements: (1) 'that the defendant was a party to a contract, combination . . . or conspiracy' and (2) 'that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.'" (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010))).

2.    <u>Section 2 of the Sherman Act</u>

Section 2 of the Sherman Act prohibits unilateral abuse of monopoly power. Under Section 2, it is unlawful for a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. Section 2 is "the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists." *LePage's Inc. v. 3M*, 324 F.3d 141, 169 (3d Cir. 2003). "A Section 2 claim has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Kenney v. Am. Bd. of Internal Med.*, 847 F. App'x 137, 145 (3d Cir. 2021) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571 (1966)). "Monopoly power is the ability to control prices and exclude competition in a given market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007) (citing *Grinnell Corp.*, 384 U.S. at 570–71).

Section 2 also prohibits attempted monopolization and conspiracy to monopolize. *See* 15 U.S.C. § 2. To state a claim for attempted monopolization under Section 2, a plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3d Cir. 2007) (quoting *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998)). To state a claim for conspiracy to monopolize, a plaintiff must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Laboratories Inc.*, 602 F.3d at 253.

### 3.    Section 7 of the Clayton Act

Section 7 of the Clayton Act prohibits corporations from creating a monopoly or substantially lessening competition through mergers and acquisitions. As Section 7 provides, "[n]o person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share . . . [or] the assets of another person engaged also in commerce or in any activity affecting commerce . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. "Congress used the words '*may be* substantially to lessen competition' . . . to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) (emphasis added). Congress tempered its desire "to create an effective tool for preventing all mergers having demonstrable anti-competitive effects" with its recognition that "stimulation to competition that might flow from particular mergers." *Id.* at 319.

To establish the *prima facie* case for a Section 7 violation, a plaintiff must "(1) propose the proper relevant market, and (2) show that the effect of the merger in that market is likely to be

anticompetitive." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337–38 (3d Cir. 2016). A "determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act," as the "threatened monopoly must be one which will substantially lessen competition 'within the area of effective competition.'" *Brown Shoe Co.*, 370 U.S. at 324 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)). The "area of effective competition" is defined in terms of "a product market (the line of commerce) and a geographic market (the section of the country)." *Id.* (internal quotation marks omitted).

In analyzing the second element, "a court must consider 'the interdependence of the market share foreclosed by, and the economic purpose of' the merger along with 'the share of the market foreclosed.'" *Camaisa v. Pharm. Rsch. Assocs., Inc.*, No. 21-00775, 2022 WL 843653, at *7 (D. Del. Mar. 22, 2022) (quoting *Brown Shoe Co.*, 370 U.S. at 328–329). The "traditional method" of proof is to show that "a merger would 'produce a firm controlling an undue percentage of the relevant market' and would 'result[ ] in a significant increase in the concentration of firms in that market.'" *Id.* (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)).

## C.    MOTIONS TO DISMISS

Defendants each raise numerous grounds for dismissal of the claims against them. *First*, neither Section 5(i) of the Clayton Act nor fraudulent concealment toll the applicable statute of limitations to save Plaintiffs' untimely claims. *Second*, Plaintiffs fail to plausibly plead an anticompetitive effect regarding their CEW market claims because, among other reasons, the non-compete provisions cannot constitute unreasonable restraints on trade because Safariland was not an actual or potential competitor in the CEW market. *Third*, Plaintiffs cannot establish antitrust standing to pursue their CEW market claims because Axon's patents are an independent barrier to entry. *Fourth*, Plaintiffs Howell and Augusta lack standing to pursue their BWC Systems' claims because they did not purchase Axon's BWC products. *Fifth*, Plaintiffs are not entitled to injunctive

relief because they fail to satisfy the elements of a permanent injunction and they lack standing to pursue such relief. *Sixth*, the laches defense bars Plaintiffs' claims for injunctive relief, including their request for divestiture, because Plaintiffs did not timely pursue them. *Seventh*, the Court must dismiss Plaintiffs' Section 7 claim against Safariland because it is the seller, not acquirer. *Eighth*, Plaintiffs' claims fail because their market definitions, as pled, are not cognizable. *Ninth*, Plaintiffs' Section 2 claim against Safariland fails because they have not alleged Safariland's specific intent to endow Axon with monopoly power.

The Court will address these arguments in their most logical sequence.

        1.    <u>Statute of Limitations</u>

The parties do not dispute that Plaintiffs filed their claims beyond the applicable statute of limitations. The parties agree that the statute of limitations as to all of Plaintiffs' claims began to run on May 3, 2018, the date of Axon's acquisition of VieVu. (ECF No. 76-1 ("Axon MTD Br.") at 31; ECF No. 80 ("Pls. Axon MTD Opp.") at 23–24.) They also agree that the statute of limitations applicable to all claims in the CAC is four years and that Plaintiffs initiated this action in August 2023, over five years after the acquisition date. (*Id.*) The parties' dispute, instead, centers on whether Section 5(i) of the Clayton Act or fraudulent concealment tolled the four-year limitations period.[9] For the foregoing reasons, the Court finds that Plaintiffs' claims (Counts I, II,

---

[9] Plaintiffs do not respond to Axon's argument that they failed to plead a continuing violation. Thus, the Court will not consider whether Plaintiffs have adequately pled continuing violations as a basis for tolling the statute of limitations. *See Sang Geoul Lee v. Won Il Park*, 720 F. App'x 663, 666 (3d Cir. 2017) ("Failure to respond to the pertinent opposition-brief argument acts as a concession of that argument."); *Leisure Pass N. Am., LLC v. Leisure Pass Grp., Ltd.*, No. 12-03375, 2013 WL 4517841, at *4 (D.N.J. Aug. 26, 2013) ("Plaintiff has waived its opposition to this argument by failing to respond to it.").

VI, VII, VIII) regarding the CEW market are untimely and dismisses them. As to Plaintiffs' BWC Systems claims, the Court concludes that Section 5(i) tolls the statute of limitations.

i.   Section 5(i) of the Clayton Act

Axon[10] argues that Plaintiffs are not entitled to tolling under Section 5(i) because their BWC Systems market, as pled, is broader than the market defined in the FTC's action. (Axon MTD Br. at 32–34.) In a footnote, Axon asserts that Plaintiffs' CEW claims are also not entitled to tolling under this provision as the FTC action "did not even define a CEW Market" and, thus, are "even further afield from the FTC's complaint." (*Id.* at 34 n.7.) Plaintiffs respond that they satisfy the liberal "substantial identity" standard under Section 5(i) because their case and the FTC's action are both based on the same anticompetitive conduct and its effects. (Pls. Axon MTD Opp. at 24–27.) They also argue that the FTC complaint includes allegations regarding the non-compete provisions, which include reference to the CEW market, and their anticompetitive effects. (*Id.* at 26 n.16.)

Section 5(i) of the Clayton Act suspends, during the pendency of "any civil or criminal proceeding instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . and for one year thereafter," the statute of limitations "in respect to every private or State right of action arising under said laws" that is based "in whole or in part on any matter complained of in said proceeding." 15 U.S.C. § 16(i). As the Supreme Court has cautioned, "care must be exercised to insure that reliance upon the government proceeding is not mere sham and that the matters complained of in the government suit bear a *real relation* to the private plaintiff's claim for relief." *Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59 (1965) (emphasis added). However,

---

[10] Safariland adopts and incorporates into its Motion to Dismiss Axon's arguments regarding statute of limitations. (Safariland MTD Br. at 30.)

in determining whether Section 5(i) tolling applies, courts must give effect to the "broad terms of the statute itself—'based in whole or in part on any matter complained of' []—read in light of Congress' belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." *Id.* (internal quotation marks omitted). "It is plain that . . . Congress meant to assist private litigants in utilizing any benefits they might cull from government antitrust actions." *Minn. Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 317 (1965).

With those matters in mind, the Third Circuit has crafted its own restatement of the Supreme Court's "real relation" requirement: "[t]he tolling statute . . . will only apply if there is a *substantial identity* between the matters alleged in the Government's action and those alleged in the private action." *State of N.J. v. Morton Salt Co.*, 387 F.2d 94, 98 (3d Cir. 1967) (emphasis added); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2019 WL 130535, at *9 (E.D. Pa. Jan. 8, 2019). In assessing substantial identity or real relation, "courts have considered whether the violations involve similar objectives, means, time span, and geographic scope." *Winn-Dixie Stores, Inc.*, 2019 WL 130535, at *9 (collecting cases) (internal quotation marks omitted). For instance, Section 5(i) tolling would be applicable if the private civil action alleged a conspiracy that used "substantially similar means to accomplish the same anticompetitive goal in the same market as the prior government suit." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 885 F. Supp. 2d 617, 628 (S.D.N.Y. 2012). However, "there is no requirement . . . of complete identity of the means, objectives, or statutory violations in the public and private lawsuits. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 320 (4th Cir. 2007) (citing *Leh*, 382 U.S. at 59). Indeed, "[a] private action that is substantially broader than a prior government action may still benefit from § 16(i) tolling where the allegations in the private action incorporate the subject matter of the Government

action." *Hinds Cnty., Miss.*, 885 F. Supp. 2d at 627 (citing *In re Antibiotic Antitrust Actions*, 333 F. Supp. 317, 321 (S.D.N.Y.1971); *In re Scrap Metal Antitrust Litig.*, No. 02-0844, 2006 WL 2850453, at *22 (N.D. Ohio 2006)); *see also In re Refrigerant Compressors Antitrust Litig.*, 92 F. Supp. 3d 652, 663 (E.D. Mich. 2015). The court conducts its "substantial identity" assessment "limited to a comparison of the two complaints on their face." *Leh*, 382 U.S. at 66.

In the FTC complaint, the FTC alleged that Axon's acquisition of VieVu "eliminated price and innovation competition between Respondent Axon and VieVu in the relevant market" and would "likely entrench Respondent Axon's already dominant share of the relevant market and [] significantly increase market concentration." FTC Compl. ¶¶ 8, 35.[11] The relevant product market identified in the FTC complaint is "the sale of BWC Systems, comprising BWCs and DEMs, to large, metropolitan police departments in the United States." *Id.* ¶ 20. "BWCs are the hardware component, and DEMS are the software component, of an integrated BWC System." *Id.* ¶ 21. The FTC also noted that, as part of the acquisition, Respondents Axon and Safariland agreed to non-compete provisions that "prevent actual and potential competition between Respondents and Safariland." *Id.* ¶ 44. The FTC stated that, in Section 15.1 of the Holster Agreement, Safariland agreed not to compete in the CEW and BWC industry, among other industries, "anywhere in the world for 12 years." *Id.* ¶ 46. The FTC claimed that the non-compete provisions went "far beyond any intellectual property, goodwill, or customer relationship necessary to protect Respondent Axon's investment in VieVu" and that the "lengths of the Non-Competes are longer than reasonably necessary." *Id.* ¶ 53.

---

[11] https://www.ftc.gov/system/files/documents/cases/d09389_administrative_part_iii
_-_public_redacted.pdf (last visited Jan. 31, 2025).

In the CAC in this action, Plaintiffs identify the relevant product markets as "the sale of (1) BWC Systems and (2) long-range CEWs—all in the United States." (CAC ¶ 34.) Plaintiffs allege that BWCs "operate in conjunction with associated hardware including docks and with DEMS, the software component," which, "[t]ogether . . . form an integrated BWC System." (*Id.* ¶ 36.) They claim that docks "connect to BWCs for purposes of charging the BWCs' batteries and uploading data . . . from the BWCs onto a computer." (*Id.* ¶ 38.) Plaintiffs also allege that Axon sells "transcription, redaction, and warrant[y] services related to BWC Systems." (*Id.* ¶ 39.) The warranties, for example, include coverage for "several years, spare BWCs or Docks, and replacement or upgraded BWCs or Docks after several years." (*Id.*) Plaintiffs allege that "[p]olice departments frequently issue requests for proposals seeking to purchase BWC Systems components together as part of an integrated BWC System." (*Id.* ¶ 40.) Plaintiffs identify the relevant geographic market for these products as "customers in the United States." (*Id.* ¶ 44.)

The Court finds that Section 5(i) does not toll Plaintiffs' claims regarding the CEW market. The United States Court of Appeals for the Fourth Circuit's decision in *Novell, Inc. v. Microsoft Corp.*, is instructive on this point. In that case, Novell claimed that Microsoft's conduct injured competition in the markets for "PC operating systems" and "office-productivity applications." *Novell*, 505 F.3d at 304–305. The United States and several states had initiated an action challenging Microsoft's conduct in the PC operating system and Internet browser markets. *Id.* at 306. The district court dismissed Novell's claims based on office-productivity applications as untimely. *Id.* at 304. In affirming the district court's ruling, the Fourth Circuit looked to the "competing policy objectives" of Section 5(i) tolling—Congress's belief that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws" and "congressional emphasis on certainty and predictability in the application of the tolling provision

so as to avoid undue prolongation of [antitrust] proceedings." *Id.* at 320 (quoting *Minnesota Min. & Mfg. Co.*, 381 U.S. at 320; *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 335 (1978)). The Fourth Circuit also recognized the "general rule that limitations are not tolled when the government and subsequent private suits . . . arose in distinct markets." *Id.* (citing 2 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 321a, at 241 (2d ed. 2000); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 481, 483–484 (C.D. Cal. 1991); *Charley's Tour and Transp., Inc. v. Interisland Resorts*, Ltd., 618 F. Supp. 84, 86 (D. Haw. 1985) (internal quotation marks omitted).

Based on these principles, the court rejected Novell's argument that, because the "DOJ complaint reference[d] other software markets," that complaint was also complaining of harm to office-productivity applications. *Id.* at 321. The Fourth Circuit also pointed out that "the Supreme Court has accepted tolling only where private plaintiffs make claims in markets identical to, or completely encompassed by those at issue in the earlier government suit." *Id.* at 321–322 (citing *Zenith v. Hazeltine Research, Inc.*, 401 U.S. 321, 323–25, 333–334 (1971); *Leh*, 382 U.S. at 64; *Minn. Mining & Mfg. Co.*, 381 U.S. at 315, 322–323). Because the market for office-productivity applications was "distinct" from the markets defined in the prior government complaint, the Fourth Circuit held that the Clayton Act's tolling provision did not apply to such claims. As the court explained, Section 5(i) of the Clayton Act should not be construed to "permit private plaintiffs to sit on their rights and to assert, years after the traditional statute of limitations has run, claims so much broader than those asserted by the government that they open entirely new vistas of litigation." *Id.* at 322 (internal quotation marks omitted).

The Court applies those same principles here. CEWs were not part of the proposed market definition in the FTC action, which was clearly circumscribed to BWCs and DEMS. They are in

this case. That difference is significant. While the Court appreciates that the FTC action touched upon the alleged anticompetitive effect of the non-compete provisions—which included restrictions as to both the BWC product market defined in that action and CEWs, a product outside of that definition—the reference to those provisions does not overcome the distinct nature of the two proposed market definitions. Indeed, in distinguishing the cases cited by Defendants when applied to the BWC Systems market, Plaintiffs readily acknowledge that those matters addressed "situations where the private plaintiffs' proposed market did not overlap with the market in the government case at all." (Pls. Axon MTD Opp. at 27 & n.4.) Plaintiffs cannot ignore that same precedent when applied to CEWs—an entirely different product market.

Furthermore, Plaintiffs' contention that Defendants rely only on "out-of-Circuit cases" to support the proposition that "Section 5(i) applies only to private suits that allege markets identical to or narrower than the market in the government lawsuit" is incorrect. That proposition is based on Supreme Court precedent. *Novell*, 505 F.3d at 321–322. The Supreme Court cases relied on in *Novell* applied Section 5(i) tolling "in markets identical to, or completely encompassed by," the market at issue in the prior government action. *Id*. Plaintiffs have cited to no case in which a court has applied Section 5(i) tolling to a private action including a product in its market definition that is wholly unrelated to or entirely distinct from what was proposed in the prior government action. Considering the principles established by the Supreme Court and in Circuit cases like *Novell*, this Court declines to extend Section 5(i) to any such situation, as it is foreclosed by precedent from doing so. Thus, Section 5(i) does not save Plaintiffs' untimely CEW claims. The Court dismisses Counts I and II to the extent that they are based on the CEW market and Counts VI, VII, and VIII in their entirety.

However, as these same principles teach, the Court will toll Plaintiffs' BWC Systems claims under this provision. Unlike the CEW market, both the FTC action and this case include BWC Systems in their proposed market definition. Defendants contend, however, that there is no substantial identity between the two cases because the market definition for BWC Systems is broader here than in the FTC action. That is, this case includes other BWC-related products, like BWC docks, and includes a geographic market of all United States customers, not just large, metropolitan police departments.

The Court disagrees that the two actions lack substantial identity. Unlike the CEW market, there is significant overlap between the BWC System products included in both actions. Both the FTC case and this one involve the primary product in the BWC System, the BWCs themselves, and the DEMS, the software component by which users view, store, and share content captured by the BWCs. Plaintiffs also include in their market definition other "closely related" BWC products and services "frequently" sold together with the BWC and DEMS "as part of an integrated BWC System," like the dock, which charges the BWC, and warranties that provide spare and replacement BWCs. (CAC ¶ 40.) These products and services, while not alleged in the FTC action, are all ancillary to the BWCs and assist in their operation or improve their functionality. (*See* CAC ¶¶ 38–40.) Furthermore, "complete identity" is not necessary to apply Section 5(i) tolling. *See Leh*, 382 U.S. at 59. The Court must give effect to the "broad terms of the statute itself—'based in whole or in part on any matter complained of,'" *id.* (internal quotation marks omitted), as well as the congressional purpose of 5(i), which is to "assist private litigants in utilizing any benefits they might cull from government antitrust actions." *Minn. Mining & Mfg. Co.*, 381 U.S. at 317. Accordingly, the Court finds that there is substantial identity between the FTC action and this case even with the inclusion of a few additional, ancillary BWC-related products.

The Court reaches the same conclusion as to geographic product market. Defendants rely primarily on *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 782 F. Supp. 481 (C.D. Cal. 1991), to support their contention that substantial identity is lacking because the geographic market is broader here, but that case is distinguishable. In *Petroleum Products*, the government action's geographic market "excluded any area west of the Rockies," implying "that the West Coast, including Arizona, was *not* included." 782 F. Supp. at 486 (emphasis in original). The court found that the private action alleged that "conduct in violation of the Sherman Act occurred on the West Coast." *Id.* Thus, according to the court, any anticompetitive conduct that might have occurred in the geographic market of the government action, which included only Eastern, Gulf Coast, and Mid-Continent markets, would be "irrelevant" to the private action because "plaintiffs are not required to prove *any* Eastern, Gulf Coast[,] Mid-Continent acts in order to prevail in these cases." *Id.* Unlike *Petroleum Products* where there was no overlap whatsoever of geographic markets, the FTC action's market of large, metropolitan police departments is included in Plaintiffs' proposed market of all customers in the United States. As Plaintiffs allege, of the "69 major U.S. metropolitan agencies," Axon controlled "4 of the top 5, 7 of the top 10, and 15 of the top 20," dominating "among the very largest U.S. agencies." (CAC ¶¶ 49–52.) The Court concludes that there is significant overlap between these geographic market definitions and, therefore, substantial identity between the FTC action and this one.

Finally, the Court notes that Plaintiffs pursue BWC System claims based on the same anticompetitive conduct and its effects as the FTC action. That is, both actions challenge substantially similar, if not the same, means employed by Defendants to accomplish the same anticompetitive goal. *See Hinds Cnty., Miss.*, 885 F. Supp. 2d at 628. Based on a comparison of

the two actions as a whole and in light of the principles underlying Section 5(i), the Court finds that the FTC action and this case are substantially similar as to Plaintiffs' BWC System claims. Accordingly, the Court tolls, under Section 5(i), Counts I and II to the extent that they rely on the BWC Systems market and Counts III, IV, and V in their entirety and denies Defendants' Motions to dismiss as to the timeliness of these claims.

ii.    Fraudulent Concealment

Since the Court has determined that Section 5(i) does not toll the CEW claims set forth in Counts I, II, VI, VII, VIII, it will consider whether Plaintiffs succeed on those claims under a fraudulent concealment theory of tolling. (CAC ¶¶ 151–152.) Axon argues that Plaintiffs have not pled fraudulent concealment because they fail to allege that Axon "actively misled" them, that Plaintiffs were reasonably diligent in attempting to uncover relevant facts, and that they were "actually misled" into thinking they did not have a cause of action. (Axon MTD Br. at 34–37.) Plaintiffs respond that the relevant non-compete provisions were not publicly known until the FTC action brought them to light on January 3, 2020. (Pls. Axon MTD Opp. at 28.) They claim that they have pled with particularity that Defendants fraudulently concealed the non-compete provisions and that they had no reason to exercise due diligence before those provisions became public. (*Id.*)

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). Like fraud, "fraudulent concealment[] must be pleaded with particularity." *Commodity Futures Trading Comm'n v. Worldwide Markets, Ltd.*, 675 F. Supp. 3d 496, 504 (D.N.J. 2023) (quoting *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984)). Rule 9(b) "requires, at a minimum, that plaintiffs support their allegations of [] fraud with all of the

49

essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re: Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, 172 F. Supp. 3d 724, 738–39 (D.N.J. 2016) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006)).

Fraudulent concealment has four elements: "(1) the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of his or her claim within the limitations period; and (3) the plaintiff's ignorance is not attributable to his or her lack of reasonable diligence in attempting to uncover the relevant facts." *Id.* (quoting *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2023). To prove "active misleading," a plaintiff must show that the defendant took steps "beyond the challenged conduct itself to conceal that conduct from the plaintiff." *LabMD Inc. v. Boback*, 47 F.4th 164, 181 (3d Cir. 2022). Silence or passive conduct does not constitute fraud unless "there is an affirmative duty to disclose because of a fiduciary relationship between the parties or a similar relationship of trust and confidence." *Mest v. Cabot Corp.*, 449 F.3d 502, 517 (3d Cir. 2006).

Plaintiffs allege that "Defendants fraudulently concealed the ancillary noncompete agreements that they entered into in connection with [Axon's] Acquisition" of VieVu. (CAC ¶ 151.) Plaintiffs claim that they were not aware of the non-compete provisions until the FTC action brought them to light on January 3, 2020. (*Id.* ¶¶ 128, 151.) Plaintiffs also allege that "[m]any of the overt acts in furtherance of the conspiracy alleged in this complaint were done with the purpose of concealing the conspiracy and preventing Plaintiffs . . . from learning about the conspiracy's existence." (*Id.* ¶ 152.)

Plaintiffs have failed to plead with the requisite particularity fraudulent concealment. Save a conclusory statement that Defendants "fraudulently concealed" the noncompete provisions, (*id.*

¶ 151), Plaintiffs plead no facts to support that Defendants *actively* misled them. Plaintiffs also do not plead that Defendants had a duty to reveal the non-compete provisions to Plaintiffs because of a fiduciary or similar relationship of trust and confidence such that Defendants' silence or failure to reveal publicly the noncompete provisions constituted fraud. *See Mest*, 449 F.3d at 517. Furthermore, Plaintiffs do not allege that Defendants acted beyond the challenged conduct itself to conceal the non-compete provisions. Indeed, they rely on the same "overt acts in furtherance of the conspiracy" to prove fraudulent concealment. (*Id.* ¶ 152.) The Court, therefore, concludes that Plaintiffs have failed to sufficiently plead that fraudulent concealment tolls the four-year statute of limitations applicable to their CEW claims.[12]

### 2. Howell and Augusta's Standing

Defendants argue that Plaintiffs Howell and Augusta lack standing to pursue their BWC Systems claims (Counts I, II, III, IV, V) because neither of them purchased those products from Axon. (Axon MTD Br. at 44.) Plaintiffs respond that all three Plaintiffs have standing to pursue such claims because, at least one Plaintiff, Baltimore, purchased BWC products from Axon. (Pls. Axon MTD Opp. at 53.)[13] Even if that were not the case, Plaintiffs assert that Howell and Augusta could bring BWC claims on behalf of the putative class because the same anticompetitive conduct as to BWC products harmed them as CEW purchasers. (*Id.* at 54.)

A plaintiff must always satisfy the threshold requirement of Article III standing. *Nahas v. Shore Med. Ctr.*, 473 F. Supp. 3d 383, 398 (D.N.J. 2019), *aff'd*, 828 F. App'x 89 (3d Cir. 2020); *see also Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 232 (3d Cir. 2013). To

---

[12] Because the Court dismisses Plaintiffs' CEW claims on statute of limitations grounds, the Court need not address Axon's arguments regarding anticompetitive effect and independent barriers to entry.

[13] Plaintiffs also point out that the CAC contains allegations that Howell also purchased BWCs from Axon. (Pls. Axon MTD Opp. at 44 n.15.)

establish standing under Article III, a plaintiff must show: (1) injury in fact; (2) causation; and (3) redressability. *Hemy v. Perdue Farms, Inc.*, No. 11-888, 2011 WL 6002463, at \*10 (D.N.J. Nov. 30, 2011); *see also Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 455 (3d Cir. 2003). In antitrust actions, plaintiffs must also establish "antitrust standing." The Third Circuit sets forth a multi-factor test for analyzing antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Nahas*, 473 F. Supp. 3d at 398 (quoting *Ethypharm S.A. France*, 707 F.3d at 232). Generally, an antitrust plaintiff that fails to allege that it purchased the product at issue lacks standing. *E.g.*, *Hemy*, 2011 WL 6002463, at \*11 (finding that plaintiffs lacked standing because they failed to allege that they had purchased Perdue-brand chicken products).

In the context of a class action, only the named plaintiff must demonstrate standing. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 362 & n.3 (3d Cir. 2015) ("[U]nnamed, putative class members need not establish Article III standing. Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has standing.") (citing 5 Jerold S. Solovy et al., Moore's Federal Practice - Civil § 23.63 (3d ed. 1997) ("The named plaintiff in a class action must meet all the jurisdictional requirements to bring an individual suit asserting the same claims, including standing.")). Once the court determines Article III standing "vis-a-vis the named parties . . . there remains no further separate class standing requirement in the constitutional sense." *Neale*, 794 F.3d at 361. However, "[i]f none of the named plaintiffs purporting to represent a class establishes

the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) (finding that "at least one of the four named Plaintiffs must have Article III standing in order to maintain this class action") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)). The named plaintiff in a class action "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.*

As an initial matter, Plaintiffs misunderstand how to satisfy standing in the class action context. They seem to imply that, because Baltimore has allegedly purchased BWCs from Axon, standing is satisfied as to all named Plaintiffs. Not so. It is true that, because Baltimore has standing, Baltimore may pursue BWC claims on behalf of *unnamed*, putative class members, and the class action survives this stage. *See Neale*, 794 F.3d at 361. However, Baltimore cannot confer its standing on other *named* Plaintiffs. Each plaintiff seeking to proceed as a named plaintiff on behalf of the class must satisfy Article III's standing requirement. *Id.* That is, Howell and Augusta must each establish standing to proceed as named plaintiffs.

The Court finds that the question of standing centers only on Augusta, which did not allege the purchase of BWC Systems from Axon in the CAC. In contrast, Howell explicitly alleges that it purchased BWC Systems from Axon. (CAC ¶ 22.) To rebut this allegation, Axon directs the Court to the Howell Township Police Department's publicly available internal affairs webpage. At the bottom of this page, it states, "Howell Township Police Department utilizes the Motorola Watchguard V300 Body Worn Camera."[14] The webpage contains no information regarding how long Howell's police department has used Motorola BWCs and if it did so throughout the entire

---

[14] https://www.howellpolice.org/internal-affairs/ (last visited Jan. 31, 2025).

Class Period. This webpage also does not foreclose the possibility that Howell uses Axon's BWCs simultaneous with Motorola's. While the Court notes the representation in Axon's brief that it has no record of Howell ever having purchased a BWC from Axon, in this pre-discovery 12(b)(6) posture, the Court, as the parties know, may only consider the allegations in the CAC. *See Mayer*, 605 F.3d at 230. Thus, based on the CAC's allegations, the Court finds that Howell has standing to pursue its BWC Systems claims. Defendants, however, may re-raise the issue of standing after class discovery when this Court must assess whether Howell can serve as a class representative.

Regarding Augusta, the Court concludes that it lacks standing to pursue its BWC Systems claims as Augusta has not alleged the purchase of BWCs from Axon. Plaintiffs contend that, because Augusta purchased CEWs during the Class Period, it has standing to pursue BWC claims as well. However, this Court has dismissed all CEW claims as untimely. Because only BWC claims remain and the Court finds that Augusta lacks standing to bring them, the Court dismisses the CAC as brought by Augusta.

### 3. Injunctive Relief

Axon argues that the Court must dismiss Plaintiffs' claims for injunctive relief for two reasons. First, Axon claims that Plaintiffs fail to allege that they will be irreparably harmed in the future and, second, they lack standing to seek injunctive relief because they do not plead a threat of future injury as past purchasers of Axon's products. (Axon MTD Br. at 41–44.) Plaintiffs respond that it is premature for the Court to determine at the pleading stage whether a permanent injunction should issue. (Pls. Axon MTD Opp. at 45–47.) Plaintiffs argue that they have adequately pled irreparable future injury due to "substantially increased prices, reduced product quality, and lack of innovation" in the BWC Systems market. (*Id.* at 47.) They also assert their standing to pursue injunctive relief based on the following: Baltimore's future need for replacement BWC System products when they "[i]nevitably" break; (2) the "extreme[]" difficulty that customers

generally confront when switching products because BWC products are bundled and integrated with police department software; and (3) the length of Axon's contracts commit customers to purchase Axon products for years. (*Id.* at 50.)

"In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof)" before considering the "appropriate remedy." *Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 850 (3d Cir. 1984). A court may grant a permanent injunction if the plaintiff has demonstrated "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (internal quotation marks omitted).

However, a plaintiff seeking injunctive relief must first possess Article III standing to do so. Article III standing requires "(1) injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 290–91 (3d Cir. 2005). To claim "possible future injury" is not sufficient. *McCray v. Fid. Nat. Title Ins. Co.*, 682 F.3d 229, 243 (3d Cir. 2012). "'A threatened injury must be certainly impending,' and 'proceed with a high degree of immediacy.'" *Id.* (quoting *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011)). "In the context of class actions, Article III standing 'is determined vis-a-vis the named parties.'" *Id.* (quoting *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 306 (3d Cir. 1998)).

According to Plaintiffs, they have plausibly alleged that they will "imminently purchase Axon's products" and, therefore, have standing to pursue injunctive relief against Defendants. The Court disagrees. Plaintiffs[15] have pled no facts indicating that the named Plaintiffs have "actual or imminent" plans to purchase Axon BWC products. Plaintiffs argue that Baltimore has purchased "millions of dollars' worth" of Axon BWC products that will "[i]nevitably" break and require replacement. The CAC, however, contains no such allegation. Indeed, it is bare of any allegation that Baltimore is even a current customer, let alone will purchase Axon products again. In addition, Plaintiffs' assertions that Axon's contracts are "long-term" and typically bundled, (CAC ¶¶ 19, 67, 69), are pled generally, not specific to any named Plaintiffs. Although these allegations may apply to some potential class members, named Plaintiffs must each have standing to pursue injunctive relief if they seek class representation. *See McCray*, 682 F.3d at 243.

Furthermore, even assuming that Plaintiffs are current customers, subject to a lengthy contract with Axon—none of which is pled—the injury associated with Plaintiffs entering into those contracts is past. *See In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 35 (D.D.C. 2008) ("An order enjoining defendants from specific future conduct would have no remedial effect whatsoever on the continuing future damages plaintiffs expect to experience due to the past injury they allege was inflicted at the time when their loans originated."). The length of the contract may generate damages from that past injury realized in the future (or future damages), but it will not create future injury. *Id.* ("Plaintiffs have conflated damages from a past injury that will be realized

---

[15] The Court has already determined that Augusta lacks standing to bring any BWC Systems claims against Defendants.

in the future, sometimes referred to as future damages, with the threat of a future injury."). Accordingly, the Court dismisses Plaintiffs' claims for injunctive relief.[16]

### 4.     Section 7 Claim Against Safariland

Safariland argues that the plain language of Section 7 of the Clayton Act applies only to "acquirers," not sellers, and the Court must dismiss such claim (Count I) against it. (ECF No. 78-2 ("Safariland MTD Br.") at 15.) Plaintiffs respond that they do not seek damages from Safariland under Section 7 but, instead, pursue that Count against Safariland in the event that its presence is needed to effect appropriate injunctive relief, such as recission. (ECF No. 81 ("Pls. Safariland MTD Opp.") at 10.) Because the Court has determined that Plaintiffs lack standing to pursue injunctive relief and Plaintiffs' Section 7 claim against Safariland rests solely on the potential for that relief, the Court dismisses Count I against Safariland.

### 5.     Relevant Market Definition

Axon argues that the Court should dismiss all of Plaintiffs' claims because their proposed market definition lumps together complementary products and services that are not substitutes for each other. (Axon MTD Br. at 46–47.) Plaintiffs respond that they have properly alleged "cluster markets" of "complex, interrelated, and interdependent" products and services offered by Axon. (Pls. Axon MTD Opp. at 34–35.) They also argue that relevant market definition is a fact-intensive inquiry requiring discovery ultimately best left to the factfinder. (*Id.* at 32.)

"A plaintiff bears the burden of defining both a relevant geographic and a relevant product market." *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018). A court may dismiss a complaint "if it defines the relevant market without reference to interchangeability or

---

[16] Axon argues that the laches defense bars Plaintiffs' claims for injunctive relief because they unreasonably delayed bringing suit, prejudicing Axon. (Axon MTD Opp. at 38.) The Court has already dismissed all claims for injunctive relief. Therefore, it need not determine whether laches bars them.

cross-elasticity of demand or if it 'alleges a proposed market that clearly does not encompass all interchangeable substitute products.'" *Id.* (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124. F3d 430, 436 (3d Cir. 2018)). However, a party may group "distinct, non-interchangeable services" into one market "if 'companies recognize that to compete effectively, they must offer all or nearly all types of service.'" *Marchese v. Cablevision Sys. Corp.*, No. 10-2190, 2012 WL 78205, at *8 (D.N.J. Jan. 9, 2012) (quoting *Grinnell Corp.*, 384 U.S. at 572) ("[N]onsubstitutable goods could constitute a relevant 'cluster' market based on the rationale of 'economies of joint provision,' or economies produced in a relevant market that would give a monopolist [who] combin[es] separate goods a decisive cost advantage over those who offered the services separately . . . ."). The ultimate inquiry is whether the relevant market "correspond[s] to the commercial realities of the industry and [is] economically significant," *Lifewatch Servs. Inc.*, 902 F.3d at 337 (quoting *Brown Shoe Co.*, 370 U.S. at 336–337). The corresponding commercial realities may reflect the need to combine into a single market "a number of different products or services." *Grinnell Corp.*, 384 U.S. at 572; *see also Brown Shoe Co.*, 370 U.S. at 327 (declining to subdivide the shoe market at issue into "age/sex distinctions" and considering men's, women's, and children's shoes together in a single market); *Marchese*, 2012 WL 78205, at *8 ("The Supreme Court has generally considered 'cluster' markets in contexts in which, as a matter of trade or commercial reality, a cluster of products create a distinct line of commerce.").

Courts are "cautious" before dismissing a complaint "for failure to define a relevant market." *Lifewatch Servs. Inc.*, 902 F.3d at 337. Because a determination of relevant product market requires an assessment of the commercial realities faced by consumers, "in most cases, proper market definition can be determined only after a factual inquiry into" those realities. *Id.* (internal quotation marks omitted); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199

(3d Cir. 1992) ("[T]he determination of a relevant product market or submarket . . . is a highly factual one best allocated to the trier of fact.").

The Court will likewise defer the determination of relevant product market until the parties have developed a factual record sufficient to determine whether a company must offer all or nearly all types of services pled to compete effectively in the BWC Systems market. Here, Plaintiffs allege that police departments "frequently issue[d] requests for proposals seeking to purchase BWC Systems components together as part of an integrated BWC System." (CAC ¶ 40.) They also assert that Axon, for instance, "requires policy departments to integrate Axon BWCs with Evidence.com, Axon's DEMS, because Axon body cameras only work with Evidence.com." (*Id.*) According to Plaintiffs, Axon "touts the efficiencies" of using their products together:

> [Axon] stat[es] that [a]ll technologies in one bundled offering that includes BWCs, Docks, and DEMS work together to deliver unprecedented efficiency and impact. Axon similarly states that Axon BWCs are fully integrated with the growing Axon network [including DEMS] to give you better evidence capture and management.

(*Id.* (internal quotation marks omitted).) Discovery has not yet substantiated these allegations and whether "commercial realities" warrant combining the BWC Systems products and services at issue into a single market. Accordingly, the Court denies Axon's Motion to Dismiss the CAC for failure to plead a cognizable product market.

### 6. *Per Se* Violations

Safariland argues that none of the conduct challenged by Plaintiffs states a *per se* violation of Section 1 of the Sherman Act (Count II) because the agreements at issue do not fall within the "small category of recognized *per se* unlawful agreements." (Safariland MTD Br. at 23–27.) Plaintiffs respond that the Court need not choose between the *per se* or rule-of-reason standards prior to discovery. (Pls. Safariland MTD Opp. at 12.) Nonetheless, according to Plaintiffs, they

contend that they have plausibly alleged that the non-compete provisions are "*per se* unlawful market allocation" agreements. (*Id.*) The Court disagrees and dismisses Plaintiffs' Section 1 claim (Count II) to the extent that it asserts *per se* violations.

"[C]ourts examine alleged illegal conduct [under Section 1 of the Sherman Act] under one of two distinct tests: *per se* violation or rule of reason." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 138 (3d Cir. 2001). A "horizontal" restraint on trade, or a "restraint among competitors" as opposed to a "vertical" restraint, or a restraint on "market participants at different points in a product's supply chain," is "more rigorously scrutinized for an antitrust violation because it could more easily facilitate competitive harms, such as the exclusion of rivals, price fixing, or the consolidation of market power." *Lifewatch Servs. Inc.*, 902 F.3d at 335. Thus, "some horizontal restraints, including price fixing and market division, are considered anticompetitive by their very nature." *Id.* (collecting cases). That is, their "pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Larry V. Muko, Inc. v. Sw. Pennsylvania Bldg. & Const. Trades Council*, 670 F.2d 421, 428 (3d Cir. 1982) (internal quotation marks omitted). These agreements are treated as *per se* antitrust violations. *Lifewatch Servs. Inc.*, 902 F.3d at 335.

However, courts are "reluctant 'to adopt per se rules . . . where the economic impact of certain practices is not immediately obvious.'" *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (internal quotation marks omitted)). A finding of *per se* illegality should not be "casually made." *Larry V. Muko, Inc.*, 670 F.2d at 428. "[I]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *Id.* (quoting *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 166-67 (3d Cir. 1979)); *see also*

*Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 143 (D.N.J. 2002), *aff'd*, 84 F. App'x 257 (3d Cir. 2004) ("[T]he *per se* rules of illegality are the exception to antitrust analysis and are only employed in certain recognized categories.").

Indeed, "many horizontal restraints are not so clearly harmful to competition." *Lifewatch Servs. Inc.*, 902 F.3d at 336. "[T]hey may . . . facilitate the creation of new products, improve efficiencies, or lead to lower consumer costs." *Id.* For example, "combinations, such as mergers [and] joint ventures, . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). "A restraint that is not *per se* unreasonable is analyzed under some form of a 'rule of reason' burden-shifting framework, which seeks to determine whether the restraint's harmful effects are outweighed by any procompetitive justifications and, if so, whether there are less restrictive alternatives." *Lifewatch Servs. Inc.*, 902 F.3d at 336. Under the "rule of reason" test, "plaintiffs have the burden of establishing that, under all the circumstances, 'the challenged acts are unreasonably restrictive of competitive conditions' in the relevant market." *Eichorn*, 248 F.3d at 138 (quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 28 (1911)). "An analysis of the reasonableness of particular restraints includes the consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *Id.* (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607 (1972)).

Plaintiffs contend that, at this stage, they need only plausibly plead an antitrust violation under either the *per se* or rule-of-reason standard. (Pls. Safariland MTD Opp. at 12.) Although the Court recognizes that parties may plead alternative claims or theories of relief, *see* Fed. R. Civ. P. 8(a)(3), (d)(2), the Court finds that the non-compete provisions at issue are not, as a matter of law,

61

*per se* unlawful, either under Plaintiffs' market allocation theory or otherwise. The Court need not delay its determination on this point until after discovery.

Plaintiffs allege that the "Acquisition Agreement" and "Holster Agreement" between Defendants forbade Safariland from competing in the BWC Systems market for 10 or 12 years, respectively, and the CEW market for 12 years. (CAC ¶¶ 92–93.) The "Holster Agreement" also included a provision in which Safariland agreed that it would "serve as Axon's preferred supplier for holsters." (*Id.* ¶ 90.)[17] Plaintiffs claim that these provisions constitute a *per se* unlawful market allocation agreement. A "market allocation agreement" is an "agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). It is true that courts have found such agreements to be *per se* unlawful. *E.g.*, *id.*; *see also Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50 (1990) (finding an illegal market allocation agreement where the defendants, who had previously competed in the Georgia market, agreed that one defendant would receive that market, while the other retained the remainder of the United States, with "[e]ach agreeing not to compete in the other's territories").

Plaintiffs cite to no case, however, in which a court has found a non-compete provision executed as part of an acquisition to constitute a market allocation agreement or to be *per se* unlawful. To the contrary, "[a]s early as 1899," courts have recognized that "covenants not to compete" in this context do not violate Section 1 of the Sherman Act. *Eichorn*, 248 F.3d at 145 ("[C]ovenants not to compete executed upon the sale of a business to a third party are generally not recognized as antitrust violations."); *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S.

---

[17] Plaintiffs admit that their market allocation theory does not "hinge" on this aspect of the "Holster Agreement." (Pls. Safariland MTD Opp. at 14.)

717, 730 n.3 (1988) ("The classic 'ancillary' restraint is an agreement by the seller of a business not to compete within the market."). Indeed, as the Third Circuit has explained:

> It [i]s of importance, as an incentive to industry and honest dealing in trade, that, after a man ha[s] built up a business with extensive good will, he should be able to sell his business and good will to the best advantage, and he could not do so unless he could bind himself by an enforceable contract not to engage in the same business in such a way as to prevent injury to that which he was about to sell.

*Id.* (internal quotation marks omitted). Accordingly, courts "uniformly" apply the rule-of-reason standard to covenants not to compete. *Id.* at 144 (collecting cases).

This Court will do the same. Safariland sold its BWC Systems business, VieVu, to Axon, and, as part of that sale, Safariland agreed not to compete in the BWC Systems market for 10 years. Such an ancillary restraint on trade is not *per se* unlawful. *Id.* Plaintiffs' challenge to the legitimacy of the VieVu sale is of no moment to this Court's assessment of the appropriate standard—here, the rule of reason. Indeed, the factfinder may still deem the non-compete provisions, as applied to the BWC Systems market, unreasonable. *See id.* at 145 ("So long as these covenants are reasonable in scope, there is no antitrust violation under the rule of reason."). Additionally, the cases cited by Plaintiffs to support the application of the *per se* standard in this context are distinguishable. *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 338 F. Supp. 3d 404, 411–412 (E.D. Pa. 2018), and *In re Magnesium Oxide Antitrust Litigation*, No. 10-5943, 2011 WL 5008090, at *1–2 (D.N.J. Oct. 20, 2011), involved alleged agreements among competitors to fix prices and allocate shares of the magnesium oxide and generic drug markets, respectively. Neither district court was tasked with construing non-compete provisions in the context of an acquisition. Furthermore, courts have readily found the type of agreements at issue—price fixing and market allocation—to constitute *per se* antitrust violations. *See e.g.*, *Lifewatch Servs. Inc.*, 902 F.3d at 335 (collecting cases).

Because Plaintiffs cannot pursue, as a matter of law, a *per se* theory of liability as to the non-compete provisions at issue, the Court dismisses with prejudice Plaintiffs' Section 1 claim (Count II).[18]

### 7.    Section 2 of the Sherman Act: Specific Intent

Safariland argues that Plaintiffs have failed to plausibly plead that it had specific intent under Section 2 of the Sherman Act (Count III) to endow Axon with monopoly power in the BWC Systems market. (Safariland MTD Br. at 28–29.) Plaintiffs respond that their allegations regarding "Defendants' pre-Acquisition history as vigorous competitors, Safariland's economic incentive to facilitate Axon's monopoly, and Axon's possession of actual monopoly power," taken as a whole, adequately plead specific intent. (Pls. Safariland MTD Opp. at 21.)

As set forth *supra*, to prove a claim for conspiracy to monopolize under Section 2 of the Sherman Act, a plaintiff must allege "specific intent to monopolize." *Howard Hess Dental Laboratories Inc.*, 602 F.3d at 253; *Black Box Corp. v. Avaya*, Inc., No. 07-6161, 2008 WL 4117844, at *8 (D.N.J. Aug. 29, 2008). "Specific intent is an essential element of a conspiracy to monopolize claim." *Howard Hess Dental Laboratories Inc*, 602 F.3d at 257. It requires proof of intent "beyond the mere intent to do the act." *Id.* (internal quotation marks omitted). "The specific intent element requires plaintiffs to plead that [the] alleged conspirators 'had a conscious commitment to [the] common scheme designed to achieve an unlawful objective, namely that of endowing . . . monopoly power." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-2445, 2017 WL 4910673, at *16 (E.D. Pa. Oct. 30, 2017) (quoting *Howard Hess Dental Laboratories. Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 341 (D. Del. 2007));

---

[18] The Court has already dismissed Plaintiffs' CEW claims on other grounds and, thus, does not consider those non-compete provisions in determining the applicable antitrust standard.

*see also Howard Hess Dental Lab'ys Inc*, 602 F.3d at 257 ("'[T]he defendant must have 'intended to achieve an illegal monopoly.'"). A plaintiff may prove specific intent through "direct, *i.e.*, 'smoking gun,' evidence or . . . through circumstantial evidence." *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 739 (D. Del. 2012) (quoting *Advo v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3rd Cir. 1995)). A court may also infer "specific intent in the antitrust context . . . from a defendant's unlawful conduct." *Howard Hess Dental Lab'ys Inc*, 602 F.3d at 257.

Plaintiffs allege that Safariland agreed to Axon's "unlawful" acquisition of VieVu and to not compete with Axon in the BWC Systems market with the "specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits." (CAC ¶ 198.) In support of that claim, Plaintiffs allege the following facts:

- In May 2018, Axon, "by far the dominant maker and supplier of BWC Systems and long-range CEWs," acquired VieVu, "its largest and most vigorous competitor in the BWC Systems market," from Safariland. (*Id.* ¶¶ 6, 80–86.)

- Safariland acknowledged that it owned "the #2 player in the [BWC] market," behind Axon, and "to date [saw] no other credible market entrant." (*Id.* ¶ 80.)

- As part of Axon's acquisition of VieVu, Safariland received "$2.4 million, or 58,843 shares, of Axon common stock issued to Safariland" and "up to $6.0 million, or 141,226 additional shares of Axon common stock, if certain conditions were met." (*Id.* ¶ 90.)

- Safariland also agreed to not compete in the BWC Systems market for 10 or more years. (*Id.* ¶¶ 91–94.)

- Without competition from VieVu, Axon "began touting its pricing power, enacting substantial price increases, including on BWC Systems and on long-range CEWs." Axon's average selling price for BWCs "actually *declined* from $195.17 in 2016 to $169.07 in 2017, while it was intensely competing with VieVu." In 2018, Axon's average BWC selling price "jumped by *34%* to *$254.56*." The average price for BWCs "relentlessly began to increase after that, to *$290.69* in 2019, *$313.09* in 2020, *$415.52* in 2021, and *$489.80* in 2022—a nearly *threefold* increase from 2017." (*Id.* ¶¶ 11–12 (emphasis in original).)

- "This is exactly what . . . Safariland[] predicted would happen[:] 'I believe this will greatly improve [Axon's] ability to increase price in the BWC and I can easily see

[Axon's] stock lifting by 20% or more.'" Axon's stock price increased "by more than 40% in the month following the acquisition." (*Id.* ¶ 11.)

- Before acquiring VieVu, Axon "already control[ed] approximately 60% to 80% of the market for BWC Systems." In acquiring VieVu, Axon "swallowed up VieVu's BWC Systems contracts[,]" which included the "NYPD and other major police departments, such as Miami-Dade, Florida; Phoenix, Arizona; Oakland, California; and Aurora, Colorado." Since the acquisition, one firm, Axon, has controlled an estimated 85% of the BWC Systems market as measured by output or revenue. (*Id.* ¶¶ 15, 51, 89.)

Taken collectively, the Court concludes that these allegations permit a plausible inference that Safariland consciously committed to the common scheme of endowing Axon with monopoly power and benefitting from that power. *LePage's Inc.*, 324 F.3d at 162 ("[C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 4910673, at *17 ("[A] plaintiff can allege a series of actions that when taken together make out antitrust liability even though some of the individual actions, when viewed independently, are not all actionable." (internal quotation marks omitted)). According to Plaintiffs, Safariland knowingly sold Axon its "#2" BWC competitor, VieVu, and agreed not to compete in the BWC Systems market for over a decade, predicting that doing so would "greatly" improve Axon's ability to raise prices and increase Axon's stock price—both of which occurred. After receiving millions of dollars' worth of Axon shares in the VieVu acquisition, Safariland plausibly benefitted from Axon's alleged monopoly power. The Court, therefore, denies Safariland's Motion to Dismiss Count III for failure to plead Safariland's specific intent to monopolize.

## **CONCLUSION**

For the foregoing reasons, Axon's Motion to Strike (ECF No. 77) is **GRANTED in part** and **DENIED in part**; Defendants' Motions to Dismiss (ECF Nos. 76, 78) are **GRANTED in part** and **DENIED in part**; and the FTC's Motion for Leave to File as *Amicus Curiae* (ECF No. 86) is **DENIED**. An appropriate Order will accompany this Opinion.

Dated: January 31, 2025

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**