**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE AXON VIEVU ANTITRUST LITIGATION | Case No. 3:23-cv-07182 (RK-RLS) |

**DEFENDANT AXON'S ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Defendant Axon Enterprise, Inc., ("Axon"), hereby answers allegations in the Second Amended Consolidated Complaint ("SAC") filed by the Township of Holmdel (NJ), the City of Baltimore (MD), and LaSalle County (IL) (collectively, "Plaintiffs"). Axon admits, denies and states as follows:

## PRELIMINARY STATEMENT

Axon is a leading provider of public safety technology. Axon develops and sells products to support its mission to Protect Life, providing law enforcement with cutting-edge technology to protect them and the communities they serve, as well as increasing transparency and accountability.

This action is premised on named Plaintiffs' misguided claim that Axon became a leader in the sale of body worn cameras ("BWCs") and digital evidence management systems ("DEMS") because of anticompetitive conduct. That is wrong. Axon develops best-in-class, innovative products and provides unparalleled customer service. Unsurprisingly, that makes Axon successful because that is the very essence of pro-competitive conduct.

In the seven-years since Axon acquired Vievu from Safariland, customers have continued to benefit from increased innovation and competition. Indeed, post-acquisition Axon launched its next

generation AB3 and AB4 BWCs in 2018 and 2023, respectively—with cutting-edge, value-added features like live-streaming and two-way communications that make them much more than cameras. Plaintiffs ignore such innovation and grossly conflate financial data to paint a false picture of Axon pricing. And competition remains robust today. Leading technology companies including Motorola, Panasonic, Utility and Getac compete alongside Axon in highly competitive bidding processes. Axon must fight for and earn every contract win.

Vievu's market exit was inevitable. At the time of the acquisition, Vievu was losing a million dollars a month, was saddled with more than $19 million in debt, and had less than three days operating cash. With this financial sheet, Safariland could find no buyer—despite an exhaustive shop effort—and approached Axon as a last resort. So, contrary to Plaintiffs' allegations, Axon's purchase of Vievu did not reduce competition. It preserved vital services for police departments across the country as Vievu inched toward implosion. Plaintiffs' claims to the contrary are without merit.

Plaintiffs' allegations of an agreement between Axon and Safariland to allocate markets is also without basis in fact. Safariland was unloading its failing BWC/DEMS business unit (Vievu) and had no intention of ever reentering this software-dominated market. The parties' short-lived non-compete provisions—rescinded in January 2020—provided legitimate protection for Axon's proprietary information shared with Safariland to develop holsters for next generation TASER® energy weapons. And despite the Court's dismissal of all CEW-based claims, Plaintiffs' Complaint continues to make much ado about Defendants' irrelevant ancillary holster supply agreement.

Finally, Plaintiffs' action cannot proceed on a class wide basis because, among other reasons, their claims lack commonality and individual issues predominate. Axon's customer contracts are individually negotiated and priced; involve vastly different combinations of products and licenses based on agency needs, size and budget; utilize a wide variety of geographic and department-specific

procurement processes, including RFP competitive bidding, cooperative agreements, and purchase orders; and are subject to approval processes under a multitude of local ordinances. Thus, class treatment of named Plaintiffs' claims is improper.

## ANSWER

**For ease of reference only, and not by way of adoption or admission of any kind, Axon sets forth verbatim the allegations of the Second Amended Complaint ("SAC")[1] together with its answers to each paragraph:**

I.     **Nature of Action**

1.     This is an action for damages and injunctive relief under the federal antitrust laws to redress injuries to competition caused by Axon Enterprise, Inc. ("Axon") and Safariland, LLC ("Safariland"). The relevant geographic market is the United States, and the relevant product market is Body-Worn Camera ("BWC") Systems, which are BWCs, digital evidence management systems ("DEMS"), docks, and related services such as transcription, redaction, and warranties (collectively, the "BWC Systems market").

**ANSWER: Plaintiffs' characterization of its own claims and geographic and product markets requires no response. Axon denies it caused any injury to competition and further denies the existence of a "BWC Systems market" as defined by Plaintiffs. The BWCs, DEMS, docks, and related software and services manufactured and supplied by Axon are sold with separate product SKUs and customers can (and do) purchase these products separately. Consequently, Axon objects to the term "BWC Systems" as used throughout the SAC.**

2.     BWCs are body-worn cameras specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions. BWCs operate with certain hardware,

_____

[1] Footnotes and graphics omitted.

including docking stations ("docks"), and certain software, DEMS. DEMS enable police departments to store BWC data in a central location; redact non-relevant images, such as the faces of bystanders; share pertinent evidence with prosecutors; and maintain chain of custody of the video for evidentiary use. DEMS can also work with camera data from camera types other than BWCs, such as in-car cameras (which Axon also manufactures). Together, BWCs, along with DEMS and docks, comprise a BWC System. Although these components of BWC Systems may be purchased separately, many, if not most, police departments buy them all together along with related services such as transcription, redaction, and warranties, typically from the same manufacturer—for example, Axon. Axon touts the efficiencies that come from using the products together.

**ANSWER: Axon admits its body-worn cameras are designed to withstand the rigorous demands of police usage and capture video and audio interactions between police and the public. Axon admits its cloud-based digital evidence management system Axon Evidence, also known as Evidence.com, enables police departments to securely store, redact, and share BWC data while maintaining evidentiary chain of custody, among a multitude of other features. In addition to BWC footage, Axon's DEMS software may be used to host and manage video evidence from a variety of third-party sources, including in-car cameras, CCTV cameras, drones, cell phones, etc. Although BWCs and DEMS are often purchased together at customer request to maximize efficiencies, they are also priced and sold separately. Axon denies the remaining allegations in this paragraph.**

3.      BWCs have been described as "a powerful tool for increasing transparency and accountability for officers, the public and for police officials."[1] For example, a 2020 report by a federal monitor appointed to oversee reforms of policing practices by the New York City Police Department ("NYPD") found that officers who wore the devices were more likely to accurately report pedestrian

stops they made under the department policy known as stop-and-frisk.[2] The American Civil Liberties Union has stated that police cameras "have the potential to be a win-win, helping protect the public against police misconduct, and at the same time helping protect police against false accusations of abuse.[3]

**ANSWER: Axon admits BWCs increase transparency and accountability, including, among other benefits, protecting the public against potential police misconduct and protecting police against false accusations. The footnoted third-party publications speak for themselves, are irrelevant, and require no response. Axon denies the remaining allegations in this paragraph.**

4.      Long-range conducted energy weapons ("CEWs")—which are virtually synonymous with Axon's dominant long-range CEW, the Taser—are a type of "less-lethal" weapon, which is a class of weapons that can be used to deal with a threat to the public, bystanders, or police, from violent or armed individuals without resorting to deadlier weapons such as firearms. Less-lethal weapons are a key part of a police officer's arsenal to subdue threatening individuals without resorting to deadly force.[4] Unlike other CEWs such as stun guns, which deliver an electric shock to their target by making direct contact, long-range CEWs fire a barbed probe at their target, allowing the shock to be delivered at long range (up to 35 feet away).

**ANSWER: Axon admits that TASER® energy weapons,[2] sometimes referred to as CEWs, are important less-lethal tools that, when used in probe-deployment mode, can incapacitate dangerous subjects from a distance alleviating the need for law enforcement to resort to deadly force. The footnoted third-party publications speak for themselves, are irrelevant, and require no**

---

**[2] TASER® is a registered trademark of Axon Enterprise, Inc. (formerly TASER International, Inc.). As an acronym, TASER is always written in all capital letters, including in the company name. Axon manufacturers conducted energy weapons or CEWs, not "tasers."**

**response. Further, the CEW allegations throughout this SAC are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. Axon denies the remaining allegations in this paragraph.**

5.      Long-range CEWs include the main weapon component itself along with various other components, including electricity cartridges, battery packs, docks, cameras, and signals. The electricity cartridges supply the charge to the barbed probes and must be replaced each time the long-range CEW is fired. Axon advertises that only Axon-produced cartridges may be used with its long-range CEWs. Although these cartridges may be purchased separately, many, if not most, police departments buy them together with the other components of long-range CEWs and related services such as training and warranties from Axon.

**ANSWER: Axon admits it manufactures and sells several different CEW models with different features, functionalities, and accessories, including a variety of probe cartridges, battery packs, and docks that agencies can choose from to fit their specific needs and policies. Each agency's purchase of CEW accessories and services is highly individualized and may or may not accompany the purchase of energy weapons. Axon denies the remaining allegations in this paragraph. Further, the CEW allegations throughout this SAC are irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

6.      In May 2018, Axon, already by far the dominant maker and supplier of BWC Systems and long-range CEWs, unlawfully gained monopoly power in the BWC Systems market by acquiring its largest and most vigorous competitor, VieVu, LLC ("VieVu"), from Safariland (the "Acquisition"). As part of the deal, Axon and Safariland further entered into various related anticompetitive agreements with each other. Among other things, these agreements prohibited Safariland from competing with Axon in the BWC Systems and long-range CEW markets for a decade or more. The Federal Trade Commission ("FTC") challenged the Acquisition and its related agreements as anticompetitive and

6

unlawful, alleging that the Acquisition violated Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.[6] Section 7 of the Clayton Act prohibits acquisitions the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

**ANSWER: Axon admits it acquired Vievu from Safariland in May 2018. The FTC's dismissed administrative complaint speaks for itself. The cited statutes also speak for themselves, constitute legal conclusions, and require no response. To the extent a response is required, the allegations are denied. Axon denies the remaining allegations in this paragraph.**

7.    In recent years, many local governments and agencies around the country have invested significant sums of money—often tens of millions of dollars—to purchase Axon's BWC Systems. Yet ever since and because of Axon's anticompetitive acquisition of VieVu, these governments and agencies have overpaid substantially for these BWC Systems. They have also been deprived of the added innovation in BWC Systems that would have occurred but for the Acquisition.

**ANSWER: Axon admits customers purchase BWC and DEMS products, sometimes together and sometimes separately, and each customer's purchase price varies based on the type and quantity of the products purchased. Axon denies the remaining allegations in this paragraph.**

8.    The Acquisition eliminated direct and substantial competition between Axon and VieVu, which Axon described as the "#2 competitor."[7] This reduced competition allowed Axon to increase prices for BWC Systems, and suppressed output and innovation.

**ANSWER: Denied.**

9.    Before the Acquisition, VieVu aggressively competed against Axon for the sale of BWC Systems to police departments in the United States. This competition resulted in substantially lower prices and provided customers with robust features and significant improvements. For example, Axon

7

told its Board in May 2018 that the "VieVu business strategy [was to] [u]ndercut on price."[8] VieVu also focused on improving its products in part because Axon "is aggressively pushing feature set and existing customers are demanding those features."[9]

**ANSWER: Axon admits that prior to 2017, Vievu competed with Axon for the sale of BWCs and DEMS to police departments in the United States. Axon denies the remaining allegations in this paragraph.**

10.     The competition between Axon and VieVu was intense. VieVu was successful in winning accounts at prices well below Axon's for several large police departments. The competition between the two rivals became especially intense after VieVu won a contract with NYPD—by far the largest municipal police department in the country—with a bid that was *62%* lower than Axon's. VieVu's former General Manager acknowledged that "[w]e started a price war."[10] Axon's CEO testified that after losing the contract, Axon made an offer of 1,000 free BWCs to New York City. Axon eventually expanded its promotion on or around April 5, 2017, when it offered free BWC Systems for one year to every police agency in the United States. Axon's CEO also admitted that part of its reason for acquiring VieVu was to obtain the huge NYPD account.

**ANSWER: Axon admits Vievu won the NYPD contract, but denies the allegation that this started a "price war." Axon admits that acquiring the NYPD contract was a factor in its decision to purchase Vievu—a failing firm. Axon further admits it offered a one-year free trial of its BWCs and DEMS in 2017 to U.S. law enforcement agencies. Axon denies the remaining allegations in this paragraph.**

11.     After, and as a result of the Acquisition, customers lost the benefit of this head-to-head competition. Axon began to tout its pricing power, enacting "substantial price increases," including on BWC Systems and on long-range CEWs, according to a source cited in the FTC's complaint.[11] This is

exactly what VieVu's owner before the Acquisition, Safariland, predicted would happen, stating, "I believe this will greatly improve their ability to increase price in the BWC and I can easily see [Axon's] stock lifting by 20% or more."[12] (Axon's stock price actually increased by more than 40% in the month following the acquisition, far more than the broader U.S. stock market.)

**ANSWER: Axon lacks knowledge, and therefore denies, the alleged third-party statements, which speak for themselves. Axon denies the remaining allegations in this paragraph.**

12.     As a result of the Acquisition, Axon charges substantially higher prices for BWC Systems. One need hardly look further than Axon's own reported sales and revenue data in its SEC filings to see this dramatic effect. Axon's 10-K filings show that its average selling price for BWCs actually *declined* from $195.17 in 2016 to $169.07 in 2017, while it was intensely competing with VieVu, even as Axon's annual BWC unit sales increased. But in 2018, the year of the Acquisition, Axon's average BWC selling price jumped by *34%* to *$254.56*. The average price relentlessly continued to increase after that, to *$290.69* in 2019, *$313.09* in 2020, *$415.52* in 2021, and *$489.80* in 2022—a nearly *threefold* increase from 2017.

**ANSWER: Axon denies that any decline in average BWC pricing in 2016-2017 was caused by competition from Vievu. Axon also denies it increased pricing because of the 2018 Vievu acquisition. Axon denies the remaining allegations in this paragraph.**

13.     Axon admitted in its SEC filings to such "increase[s] in the average sales price" for its BWC Systems since the Acquisition. Moreover, Axon's reported gross margins on BWCs follow a nearly identical trend, increasing every year from 2017 to 2022 (after declining from 2016 to 2017), jumping nearly *fourfold* over that period, indicating that these price increases cannot be explained by increasing costs.

**ANSWER: Denied.**

14.     In addition to increasing prices, Axon limited the availability of VieVu BWC Systems to customers and stopped developing new generations of VieVu hardware and software.

**ANSWER: Denied.**

15.     The Acquisition has entrenched Axon's already dominant share of the BWC Systems market and significantly increased market concentration. Pre-Acquisition, Axon was described by one Wall Street analyst as already controlling approximately 60% to 80% of the market for BWC Systems.[13] For its part, VieVu had hundreds of BWC Systems contracts with police agencies around the country, including the NYPD and other major police departments, such as Miami-Dade, Florida; Phoenix, Arizona; Oakland, California; and Aurora, Colorado.

**ANSWER: The footnoted third-party publications speak for themselves, are irrelevant, and require no response. Allegations concerning relevant market and purported market share constitute legal conclusions that require no response. Axon admits that at the time of the acquisition Vievu had contracts with the five listed agencies. Axon denies the remaining allegations in this paragraph.**

16.     Due to the Acquisition, Axon swallowed up VieVu's BWC Systems contracts.[14] Another analysis concluded that, immediately after, and as a direct result of the Acquisition, Axon "own[ed] *80%* of all big-city police department contracts."[15] Axon boasted that "[a]s of the end of the second quarter of 2019, 48 of the 79 major city law enforcement agencies have purchased Axon body-worn cameras and/or its digital evidence management solution."[16] Because Axon was so dominant among the very largest cities, including New York City, Axon's true share of large metropolitan police department purchases was likely even higher than 80%. Axon's market share is likely similar in the broader relevant market, given the breadth of its agency relationships.

**ANSWER: The footnoted third-party publications speak for themselves, are**

**irrelevant, and require no response. Allegations concerning the relevant market and any purported market share constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied. Axon admits that as of mid-2019, 48 major city law enforcement agencies had purchased BWCs and DEMS from Axon and its Vievu subsidiary. Axon denies the remaining allegations in this paragraph.**

17.    Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2,500 points as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points, renders a merger presumptively unlawful. According to the FTC complaint, Axon's acquisition of VieVu resulted in an HHI above 2,500, and increased HHIs in an already concentrated market by well over 200 points. Thus, the Acquisition is presumptively unlawful.

**ANSWER: The Merger Guidelines and the dismissed FTC complaint speak for themselves and Axon denies the allegations in this paragraph to the extent inconsistent with those documents. Further, the allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

18.    The Acquisition also entrenched Axon's monopoly power in the long-range CEW market. Before the Acquisition, Axon already controlled approximately 95% of this market.[17] With the Acquisition, Axon further cemented that dominance by extracting an agreement from Safariland, a potential competitor in the long-range CEW market, not to compete in that market for *12 years*. Showing that Axon viewed entry by Safariland into the long-range CEW market as a real threat, Axon's CEO called this noncompete a "hidden jewel in the deal."[18] As part of their broader anticompetitive deal, Axon and Safariland further agreed that Safariland, a maker of holsters for long-range CEWs,

would supply these holsters exclusively to Axon and serve as Axon's preferred supplier for the holsters.

**ANSWER: The footnoted third-party publications and unproven allegations in the FTC's dismissed complaint speak for themselves, are irrelevant, and require no response. Allegations concerning the relevant market and any purported market share constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied. The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. Any remaining allegations in this paragraph are denied.**

19.     New entry or repositioning by existing producers has not been and will not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. Barriers to entry in the BWC Systems and long-range CEW markets are high because of the substantial upfront capital investment required, switching costs, Axon's long-term customer contracts, bundling, and the need for references from police departments. With respect to BWC Systems, Safariland's then-Executive Vice President noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done."[19]

**ANSWER: The footnoted third-party publications speak for themselves, are irrelevant, and require no response. The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. The remaining allegations in this paragraph are denied.**

20.     Axon also cannot show that the Acquisition resulted in merger-specific efficiencies sufficient to outweigh the competitive harm caused by the Acquisition. Axon did not analyze or anticipate efficiencies when deciding to acquire VieVu.

**ANSWER: Denied.**

21.     The Acquisition and Defendants' other anticompetitive conduct thus substantially

lessened competition and created a monopoly in the BWC Systems market. Defendants' conduct has harmed and continues to harm Plaintiffs and others who have purchased the Products from Axon after the Acquisition, causing them to pay inflated prices, and reducing output and innovation in these markets with important public-safety and civil-rights ramifications. Thus, Plaintiffs bring this action to hold Axon and Safariland accountable for their violations of the federal antitrust laws.

> **ANSWER: Denied.**

**II.     Parties**

22.     Plaintiff Township of Holmdel, Monmouth County, New Jersey ("Holmdel Township") is a township located in Monmouth County, and is a public entity organized and existing pursuant to the laws of New Jersey. Holmdel Township manages the operations of the Holmdel Township Police Department, and directly purchased BWC Systems products from Defendant Axon at unlawfully inflated prices in 2021. As a result of Defendants' conduct, Holmdel Township was and will continue to be injured in its business or property by reason of the violations of law alleged herein.

> **ANSWER: Axon admits only that Holmdel Township purchased BWCs and DEMS directly from Axon. Axon denies it sold Holmdel BWCs and DEMS at unlawfully inflated prices and denies Holmdel has been injured by any Axon conduct. Axon lacks sufficient knowledge concerning the remaining allegations in this paragraph and therefore denies them.**

23.     In March and October of 2021, Holmdel Township made purchases of products in the BWC Systems market at inflated, post-acquisition prices, including Axon Body 3 cameras, Evidence.com licenses and additional digital storage, docks, accessories, and warranties, including the "Technology Assurance Plan." The Technology Assurance Plan bound Holmdel Township to Axon's products for a minimum of four years by providing for "product refreshes" of new Axon Body 3 cameras and docks in 2023 and 2025. In fact, pursuant to Holmdel Township's 2021 purchase

agreement with Axon, Holmdel Township is due to receive new BWCs and docks from Axon later this month and paid artificially inflated prices for those BWCs and docks. More generally, given its intent to continue using BWC Systems (including the DEMS required to store and process BWC footage) in its police department, as well as its intent to continue purchasing BWC Systems in the future after its current purchase agreements expire, Holmdel Township continues and will continue to be harmed by the inflated prices, reduced competition, choice, quality, and innovation in the BWC Systems market that continue to result from Defendants' unlawful conduct.

**ANSWER: Axon admits Holmdel purchased Axon Body 3 (AB3) cameras in 2021 along with docks, certain Evidence.com licenses and storage, and Technology Assurance Plan ("TAP") warranties. Axon denies any suggestion that Holmdel's own purchasing decisions somehow unfairly "bound" it to a multi-year contract or that Holmdel may somehow continue to be harmed if it again chooses to renew its contracts with Axon. Axon denies the remaining allegations in this paragraph.**

24. Plaintiff the Mayor and City Council of Baltimore ("City of Baltimore") is a municipality located in Baltimore, Maryland. The City of Baltimore has directly purchased millions of dollars' worth of BWC Systems from Defendant Axon at unlawfully inflated prices during the Class Period, and has current contracts with Axon for BWC Systems products and services. As a result of Defendants' conduct, the City of Baltimore was injured in its business or property by reason of the violations of law alleged herein.

**ANSWER: Axon admits the City of Baltimore has been a BWC and DEMS customer of Axon since 2016. Axon further admits Baltimore has spent millions of dollars on Axon BWCs and DEMS to support its 2,100+ police force and major metropolitan community across numerous contract amendments and extensions. Axon denies it has sold BWCs to**

**Baltimore at unlawfully inflated prices and denies the City has been injured by any Axon conduct. Axon lacks sufficient knowledge concerning the remaining allegations in this paragraph and therefore denies them.**

25.     Given its intent to continue using BWC Systems (including the DEMS required to store and process BWC footage), as well as its intent to continue purchasing BWC Systems in the future after its current purchase agreements expire, the City of Baltimore continues and will continue to be harmed by the inflated prices, reduced competition, choice, quality, and innovation in the BWC Systems market that continue to result from Defendants' unlawful conduct.

**ANSWER: Denied.**

26.     Plaintiff LaSalle County is a body corporate and politic in the State of Illinois that establishes the budgeting of the LaSalle County Sheriff's Office. LaSalle County directly purchased BWC Systems products from Defendant Axon at unlawfully inflated prices in 2020 and 2022. As a result of Defendants' conduct, LaSalle County was and will continue to be injured in its business or property by reasons of the violations of law alleged herein.

**ANSWER: Axon admits only that LaSalle County has purchased BWCs and DEMS directly from Axon. Axon denies its BWC sales to LaSalle were made at unlawfully inflated prices and denies LaSalle has been injured by any Axon conduct. Axon lacks sufficient knowledge concerning the remaining allegations in this paragraph and therefore denies them.**

27.     In November of 2022, for example, LaSalle County made purchases of products in the BWC Systems market at inflated, post-acquisition prices, including Axon Body 3 cameras, docks, Evidence.com licenses, DEMS-related services such as redaction assistance and "Auto Tagging," and warranties, including the Technology Assurance Plan. The Technology Assurance Plan purchased by LaSalle County bound LaSalle County to Axon's products for a minimum of five years by providing

for "product refreshes" of Axon BWCs and docks in May of 2025 and November of 2027 at artificially inflated prices. More generally, given its intent to continue using BWC Systems (including the DEMS required to store and process BWC footage) in its sheriff's office, as well as its intent to continue purchasing BWC Systems in the future after its current purchase agreements expire, LaSalle County continues and will continue to be harmed by the inflated prices, reduced competition, choice, quality, and innovation in the BWC Systems market that continue to result from Defendants' unlawful conduct.

**ANSWER: Axon admits LaSalle purchased AB3 cameras along with docks, Evidence.com licenses, additional software products such as redaction assistant and auto-tagging, and TAP warranties. Axon denies any suggestion that LaSalle's own purchasing decisions somehow unfairly "bound" it to a multi-year contract or that LaSalle will be harmed if it chooses to renew its contracts with Axon. Axon denies the remaining allegations in this paragraph.**

28.    Defendant Axon Enterprise, Inc. is a Delaware corporation, with its principal place of business in Scottsdale, Arizona. Axon changed its name in 2017 from Taser International, Inc.

**ANSWER: Axon admits it is a Delaware corporation with its principal place of business in Scottsdale, Arizona, and that it changed its name in 2017. The former company name, however, was TASER International, Inc.**

29.    Defendant Safariland, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Safariland is wholly owned by Cadre Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware. Cadre Holdings' principal place of business is located at 13386 International Parkway, Jacksonville, Fla.

**ANSWER: Admitted.**

### III.    Jurisdiction, Venue, and Interstate Commerce

30.    This action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2), and

Section 7 of the Clayton Act (15 U.S.C. §§ 18). This action seeks injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorney's fees.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response.**

31.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response.**

32.    This Court has personal jurisdiction over Axon and Safariland because they transacted business, maintained substantial contacts, and committed overt acts in furtherance of their conspiracy to restrain trade and conspiracy to monopolize the market for BWC Systems as well as Axon's attempt to monopolize, or its actual monopolization of, the market for BWC Systems in the United States, including in this District. Axon and Safariland should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted here.

**ANSWER: Axon admits it transacted business and maintained substantial contacts in this District and does not contest this Court's personal jurisdiction over it. Axon denies the remaining allegations in this paragraph.**

33.    Axon and Safariland's anticompetitive conduct was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

**ANSWER: Axon denies it participated in anticompetitive conduct with Safariland or otherwise and denies the remaining allegations in this paragraph.**

34.     Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c). Defendants transacted business or acted through subsidiaries or agents present in this District; a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

A.     Axon negotiated contracts with purchasers in this District to provide BWC Systems, including to members of the Class; and

B.     Axon delivered BWC Systems to purchasers in this District, including to members of the Class.

C.     Safariland negotiated contracts with purchasers in this District to provide BWC Systems, including to members of the Class; and

D.     Safariland delivered BWC Systems to purchasers in this District, including to members of the Class.

**ANSWER: Axon does not contest venue in this District. Axon admits it has transacted business in this District, including the sale and delivery of BWCs, DEMS and other products to at least the Holmdel Police Department. Axon lacks sufficient knowledge concerning Safariland's business activities in the District and therefore denies those allegations.**

35.     Axon markets and delivers BWC Systems to purchasers across state lines. Axon makes and receives substantial payments across state lines for and from the sale of BWC Systems, and Axon's business activities that are the subject of this Complaint are within the flow of, and have substantially affected, the interstate commerce of the United States. During the Class Period, Axon used the instrumentalities of interstate commerce, including interstate wires, in furtherance of Defendants' conspiracy to monopolize the market for BWC Systems as well as its attempted or actual

monopolization of the market for BWC Systems.

**ANSWER: Axon admits it markets, delivers and receives payment for BWCs and DEMS across state lines, and conducts business activities within the flow of interstate commerce. Axon denies the remaining allegations in this paragraph.**

36.     Safariland marketed and delivered BWC Systems to purchasers across state lines. Safariland made and received substantial payments across state lines for and from the sale of BWC Systems, and Safariland's business activities that are the subject of this Complaint are within the flow of, and have substantially affected, the interstate commerce of the United States. Safariland used the instrumentalities of interstate commerce, including interstate wires, in furtherance of Defendants' conspiracy to monopolize the market for BWC Systems.

**ANSWER: Axon lacks sufficient knowledge concerning Safariland's business activities and therefore denies the allegations in this paragraph.**

**IV.     Allegations of Fact Supporting Plaintiffs' Claims for Relief**

      **A.  Relevant Market and Monopoly Power**

37.     The relevant market in which to analyze the effects of Defendants' conduct is the sale of BWC Systems in the United States. A hypothetical monopolist in this market would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

**ANSWER: Allegations concerning the relevant market and any SSNIP analysis constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied. Axon also denies the existence of a "BWC Systems" market as defined by Plaintiffs and objects to the term "BWC Systems" as used throughout the SAC.**

      **1.  BWC Systems---Product and Geographic Markets**

38.     BWCs are cameras specifically designed to withstand the rigorous demands of police

usage and capture video and audio of police actions. Axon's BWCs include the Axon Body and the Axon Flex. The Body is a one-piece camera typically worn on the chest. The Flex is a two- part system with a smaller camera piece that can be mounted on eyewear.

**ANSWER: Admitted.**

39.    BWCs operate in conjunction with associated hardware including docks and with DEMS, the software component. Together, these components form an integrated BWC System.

**ANSWER: Axon admits its BWCs, docks and DEMS can interoperate. The remaining allegations in this paragraph are denied.**

40.    DEMS enable police departments to store body camera data in a central location; redact non-relevant images, such as the faces of bystanders; share pertinent evidence with prosecutors; and maintain chain of custody of the video for evidentiary use. Axon's DEMS is called Axon Evidence and uses the website name Evidence.com. DEMS can also work with camera data from camera types other than BWCs, such as in-car cameras. Axon's DEMS, for example, also works with its in-car camera, the Fleet. Axon's acquisition of VieVu further harmed competition in the BWC Systems market by eliminating VieVu's DEMS product, VERIPATROL, which was a viable competitor to Evidence.com.

**ANSWER: Axon admits that DEMS, among other things, enable police departments to store body camera data in a central location, redact non-relevant images, share evidence with prosecutors, maintain chain of custody, and ingest data from in-car cameras. Axon admits its in-car camera product is known as Fleet. Axon denies the remaining allegations in this paragraph.**

41.    Docks are hardware that connect to BWCs for purposes such as charging the BWCs' batteries and uploading data (including video footage) from the BWCs onto a computer or cloud-based server system. Axon sells docks for its BWCs under the brand name Axon Dock (the "Dock").

According to Axon, the Dock provides intuitive uploading of data from Axon BWCs to Evidence.com, allows recharging of Axon BWC batteries, and acts as a mechanism to ensure Axon BWCs receive and operate the most updated firmware.[20]

        **ANSWER: Admitted.**

42.     Axon also sells services such as transcription, redaction, and warranties related to BWC Systems. For example, Axon sells a Technology Assurance Plan (formerly known as the Taser Assurance Plan) for its BWCs and Docks, which includes warranty coverage for several years, spare BWCs or Docks, and replacement or upgraded BWCs or Docks after several years.

        **ANSWER: Axon denies it sells "BWC Systems" as defined in the SAC. Axon admits it sells software, including transcription and redaction, and product warranties. Axon admits it offers a subscription-based Technology Assurance Plan for qualifying BWCs that provides replacement and upgraded hardware during the term of the contract for no additional cost. Axon denies the remaining allegations in this paragraph.**

43.     Police departments frequently issue requests for proposals seeking to purchase BWC Systems components together as part of an integrated BWC System. The products are closely related, and it is important for them to interoperate effectively. Indeed, Axon requires police departments to integrate Axon BWCs with Evidence.com, Axon's DEMS, because Axon body cameras only work with Evidence.com.[21] Axon touts the efficiencies that come from using the products together, for example stating that "[a]ll technologies" in one bundled offering that includes BWCs, Docks, and DEMS "work together to deliver unprecedented efficiency and impact."[22] Axon similarly states that Axon BWCs are "fully integrated with the growing Axon network [including DEMS] to give you better evidence capture and management."[23]

        **ANSWER: The footnoted third-party publications speak for themselves, are**

**irrelevant, and require no response. Axon admits many police departments issue requests for proposal to procure products or services. Each RFP speaks for itself. Axon's product webpages also speak for themselves and Axon denies allegations in this paragraph inconsistent therewith. Axon admits its BWC and DEMS products interoperate. Axon denies the remaining allegations of this paragraph.**

44.     There are no reasonably interchangeable substitutes for BWC Systems. Police departments could not realistically switch to other products in the face of a SSNIP for any of these products. Other recording systems, such as in-car camera systems, cannot record interactions outside of the view of the car, or when officers patrol on foot or bicycle. Further, seven states now require law enforcement to use body cameras while on duty.[24] In-car cameras also tend to be more expensive than body cameras. According to the FTC, Axon's Chief Revenue Officer has testified that in-car systems and BWC Systems are not good substitutes.[25]

**ANSWER: The footnoted third-party publications and dismissed FTC allegations speak for themselves, are irrelevant, and require no response. Allegations concerning interchangeable substitutes and SSNIP constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

45.     Records Management Systems ("RMS") are not substitutes for DEMS. RMS collect and centralize in one source, in digital format, the many types of written reports generated by police agencies, including arrest, probation, and crime scene reports, whereas DEMS are designed principally to record video and audio evidence captured by BWCs. Industry participants do not view RMS as a substitute for BWC Systems or for the DEMS component of those systems.

**ANSWER: Axon admits its law enforcement customers do not view RMS as a substitute for DEMS. The first sentence of this paragraph is admitted except that DEMS manage**

**(not record) video and audio evidence.**

46. BWC Systems use is widespread. In 2022, nearly half of police departments in the United States used body cameras, and seven states currently have laws requiring police officers to use them. And where police departments use body cameras, over 90% of prosecutors use body camera evidence to prosecute civilians—so police departments' operations depend on having body camera footage integrated into their evidence systems.[26]

**ANSWER: Axon admits BWC use is widespread in the United States and that several states have mandated their use by police departments. The footnoted third-party publication speaks for itself, is irrelevant and requires no response. Axon denies the remaining allegations in this paragraph.**

47. The relevant geographic market is customers in the United States. In the relevant market it is possible for producers to price discriminate to specific customers. Customers based in the United States cannot arbitrage or substitute based on different prices offered to customers outside the United States, including differing laws and rights for evidence collected from body cameras outside of the United States.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

48. Many police departments also are required to comply with the FBI's Criminal Justice Information Service ("CJIS") standards. CJIS compliance requires storing BWC-generated data in the United States. Additionally, U.S.-based police departments look mostly to other U.S.-based police departments to vet potential BWC Systems vendors.

**ANSWER: Axon admits that the storage of criminal justice information, including BWC footage, must be within the U.S. Axon lacks sufficient knowledge regarding the allegations**

23

**in the last sentence of this paragraph and therefore denies them.**

49.    A hypothetical monopolist in the market for BWC Systems would find it profit-maximizing to impose at least an SSNIP in this market. This is evident from Axon's own reported financial data, which, as noted above, shows that Axon significantly increased its annual unit sales of BWCs from 2017 to 2022 even as it raised its average price nearly *threefold* over that period and profit margins also increased.

**ANSWER: The allegations in the first sentence of this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied. Axon denies the remaining allegations of this paragraph.**

**2.    Axon Exercises Monopoly Power Within the U.S. BWC Systems Market**

50.    At all relevant times, the U.S. market for BWC Systems has been highly concentrated and dominated by one player: Axon.

**ANSWER: Denied.**

51.    Before the Acquisition, Axon was described by one Wall Street analyst as controlling approximately 60% to 80% of the market for BWC Systems.[27] A Huffington Post article from April 2017 reported that Axon "has already provided gear and service to more than 85 percent of major cities that have adopted body cameras."[28]

**ANSWER: The footnoted third-party publications speak for themselves, are irrelevant, and require no response.  Axon denies the remaining allegations in this paragraph.**

52.    VieVu was the next largest competitor by market share. Before the Acquisition, VieVu had hundreds of BWC Systems contracts with police agencies around the country, including at least five of the 69 major U.S. metropolitan agencies comprising the Major Cities Chiefs Association ("MCCA"), a professional organization of police executives representing the largest cities in the United

States and Canada. These five were New York City; Miami-Dade, Florida; Phoenix, Arizona; Oakland, California; and Aurora, Colorado. VieVu's contract with New York City in particular significantly boosted its market share as measured by output and revenue.

**ANSWER: Axon admits that at the time of the acquisition Vievu had contracts with the five listed MCCA agencies. The allegations in this paragraph regarding market share constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

53.    Post-Acquisition, the BWC Systems market has been even more highly concentrated. Under a bullet point regarding Axon's "Software and Sensors" business segment, which includes BWC Systems, Axon's 10-K for the year ending 2018 stated that "[o]f the 69 largest metropolitan area police departments in the U.S., 46 are on the Axon network"—fully two-thirds of these departments. A December 2019 Axon investor presentation represented that Axon BWC Systems controlled 47 of the 69 U.S. Major City Chiefs Agencies.[29] Further, 10 of these 69 agencies did not have a BWC contract at all. Thus, Axon reported controlling 47 of the 59 relevant agencies as of December 2019, i.e., *80% of them*.[30] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies.[31]

**ANSWER: Axon denies that competition for BWCs and DEMS became more concentrated post-acquisition. The footnoted third-party publications speak for themselves, are irrelevant, and require no response. Axon's 10-K filing and investor presentation speak for themselves and Axon denies the allegations to the extent inconsistent therewith. Axon admits it has customer relationships with thousands of U.S. law enforcement agencies that have purchased its products, but denies all these agencies are BWC and DEMS customers.**

54.    Measured in terms of output or revenue, Axon's market share among large U.S. cities is

25

even higher than 80%—likely at least 85%. This is indicated by a chart from the same presentation, showing Axon BWC Systems' dominance in terms of U.S. Major City Chief Agencies ranked by size, starting with New York City at the top left, then moving downward and spilling over into the subsequent columns, with the smallest agency in the chart being Salt Lake City, at bottom right:[32] As the chart shows, of the 69 Major City Chief members, Axon controlled 4 of the top 5, 7 of the top 10, and 15 of the top 20. In other words, Axon similarly dominated among the very largest U.S. agencies, which are much larger than the smaller MCCA agencies. According to available data, around this same time, New York City and Chicago alone accounted for approximately 31% of the total officers and non-sworn personnel of all U.S. MCCA members combined.[33] Assuming that New York and Chicago made up 31% of the market represented by the MCCA, and that the remaining 67 MCCA cities each represent an equal share of the remaining 69% of the market (a simplifying assumption), then according to the data from its December 2019 investor presentation, Axon had 85% of the market represented by the MCCA.

**ANSWER: Allegations concerning the relevant market and any purported market share constitute legal conclusions that require no response. Axon denies the existence of a "BWC Systems market" as defined by Plaintiffs. The MCCA chart depicted in this paragraph speaks for itself. Axon denies the remaining allegations in this paragraph.**

55.    Axon acknowledges its dominance—according to the FTC, in a company presentation, Axon implored its salespeople to "embrace being the gorilla," and Axon's CEO confirmed that Axon is a "really strong market leader."[34]

**ANSWER: Allegations based on the FTC's dismissed complaint are unproven, misleading, and denied. Axon denies the remaining allegations in this paragraph.**

56.    As a result of its dominance, Axon wields its monopoly power to profitably charge

supracompetitive prices for BWC Systems and their components, including the huge price increases Axon implemented after the Acquisition, and to generate high profit margins.[35] In 2022, Axon reported $392 million in gross margin in its "software and sensors" department, driven primarily by sales of its BWC Systems. With $658 million in net sales from software and sensors, Axon generates a 60% profit margin from these BWC Systems, an extremely high margin reflecting its monopoly power.[36]

**ANSWER: The cited SEC filing speaks for itself and Axon denies the allegations in this paragraph to the extent inconsistent therewith. Axon denies the remaining allegations in this paragraph.**

57.    Motorola, Panasonic, and Utility largely make up the rest of the BWC Systems market. As demonstrated by the dramatic price increases that Axon implemented after acquiring VieVu, none of these other competitors pose the same competitive constraint on Axon as did VieVu, and none were able to constrain the exercise of Axon's monopoly power. These other competitors' BWC Systems rarely provided significant competition to Axon in RFP processes conducted by police departments. A chart included in a December 2019 Axon investor presentation shows the meager market share these competitors had compared to Axon, with the closest competitor, Motorola, controlling only 7 of 69 U.S. Major City Chief Agencies compared to Axon's 47.[37]

**ANSWER: Axon admits that Motorola, Panasonic, Utility and many others regularly compete with Axon for BWC and DEMS contracts, including MCCA agencies in rigorous RFP bid processes. The referenced December 2019 chart speaks for itself and demonstrates these competitors can and do win contracts in head-to-head competition with Axon, including 12 MCCA agencies. Axon denies the remaining allegations in this paragraph.**

**3. Long-Range CEWs**

58.    Long-range CEWs are a type of "less-lethal" weapon, which is a class of weapons that

can be used "to deal with a threat to the public, bystanders or police, from violent or armed individuals . . . prior to it escalating to a level where firearms would otherwise have to be used."[38] Less-lethal weapons include CEWs (both long-range CEWs like Tasers and traditional CEWs like stun guns), pepper spray, tear gas, rubber bullets, and other types of riot gear, which are less likely to injure or kill their target.[39] Less-lethal weapons are a key part of a police officer's arsenal to subdue threatening individuals without resorting to deadly force.[40]

**ANSWER: The allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. Axon admits, however, that TASER energy weapons are categorized as less-lethal weapons and, when used in probe-deployment mode, can incapacitate dangerous subjects from a distance alleviating the need for law enforcement to resort to deadly force. The footnoted third-party publications speak for themselves and require no response.**

59.     Long-range CEWs are highly differentiated from other types of less-lethal weapons because of their accuracy, effectiveness, and versatility. Unlike traditional stun guns or pepper spray, long-range CEWs can be used on targets up to 35 feet away.[41] Further, unlike other long-range less-lethal weapons like tear gas and rubber bullets, long-range CEWs are designed to be used on a single person and can be highly accurate up to more than 30 feet away.[42]

**ANSWER: The CEW allegations this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. Axon denies that the term "long-range CEW" is used in the industry. The footnoted third-party publications speak for themselves and require no response. Axon denies the remaining allegations in this paragraph.**

60.     The main weapon component of long-range CEWs is used in conjunction with related components including electricity cartridges, battery packs, and docks. Cartridges supply the electricity charge to the barbed probe and must be replaced each time the long-range CEW is fired.[43] Battery packs

supply the power needed to operate the long-range CEW, and docks allow the battery packs to charge and upload data to the DEMS.[44] Further, Axon recommends using cameras and camera signals in conjunction with long-range CEWs. Taser cameras record the actions of the long-range CEW, while camera signals send a signal to the officer's BWC to record when the long-range CEW is removed from its holster.[45] Axon also recommends purchasing long-range CEW training and warranties for the long-range CEWs, which are included in its standard supply contracts.[46] Thus, the long-range CEW market also includes these components and related services. Police departments prefer to buy these products in an all-inclusive supply contract with the long-range CEW manufacturer, which saves the police departments time and resources compared to buying them separately.

**ANSWER: The allegations in this paragraph contain significant inaccuracies (e.g., there is no such thing as an "electricity cartridge") and therefore are denied. This entire paragraph is irrelevant in any event following the Court's dismissal of Plaintiffs' CEW claims.**

61.    Long-range CEW use is widespread. As of 2018, two-thirds of police departments used long-range CEWs,[47] and as of 2020, an estimated 73% of police officers carried long-range CEWs when on duty.[48] Axon bragged in a 2019 investor presentation that "17,000 out of 18,000 US police agencies procure Taser devices," adding, "[w]e estimate ~70% of US patrol officers carry a Taser device."[49]

**ANSWER: Axon admits TASER CEWs are deployed by many U.S. law enforcement agencies, but states that fact is irrelevant following the Court's dismissal of Plaintiffs' CEW claims. The footnoted third-party publications and Axon's investor presentation speak for themselves and require no response.**

62.    Because of long-range CEWs' differentiation from other less-lethal weapons, long-range CEWs are a vital tool for law enforcement, and they cannot be easily replaced by other less-lethal or

lethal weapons. Recognizing this differentiation, Tom Shea, the program director of the Police Graduate Studies Program at Seton Hall University and a former police lieutenant, "said it's hard to imagine not arming police with Tasers. 'When someone's holding a knife and is violent and obviously irrational and out of his mind on drugs, those are situations where Tasers are absolutely necessary, because otherwise, you're going [to] resort to deadly force.'"[50] Currently and throughout the class period, no substitutes exist for long-range CEWs.

**ANSWER: The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. The footnoted third-party publication speaks for itself and requires no response.**

63.     For the same reasons that police officers prefer to use long-range CEWs over other types of less-lethal and lethal weapons, civilians interested in self-defense also prefer to use long-range CEWs: they enable civilians to incapacitate a would-be attacker at a safer distance and more effectively than other CEWs and less-lethal weapons.

**ANSWER: The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. Axon denies that the CEW use case for untrained civilian self-defense is the same as for experienced law enforcement officers.**

64.     The relevant geographic market for long-range CEWs is the United States, as importing long-range CEWs into the United States is impractical due to their regulation as a crime-control product.[51]

**ANSWER: Denied and irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

**4.   Axon Exercises Monopoly Power in the U.S. Long-Range CEW Market**

65.     Axon is effectively the sole player in the market for long-range CEWs, with an estimated

95% market share.[52] Axon has no notable competitors in long-range CEW manufacturing, as only a handful—if any—police departments use non-Axon CEWs.

**ANSWER: Axon denies it is the sole player in the CEW market. The footnoted third-party publication speaks for itself and requires no response. The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

66.    Axon enjoys healthy profits from its long-range CEWs, with a 63.3% gross margin in 2022.[53] Axon also enjoys healthy profits by selling the cartridge component of long-range CEWs. In 2022, over 40% of Axon's Taser-related revenue derived from non-weapon sales, most of which were attributed to cartridges.[54]

**ANSWER: The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims. Axon's footnoted Form 10-K speaks for itself.  The remaining allegations in this paragraph are denied.**

67.    Axon's high operating margins and market share show that the long-range CEW market is highly concentrated, with Axon exercising monopoly power.

**ANSWER: Axon denies that its CEW margins or market share are the result of an illegal monopoly, but rather its significant investment in research and development ("R&D") for over 30 years, relentless technology innovation to advance its mission to Protect Life, high quality products, and top-rated customer service. The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

**5.    The BWC Systems and Long-Range CEW Markets Have High Barriers to Entry**

68.    Axon's monopoly power over BWC Systems and long-range CEWs is durable because it benefits from significant barriers to entry. These barriers include high capital investment, contract length, switching costs, integration, bundling, sales relationships, patents, and regulations.

**ANSWER: The CEW allegations in this paragraph are denied and irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

69.     First, the high capital investment it takes to develop a BWC System represents a significant barrier to entry. Axon developed Evidence.com in 2009 and invests millions in research and development annually.[55] The large amount of capital necessary to develop and service an effective BWC System can be profitable only when costs are spread across a substantial number of BWC Systems users. Because of this, new entrants to the BWC Systems market must capture a significant proportion of police department contracts to maintain profitability.

**ANSWER: Axon admits it launched its award-winning cloud-based DEMS Evidence.com and invests millions in R&D annually. Axon denies the remaining allegations in this paragraph.**

70.     Contract length remains another barrier to entry. BWC Systems and long-range CEW supply contracts can last ten years or longer,[56] limiting the number of police departments with which BWC Systems and long-range CEW suppliers can attempt to contract in any given year. Typical supply agreements for long-range CEWs cover not only the weapons themselves, but also associated components like cartridges and battery packs, training, warranties, and servicing.[57] Given the significant capital investment needed to develop and maintain BWC Systems, as well as the significant time needed to develop a long-range CEW, the inability to compete for most police departments at any one time due to contract length further renders market entry unprofitable for would-be competitors.

**ANSWER: The CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims, and the footnoted contracts speak for themselves. Axon denies contract length is a barrier to entry. Axon denies the remaining allegations in this paragraph.**

71.     Further, because Axon includes both BWC Systems and long-range CEWs in its general supply contracts, companies must provide both long-range CEWs and BWC Systems to compete for those police departments that prefer to integrate their long-range CEW and BWC Systems supply.

**ANSWER:  Denied.**

72.     Switching costs pose another barrier to entry. BWC Systems are complex, with police departments taking months to become fully trained on Evidence.com's capabilities. If a police department does switch BWC Systems, it must incur significant IT and training costs in switching its body camera videos away from the DEMS.[58] Further, police officers using BWCs also face high switching costs because police officers themselves use them habitually, and retraining police officer habits at scale is difficult.[59]

**ANSWER: Denied.**

73.     Axon is well aware of these high switching costs: its 2017 offer of free body cameras enticed police departments into using the Axon BWC System, because Axon's body cameras work only with Axon software. Safariland's then-Executive Vice President called the Axon offer for free body cameras a "Venus fly trap" and noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done."[60]

**ANSWER: The footnoted third-party publication speaks for itself, is irrelevant, and requires no response. Axon denies the remaining allegations in this paragraph.**

74.     This "free" Evidence.com subscription also served to entrench Axon's position in the long-range CEW market, since Evidence.com "seamlessly integrates" with Tasers.[61] This integration further locked purchasers into the Axon system for both long-range CEWs and BWC Systems.[62]

**ANSWER: The CEW allegations in this paragraph are denied and irrelevant following the Court's dismissal of Plaintiffs' CEW claims. The footnoted third-party publication**

speaks for itself, is irrelevant, and requires no response.

75.    Long-range CEWs also have significant switching costs. Axon includes Taser training in its typical supply contracts,[63] and police departments that provide Tasers have trained a significant proportion of police officers in Taser use and protocol.[64] Would-be competitors wishing to sell their own long-range CEWs would need to entice police departments to retrain their police force to use a new type of long-range CEW.

**ANSWER: The CEW allegations in this paragraph are denied and irrelevant following the Court's dismissal of Plaintiffs' CEW claims. The footnoted third-party publication speaks for itself, is irrelevant, and requires no response.**

76.    Because of these high switching costs, police departments seldom switch their BWC Systems or long-range CEW provider from one supplier to another when a contract is renewed.

**ANSWER: Axon denies that switching costs prevent customers from changing providers. Further, the CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

77.    Product integration and bundling are another key barrier to entry. Currently, Axon's BWC Systems integrate with its Tasers, and police departments that want to integrate Taser data into their evidence software must use the Axon BWC System. Many police departments use Axon to supply both long-range CEWs and BWC Systems in the same contract. Axon has also bundled BWC Systems and long-range CEWs in contracts with police departments. BWC Systems competitors without long-range CEWs are disadvantaged in competing for those police departments that want their BWC Systems to integrate with long-range CEWs.

**ANSWER: Axon denies that CEW product integration and bundling are barriers to entry. Moreover, the CEW allegations in this paragraph are irrelevant following the Court's**

**dismissal of Plaintiffs' CEW claims. Axon denies that CEWs integrate with BWCs and denies the remaining allegations in this paragraph.**

78.    Axon's nearly 300 U.S. patents covering its products form another barrier to entry.[65] Axon is unafraid to enforce its patents and has instituted numerous lawsuits against would-be competitors, most involving its Tasers.

**ANSWER: Axon admits it holds numerous patents, but denies its patent portfolio is a barrier to entry for any market relevant to this case. Axon admits it has filed lawsuits to lawfully protect and enforce its intellectual property rights.  Axon, however, denies it has sued any BWC or DEMS competitor for patent infringement. Axon denies the remaining allegations in this paragraph.**

79.    One would-be competitor, Robert Gruder, attempted to launch competing long-range CEW companies Stinger Systems and Karbon Arms. Both times, according to Gruder, Axon "sued [the companies] out of business."[66]

**ANSWER: The footnoted third-party publication speaks for itself, is irrelevant, and requires no response. Moreover, the CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

80.    Regulations pose a final barrier to potential new entrants, which must ensure their BWC Systems and long-range CEWs comply with a variety of state and local laws governing recording and less-lethal weapons.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

**B. Axon and Safariland Agree to Restrain Competition in the BWC Systems Market**

**1. Before the Acquisition, Safariland Aggressively Competed with Axon for BWC Systems, Yielding Lower Prices and Other Benefits for Customers**

81. Axon and Safariland have engaged in anticompetitive conduct to entrench Axon's unlawful monopolies in the BWC Systems market.

**ANSWER: Denied.**

82. In 2018, before the Acquisition, as described above, Axon dominated both the long-range CEW market and the BWC Systems market, with 95% market share in long-range CEW supply to police departments and approximately 70%-85% market share in BWC Systems supply.[67]

**ANSWER: The footnoted third-party publication speaks for itself, is irrelevant, and requires no response. Allegations concerning the relevant market and any purported market share constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied. Moreover, the CEW allegations in this paragraph are irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

83. VieVu was Axon's closest and most serious competitor in the BWC Systems market. For example, Safariland acknowledged: "We own the #2 player in the market, and to date we have seen no other credible market entrant," and "VieVu and Taser are consistently the finalists in major opportunities."

**ANSWER: Axon admits Vievu and Axon competed for BWC and DEMS opportunities, however, after winning the NYPD contract in 2016, Vievu did not win a bid for another MCCA member city. Axon denies the remaining allegations in this paragraph.**

84. Stock analysts and the financial press also recognized that VieVu was Axon's most significant competitor. A Raymond James stock report stated: "In May 2018, Axon closed the $7.1 million strategic tuck-in acquisition of its most formidable body cam competitor, VieVu."[68] A Bloomberg article dated May 4, 2018, titled "The Biggest Police Body Cam Company Is Buying Its Main Competitor," declared that "[t]he combination of the two largest providers of the recording

36

devices will create a dominant force in police surveillance."[69] A May 18, 2018 article from the Motley Fool, titled "Axon Enterprise Now Owns the Police Body Cam Market," observed that "[t]here is going to be no stopping Axon Enterprise . . . now that it has acquired its main body camera rival VieVu."[70]

**ANSWER: The footnoted third-party publications speak for themselves, are irrelevant, and require no response. To the extent a response is required, the allegations of this paragraph are denied.**

85.     Before the Acquisition, VieVu and Axon were the competitors that could best satisfy the RFP requirements, from both a technical and price perspective, for BWC Systems for many of the police agencies in the United States. A number of police agencies found that, of multiple bidders, Axon and VieVu had the best offerings by a significant margin.

**ANSWER: Denied.**

86.     Axon and VieVu vigorously and consistently competed on the price of BWC Systems in an effort to win police department contracts. After Respondent Safariland acquired VieVu in 2015, VieVu lowered its pricing in an explicit effort to take market share from Axon. VieVu's former General Manager confirmed that in early 2016, VieVu "made a relatively deliberate decision to take price down in the market considerably," and VieVu admittedly "took [Axon] by surprise with disruptive pricing and nearly comparable technology." As late as 2018, VieVu's strategy was to "win on price," including specifically to charge "less than Axon."[71] By early 2018, VieVu had won the contracts of at least five of the largest 90 U.S. police departments.[72]

**ANSWER: Allegations based on the FTC's dismissed complaint are unproven, misleading, and denied. The footnoted third-party publications speak for themselves, are irrelevant, and require no response. Axon admits that prior to 2017, Vievu won MCCA agencies Miami-Dade, Phoenix, Oakland, Aurora, and NYPD. Axon denies Vievu had technology**

comparable to Axon. Axon denies the remaining allegations in this paragraph.

87.    Competition between Axon and VieVu resulted in substantially lower BWC System prices for police departments. A number of cities received substantially lower bids from VieVu as compared to Axon. For example, in a blind bidding process, VieVu's bid for the NYPD contract was *$6.4 million* compared to Axon's *$17 million*.[73]

ANSWER: Axon admits Vievu's bid for the NYPD contract was lower than Axon's. The NYPD bid materials speak for themselves and Axon denies the allegations in this paragraph to the extent inconsistent therewith. The remaining allegations in this paragraph are denied.

88.    VieVu's lower pricing caused Axon to reduce its own bids. VieVu at times responded to Axon's competing bids by offering better terms. In 2017, Axon was forced to offer free BWC Systems for one year in order to promote its BWC System against this competition from VieVu.[74] Axon admitted that VieVu was "undercutting" the company on price for BWC Systems, while VieVu's CEO noted that VieVu has started a "price war" with Axon.[75] VieVu at times responded to Axon's competing bids by offering better terms.

ANSWER: The footnoted third-party publications and unproven allegations in the FTC's dismissed complaint speak for themselves, are irrelevant, and require no response. Axon denies the allegations in this paragraph as competitor proposals and pricing are generally not public during the RPF bidding process, and Axon's pricing reflected the value added by its superior product offerings.

89.    Axon and VieVu also competed vigorously on non-price aspects of BWC Systems, including the development of various innovative features such as auto-activation of BWCs in the event of an officer unholstering a gun or Taser, and computer-assisted facial redaction tools for DEMS videos. Consumers benefited from this competition in innovation.

**ANSWER: Axon admits it has continuously innovated its BWC product offerings. Axon denies Vievu developed any of the features identified in this paragraph. Axon denies the remaining allegations of this paragraph.**

### 2. The Acquisition and Its Presumptive Illegality

90.    Rather than compete with VieVu and Safariland, on May 3, 2018, Axon instead acquired VieVu from Safariland and entered into related anticompetitive agreements with Safariland.

**ANSWER: Denied.**

91.    Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful.[76] HHIs are calculated by totaling the squares of the market shares of every firm in the relevant market. The Acquisition significantly increased concentration in the U.S. BWC Systems market.

**ANSWER: The Merger Guidelines and the dismissed FTC complaint speak for themselves and Axon denies the allegations in this paragraph to the extent inconsistent with those documents. Further, the allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

92.    Since the Acquisition, one firm, Axon, has controlled an estimated 85% of the BWC Systems market as measured by output or revenue. According to the FTC Complaint, the Acquisition resulted in a post-Acquisition HHI in excess of 2,500, and increased concentration by more than 200 points—a conclusion further supported by the market share analysis contained herein.[77] Therefore, the Acquisition is presumptively anticompetitive under the Merger Guidelines and applicable case law.

**ANSWER: Allegations concerning the relevant market and any purported market**

**share constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied. Allegations based on the FTC's dismissed complaint are unproven, misleading, and denied.**

93.     In its 10-K for fiscal year 2018, Axon reported the total purchase price as $17.6 million. The consideration Axon paid included $5.0 million in cash; $2.4 million, or 58,843 shares, of Axon common stock issued to Safariland, contingent consideration of up to $6.0 million, or 141,226 additional shares of Axon common stock, if certain conditions were met (the fair value of which as of the acquisition date was $5.8 million, according to Axon), and the "Holster Agreement." Pursuant to the Holster Agreement, Safariland agreed for 10 years, *inter alia*, to develop a new CEW holster for Axon's next-generation CEW and to supply CEW holsters exclusively to Axon. Axon agreed, *inter alia*, to make Safariland its preferred supplier of CEW holsters. According to Axon, the estimated fair value of the Supply Agreement as of the acquisition date was $4.5 million.

**ANSWER: Axon's 10-K and Product Development and Supplier Agreement (i.e., Holster Agreement) speak for themselves and Axon denies the allegations in this paragraph to the extent inconsistent with those documents. Allegations regarding the Holster Agreement are irrelevant based on the Court's dismissal of Plaintiffs' CEW claims.**

94.     Axon and Safariland also agreed, as part of the Acquisition Agreement and Holster Agreement, to several market-allocation and noncompete agreements related to the BWC Systems market, as well as to long-range CEWs. As described in more detail below, "Safariland agreed not to compete (i) for products and services that Respondent Axon supplies and in industries where Respondent Axon is active, irrespective of their relation to the [Acquisition] and (ii) for Respondent Axon's customers; and both [Defendants] agreed not to affirmatively solicit each other's employees."[78] These agreements each lasted 10 or more years. According to the FTC's complaint, the noncompete

agreements are contained in the Acquisition Agreement itself and in Exhibit E, the Holster Agreement.[79]

**ANSWER: The Membership Interest Purchase Agreement and the Product Development and Supplier Agreement speak for themselves and Axon denies the allegations in this paragraph to the extent inconsistent with those agreements. Allegations based on the FTC's dismissed complaint are unproven, misleading, and denied. Allegations regarding the Holster Agreement are irrelevant based on the Court's dismissal of Plaintiffs' CEW claims and Defendants' January 16, 2020 recission of the referenced provisions. Axon expressly denies it ever entered into any "market-allocation" agreement with Safariland.**

95.    In Section 5.03(a) of the Acquisition Agreement, Safariland agreed not to engage in "(a) body worn video products and services, (b) in-car video products and services, (c) digital evidence management products and services provided to third parties that ingest digital evidence audio and video files, and (d) enterprise records management systems provided to third parties," anywhere in the world for 10 years.

**ANSWER: The Membership Interest Purchase Agreement speaks for itself and Axon denies the allegations in this paragraph to the extent inconsistent with that agreement. Axon further avers that Defendants rescinded all non-compete provisions on January 16, 2020.**

96.    In Section 15.1 of the Holster Agreement, Safariland further agreed not to compete in the "CEW industry, BWC industry, fleet or vehicle camera industry, surveillance room camera industry, and digital evidence management system and storage industry, with regard to law enforcement, military, security or consumers," anywhere in the world for 12 years.

**ANSWER: The Product Development and Supplier Agreement speaks for itself**

**and Axon denies the allegations in this paragraph to the extent inconsistent with that agreement. Axon further avers that Defendants rescinded all non-compete provisions on January 16, 2020.**

97.    According to the FTC complaint, "Respondent Axon was concerned about Respondent Safariland potentially entering into competition with Respondent Axon's lucrative [long-range] CEW business. Respondent Axon's CEO called the 12-year CEW noncompete a 'hidden jewel in the deal.'"[80] Axon's CEO's comment demonstrates that Axon viewed the CEW noncompete as having significant value for Axon. This could only be the case if Axon believed that Safariland would otherwise be a *bona fide* potential competitor in the long-range CEW market.

**ANSWER: The allegations in the FTC's dismissed complaint are unproven, misleading, and denied. Further, the Court's dismissal of Plaintiffs' CEW claims renders all CEW allegations irrelevant. Axon denies the remaining allegations in this paragraph.**

98.    In Section 5.03(c) of the Acquisition Agreement, "Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting business or services away from Axon, for 10 years."[81]

**ANSWER: The Membership Interest Purchase Agreement speaks for itself and Axon denies the allegations in this paragraph to the extent inconsistent with that agreement. Axon further avers that Defendants rescinded all non-solicitation provisions on January 16, 2020.**

99.    "In Section 15.3 of the Holster Agreement, Safariland agreed not to solicit or entice any of Axon's customers or potential customers for purposes of diverting CEW, CEW holster, or CEW accessory business or purchases away from Axon, for 11 years."[82]

**ANSWER: The Product Development and Supplier Agreement speaks for itself**

**and Axon denies the allegations in this paragraph to the extent inconsistent with that agreement. Axon further avers that Defendants rescinded all non-solicitation provisions on January 16, 2020.**

100.    In Section 5.03(b) of the Acquisition Agreement, "Safariland agreed not to hire or solicit any of Axon's employees, or encourage any employees to leave Axon, or hire certain former employees of Axon, except pursuant to a general solicitation. Safariland agreed to refrain from these activities for 10 years."[83]

**ANSWER: The Membership Interest Purchase Agreement speaks for itself and Axon denies the allegations in this paragraph to the extent inconsistent therewith. Axon further avers that Defendants rescinded all non-solicitation provisions on January 16, 2020.**

101.    In Section 5.06(a) of the Acquisition Agreement, "Axon agreed not to hire or solicit any of Safariland's employees, or encourage any employees to leave Safariland, or hire certain former employees of Safariland, except pursuant to a general solicitation. Axon agreed to refrain from these activities for 10 years.[84]

**ANSWER: The Membership Interest Purchase Agreement speaks for itself and Axon denies the allegations in this paragraph to the extent inconsistent therewith. Axon further avers that Defendants rescinded all non-solicitation provisions on January 16, 2020.**

102.    "In Section 15.4 of the Holster Agreement, Respondents Axon and Safariland agreed not to solicit each other's employees for the purpose of inducing the employees to leave their respective employers, except pursuant to a general solicitation. Respondents Axon and Safariland agreed to refrain from this activity for 11 years."[85]

**ANSWER: The Product Development and Supplier Agreement speaks for itself and Axon denies the allegations in this paragraph to the extent inconsistent with that**

**agreement. Axon further avers that Defendants rescinded all non-solicitation provisions on January 16, 2020.**

103.    By prohibiting Safariland from competing against Axon—in terms of products and services Safariland can offer as well as customers Safariland can solicit—these provisions harmed customers who would otherwise benefit from potential or actual competition by Safariland, including specifically in the market for BWC Systems. By prohibiting Axon and Safariland from affirmatively soliciting each other's employees, these provisions eliminated a form of competition to attract skilled labor and thereby tended to reduce quality, service, and innovation, including specifically in the market for BWC Systems.

**ANSWER: Denied.**

104.    These provisions also harmed customers who would otherwise benefit from potential or actual competition by Safariland in the market for long-range CEWs. Axon's decision to include the long-range CEW market in its noncompete agreements reflects Axon's understanding that Safariland was poised to develop a long-range CEW that could compete with Axon's long-range CEWs. Further, Safariland's success in developing VieVu showed that Safariland likely had the technological capability, capital, and sales relationships necessary to develop and distribute a rival long-range CEW.

**ANSWER: Axon denies the allegations in the paragraph. Further, the Court's dismissal of Plaintiffs' CEW claims renders all CEW allegations irrelevant.**

105.    The noncompete agreements were not reasonably limited in scope to protect a legitimate business interest. A mere general desire to be free from competition is not a legitimate business interest, nor were these agreements protecting a legitimate investment by Axon in VieVu since the Acquisition itself was unlawful. But even if the Acquisition were lawful (which it was not), the noncompete agreements went far beyond any intellectual property, goodwill, or customer relationship necessary to

protect Axon's investment in VieVu. Moreover, even if a legitimate interest existed, the noncompete agreements were longer in duration than reasonably necessary because they prevented Safariland and Axon from competing for products and services, customers, and employees for 10 years or longer.

**ANSWER: Denied.**

### 3. Defendants' Conduct Has Harmed Competition Substantially

106.    Axon's dominance in the BWC Systems market became impenetrable after the VieVu acquisition and related market-allocation and noncompete agreements with Safariland. Axon remains the market leader of both long-range CEWs and BWC Systems, with 90% of the long-range CEW market and approximately 70%-85% of the BWC Systems market.[86] Through its acquisition, market-allocation, and noncompete agreements, Axon has effectively acquired and maintained its unlawful monopoly power in these markets.

**ANSWER: The footnoted third-party publications speak for themselves, are irrelevant, and require no response. The CEW allegations in this paragraph are also irrelevant following the Court's dismissal of Plaintiffs' CEW claims. Axon denies the remaining allegations in this paragraph.**

107.    The Acquisition eliminated intense price and innovation competition between Axon and VieVu in the BWC Systems market. The result has been higher prices and reduced quality, service, and innovation.

**ANSWER: Denied.**

108.    As described above, Axon and VieVu were each other's closest competitors, and industry analysts predicted that the Acquisition would make Axon a monopolist. Before the Acquisition, Axon and VieVu's competition caused Axon to reduce its own bids and resulted in substantially lower prices in the BWC Systems market overall. Axon and VieVu's competition also led

to increased innovation in that market.

**ANSWER: Denied.**

109.    Post-Acquisition, customers lost the benefit of this head-to-head price and innovation competition.

**ANSWER: Denied.**

110.    The prices Axon charges for BWC Systems have shot up dramatically as a result of the Acquisition. This is shown by Axon's own 10-K filings with the SEC. Notably, these filings show that Axon's average selling price for BWCs (calculated as revenue per unit sold) *declined* from $195.17 in 2016 to $169.07 in 2017, the last year before the Acquisition, while VieVu was still vigorously competing with Axon, even as Axon sold substantially more BWCs in 2017 than in 2016. But Axon's revenue per BWC sold jumped to ***$254.56*** in 2018, the year of the Acquisition—an increase of ***34%***— even though Axon sold roughly the same number of BWCs that year as in 2017. And its average BWC price has relentlessly increased further since then, rising to ***$290.69*** in 2019, ***$313.09*** in 2020, ***$415.52*** in 2021, and ***$489.80*** in 2022—a nearly ***threefold*** increase from 2017, the year before the Acquisition. (By comparison, Apple's base iPhone MSRP has gone up only from $699 to $799 from 2017 to 2023 despite many feature improvements over that period.)

**ANSWER: Denied.**

111.    Prices for Docks exhibit a similar pattern. Axon's 10-K reports show that the average price for its Docks *decreased* from $437.03 in 2016 to $414.44 in 2017, the year before the Acquisition. That increased to *$602.75* in 2018, the year of the Acquisition (a ***45%*** increase), and then *$918.02* in 2019 (a ***122%*** increase from 2017). By 2022, the average price was $1,043.06, well over twice as expensive as 2017.

**ANSWER: Denied.**

112.    Prices for Axon's DEMS have also increased, as is demonstrated by price quotes and contracts with local governments from before and after the Acquisition. For example, in 2017 Axon offered four Pro Evidence.com licenses to Fayetteville, Arkansas, at an effective rate of $243.34 per license per year for five years (net of discounts). In 2020, however, Axon offered two Pro Evidence.com licenses to another local government for an effective rate of $468 per license per year for five years— nearly twice the effective 2017 price.

**ANSWER: Axon lacks sufficient knowledge regarding license pricing for an unidentified local government for comparison purposes and therefore denies the allegations in this paragraph. Axon also denies that it reports DEMS pricing as defined by Plaintiffs.**

113.    Further evidence that the Acquisition has led to supracompetitive prices comes from Axon's reported profit margins on BWCs. Indeed, these margins follow a trend nearly identical to Axon's BWC prices from 2016 to 2022. Axon's reported gross margin on "hardware" in its "Software and Sensors" segment (the term it uses for its BWC business) was 17.6% in 2016 and just 10.5% in 2017, when it was competing intensely with VieVu. That figure (later reported as "product gross margin," as opposed to "service margins," for the Software and Sensors segment) then jumped to 20.8% in 2018, *29.8*% in 2019, *36.6*% in 2020, *39.2*% in 2021, and *42.1*% in 2022—a ***fourfold*** increase from 2017.

**ANSWER: Axon denies that the acquisition led to supracompetitive prices and denies its "Software and Sensors" segment is limited to its BWC business. Axon denies the remaining allegations in this paragraph.**

114.    This profit margin data shows that the increase in Axon's BWC Systems prices after the Acquisition is not due to increased costs (to the extent they increased at all).

**ANSWER: Denied.**

115.    Since the Acquisition, Axon has likewise raked in eye-popping gross margins on its DEMS business—74.6% in 2021, and 73.3% in 2022, for example, according to its 10-K filings.

**ANSWER: Axon denies that it reports gross margins for a "DEMS business." Further, Axon's SEC filings speak for themselves and allegations inconsistent therewith are denied.**

116.    Existing BWC Systems providers have not replaced the competition that was lost as a result of the Acquisition between Axon and VieVu, which were the two closest competitors in the relevant market. While each remaining competitor has different strengths and weaknesses, each competitor faces real and significant challenges in replacing competition lost through Axon's Acquisition of VieVu. These challenges include, but are not limited to, reputation or lack of references from police department customers, service levels that are inadequate for such customers, and software with limited functionality.

**ANSWER: Denied.**

117.    The challenges faced by these competitors are even greater because of the clout Axon has with police departments from its Taser product. Axon has acknowledged that this is a "key" "[d]ifferentiator" that sets Axon apart, bragging in a 2019 investor presentation that "Taser success drives customer access" more broadly and that "17,000 out of 18,000 US police agencies procure Taser devices." Axon further acknowledged that it "leveraged its deep agency relationships and Taser's strength to establish the market lead in body cameras & software."[87]

**ANSWER: Axon's investor presentation speaks for itself and Axon denies any allegations and characterizations inconsistent therewith. Axon denies the remaining allegations in this paragraph.**

118.    Moreover, some of the other BWC Systems providers price significantly higher than

VieVu and have not sufficiently replaced VieVu's aggressive pricing. As the analysis of Axon's prices above demonstrates, the remaining firms in the relevant market have not replaced the competitive constraint of VieVu's lower-priced offerings.

**ANSWER: Axon denies that Vievu's pricing was ever a competitive constraint on Axon and lacks sufficient knowledge concerning the pricing of other BWC and DEMS competitors and therefore denies those allegations. Axon won competitive bids against Vievu even when its pricing exceeded Vievu's based on superiority of its products.**

119.    Axon's price increases have been highly profitable for it. Its annual unit sales of BWCs and DEMS have increased significantly since the Acquisition despite its higher prices. It is clear, therefore, that Axon has been able to impose and profitably sustain a significant non-transitory price increase in BWC Systems market since and as a result of the Acquisition.

**ANSWER: Denied.**

120.    Defendants' anticompetitive conduct has also increased prices for long-range CEWs compared to what those prices would have been absent the Acquisition and Defendants' conduct.

**ANSWER: Denied and irrelevant following the Court's dismissal of Plaintiffs' CEW claims.**

121.    Safariland was a large manufacturer of less-lethal weapons through its Defense Technology brand. Its products included pepper spray and rubber bullets, as well as weapon holsters. These products allowed it to develop relationships with police departments and become a trusted supplier of less-lethal weapons.[88]

**ANSWER: Axon admits that Safariland manufactures holsters and sells other personal protection equipment for law enforcement. The footnoted references to the FTC's dismissed complaint are unproven, irrelevant, and require no response. Axon lacks sufficient**

**knowledge concerning the remaining allegations in this paragraph and therefore denies them.**

122.    Absent the Acquisition and Defendants' other anticompetitive conduct, entry into the long-range CEW market by Safariland would have been likelier, and this threat would have lowered prices. As noted above, Axon's own CEO's comment that the Acquisition's market-allocation provision with respect to long-range CEWs was a "hidden jewel" of the Acquisition indicates that Axon itself viewed entry by Safariland into the long-range CEW market as a real threat.[89]

**ANSWER: The allegations in the FTC's dismissed complaint are unproven, misleading, and denied. Further, the Court's dismissal of Plaintiffs' CEW claims renders all CEW allegations irrelevant. Axon denies the remaining allegations in this paragraph.**

123.    Axon's actual prices and profit margins on long-range CEWs reflect this anticompetitive impact. For example, in 2014–15, Oklahoma City paid around $630,000 and $683,325 for five-year contracts of at least 305 Tasers and a BWC System with 305 body cameras (supplied by competitor WatchGuard).[90] Under its new contract, all with Axon, it pays $28.9 million over ten years for a full supply agreement with 500 long-range CEWs and 665 body cameras—of which, $18.7 million is allocated to long-range CEWs and BWC Systems. These contracts represent a per-year cost increase for long-range CEWs and BWC Systems from just under $263,000 to $1.9 million, an increase of 611%, when its supply of long-range CEWs and body cameras increased by less than 100%.

**ANSWER: The footnoted third-party publications speak for themselves, are irrelevant, and require no response. Further, the Court's dismissal of Plaintiffs' CEW claims renders all CEW allegations irrelevant. Axon lacks sufficient knowledge concerning Oklahoma City's prior contract with Watchguard and therefore denies those allegations. Axon denies the remaining allegations in this paragraph.**

124.    Moreover, Axon's gross margins on its Taser business have exceeded 61% every year

from 2019 through 2022, reaching 65.7% in 2021, according to its 10-K filings.

**ANSWER: The Court's dismissal of Plaintiffs' CEW claims renders all CEW allegations irrelevant.  Axon's SEC filings speak for themselves and allegations inconsistent therewith are denied.**

125.    Axon has acknowledged the negative impact of price increases on budget constrained law enforcement officers and communities: "It's no secret that budget constraints are a constant inconvenience for law enforcement agencies. Long needs lists + short funds = under equipped officers and potentially underserved communities."[91]

**ANSWER: The unattributed allegations in the FTC's dismissed complaint are unproven, misleading, and denied.**

126.    Indeed, Axon's monopoly prices have priced many police departments out of the BWC Systems market. In its 2019 article, "Some U.S. Police Departments Dump Body-Camera Programs Amid High Costs," the Washington Post reported that "many departments—especially in smaller jurisdictions—are now dropping or delaying their [BWC] programs, finding it too expensive to store and manage the thousands of hours of footage"—i.e. via DEMS.[92] The article further noted how "Axon . . . said every one of its clients that have canceled contracts cited costs."[93] This type of "dead-weight loss," as economics calls it—where a monopolist's supracompetitive prices price out buyers who would otherwise buy the product if it were priced competitively—is a classic harm inflicted by monopoly power, which reduces total economic output and welfare.

**ANSWER: The footnoted third-party publications speak for themselves, are irrelevant, and require no response. The first and last sentences in this paragraph constitute legal conclusions that require no response. Axon denies any remaining allegations in this paragraph.**

127.    Further, Defendants' anticompetitive misconduct continues and will continue to harm

Plaintiffs and other Class members who purchase BWC Systems products directly from Axon. Axon continues to charge supracompetitive prices for BWC Systems—and Plaintiffs and the Class have suffered and will continue to suffer reduced choice, product quality, and innovation in the BWC Systems market—as a result of the Acquisition.

> **ANSWER: Denied.**

C. **Lack of Countervailing Factors**

1. **High Barriers to Entry and Expansion**

128.    Defendants cannot demonstrate that new entry or expansion by existing firms has been or would be timely, likely, or sufficient to offset the anticompetitive effects of their conduct. *De novo* entrants into the BWC Systems market would face considerable barriers in replicating the competition that the Acquisition has eliminated. Effective entry into the BWC Systems market would require substantial, costly upfront investments in creating a new BWC System. These products also must be designed for use by law enforcement agencies, with features such as secured layers for authorized personnel access and strict recording of file access history for chain of custody purposes. There are high switching costs related to the transfer of metadata for DEMS video files, as well as long-range CEW training; in both situations, training officers is challenging and expensive, making customers sticky.

> **ANSWER: The allegations in this paragraph constitute legal conclusions that require no response.  To the extent a response is required, the allegations are denied.**

129.    Barriers to entry are even higher because of Axon's clout with police departments thanks to its Taser product. As noted above, Axon has acknowledged that this clout is a "key" "[d]ifferentiator" that sets Axon apart, allowing it to "leverage[] its deep agency relationships" to market and sell products.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

130.    Significant barriers to entry and expansion are confirmed by Axon's continued dominance in the BWC Systems market today despite its continuing price increases that would otherwise be expected to entice new market participants to enter or existing participants to expand.

**ANSWER: Denied.**

**2. Efficiencies**

131.    Defendants cannot show that merger-specific efficiencies would result from the Acquisition that will offset the anticompetitive effects. According to the FTC, Axon's President admitted that potential efficiencies played no role in Axon's analysis of the Acquisition.[94]

**ANSWER: The first sentence of this paragraph constitutes a legal conclusion that requires no response. To the extent a response is required, the allegations are denied. The unidentified statement from the FTC's dismissed complaint is unproven, misleading, and therefore denied.**

**D. The FTC Alleges the Acquisition Violates the Antitrust Laws**

132.    On January 3, 2020, the Federal Trade Commission issued an administrative complaint against Axon and Safariland alleging that the Acquisition "constitutes a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45."[95] The complaint also alleged that the Acquisition "constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45."[96] The Commission vote to issue the administrative complaint was 5-0.[97]

**ANSWER: Axon admits the FTC issued an administrative complaint against it and Safariland on January 3, 2020, which speaks for itself and Axon denies any allegations**

inconsistent therewith.  Axon denies the remaining allegations in this paragraph.

133.    Many of the allegations from the FTC complaint are specifically incorporated and realleged herein. The FTC complaint specifically alleged, *inter alia*, that the Acquisition "eliminated intense price and innovation competition between Respondent Axon and VieVu in the relevant market" and has resulted in higher prices for BWC Systems.[98]

**ANSWER: Axon admits that the allegations in the SAC are copied from the FTC's dismissed and unproven complaint. Axon denies the remaining allegations in this paragraph.**

134.    The relief contemplated by the FTC complaint consisted of various forms of injunctive relief, including, *inter alia*, divestiture of assets (including those acquired from Safariland) to restore the level of competition that was lost through the Acquisition, taking various steps to assist the divested business, and voiding all anticompetitive agreements between Axon and Safariland.

**ANSWER: The FTC's complaint speaks for itself and Axon denies any allegations inconsistent therewith.**

135.    On June 11, 2020, Safariland settled with the FTC.[99] Under the terms of the settlement agreement, Safariland must obtain approval from the FTC before entering into any noncompete or similar agreements with Axon.

**ANSWER: Admit that the FTC entered a Decision and Order relating to its claims against Safariland.  The Decision and Order speaks for itself and Axon denies any allegations in this paragraph inconsistent therewith.  Axon denies the remaining allegations in this paragraph.**

136.    On October 6, 2023, the FTC dismissed its complaint against Axon and returned the matter to adjudication.[100] That dismissal followed years of litigation by Axon challenging the constitutionality of the FTC's administrative adjudication process. In dismissing its complaint, the FTC cited factors "including the increasingly unlikely possibility of reaching a timely resolution of the

antitrust merits that led to the filing of our complaint in the first place."[101] In reaching that "difficult conclusion," the FTC reaffirmed its view that the allegations in its complaint remain sound. That is, this was an "anticompetitive merger" that "harms markets and adversely affects the American people" by "eliminat[ing] competition between two rivals, effectively creating a monopoly and harming both police departments and communities who fund them."[102]

**ANSWER: Axon admits the FTC dismissed its complaint on October 6, 2023, without consent degree or other condition. The dismissal followed the U.S. Supreme Court's unanimous decision in favor of Axon regarding its federal court constitutional challenge to the FTC's administrative structure. The dismissal order speaks for itself and Axon denies any allegations inconsistent therewith.**

### E.    Defendants' Conduct Has Harmed the Class

137.    Defendants' conduct has harmed Plaintiffs and other Class members who purchased BWC Systems (or their components) from Axon after the Acquisition. As a result of the Acquisition and Defendants' other anticompetitive conduct, Plaintiffs and Class members have paid supracompetitive prices for these products and services. Plaintiffs and Class members have also suffered from reduced quality, service, and innovation in the BWC Systems Market because of Defendants' conduct. These are antitrust injuries of the type that the antitrust laws were meant to punish and prevent.

**ANSWER: Denied.**

## V.    CLASS ACTION ALLEGATIONS

138.    Plaintiffs bring this action on behalf of themselves and, pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who have directly purchased any of the following from Axon in the United States from May 3, 2018 until the effects of

Defendants' unlawful conduct cease (the "Class Period"): a BWC System or any component of a BWC System or related services such as transcription, redaction, and warranties.

**ANSWER: Axon admits Plaintiffs purport to bring this action on behalf of a nationwide class of customers who have purchased certain Axon products and services. Axon denies the remaining allegations in this paragraph.**

139.    The following are specifically excluded from the Class: Defendants; the officers, directors, and employees of Defendants; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants. Also excluded from the Class are: federal and state government entities;[103] any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified in this action.

**ANSWER: Axon admits that these and many others must be excluded from the putative class.  Axon denies that Plaintiffs' claims can proceed on a class wide basis.**

140.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

141.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class were damaged by the same wrongful conduct of Defendants.

**ANSWER: Denied.**

142.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members

of the Class.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

143.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of antitrust, class action, and other complex litigation.

**ANSWER: Axon lacks knowledge regarding the allegations in this paragraph and therefore deny them.**

144.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

   a.    whether the Acquisition substantially lessened competition and/or tended to create a monopoly;

   b.    the definition of the relevant market;

   c.    whether the alleged market-allocation and noncompete agreements violated the federal antitrust laws;

   d.    whether, through the conduct alleged herein, Axon willfully acquired, maintained, and/or enhanced its monopoly power in the BWC Systems market in the United States;

   e.    whether Axon unlawfully attempted to monopolize the relevant market;

   f.    whether Defendants unlawfully conspired to monopolize the relevant market;

   g.    whether Defendants' conduct caused Class members to suffer antitrust injury and, if so, the appropriate measure of damages; and

   h.    whether Defendants have acted or refused to act on grounds generally applicable

to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

145.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

146.    The benefit of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

**ANSWER: Denied.**

147.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

148.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, Axon lacks knowledge regarding the**

**allegations and therefore denied them.**

149.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**ANSWER: Denied.**

## VI.    CONTINUING VIOLATION

150.    From May 3, 2018 and continuing to the present day, as a result of the anticompetitive conduct described above, Defendants have repeatedly overcharged customers throughout the United States for BWC Systems. Each such sale was an overt act causing additional anticompetitive injury to the proposed Class.

**ANSWER: Whether any particular conduct constitutes an "overt act" is a legal conclusion that requires no response. Axon denies the remaining allegations in this paragraph.**

## VII.    TOLLING OF STATUTE OF LIMITATION

151.    Plaintiffs incorporate by reference and reallege, as though fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

**ANSWER: Except where specifically admitted above, the allegations in the preceding paragraphs of the SAC are denied.**

152.    The federal government's initiation of its antitrust action concerning Defendants' unlawful conduct operates to toll any federal statute of limitations under Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i), which tolls the running of the statute of limitations "during the pendency" of a government action about the same matter "and for one year thereafter."

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

153.    The FTC initiated a government action against Defendants based on the acquisition of

VieVu and Defendants' associated noncompete and market-allocation agreements. Because Axon launched a collateral attack on the FTC administrative complaint, the FTC's case against Axon remained pending until October 6, 2023. The administrative complaint qualifies for tolling the statute of limitations on related private actions.

**ANSWER: Axon admits the FTC initiated an administrative action on January 3, 2020, which was dismissed against Axon without consent decree or other condition on October 6, 2023. Axon denies that Defendants entered into any market allocation agreement. The last sentence of this paragraph constitutes a legal conclusion requiring no response.**

154.   This action, which is based on the acquisition of VieVu and Defendants' market-allocation and noncompete agreements in the BWC Systems market, is based in part on a matter complained of in the government action. Because this action meets all requirements for tolling under Section 5(i) of the Clayton Act, tolling is appropriate, and this action has been brought within the statute of limitations.

**ANSWER: Axon admits this action and the FTC matter were both based on the Vievu acquisition but denies Plaintiffs' alleged BWC Systems market was the subject of the FTC complaint. The last sentence of this paragraph constitutes a legal conclusion requiring no response.**

155.   The statute of limitations is further tolled because Defendants' fraudulently concealed their conspiracy. Specifically, Defendants fraudulently concealed the ancillary noncompete agreements that they entered into in connection with the Acquisition. Defendants' affirmative acts of fraudulent concealment in connection with their anticompetitive conduct in the BWC Systems market prevented Plaintiffs and members of the class from having notice of their claims more than four years before filing this Complaint, and tolled the statute of limitations on Plaintiffs' claims.

**ANSWER: Axon denies any conspiracy, fraudulent concealment, or duty to disclose the terms of its agreements with Safariland, which became public in any event on January 3, 2020, and were rescinded in relevant part two weeks later. Whether the statute of limitations was tolled constitutes a legal conclusion requiring no response. The remaining allegations in this paragraph are denied.**

156.    Many of the overt acts in furtherance of the conspiracy alleged in this complaint were done with the purpose of concealing the conspiracy and preventing Plaintiffs and other purchasers of BWC Systems from learning about the conspiracy's existence. Accordingly, Plaintiffs did not know or reasonably suspect the existence of their claims more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims.

**ANSWER: Denied.**

## VIII.   CLAIMS FOR RELIEF[104]

### FIRST CLAIM FOR RELIEF VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18
### (Axon)

157.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER: Except where specifically admitted above, the allegations in the preceding paragraphs of the SAC are denied.**

158.    Axon's acquisition of VieVu was a stock acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

159.    Axon's acquisition of VieVu from Safariland eliminated one of Axon's potential competitors.

**ANSWER: Denied.**

160.    The effect of this acquisition has been to substantially lessen competition and to tend to create a monopoly in the BWC Systems market in the United States, in violation of Section 7 of the Clayton Act.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

161.    The relevant product and geographic market consists of BWCs Systems and their components and related services sold in the United States.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

162.    The Products are not reasonably interchangeable with any other products in the United States. There is no reasonably interchangeable product that would effectively constrain, or has effectively constrained, Axon from imposing and profitably sustaining a SSNIP.

**ANSWER: The allegations in this paragraph constitute legal conclusions that require no response. To the extent a response is required, the allegations are denied.**

163.    High barriers to entry and expansion have made it infeasible for a competitor to enter the BWC Systems market to compete with Axon and restrain its monopoly power despite dramatic price increases.

**ANSWER: Denied.**

164.    Axon controls an estimated 85% of the BWC Systems market.

**ANSWER: Denied.**

165.    As a result of Axon's conduct in violation of Section 7 of the Clayton Act, Plaintiffs and the Class have been and will continue to be injured, including by paying artificially inflated prices for the Products and suffering reduced choice, quality, and innovation.

**ANSWER: Denied.**

166.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Axon preventing and restraining the violations and injuries alleged herein.

**ANSWER: Denied**

### SECOND CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### Conspiracy in Restraint of Trade (Axon & Safariland)

167.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER: Except where specifically admitted above, the allegations in the preceding paragraphs of the SAC are denied.**

168.    Axon entered into a number of agreements with Safariland that have reduced competition, output, and innovation and raised prices above competitive levels in the BWC Systems market.

**ANSWER: Denied.**

169.    Defendants' conduct violates the rule-of-reason standard of antitrust liability because Defendants' conduct had actual anticompetitive effects with no or insufficient offsetting procompetitive benefits.

**ANSWER: Denied.**

170.    Defendants' anticompetitive acts have injured and will continue to injure competition in the BWC Systems market.

63

**ANSWER: Denied.**

171.    Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

**ANSWER: Denied.**

172.    Defendants' conduct has caused Plaintiffs and all the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

**ANSWER: Denied.**

173.    Plaintiffs and the Class are threatened with future injury to their business and property by Defendants' past and continuing violation of Section 1 of the Sherman Act.

**ANSWER: Denied.**

174.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations and injuries alleged herein.

**ANSWER: Denied.**

**THIRD CLAIM FOR RELIEF VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Monopolization of the BWC Systems Market (Axon)**

175.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER: Except where specifically admitted above, the allegations in the preceding paragraphs of the SAC are denied.**

176.    The relevant product and geographic market consists of BWC Systems and their components and related services sold in the United States.

**ANSWER: Denied.**

177.    Since the Acquisition, Axon has had monopoly power in the relevant market.

**ANSWER: Denied.**

178.    Axon willfully obtained and maintained its monopoly power through the Acquisition and related noncompete agreements.

**ANSWER: Denied.**

179.    Axon's conduct has had substantial anticompetitive effects. It has raised prices for BWC Systems above competitive levels and otherwise injured competition with no or insufficient offsetting procompetitive benefits.

**ANSWER: Denied.**

180.    Axon's anticompetitive acts have injured, and will continue to injure, competition in this market.

**ANSWER: Denied.**

181.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

**ANSWER: Denied.**

182.    Axon's conduct has caused Plaintiffs and the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

**ANSWER: Denied.**

183.    Plaintiffs and the Class are threatened with future injury to their business and property from Axon's past and continuing violation of Section 2 of the Sherman Act.

**ANSWER: Denied.**

184.    Plaintiffs and members of the Class are entitled to treble damages and an injunction

against Axon preventing and restraining the violations and injuries alleged herein.

**ANSWER: Denied.**

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Attempted Monopolization of the BWC Systems Market (Axon)

185.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER: Except where specifically admitted above, the allegations in the preceding paragraphs of the SAC are denied.**

186.    The relevant product and geographic market consists of BWC Systems and their components and related services sold in the United States.

**ANSWER: Denied.**

187.    If Axon does not already have monopoly power in the United States for BWC Systems, Axon has attempted to monopolize this market. Axon attempted to acquire and maintain that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of foreclosing competition in the market for BWC Systems and inflating the price of BWC Systems.

**ANSWER: Denied.**

188.    As described in more detail above, with its purchase of VieVu, Axon attempted to acquire and maintain market power through anticompetitive conduct, including the acquisition of VieVu from Safariland and the noncompete agreements entered between Axon and Safariland.

**ANSWER: Denied.**

189.    The anticompetitive conduct described here, undertaken by Axon, creates a dangerous probability that Axon will achieve monopoly power in the BWC Systems market.

**ANSWER: Denied.**

190.    Axon's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

**ANSWER: Denied.**

191.    As a direct and proximate result of Axon's continuing attempted violation of Section 2 of the Sherman Act, prices of BWC Systems in the U.S. have been raised above competitive levels and otherwise injured competition with no or insufficient offsetting procompetitive benefits, causing injury to Plaintiffs and members of the Class.

**ANSWER: Denied.**

192.    Axon's anticompetitive acts have injured and will continue to injure competition in this market.

**ANSWER: Denied.**

193.    Axon's anticompetitive acts affect interstate commerce and injure competition nationwide.

**ANSWER: Denied.**

194.    Axon's conduct has caused Plaintiffs and the other members of the Class to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Axon does not cease its anticompetitive conduct.

**ANSWER: Denied.**

195.    Plaintiffs and the Class are threatened with future injury to their business and property by Axon's past and continuing violation of Section 2 of the Sherman Act.

**ANSWER: Denied.**

196.    Plaintiffs and members of the Class are entitled to treble damages and an injunction

against Axon preventing and restraining the violations and injuries alleged herein.

**ANSWER: Denied.**


**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopolize the BWC Systems Market (Axon & Safariland)**

197.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

**ANSWER: Except where specifically admitted above, the allegations in the preceding paragraphs of the SAC are denied.**

198.    Defendants entered into and engaged in an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in exclusionary conduct designed to prevent competition on the merits in the relevant market for BWC Systems.

**ANSWER: Denied.**

199.    Specifically, in exchange for Axon's purchasing VieVu and signing the Holster Agreement, Safariland agreed to withdraw from the market for BWC Systems and not to re-enter, thereby securing Axon's ability to achieve monopoly profits by eliminating a competitor well-situated to compete on price and innovation.

**ANSWER: Denied.**

200.    Overt acts in furtherance of this conspiracy consisted of, inter alia: (a) the unlawful customer and product market-allocation agreements between Axon and Safariland entered into on May 3, 2018 by which Safariland agreed not to compete in the BWC Systems market or solicit Axon's customers or employees, and (b) the unlawful acquisition of VieVu on May 3, 2018 by which Safariland agreed to withdraw from the BWC System market.

**ANSWER: Denied.**

201.    Defendants engaged in this with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits.

**ANSWER: Denied.**

202.    Defendants' anticompetitive and unlawful conduct proximately caused injury to Plaintiffs and members of the Class by eliminating independent competition by Safariland on price, promotional activity, and innovation. This conduct has reduced customer choice and allowed Axon to raise, maintain, or stabilize the prices of BWC Systems sold to direct purchasers in the United States.

**ANSWER: Denied.**

203.    Defendants' anticompetitive acts affect interstate commerce and injure competition nationwide.

**ANSWER: Denied.**

204.    Defendants' conduct has caused Plaintiffs and the other Class members to suffer damages in the form of injuries to their business or property, which they will continue to suffer if Defendants do not cease their anticompetitive conduct.

**ANSWER: Denied.**

205.    Plaintiffs and the Class are threatened with future injury to their business and property by Defendants' past and continuing violation of Section 2 of the Sherman Act.

**ANSWER: Denied.**

206.    Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants preventing and restraining the violations and injuries alleged herein.

**ANSWER: Denied.**

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Axon demands a trial

by jury as to all issues so triable.


## AFFIRMATIVE AND OTHER DEFENSES

Axon asserts the following defenses and reserves the right to assert other defenses or claims when and if they become appropriate or available in this action. The statement of defenses herein does not assume the burden of proof for any issue, fact, or element of a claim.

### FIRST DEFENSE

The alleged product market definition fails as a matter of both fact and law.

### SECOND DEFENSE

The alleged geographic market definition fails as a matter of both fact and law.

### THIRD DEFENSE

The SAC fails to allege harm to competition.

### FOURTH DEFENSE

The SAC fails to allege harm to consumers.

### SIXTH DEFENSE

The SAC fails to allege harm to consumer welfare.

### SEVENTH DEFENSE

The SAC fails to allege an antitrust injury.

### EIGHTH DEFENSE

Any alleged harm to potential competition is not actionable.

### NINTH DEFENSE

The SAC fails to state a claim for the additional reasons that new entrants to the relevant market were (and are) timely, likely, and sufficient to offset any alleged anticompetitive effects of the transaction.

## TENTH DEFENSE

The transaction was procompetitive, having resulted in merger-specific efficiencies, cost-synergies, product-quality improvements, and other pro-competitive effects that benefit consumers. The benefits outweigh any alleged anticompetitive effects.

## ELEVENTH DEFENSE

Vievu was a failing or flailing firm.

## TWELFTH DEFENSE

The SAC and each claim for relief therein is barred, in whole or in part, by the doctrine of laches.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Defendants' conduct has been reasonable, based on independent, legitimate business and economic justifications, without any purpose or intent to injure competition.

## FOURTEENTH DEFENSE

Plaintiffs are not entitled to injunctive or other equitable relief because they have not alleged and cannot demonstrate irreparable harm and/or the absence of any adequate remedy at law.

## FIFTEENTH DEFENSE

Plaintiffs lack standing to pursue these claims.

## SIXTEENTH DEFENSE

The harm alleged is not a result of, and is independent of, the transactions and is not the type of harm the antitrust laws were designed to prevent.

## SEVENTEENTH DEFENSE

The SAC and each claim for relief therein is barred by the statute of limitations.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the alleged injuries and damages, if any, resulted from an intervening or superseding cause.

## NINETEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the acts or omissions of Axon did not substantially lessen competition through the exercise of market power in any properly defined market.

## TWENTIETH DEFENSE

This action may not properly proceed as a class action under Federal Rule of Civil Procedure 23 for a variety of reasons, including that Plaintiffs' factual allegations are not typical of the claims of each putative class member; questions of law and fact allegedly common to the putative class do not predominate over the numerous questions affecting only putative class members; a class action is not superior to other available methods for the fair and efficient adjudication of Plaintiffs' claims and any claims of putative class members; Plaintiffs and their counsel are unable to fairly and adequately protect the interests of the putative class members; and there are insurmountable difficulties that would be encountered in any attempt to proceed as a class action.

## TWENTY-FIRST DEFENSE

Plaintiffs' action is barred because Plaintiffs lack the capacity to bring this action or because this action was brought by counsel who lack authority to represent Plaintiffs in this case.

\*       \*       \*

WHEREFORE, Axon respectfully requests that this Court:

   i.    Dismiss the SAC with prejudice;

   ii.    Enter judgment in favor of Axon and against Plaintiffs on all claims; and

   iii.    Award Axon any other relief as the Court may see fit.

Dated: April 25, 2025

*/s/ Liza M. Walsh*
Liza M. Walsh
Katelyn O'Reilly
Eric S. Padilla
**WALSH PIZZI O'REILLY FALANGA LLP**
Three Gateway Center
100 Mulberry Street
15th Floor
Newark, NJ 07102
(973) 757-1100
lwalsh@walsh.law
koreilly@walsh.law
epadilla@walsh.law

Julie E. McEvoy (*pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Tel: (202) 879-3939
jmcevoy@jonesday.com

Aaron M. Healey
**JONES DAY**
250 Vesey Street
New York, NY 10281
Tel: (212) 326-3939
ahealey@jonesday.com

Pamela B. Petersen (*pro hac vice*)
Gayathiri Shanmuganatha (*pro hac vice*)
**AXON ENTERPRISE, INC.**
17800 N. 85th Street
Scottsdale, Arizona 85255
Tel: (623) 326-6016
pppetersen@axon.com

***Counsel for Defendant Axon Enterprise, Inc.***