**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE AXON VIEVU ANTITRUST LITIGATION** | Civ. Action No. 23-7182 (RK) (RLS) <br><br> **TO BE FILED UNDER SEAL** |

**MEMORANDUM OPINION**

**PREVIOUSLY** before the Court was an informal application by Plaintiffs the Township of Holmdel, Monmouth County, New Jersey, the Mayor and City Council of Baltimore and LaSalle County, Illinois (collectively, "Plaintiffs") to compel certain discovery from Defendant Axon Enterprise, Inc. ("Axon") raised pursuant to Local Civil Rule 37.1 (the "Motion"). (Doc. No. 175). The Court heard oral argument on the discovery disputes on January 20, 2026. (Doc. No. 183).

On January 23, 2026, the Court granted in part and denied in part that Motion through an oral opinion. (Doc. Nos. 184-186). More specifically, in part, the Court denied the Motion seeking to compel production of documents and data relating to non-law enforcement agencies (the "non-LEA discovery") as well as additional custodial files of Andrea James through December 31, 2023 (the "James discovery"). (*See* Doc. Nos. 185-186). In so ruling, the Court reserved the opportunity to issue a written decision in the event a party seeks to appeal. Thereafter, Plaintiffs appealed the denial of the requests to compel the non-LEA discovery and James discovery. (*See* Doc.

No. 189).  The undersigned thus issues this written opinion as to the two issues on which Plaintiffs appealed.

## I.      RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The parties are familiar with the background of this matter and, thus, the Court briefly addresses the background and procedural history relevant to the instant dispute.

Plaintiffs bring this putative class action alleging antitrust violations arising from the May 2018 sale of VieVu, LLC ("VieVu") from Defendant Safariland, LLC ("Safariland") to Axon.  (*See* Doc. No. 120 (Second Consolidated Amended Class Action Complaint (the "Second Consolidated CA Complaint"))).  In relevant part, Plaintiffs allege that, at the time of the acquisition, Axon was "the dominant maker and supplier" of Body Worn Camera ("BWC") Systems and long-range conducted energy weapons ("CEWs") in the United States.  (Doc. No. 120 at ¶ 6).  Plaintiffs define BWCs as "body-worn cameras specifically designed to withstand the rigorous demands of police usage and capture video and audio of police actions."  (Doc. No. 120 at ⁋ 2).  They define BWC Systems as "BWCs, digital evidence management systems ('DEMS'), docks, and related services such as transcription, redaction, and warranties." (Doc. No. 120 at ¶ 1).

Prior to the acquisition at issue, Safariland sold BWCs through its subsidiary, VieVu, Axon's competitor.  As part of Axon's acquisition of VieVu, Axon and Safariland agreed to various terms relating to the BWC and CEW markets.  Plaintiffs,

who purchased BWC Systems and/or CEWs from Axon after the acquisition, claim to have been harmed by the alleged anticompetitive acquisition and agreements.

Following motion practice and amendment of the pleadings, discovery ensued. During the course of discovery, Plaintiffs raised the instant informal discovery dispute regarding three categories of discovery requests served on Axon, to which Axon objected. (*See* Doc. No. 175). Relevant here, Plaintiffs sought to compel Axon to produce responsive discovery relating to the selling of BWCs to non-LEAs. Axon opposed the application, arguing that the non-LEAs are not relevant to and outside the allegations of the Second Consolidated CA Complaint. (*See* Doc. No. 175 at pp. 10-11). Plaintiffs countered that that their proposed class covers "all persons or entities" who directly purchased BWC systems or components within the United States and thus non-LEA customers are relevant to this action. (*See* Doc. No. 175 at pp. 7-10).

Plaintiffs also sought the Court to compel Axon to include its former employee, Andrea James, as a custodian for the time period of February 28, 2020 to December 31, 2023, which postdates the discovery period in an action brought by the FTC which challenged the acquisition of VieVu (the "FTC Action"). James began working for Axon in 2017 as Vice President of Investor Relations. (*See* Doc. No. 175 at p. 13). In May 2019, she began the role of Vice President of Corporate Strategy and Investor Relations, which she held until September 2022, when she became Axon's Chief Communications Officer and Investor Relations Head. (*See* Doc. No. 175 at p. 13). She ceased her employment with Axon in December 2023. (*See* Doc. No. 175 at p. 13).

Plaintiffs contend her custodial files contain information relevant to "competitive dynamics in the BWC Systems market" and Axon's strategic planning for the market based on her communications both internally and externally regarding equity research and investment reports. (Doc. No. 175 at p. 13). They point out that Axon designated James as a custodian in the FTC Action and that the production from the FTC Action within Plaintiffs' possession reflects that she may have unique, additional responsive and relevant documents after the discovery period applied in the FTC Action. (*See* Doc. No. 175 at p. 13).

Axon opposed Plaintiffs' application to compel James as a custodian. (*See* Doc. No. 175 at pp. 16-17). Axon contends that the sought-after discovery from James' custodial files is disproportionate to the needs of the case, would be unduly burdensome, and would amount to "unreasonably cumulative or duplicative" discovery. (Doc. No. 175 at p. 16 (internal quotation marks and citation omitted)). Axon argues that it has already agreed to conduct expansive discovery, including searches from targeted sources, adding three additional custodians for discovery time period from the FTC Action, and adding nine custodians for the period after the discovery time period of the FTC Action. (*See* Doc. No. 175 at p. 16). It explains that it designated James as a custodian in the FTC Action "because she handled public communications and media correspondence about the acquisition (e.g., press statements)." (Doc. No. 175 at p. 17). However, in her roles at Axon, James was not responsible for "sales, product development, pricing, or R&D." (Doc. No. 175 at p.

17).  In addition, Axon argues that other custodians already agreed upon would possess the third-party investor reports and internal discussions that Plaintiffs appear to seek. (*See* Doc. No. 175 at p. 17).

## II.    LEGAL STANDARDS

Generally, parties may seek discovery regarding any nonprivileged matter that is relevant to a party's claim or defense and that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The information need not be admissible at the trial to be discoverable. *Id.*

Whether information is relevant "depends on the facts of each case, and the determination of relevance is within the discretion of the Court." *Carchietta v. Russo*, No. 11-7587, 2014 WL 1789459, at *3 (D.N.J. May 6, 2014).  Similarly, proportionality is a fact-sensitive inquiry based on the information provided by the parties. *See Democratic Nat'l Comm. v. Repub. Nat'l Comm.*, No. 18-1215, 2019 WL 117555, at *2 (3d Cir. Jan. 7, 2019) (recognizing that a district court "may limit discovery to ensure its scope is proportional to the needs of the case" and is "in the best position to reach a case-specific determination of the appropriate scope of discovery" (internal quotation and editing marks and footnote omitted)); Fed. R. Civ. P. 26, comment 2015 Amendments ("The court's responsibility, using all the information provided by the

parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery."). Indeed, courts must limit discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2)(C)(i). "While the scope of discovery is broad, it is not unlimited . . . and should not serve as a fishing expedition." *Burgess v. Galloway*, No. 20-6744, 2021 WL 2661290, at *2 (D.N.J. Jan. 28, 2021) (citation and internal quotation marks omitted).

A party moving to compel discovery bears the initial burden of showing that the information is relevant. *See* Fed. R. Civ. P. 37(a). The party objecting to discovery must explain and support their objections. *See Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990). Ultimately, the resolution of the instant dispute lies within the Court's sound discretion. *See, e.g.*, *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999); *Forrest v. Corzine*, 757 F. Supp. 2d 473, 477 (D.N.J. 2010) ("Magistrate Judges are given wide discretion to manage cases and to limit discovery in appropriate circumstances.").

## III.    DISCUSSION

Applying that standard here, the Court has found that the sought-after non-LEA discovery is not relevant to the claims and defenses at issue here and the James discovery is not proportional to the needs of the case.

### A.   NON-LEA DISCOVERY

In the January 23, 2026 oral Opinion, the undersigned found that the non-LEA discovery was outside the scope of the claims asserted in the Second Consolidated CA Complaint and, thus, denied Plaintiffs' request without prejudice.  (*See* Doc. No. 186 at 6:25-12:3).  The parties do not dispute that Axon sells BWCs and related parts to non-LEAs, including, for example, hospital systems for security purposes.

Plaintiffs contend that all customer types are relevant and discoverable.  They argue that their putative class includes non-LEAs because they define the class as: "all persons or entities who have directly purchased any of the following from Axon in the United States from May 3, 2018 until the effects of Defendants' unlawful conduct cease (the 'Class Period'): a BWC System or any component of a BWC System or related services such as transcription, redaction, and warranties."  (Doc. No. 120 at ¶ 138).  In addition, Plaintiffs point out that they allege the noncompete agreements between Axon and Safariland applied to all BWC Systems customers.  (*See* Doc. No. 175 at p. 7 (citing Doc. No. 120 at ¶¶ 96, 98, 94-102)).  Further, Plaintiffs contend that discovery as to non-LEAs is relevant to their claims of "market definition, monopoly power, anticompetitive effects, and damages."  (Doc. No. 175 at p. 8).  They add that Axon argued before the FTC that the market definition there included non-LEAs.[1]

---

[1]  The FTC Action was limited to large metropolitan LEAs.  (*See* Doc. No. 175 at p. 11).

Axon opposes the request for discovery into non-LEAs, which they contend is irrelevant where Plaintiffs' allegations focus on LEAs. (*See* Doc. No. 175 at pp. 10-12). It identifies multiple allegations throughout the Second Consolidated CA Complaint that focus on LEAs and the use of BWCs for police purposes. (*See* Doc. No. 175 at p. 10-11). Axon argues that Plaintiffs' sole allegation regarding non-LEAs in paragraph 96 of the Second Consolidated CA Complaint, regarding the Holster Agreement between Axon and Safariland, does not transform their claims to include non-LEAs. (*See* Doc. No. 175 at p. 11). It adds that Plaintiffs' putative class definition is "generic" and must be read in the context of the entirety of their allegations, which do not include non-LEAs. (Doc. No. 175 at p. 12).

Finally, Axon explains that it presented a white paper to the FTC wherein it referenced "the existence of untapped markets and customer segments, which would encourage competitor entry and expansion[.]" (Doc. No. 175 at p. 12). Axon contends that its statement to the FTC does not relate to the nature of Plaintiffs' allegations here. (*See* Doc. No. 175 at p. 12).

Plaintiffs are local governments that purchased BWC Systems from Axon for use in their respective police departments. (See Doc. No. 120 at ¶¶ 22-26). Throughout the Second Consolidate CA Complaint, Plaintiffs' allegations regarding the products at issue focus on LEAs:

- They define BWCs as "body-warn cameras specifically designed to withstand the rigorous demands of **police usage** and capture video and audio of <u>police</u>

actions." (Doc. No. 120 at ¶ 2 (emphasis supplied); *see also* Doc. No. 120 at ¶ 38 (describing BWCs in the same manner)).

- "DEMS enable **police departments** to store BWC data . . . ." (Doc. No. 120 at ¶ 2 (emphasis supplied) *see also* Doc. No. 120 at ¶ 40 (describing DEMS in the same manner)).

- "Together, BWCs, along with DEMS and docks, comprise a BWC System. Although these components of BWC Systems may be purchased separately, many, if not most, **police departments** buy them all together along with related services . . . ." (Doc. No. 120 at ¶ 2 (emphasis supplied)).

In asserting allegations regarding the relevant market and market power, Plaintiffs again

concentrate on police usage:

- "**Police departments** frequently issue requests for proposals seeking to purchase BWC Systems components together as part of an integrated BWC System. . . .  Indeed, Axon requires **police departments** to integrate Axon BWCs with Evidence.com, Axon's DEMS, because Axon body cameras only work with Evidence.com." (Doc. No. 120 at ¶ 43 (emphasis supplied); *see also* Doc. No. 120 at ¶ 43, fn. 21 (citing an article entitled, *In the Police Body Camera Business, the Real Money's on the Back End*)).

- "**Police departments** could not realistically switch to other products . . . . Further, seven states now require **law enforcement** to use body cameras while on duty." (Doc. No. 120 at ¶ 44 (emphasis supplied); *see also* Doc. No. 120 at ¶ 44, fn. 24 (citing the National Conference of State Legislatures' *Body-Warn Camera Laws Database*))).

- "BWC Systems use is widespread.  In 2022, nearly half of **police departments** in the United States used body cameras, and seven states currently have laws requiring **police officers** to use them.  And where **police departments** use body cameras, over 90% of prosecutors use body camera evidence to prosecute civilians—so **police departments' operations** depend on having body camera footage integrated into their evidence systems." (Doc. No. 120 at ¶ 46 (emphasis supplied)).

- "Many **police departments** also are required to comply with the FBI's Criminal Justice Information Service ("CJIS") standards. . . .  Additionally, **U.S.-based police departments** look mostly to other U**.S.-based police departments** to vet potential BWC Systems vendors." (Doc. No. 120 at ¶ 48 (emphasis supplied)).

Plaintiffs also rely on statistics and allegations as to police agencies to claim that Axon exercises monopoly power within the market.  (*See* Doc. No. 120 at ¶¶ 52-54).  Plaintiffs describe data regarding the use of BWC Systems among the Major Cities Chiefs Association ("MCCA"), which is "a professional organization of **police executives representing the largest cities** in the United States and Canada."  (Doc. No. 120 at ¶ 52 (emphasis supplied)).  Even when citing to Axon's 2018 Form 10-K and investor presentations, Plaintiffs focus on representations as to its police department customers.  (Doc. No. 120 at ¶ 53 ("As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 **law enforcement agencies**." (emphasis supplied))).  They further allege: "[m]easured in terms of output or revenue, Axon's market share among **large U.S. cities** is even higher than 80%—likely at least 85%.  This is indicated by a chart from the same presentation, showing Axon BWC Systems' dominance in terms of **U.S. Major City Chief Agencies** . . . ."  (Doc. No. 120 at ¶ 54 (emphasis supplied)).  Plaintiffs add that, according to Axon's December 2019 investor presentation, "Axon had 85% **of the market represented by the MCCA**."  (Doc. No. 120 at ¶ 54 (emphasis supplied)).  Plaintiffs allege this market dominance caused competitors of the BWC Systems market to "rarely provide[]

significant competition to Axon in RFP processes conducted by **police departments**."

(Doc. No. 120 at ¶ 57 (emphasis supplied) (referencing an Axon December 2019 investor presentation relaying that a competitor controlled "only 7 of 69 U.S. Major City Chief Agencies compared to Axon's 47")).

Similarly, as to the CEW market, Plaintiffs allege that:

- "P**olice departments** prefer to buy these products in an all-inclusive supply contract with the long-range CEW manufacturer, which saves **the police departments** time and resources compared to buying them separately." (Doc. No. 120 at ¶ 60 (emphasis supplied)).

- "As of 2018, two-thirds of **police departments** used long-range CEWs, and as of 2020, an estimated 73% of **police offers** carried long-range CEWs when on duty.  Axon bragged in a 2019 investor presentation that '17,000 out of 18,000 **US police agencies** procure Taser devices,' adding, '[w]e estimate ~70% of **US patrol officers** carry a Taser device.'"  (Doc. No. 120 at ¶ 61 (emphasis supplied)).

- "Because of long-range CEWs' differentiation from other less-lethal weapons, long-range CEWs are a vital tool for **law enforcement**, . . . ."  (Doc. No. 120 at ¶ 62 (emphasis supplied) (also quoting the program director of the Police Graduate Studies Program at Seton Hall University)).

Notably, the only allegation about non-LEAs is the allegation in paragraph 63 of the Second Consolidate CA Complaint:  "For the same reasons that police offers prefer to use long-range CEWs over other types of less-lethal and lethal weapons, civilians interested in self-defense also prefer to use long range CEWs . . . ."  (Doc. No. 120 at ¶ 63).  Yet, in asserting that Axon exerts monopoly power in the long-range CEW market, Plaintiffs allege that "Axon has no notable competitors in long-range CEW

manufacturing, as only a handful—if any—**police departments** use non-Axon CEWs." (Doc. No. 120 at ⁋ 65 (emphasis supplied)).

Furthermore, Plaintiffs target their allegations relating to barriers to entry to police departments:

- "[N]ew entrants to the BWC Systems market must capture **a significant proportion of police department contracts** to maintain profitability." (Doc. No. 120 at ⁋ 69 (emphasis supplied)).

- "BWC Systems and long-range CEW supply contracts can last ten years or longer, **limiting the number of police departments** with which BWC Systems and long-range CEW suppliers can attempt to contract in any given year. . . . [T]he inability to **compete for most police departments** at any one time due to contract length further renders market entry unprofitable for would-be competitors." (Doc. No. 120 at ⁋ 70 (emphasis supplied)).

- "[B]ecause Axon includes both BWC Systems and long-range CEWs in its general supply contracts, companies must provide both long-range CEWs and BWC Systems **to compete for those police departments** that prefer to integrate their long-range CEW and BWC Systems supply." (Doc. No. 120 at ⁋ 71 (emphasis supplied)).

- "Switching costs pose another barrier to entry. BWC Systems are complex, with **police departments** taking months to become fully trained on Evidence.com's capabilities. If a **police department** does switch BWC Systems, it must incur significant IT and training costs in switching its body camera videos away from the DEMS. Further, **police officers using BWCs** also face high switching costs because **police officers** themselves use them habitually, and **retraining police officer habits** at scale is difficult." (Doc. No. 120 at ⁋ 72 (emphasis supplied)).

- "Axon is well aware of these high switching costs: its 2017 offer of free body cameras **enticed police departments** into using the Axon BWC System, because Axon's body cameras work only with Axon software." (Doc. No. 120 at ⁋ 73 (emphasis supplied)).

- "Long-range CEWs also have significant switching costs. Axon includes Taser training in its typical supply contracts, and **police departments** that provide Tasers have trained **a significant proportion of police officers** in Taser use and protocol. Would-be competitors wishing to sell their own long-range CEWs would need to **entice police departments** to retrain their **police force** to use a new type of long-range CEW." (Doc. No. 120 at ⁋ 75 (emphasis supplied)).

- "Because of these high switching costs, **police departments seldom switch** their BWC Systems or long-range CEW provider from one supplier to another when a contract is renewed." (Doc. No. 120 at ⁋ 76 (emphasis supplied)).

- "BWC Systems competitors without long-range CEWs are disadvantaged in **competing for those police departments** that want their BWC Systems to integrate with long-range CEWs." (Doc. No. 120 at ⁋ 77 (emphasis supplied)).

Plaintiffs' allegations targeted to LEAs continue:

- "Before the Acquisition, VieVu and Axon were the competitors that could best satisfy the RFP requirements, from both a technical and price perspective, for BWC Systems **for many of the police agencies in the United States**. **A number of police agencies** found that, of multiple bidders, Axon and VieVu had the best offerings by a significant margin." (Doc. No. 120 at ⁋ 85 (emphasis supplied)).

- "Axon and VieVu vigorously and consistently competed on the price of BWC Systems **in an effort to win police department contracts**." (Doc. No. 120 at ⁋ 86 (emphasis supplied)).

- "Competition between Axon and VieVu resulted in substantially lower BWC System prices **for police departments**." (Doc. No. 120 at ⁋ 87 (emphasis supplied)).

- "Existing BWC Systems providers have not replaced the competition that was lost as a result of the Acquisition between Axon and VieVu, which were the two closest competitors in the relevant market. While each remaining

13

competitor has different strengths and weaknesses, each competitor faces real and significant challenges in replacing competition lost through Axon's Acquisition of VieVu. These challenges include, but are not limited to, **reputation or lack of references from police department customers**, service levels that are **inadequate for such customers**, and software with limited functionality." (Doc. No. 120 at ₱ 116 (emphasis supplied)).

- "The challenges faced by these competitors are even greater because of the **clout Axon has with police departments** from its Taser product." (Doc. No. 120 at ₱ 117 (emphasis supplied)).

- "Safariland was a large manufacturer of less-lethal weapons through its Defense Technology brand. Its products included pepper spray and rubber bullets, as well as weapon holsters. These products allowed it to **develop relationships with police departments** and become a trusted supplier of less-lethal weapons." (Doc. No. 120 at ₱ 121 (emphasis supplied)).

- "Barriers to entry are even higher because of **Axon's clout with police departments** thanks to its Taser product." (Doc. No. 120 at ₱ 129 (emphasis supplied)).

Indeed, Plaintiffs cite to the FTC Complaint and noted that the FTC's market share analysis was limited to large metropolitan police departments. (Doc. No. 120 at ₱ 92, fn. 77). They explain the relevant market in the FTC Complaint differs from "the relevant market alleged" in this matter as follows:

> While the FTC's [Herfindahl-Hirschman Index ("HHI")] analysis seems to be based on an alleged market limited to 'large, metropolitan police departments,' there is no reason to think that Axon's market share is any lower for the broader relevant market alleged herein, **especially given the disproportionate size of larger police departments among the overall U.S. police department populations**. For example, in its 2020 10-K, Axon boasted that it had 'dedicated sales representatives **for the 1,200 largest agencies, which account for 70% to 80% of U.S. law**

14

> **enforcement patrol officers**.'  Likewise, as of 2020, Axon reported having **a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies, or 94%.** . . . **With approximately, 36,000 officers, the NYPD alone accounts for around 7.6% of total full-time sworn officers employed by the approximately 11,800 general-purpose local police departments in the U.S.** . . . Thus[,] the Acquisition (which gave Axon control over the **New York City contract** among others) significantly increased HHI **in the relevant market alleged herein** as well.

(Doc. No. 120 at ¶ 92, fn. 77 (emphasis supplied)).

As to the alleged noncompete agreements between Axon and Safariland, Plaintiffs generically refer to "customers" without distinction between LEAs and non-LEAs.  (*See* Doc. No. 120 at ¶¶ 98-99, 103-04).  They also assert various allegations relating to Axon's average selling price and profit margins for BWCs and CEWs overall.  (*See* Doc. No. 120 at ¶¶ 110-15).  Yet, when specifying an example of anticompetitive impact, Plaintiffs rely on the pricing paid by Oklahoma City for long-range CEWs and BWC Systems.  (Doc. No. 120 at ¶ 123).  They further illustrate the economic impact to LEAs: "Axon has acknowledged the negative impact of price increases on **budget constrained law enforcement officers and communities**: 'It's no secret that budget constraints are **a constant inconvenience for law enforcement agencies**.  Long needs lists + short funds = **under equipped officers and potentially underserved communities**.'"  (Doc. No. 120 at ¶ 125 (emphasis supplied)).  Plaintiffs go on to allege that "Axon's monopoly prices have priced **many police departments** out of the BWC Systems market."  (Doc. No. 120 at ¶ 126 (emphasis supplied)).

15

Further, although Plaintiffs broadly define their class to include all direct purchasers of a BWC System or any component or related service, Plaintiffs also allege that their claims "are typical of the claims of the members of the Class." (Doc. No. 120 at ⁋ 141). Through their First Claim for Relief, for example, Plaintiffs assert, on behalf of themselves and the putative class, a claim that Axon violated Section 7 of the Clayton Act, 15 U.S.C. § 18. (*See* Doc. No. 120 at ⁋⁋ 157-66). In that claim, Plaintiffs allege that "Axon controls an estimated 85% of the BWC Systems market." (Doc. No. 120 at ⁋ 164). Plaintiffs base that estimated 85% market share off of the "market represented by the MCCA[,]" representing LEAs only. (Doc. No. 120 at ⁋ 54).

Absent from the Second Consolidate CA Complaint, drafted by Plaintiffs themselves and following the benefit of the Court's ruling on a motion to dismiss, are allegations as to market power over non-LEAs, barriers to entry for competition to non-LEAs, or any damages sustained by non-LEAs. Plaintiffs do not even allege that non-LEAs suffer the same barriers as LEAs, such as budgetary constraints, Axon's clout based off its Taser product, the need for integrated systems, or the need to comply with FBI rules and state regulations. Plaintiffs focus their Second Consolidate CA Complaint on LEAs. Their claims relate to LEAs. Plaintiffs also make no allegation to support commonality between LEAs and non-LEAs. For those reasons, discovery as to non-LEAs is not relevant to this action, as brought by Plaintiffs.

### B.    ADDITIONAL JAMES DISCOVERY

In the January 23, 2026 oral Opinion, the undersigned found that the additional James discovery was not proportional to the needs of the case.  (*See* Doc. No. 186 at 12:10-13:7).  The undersigned found that Axon already produced significant discovery, including from James, for the period leading up through February 2020, and James had a limited role relevant to the issues here after February 2020.  The undersigned also found Plaintiffs failed to convince the Court that the James discovery would include relevant and unique documents, recognizing that other custodians would possess the same or similar investor information Plaintiffs appear to seek through the James discovery.

Plaintiffs argue that discovery from James for the post-FTC discovery period would likely contain relevant, responsive documents because of her senior roles in strategy and investor relations at Axon.[2]  (*See* Doc. No. 175 at pp. 13-14).  They contend the James discovery "likely" would include "highly relevant, unique documents."  (Doc. No. 175 at p. 13).  Plaintiffs point to a set of documents produced from James's custodial files in the FTC Action, wherein equity research and investment reports were sent to James from third-parties regarding the VieVu acquisition and wherein James had communications with third-parties regarding the BWC Systems market and Axon's

---

[2]  Plaintiffs rely on portions of James' transcript in the FTC Action and her LinkedIn profile.  (*See* Doc. No. 175 at pp. 13-14, Exs. B and D).

strategy therein.[3]  (Doc. No. 175 at pp. 13-14).  According to Plaintiffs, these reports and communications likely would be located only in James's custodial files.

Axon opposes the request.  (*See* Doc. No. 175 at pp. 16-19).  It points out that Plaintiffs already have received and will receive significant discovery from both the FTC discovery period as well as the post-FTC discovery period.  Axon produced to Plaintiffs 515,057 documents that had been produced in the FTC Action.  It also has agreed to produce documents and data obtained following targeted searches, as well as discovery from three custodians for the FTC discovery period and nine custodians for the post-FTC discovery period.  (*See* Doc. No. 175 at p. 16).

Axon also explains that it designated James as a custodian in the FTC Action "because she handled public communications and media correspondence about the acquisition[,]" not because she had responsibility for "sales, product development, pricing, or R&D" or interacting with customers—tasks outside of her roles at Axon. (Doc. No. 175 at p. 17).  It argues that Plaintiffs' reliance on James's LinkedIn profile is misplaced and their reliance on "cherry-picked" documents is outweighed by documents reflecting that two other agreed-upon custodians would possess similar reports and communications that Plaintiffs seek.  (Doc. No. 175 at p. 17).  Ultimately, Axon contends that adding James as a custodian for the post-FTC discovery period is

---

[3]  Following oral argument on the discovery dispute, Plaintiffs provided the Court with copies of the referenced documents, which the Court reviewed in issuing its January 23, 2026 oral opinion.  (Doc. No. 183 at 40:13-41:7).

"unreasonably duplicative and disproportionate to the needs of the case." (Doc. No. 175 at p. 17 (citation omitted)). It adds that Plaintiffs' "request rests on speculation and would impose undue burden disproportionate to the needs of this case." (Doc. No. 175 at p. 19).

Proportionality is a fact-sensitive inquiry. *See* Fed. R. Civ. P. 26, comment 2015 Amendments (stating that a court should consider the factors set forth in Rule 26(b)(1) "in reaching a case-specific determination of the appropriate scope of discovery"). To be "proportional to the needs of the case," a court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). In addition, the Court "must" limit sought-after discovery that "is unreasonably cumulative or duplicative, or can be obtained from some source that is more convenient, less burdensome, or less expensive[.]" Fed. R. Civ. P. 26(b)(2)(C)(i). Also relevant to the analysis is Rule 1 of the Federal Rules of Civil Procedure, which calls on the Court and litigants to construe and administer the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Here, the Court finds that Plaintiffs have not shown that the sought-after James discovery is proportional to the needs of the case.[4] While the issues at stake here and the amount in controversy weigh in favor of finding a broad scope to discovery, that scope cannot be unlimited. Considering the parties' relative access to information, the information sought is clearly within the possession of Axon. However, Plaintiffs have been given access to a considerable amount of discovery from Axon, including from the custodial files of James. Moreover, the parties are sophisticated entities, making that factor neutral. The Court notes that the sought-after discovery bears some import, but not significantly, to resolving the underlying issues in this litigation. Indeed, information relating to how third-party investors perceived the acquisition can weigh on issues such as market reaction or the like. Yet, there are many other types of discovery that are more significant to resolving this matter.

The Court also considers the burden or expense to Axon in producing the discovery against its likely benefit to Plaintiffs. *See* Fed. R. Civ. P. 26(b)(1). James, in her post-February 2020 roles at Axon, did not oversee "sales, product development,

---

[4] Plaintiffs cite various cases to support their contention that the James discovery is proportional to the needs of their case and not unduly burdensome. (See Doc. No. 175 at p. 15). Notably, the majority of the cases relied upon by Plaintiffs apply Federal Rule of Civil Procedure 26(b) before its 2015 amendment which added proportionality and omitted "reasonably calculated to lead to relevant evidence." *See* cmt., Fed. R. Civ. P. 26, 2015 Amendments ("The phrase has been used by some, incorrectly, to define the scope of discovery."); *see, e.g.*, *Aetna Inc. v. Mednax, Inc.*, No. 18-2217, 2019 WL 6467349, at *1 (E.D. Pa. Dec. 2, 2019) (granting additional discovery in part because "the discovery requests seem reasonably calculated to lead to relevant evidence").

pricing, or R&D and . . . [did] not typically interact with customers or discuss proposals with them." (Doc. No. 175 at p. 17). While Axon has not specified in detail the precise cost or burden of producing the James discovery (divorced from the other custodial files Plaintiffs sought in the underlying dispute), it is evident that any potential benefit Plaintiffs would receive from this additional discovery is likely not critical.

Further, Defendants have shown that the James discovery would likely contain cumulative or duplicative discovery. *See* Fed. R. Civ. P. 26(b)(1). Plaintiffs insist that James' custodial file contains unique "third-party investor analyst reports" which are relevant to their claims. (*See* Doc. No. 175 at p. 14). As Axon explains, however, that discovery will be substantially duplicative of information that will be produced through other custodians' files for the post-February 2020 time period. (*See* Doc. No. 175 at p. 17). Accordingly, the Court finds good cause to deny Plaintiffs' request to compel the James discovery as disproportionate to the needs of this case.

## IV. CONCLUSION

For the reasons stated above, the Court denies Plaintiffs' request for discovery related to non-LEAs and to compel the inclusion of James as a custodian for the time period of February 28, 2020 to December 31, 2023.

/s/ Rukhsanah L. Singh
**RUKHSANAH L. SINGH**
**UNITED STATES MAGISTRATE JUDGE**

21